**Deborah Bailey-Wells     (114630, deborah.bailey-wells@klgates.com)**
**Kevin C. Trock          (161787, kevin.trock@klgates.com)**
**Harold H. Davis, Jr.    (235552, harold.davis@klgates.com)**
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
55 Second St., Suite 1700
San Francisco, CA  94105
Telephone    (415) 882-8200
Fax:         (415) 882-8220

Attorneys for Plaintiff HELIO LLC

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| HELIO, LLC, | Case No. C 06-7754 SBA |
| Plaintiff, | **PLAINTIFF HELIO LLC'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| vs. | |
| PALM INC. | Judge:     Hon. Saundra B. Armstrong |
| Defendant. | Date:      April 10, 2007 |
| | Time:      1:00 PM |
| | Date Filed: December 19, 2006 |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.     MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 2

4

A.   Overview.................................................................................................................... 2

5

II.    FACTUAL BACKGROUND ............................................................................................ 3

6

A.   Palm Intentionally Adopted the Slogan "Not Just a Cell Phone" Despite its Knowledge

7

of Helio's DON'T CALL IT A PHONE Marks .................................................................. 3

8

1.   Palm had not finally decided on an advertising slogan for its Treo 680 Smartphone

9

as of August 2006 ......................................................................................................... 3

10

2.   Palm Learns of Helio and its DON'T CALL IT A PHONE marks prior to deciding to

11

use the slogan "Not Just a Cell Phone" in its advertising ................................................. 4

12

3.   Palm and its advertising agency knew that Helio's DON'T CALL IT A PHONE

13

marks were similar to Palm's use of the slogan "Not Just a Cell ...................................... 7

14

B.   Palm is Still Using It's Confusingly Similar "Not Just a Cell Phone" Slogan in its

15

Advertising ...................................................................................................................... 11

16

III.    Argument..................................................................................................................... 12

17

A.   The Court Should Grant A Preliminary Injunction Because Helio Has Demonstrated

18

that there is a Likelihood of Confusion........................................................................... 12

19

B.   Helio Will Likely Succeed In Showing A Likelihood of Confusion ............................. 14

20

1.   The marks are similar in sight, sound and meaning............................................... 16

21

2.   The goods and services offered by the parties are nearly identical ...................... 20

22

3.   The Parties Use Identical Marketing Channels ..................................................... 20

23

4.   Helio's DON'T CALL IT A PHONE Marks Are Strong ........................................... 22

24

5.   Palm intentionally chose it's "NOT JUST A CELL PHONE" slogan after it knew of

25

Helio's DON'T CALL IT A PHONE marks................................................................... 21

26

6.   The "Likelihood of Expansion" factor is irrelevant where, as here, the parties

27

already compete.......................................................................................................... 23

28

i

    7.    The degree of care factor weighs in Helio's favor ................................................ 24

    8.    Actual confusion factor should weigh in Helio's favor ........................................... 24

IV.     CONCLUSION.................................................................................................................. 26

1

**TABLE OF AUTHORITIES**

2

Federal Cases

3

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,

4

   237 F.3d 198 (3d Cir. 2000)................................................................................ 18

5

Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,

6

   944 F.2d 1446 (9th Cir. 1991)........................................................................... 25

7

Anti-Monopoly, Inc. v. General Mills Fun Group,

8

   611 F.2d 296 (9th Cir.1979)............................................................................. 13

9

Apple Computer, Inc. v. Formula Intern, Inc.,

10

   725 F.2d 521 (9th Cir. 1984)............................................................................. 14

11

Brookfield Commc'ns,

12

   174 F.3d 1036 (9th Cir. 1999)..............................................................15, 23, 25

13

Checkpoint Systems, Inc. v. Check Point Software Techs., Inc.,

14

   269 F.3d 270 (3d Cir. 2001).............................................................................. 18

15

Chemical Corp. of America v. Anheuser-Busch, Inc.,

16

   306 F.2d 433 (5th Cir. 1962)............................................................................. 17

17

Dreamwerks Prod. Group, Inc. v. SKG Studio,

18

   142 F.3d 1127 (9th Cir. 1998)....................................................................... 15, 18

19

Duncan McIntosh Co., Inc. v. Newport Dunes Marina LLC,

20

   324 F. Supp. 2d 1078 (C.D. 2004)................................................................... 17

21

El Pollo Loco, Inc. v. Hashim,

22

   316 F.3d 1032 (9th Cir. 2003)........................................................................... 13

23

E. & J. Gallo Winery v. Consorzio del Gallo Nero,

24

   782 F. Supp. 457 (N.D. Cal. 1991) ............................................................... 14, 15

25

GoTo.com, Inc. v. Walt Disney Co.,

26

   202 F.3d 1199 (9th Cir. 2000)..............................................................13, 14, 15, 24

27

28

iii

Hewlett-Packard Co. v. Packard Press, Inc.,

  281 F.3d 1261 (Fed. Cir. 2002)..........................................................................17

Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.,

  963 F.2d 350 (Fed. Cir. 1992)............................................................................17

Lindy Pen Co. v. Bic Pen Corp.,

  796 F.2d 254 (9th Cir. 1986)..............................................................................14

Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,

  856 F.2d 1445 (9th Cir. 1988)......................................................................12, 13

New West Corp. v. NYM Co. of Cal., Inc.,

  595 F.2d 1194 (9th Cir. 1979)............................................................................13

Nova Wines, Inc. v. Adler Fels Winery LLC,

  No. C. 06-06149, 2006 WL 3498574 (N.D. Cal. Dec. 4, 2006).........................13

Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,

  396 F.3d 1369 (Fed. Cir. 2005)..........................................................................17

Prudhomme v. Procter & Gamble,

  800 F. Supp. 390 (E.D. La. 1992)......................................................................13

Redmond Prods., Inc v. Amino Sabre, Inc.,

  17 U.S.P.Q. 2d 1386 (C.D. Cal. 1990)...............................................................12

Rodeo Collection, Ltd. v. West Seventh,

  812 F.2d 1215 (9th Cir. 1987)............................................................................12

Southwest Voter Registration Educ. Project v. Shelley,

  344 F.3d 914 (9th Cir. 2003)..............................................................................13

Starbucks Corp. v. Lundberg,

  No. Civ. 02-948, 2005 WL 3183858, *6, *10 (D. Or. Nov. 29, 2005).................23

Sunenblick v. Harrell,

  895 F. Supp. 616 (S.D.N.Y.1995).......................................................................18

iv

Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd.,

  No. C 06-00527, 2006 WL 1214859 (N.D. Cal. May 6, 2006)...................................... 17, 23

Vision Sports, Inc. v. Melville Corp.,

  888 F.2d 609 (9th Cir. 1989)......................................................................................... 13

FEDERAL STATUTES

Fed. R. Civ. P. 65....................................................................................................................1

Local Rule 65-2.......................................................................................................................1

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that on April 10, 2007 at 1:00 PM or as soon thereafter as

3  counsel may be heard, in the United States District Court for the Northern District of

4  California, 1301 Clay Street, Oakland, CA 94612, Plaintiff Helio LLC ("Helio") will move for a

5  preliminary injunction pursuant to Fed. R. Civ. P. 65 and Local Rule 65-2.

6       Specifically, Plaintiff Helio moves this Court for a preliminary injunction enjoining

7  Defendant Palm Inc. ("Palm") and its agents, servants, employees, attorneys and all

8  persons in active concern and participation with Defendant Palm, from using the slogan

9  "NOT JUST A CELL PHONE" and any other advertising confusingly similar to Helio's DON'T

10  CALL IT A PHONE and DON'T CALL US A PHONE COMPANY marks (1) in connection

11  with Palm's sale of mobile media devices including, without limitation, mobile telephones;

12  and (2) in any print, broadcast, direct marketing, out of home advertising, internet

13  advertising or other advertising or marketing media related to Palm's "NOT JUST A CELL

14  PHONE" campaign.

15       Helio moves that this preliminary injunction stay in effect pending a hearing and

16  determination of the merits of Helio's Complaint against Palm, on the grounds that

17  immediate and irreparable injury, loss and damage will result to Helio from Palm's use of the

18  "NOT JUST A CELL PHONE" slogan.  Palm is using this prominent theme line as the

19  centerpiece of its recently launched $25 million advertising campaign which is confusingly

20  similar to Helio's registered DON'T CALL IT A PHONE and DON'T CALL US A PHONE

21  COMPANY marks.

22       This Motion is based on this Motion, the attached Memorandum pf Points and

23  Authorities, the attached Declarations of Harold H. Davis, Jr. and Kathryn Wheble, the

24  previously filed Application for a temporary restraining order and supporting declarations

25  and documents, all pleadings, records and files in this action, and upon all other matters

26  that may be presented at the hearing on this Application.

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    Overview

3       Just over two months ago, Helio sought a temporary restraining order to prohibit

4   Palm's use of the slogan "Not Just a Cell Phone." <u>See</u> Helio's Application for a Temporary

5   Restraining Order ("Helio's TRO"), declarations of Jessica Weeks ("Weeks Decl.") and

6   Kathryn Wheble ("Wheble Decl.") and supporting documents (attached as Exhibits 7, 8, 9 to

7   Declaration of Harold H. Davis Jr.("Davis Decl.")).  Although the Court ultimately determined

8   that Helio had not met its burden of establishing the need for emergency relief, it believed

9   the issue was "very close … It's just close.  I can only say [Helio] just [has] not met [its]

10  burden."  Transcript of 12/21/06 Hearing ("Tr.") 107:4-5, 13-15 (attached as Exhibit 1 to

11  Davis Decl.).  The Court based its decision in part on two preliminary findings that a) Palm

12  would be discontinuing its campaign as of December 31 and b) that there was no evidence

13  that Palm intentionally chose to use a slogan similar to Helio's DON'T CALL IT A PHONE

14  marks. <u>Id.</u> 107:6-7, 108:14-22.

15      Through two months of limited, preliminary discovery, however, Helio has uncovered

16  evidence that shows that not only was Palm and its advertising agency well aware of Helio's

17  DON'T CALL IT A PHONE marks prior to reaching a final decision on using the slogan "Not

18  Just a Cell Phone" on its own advertising, but that they recognized the similarities between

19  the marks, and still chose to launch a $25 million advertising campaign at the height of the

20  holiday season despite this understanding.

21      More importantly, despite the impression left with the Court by Palm, its outdoor

22  advertising was not terminated on December 31st, 2006.  Many billboards, bus shelters,

23  print advertising, and internet advertising featuring confusingly similar "Not Just a Cell

24  Phone" slogan are still on display as of the filing of this motion.

25      Because there is now incontrovertible evidence that a) Palm knew of Helio's DON'T

26  CALL IT A PHONE trademark prior to its final decision to use the infringing slogan in

27  commerce, b) Palm considers the slogans of the parties' advertising similar, and c) Palm's

28

2

advertising using the confusingly similar slogan still persists in the marketplace, a

preliminary injunction is necessary and appropriate to prevent further irreparable harm to

Helio.

## II.    FACTUAL BACKGROUND

**A.    Palm Intentionally Adopted the Slogan "Not Just a Cell Phone" Despite its Knowledge of Helio's DON'T CALL IT A PHONE Marks**

1.    Palm had not finally decided on an advertising slogan for its Treo 680 product as of August 2006

In 2005 and early 2006, prior to the launch of its Treo 680 product, Palm primarily

used the slogan "It's time for Treo" in connection with its Treo line of products. Deposition of

Scott Hancock ("Hancock Dep.")[1] 88:2 – 89:5 (attached as Exhibit 2 to Davis Decl.);

Deposition of Julie Patterson ("Patterson Dep.")[2] 80:4-23 (attached as Exhibit 3 to Davis

Decl.) and Ex. 5 to Davis Decl. By Spring 2006, however, Palm had developed a new

smartphone called the Treo 680 which it code-named "Camino." Hancock Dep. 30:23-31:2.

Throughout the first three quarters of 2006, Palm explored several slogans to use in

connection with the Camino campaign including "Treo by Palm" (Patterson Dep. 52:5-19

and Ex. 4-PALM 3338); "It only looks serious" (Patterson Dep. 32:20 – 33:8 and Ex. 4-

PALM10214), and "Not a Cell Phone" (Hancock Dep. 17:1-5, 21:14-20; Patterson Dep.

96:23-97:2). See also Patterson Dep. 31:11 – 32:10 (there were two or three ideas for its

Treo 680 campaign as of May or June 2006); and Ex. 5 (AKQA 3242, PALM 3329-3331,

PALM 003336-003339, PALM 35-90) (documents showing that throughout Summer 2006,

Palm was considering the slogan "Not a Cell Phone a Treo."). In fact, Mr. Hancock, Palm's

director of marketing communications, testified that the first time he ever heard of the "Not

---

[1] Mr. Hancock is the director of marketing communications and was responsible for overseeing Palm's advertising on the "Not Just a Cell Phone" campaign. Hancock Dep. 8:23 – 9:12, 12:11-16; see also exhibit 6 to Davis Decl. (Organization Chart).

[2] Ms. Patterson is an account director at Palm's advertising agency AKQA. Patterson Dep. 8:11-16. She was designated as AKQA's 30(b)(6) representative to discuss AKQA's work on the Treo 680 campaign. Id. 13:16-22.

just a cell phone" slogan was in June or July 2006. Hancock Dep. 13:9-13. Ms. Patterson, an account director at Palm's advertising agency AKQA, confirms that Palm had not even considered using the slogan "Not Just a Cell Phone" until "May [or] perhaps early June" 2006. Patterson Dep. 24:3-25:4.

Meanwhile, in May 2006, Helio launched its national advertising campaign featuring its DON'T CALL IT A PHONE marks. See Ex. 7 (Helio TRO App. at 5), Ex. 8 (Weeks Decl. ¶ 9); Ex. 9 (Wheble Decl. ¶¶ 4-13 and Exhibits A and B to Wheble Decl.) As Helio's advertising gained momentum and consumer recognition, Palm still had not even decided on the slogan to use for the Camino campaign. Patterson Dep. 140:7-15 (as of April 24, 2006, AKQA had not developed "Not Just a Cell Phone" campaign); Hancock Dep. 58:11-19 (as of June 24, 2006, Palm was using "Not a cell phone" as slogan, without the qualifier "just"); Id. at 71:18 – 74:12 (as of June 9, Palm was still debating whether to use "Not a Cell Phone" or "Not Just a Cell Phone" in its Treo 680 advertising campaign); Id. at 77:21 – 80:2 (in part "we were debating whether or not to incorporate the word "just" in this theme line [on July 14], yes"); Id. 82:24 – 86:3 (as of July 17th 2006, Palm was pushing to omit "just " in its slogan for the Treo 680); Id. at 100:10 – 101:10 and Ex. 10 (as of August 2, 2006, Palm was still using the slogan "Not a Cell Phone" in advertising mockups without the qualifier "just" in the theme line); see also Exs. 11-13; Patterson Dep. 45:8-18 and at 136:1-137:25 (document dated October 23, 2006 showing that Palm was using slogan "Not a Cell phone").

2.      Palm learns of Helio and its DON'T CALL IT A PHONE marks prior to deciding to use the slogan "Not Just a Cell Phone" in its advertising

Of course, Palm was well aware of Helio's DON'T CALL IT A PHONE advertisements by the time it finally settled on using the slogan "Not Just A Cell Phone" as the central theme of its Camino campaign. At the hearing on Helio's application temporary restraining order, Palm's key representative, Scott Hancock, declared under oath that Palm was not aware of Helio prior to launching its advertising campaign in November 2006 (Tr. 61:4 – 62:12); Ex. 14 (Hancock Decl. ¶ 6) ("**At no point** during the development of the Campaign were Helio's

4

1  current claims, "Don't call it a phone" … **ever discussed, considered or raised by Palm.**)

2  (emphasis added).  This statement is false.

3     First, Mr. Hancock's testified at deposition that he was well aware and discussed

4  Helio's advertising prior to the launch of Palm's "Not Just a Cell Phone" advertising

5  campaign.  Although Hancock initially stated that he first heard of Helio in the "Fall of 2006"

6  by seeing a Helio "T.V. commercial" (Hancock Dep. 42:1-12), he later clarified this position

7  stating that he could have seen a Helio advertisement in "late summer or early fall" of 2006.

8  Hancock Dep. 55:3-8.  Mr. Hancock also admitted to seeing Helio print advertising that

9  included Helio's DON'T CALL IT A PHONE marks.  Hancock Dep. 45:24 – 47:5.  Hancock

10  even admitted that he discussed Helio's slogans with Ms. Patterson, but he again

11  (mistakenly) placed the date as "Fall of 2006".  Hancock Dep. 43:12-21.

12     Ms. Patterson directly contradicts Mr. Hancock's claim that this conversation took

13  place in the "Fall of 2006."  Instead, Ms. Patterson testified that she first became aware of

14  Helio's DON'T CALL IT A PHONE marks in July 2006 (Patterson Dep. 39:2-20), and

15  informed Palm of AKQA's discovery of Helio's DON'T CALL IT A PHONE advertising during

16  an August 2, 2006 face-to-face meeting with Palm representatives including Mr. Hancock.

17  Patterson Dep. 53:18 – 54:16.

18     Ms. Patterson, however, is also mistaken as to when AKQA first learned of Helio.

19  Documents produced the day before this motion was filed conclusively demonstrate that

20  AKQA was well aware of Helio as early as **October 2005** and continued to monitor Helio's

21  status throughout the next year.[3]  See Ex. 15 (AKQA 5415 - 10/31/05 e-mail from B. Pullum,

22  AKQA's group creative director for the Palm Camino project, to unknown recipients, re:

23  Helio's advertising account); (AKQA 5419 - 6/27/06 e-mail from B. Pullum to "palmteam"

24  remarking that "Helio is live" and including a link to Helio's homepage); (AKQA 5422 -

25

26  _____

27  [3] Alarmingly, AKQA produced documents collected as Exhibit 15 on March 5, 2007, the day before Helio filed
   this motion and after Helio had already deposed AKQA and Palm witnesses thus depriving Helio of the
28  opportunity to question these witnesses on some of these documents.  These documents were requested by
   Helio on December 23, 2006.

HELIO'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-7754 SBA

1   undated screenshot of Helio / MySpace Promotion); (AKQA 5416 – 7/26/06 e-mail from

2   Kate Harris to "palmteam" containing link to AdWeek.com article entitled "Helio Effort

3   Straddles Love/Hate Line"); (AKQA 5220 - 08/03/06 e-mail from B. Pullum to various AKQA

4   employees re: "Interesting helio campaign feedback"); and Ex. 16 (8/15/06 email from Gina

5   Cold to Palm ad team regarding Helio opening of a Helio branded store); Ex. 17 (8/16/06

6   email referencing Helio retail store, and Palm's decision to launch a retail store); Ex. 18

7   (8/24/06 email asking whether to approach Friendster, a social networking website, to

8   create a partnership with Palm along the lines of the "deal MySpace did with Helio.").

9        Nevertheless, Ms. Patterson also exposes Mr. Hancock's false testimony that he did

10  not have any discussion about Helio with his superiors at Palm, Page Murray (Palm's Vice

11  President of Marketing) and Rose Rodd (Palm's Senior Director for Corporate Marketing).

12  Compare Hancock Decl. 54:1-10 with Patterson Dep. at 53:18 – 54:16 (testifying that she

13  told Palm of Helio as of August 2, 2006).  In fact, according to Ms. Patterson, Mr. Hancock

14  stated in that August 2 meeting that he had **already seen** Helio's television advertisement.

15  Id. ("Scott mentioned he had seen a TV spot.").

16       Finally, documents produced by Palm and AKQA belie Hancock's "recall" that he first

17  learned of Helio in the "Fall of 2006".  Palm had in its possession, and produced as part of

18  preliminary discovery, several documents which mentioned Helio and its advertising

19  campaign such that Palm would have known of Helio prior to launching its "Not Just a Cell

20  Phone" campaign.  See Ex. 19 (May 2006 Mobile Services Watch) (PALM 20458-20493);

21  see also Ex. 20 (April 2006 Mobile Services Watch excerpts); Ex. 21 (June 16, 2005 e-mail

22  to J. Patterson from CNet mentioning Helio's Hero device); Exhibit 22 (July 26, 2006 email

23  from Kate Harris to "palmteam" containing link to AdWeek article about  Helio); Ex. 23 (Nov.

24  2006 e-mails to Palm including articles mentioning Helio).[4]  One of these documents, the

25  May 2006 Mobile Services Watch, Ex. 19 (at PALM 20471), contains a story on Helio that

26  was highlighted.  These highlights strongly suggest that someone at Palm had read and

27  _____

28  [4] Patterson admits receiving the newsletter.  Patterson Dep. 143:10-144:6.

6

HELIO'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-7754 SBA

1  understood its contents, including its mention of Helio's DON'T CALL IT A PHONE

2  advertising.

3      **3.   Palm and its advertising agency knew that Helio's DON'T CALL IT A PHONE
            marks were similar to Palm's use of the slogan "Not Just a Cell Phone"**

4

5      Further, preliminary discovery revealed that Palm knew of and understood the

6  similarities between Helio's then existing DON'T CALL IT A PHONE marks on the one hand,

7  and Palm's planned advertising for the Camino project on the other.

8      When Ms. Patterson first learned of Helio's DON'T CALL IT A PHONE advertising on

9  July 31, 2006, she called an internal AKQA meeting to a) discuss the obvious similarities

10 between it and Palm's still-to-be-designed advertising, and b) to get its story straight with

11 Palm:

12     Q.   Why did you [call an internal meeting to discuss the Helio campaign]?
       A.   At that point in time we were still going back and forth with Palm
13          regarding various campaign elements, one of which was the line Not a
            Cell Phone a Treo.  And they had asked us on a couple of occasions to
14          explore alternatives, consider "just." And we had put it in, taken it out,
            put it in, taken it out on a couple of occasions on comp work.  And there
15          was still the lingering concern that the line without the use of "just"
            might imply that this was not a phone at all.  **And in light of the Helio**
16          **campaign, I thought it was something that we should discuss as a**
            **group.**
17     Q.   Why did you care about the Helio campaign?
       A.   Well, for one, I think we were trying to understand what exactly they
18          were offering.  Because it was – their line was Don't Call Us a Phone
            Company, Don't Call it a Phone.  So we were discussing what exactly
19          they were.  **And [we] had some discussion regarding whether there**
            **were similarities to the line Not a Cell Phone a Treo and Don't Call**
20          **It a Phone.**
21     Q.   **What was the nature of those discussions about similarities**
            **between the lines**?
22     A.   I think that in general the feeling was that, again, the line – which we
            knew was a topic of discussion with Palm, the line Not a Cell Phone a
23          Treo might make people in the marketplace think that it was indeed not
            a cell phone, which was not what we were trying to communicate.  And
24          so basically the discussion was around the fact that there's a product in
            the marketplace that has a line Not a Cell Phone – I'm sorry – Don't
25          Call it a Phone, Don't Call Us a Phone Company.  And then this line of
            Not a Cell Phone a Treo and really wanting to make sure that we
26          distinguish the fact that Palm is a cell phone first and more than that.

27

28

1

> So **we felt as – basically we felt as a responsible marketing**
> **partner, that we wanted to bring it to Palm's attention that – that**
> **there was a line that said Don't Call it a Phone, Don't Call Us a**
> **Phone Company.**

2

3

4   Patterson Dep. 42:22 – 44:9 (emphasis added); see also 47:3-20 (AKQA personally knew of

5   Helio's DON'T CALL IT A PHONE marks as of July 31, 2006), Ex. 24 (July 31, 2006 e-mail

6   from J. Patterson regarding meeting to "Discuss POV on Helio Campaign).

7          Further, Ms. Patterson felt that AKQA needed to come up with a "strong POV" or

8   opinion as to the Helio advertisement due to the similarity of the slogans:

9     Q.    In your note it says, Let's discuss the Helio campaign and the tag line
            so we have a strong POV [point of view] prior to our Wednesday
10          creative review [with Palm]."  Why did you want to have a strong POV
            prior to that creative review?
11    A.    We wanted to have a strong POV.  Actually, we didn't end up having a
12          strong POV.  But we wanted to – I wanted to discuss it with the team
            because as I mentioned earlier, **we felt that there was a similarity**
13          **between Don't Call It a Phone and Not a Cell Phone a Treo.**

14  Patterson Dep. 147:10-16 (emphasis added).

15         Ms. Patterson also testified that AKQA brought Helio's advertising to Palm's attention

16  *before* Palm had made a final decision to use the "Not just a cell phone" slogan on its Treo

17  680 advertisement because Palm was considering a *similar* advertising campaign at the

18  time:

19    Q.    If you don't consider Helio to be a competitor, then why would you bring
            its advertising campaign to Palm's attention?
20    A.    We brought it to their attention because there was a product in the
21          marketplace that seemed to be taking an approach to say that it was
            not a phone.  And we know that that was of great consideration to
22          Palm, to really distinguish themselves in the marketplace.  And so we
23          felt that it was appropriate to bring it to their attention.

24  Patterson Dep.  62:10-18; see also Id. at 64:17-22 (during entire Palm advertising

25  campaign, AKQA only brought Helio advertising and one other ad to Palm's attention).

26         In fact, Ms. Patterson spoke to Mr. Hancock prior to this August 2 meeting to discuss

27  the possibility of changing the Palm advertising campaign, including whether or not to

28

1  include the word "just" in AKQA's proposed slogan "Not a Cell Phone" or whether to go to

2  another alternative all together in light of, in part, the Helio campaign:

3      Q.    Can you tell me what this is.

    A.    This was an e-mail that I sent [on August 1].
4      ***

5      Q.    And you have five bullet items here and you say, "Here's what he had
        to say." So are these five references to your conversation with Mr.
6          Hancock?

7      A.    Yes.

    Q.    The second one says "Want to incorporate 'just' back into the tag line."
8          Do you see that?

    A.    Yes.
9      Q.    It says, "We talked about this one yesterday and **it may be a moot**

10         **point given the Helio conversation**, but we should comp an actual
        outdoor board with this tag line." Do you see that?

11     A.    Yes, I do.
    ***

12     Q.    So it appears as if during the development of this advertising campaign
        that Palm was going back and forth in terms of making a decision as to
13         whether or not to use the word "just" in the tag line, is that right?

14     A.    Yes.
    Q.    At least as late as August 1, 2006, right?

15     A.    Yes.
    Q.    Now you go on and you say, "We talked about this one yesterday and it
16         may be a moot point given the Helio conversation." Why would it be a

17         moot point given the Helio conversation?

    A.    Because at that point we knew again that there was a lot of discussion
18         around that line and a lot of attention had been given to the meaning
        and if Not a Cell Phone a[] Treo clearly communicated what we wanted
19         to or if it was going to confuse consumers. And so we thought that that
        might be the breaking point for Palm and even with "just"; **it could be**
20         **including "just"; it could be looking for an alternative that was**

21         **even more overt.**

    Q.    Okay. I understand that. But I'm having a difficult time understanding
22         why it would be a moot point. What do you mean when you add "it may
        be a moot point"?
23     A.    I meant that it may be that we include just. And they feel that with the

24         fact that it's been under such heavy scrutiny already **and that there's**
        **another line being used that says Don't Call it a Phone, that it may**
25         **be enough for them to want us to actually look at using just or**

26         **[r]each a different alternative altogether**.

27 Patterson Dep. 147:20 – 152:8 (with omissions) (emphasis added).

28     Moreover, Ms. Patterson then went on to admit that she felt as of August 1, 2006 that

1   the similarity between Helio's Don't Call it a Phone mark and Palm's yet-to-be determined

2   advertising campaign was so significant that it might convince Palm to adopt a different

3   advertising campaign altogether:

> 4    Q.    Well, I believe you testified that Palm may want you to explore a
> 5          different line; is that right?
>      A.    It was a possibility.
> 6    Q.    Why did you think it was a possibility?
>      A.    Because there had been so much discussion around the importance of
> 7          that line communicating that it was more than a cell phone and being
>            very clear to consumers.  And so it was already the topic of discussion.
> 8          And there was already a level of discomfort with Not a Cell Phone a[]
> 9          Treo that **we felt that all of – those factors as well as the fact that
>            there was now a line that said Don't Call it a Phone, Don't Call Us a
> 10         Phone Company may be reason enough for them to want us to
>            either include "just" or explore alternatives.**
11

12  Patterson Dep. 156:2-15 (emphasis added).

13          Moreover, when both AKQA and Scott Hancock were deposed, they both admitted to

14  the similarity between the two slogans.  Ms. Patterson, on behalf of AKQA stated:

> 15   Q.    Now, I believe you had mentioned that there was some discussion at
>            the July 31 meeting about whether or not there were similarities
> 16         between the line in the Helio advertisements and the line being
>            proposed for the Palm campaign, is that correct?
> 17
> 18   MR. COLT:   Objection.  Misstates prior testimony.
>      THE WITNESS:     The similarity that we say was with the line "Not a Cell
> 19         Phone a Treo and Don't Call it a Phone – Don't Call Us a Phone
>            Company, Don't Call It a Phone."
> 20
> 21   Q.    And what were the similarities that were being discussed?
>      A.    Essentially the fact that Don't Call it a Phone implies that it's not a
> 22         phone at all.  And Palm's issues that they had raised with Not Just –
>            Not a Cell Phone a Treo was that they felt it might mislead consumers
> 23         to thank [sic] it wasn't a cell phone.
> 24   Q.    So is it fair to say that to your mind these two lines were similar to each
>            other?
> 25
> 26   MR. COLT:   Objection.  Misstates prior testimony.
>      THE WITNESS:     **I think that there were similarities between Not a Cell
> 27         Phone a Treo and Don't Call It a Phone.**

28  Patterson Dep. 48:10 – 49:11 (emphasis added).

1    Although clearly an adverse witness, Mr. Hancock acknowledged the similarity

2  between Helio's DON'T CALL IT A PHONE marks and Palm's "Not just a cell phone"

3  slogan, but also that he was aware of the similarity prior to the launch of Palm's advertising:

4       Q.    What did you discuss [with Julie Patterson, employee of AKQA, Palm's
            advertising agency] about [Helio's] T.V. spot [which features Helio's
5            DON'T CALL IT A PHONE mark]?
6       A.    That they were – we kind of laughed it off that they were using some –
            you know, the line don't call it a phone, don't call us a phone company
7            was – used.
8       Q.    What do you mean by you laughed it off?  What does that mean?
        A.    Well, **given that we had discussed not a cell phone, a Treo, and**
9            **they were using "Don't call it a phone, don't call us a phone**
            **company," conceptually the – you know, the – high level concept**
10           **can – could have been seen as similar if we were coming from the**
            **same types of companies.**
11

12 Hancock. Dep. 44:1-13 (emphasis added).[5]

13     In fact, the fallout from the confusingly similar Helio campaign was so severe, that

14 AKQA's team devoted to the Palm's Camino project decided that they should develop

15 alternative advertising slogans for the Palm project **even though** Palm had decided to use

16 the "Not Just a Cell Phone" slogan:

17       There is a phone that recently launched called **Helio (the MySpace phone),**
          **that is using the line 'Don't call it a phone.'.**
18
19       **The similarities are unfortunate and we have raised this concern with our**
          **client.**
20
21       They have asked us to continue with our current 'Not Just' line…**but we have**
          **taken it upon ourselves to explore other options.**
22
   Ex.  25 (August 9, 2006 e-mail) (emphasis added).

23 **B.    Palm is Still Using It's Confusingly Similar "Not Just a Cell Phone" Slogan in**
       **its Advertising**
24

25     Palm insisted at the hearing on Helio's application for a temporary restraining order

26 _____

27 [5] Again, Hancock tried to backtrack on this admission by asserting that he could not "recall" whether he saw
   the Helio advertisement before or after Palm had launched its advertising campaign.  Hancock Dep. 55:15-17.
28 Nevertheless, he could not help but to admit that he saw Helio's advertising before Palm began spending on
   its "Not Just a Cell Phone" campaign. Id. at 56:18-21.

HELIO'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-7754 SBA

1  that its "Not Just a Cell Phone" outdoor advertisements would end on December 31, 2006

2  (Ex. 1 - Tr. 89:21-24) ("I think the other **key issue** is the outdoor ads end **December 31st.**

3  **This ends December 31st.**"); (Ex.1 - Tr. 91:3-8) ("We have **no intention of continuing**

4  **this passed [sic] December 31st.**"); (Ex. 1 - Tr. 104:15-15) ("This campaign ends

5  December 31st."), Hancock Decl. ¶¶ 8, 10.  The Court felt that the issue might all be moot

6  particularly since "counsel indicated [Palm is] going to stop the whole campaign December

7  31st." Ex. 1 - Tr. 111:3-4.

8       Palm's "Not Just a Cell Phone" advertising did not stop, and is still being published

9  outdoors within this district.  For example:

10       • there are billboards up throughout San Francisco advertising the slogan (on Essex
         and Harrison and at 4th St. and I-80 skyway) and Ex. 26 (PALM 23007-23010);
11

12       • bus shelters / MUNI still display Palm's "Not Just a Cell Phone" advertisements (e.g.
         Broadway and Polk) (Id.);
13

14       • Palm is running "Not Just a Cell Phone" advertisements until at least May 2007 (Ex.
         27) (PALM 15584, 15588, 15592, 15596, 15600, , Palm's Media Plan Master
15       showing ads running until 5/31/07); and (Ex. 28)(PALM 2519-2523) (indicating that
         weather.com ads will not start until after January 1, 2007)
16       • print media will appear in March, April, May with Palm's "Not Just a Cell Phone"
         advertising (Ex. 29) (PALM 021614 – 02168).
17

18  Even Hancock admitted that such advertising was still up in January and was not

19  necessarily disposed of by December 31, 2006.  Hancock Dep. 105:18 – 107:16.

20                          **III.   Argument**

21  A.   **The Court Should Grant A Preliminary Injunction Because Helio Has**
         **Demonstrated that there is a Likelihood of Confusion**
22

23       A preliminary injunction may be granted if the moving party shows either (1) a

24  combination of probable success on the merits and the possibility of irreparable harm, or (2)

25  that serious questions are raised and the balance of hardships tips sharply in the moving

26  party's favor.  See Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445,

27  1448 (9th Cir. 1988); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir.

28  1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum

                                          12

in which the required showing of harm varies inversely with the required showing of [sic] meritoriousness.'" <u>Miss World</u>, 856 F.2d at 1448 (quoting <u>Rodeo Collection</u>, 812 F.2d at 1217); <u>Southwest Voter Registration Educ. Project v. Shelley</u>, 344 F.3d 914, 918 (9th Cir. 2003).  Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." <u>Id.</u> (citation omitted).

In a trademark infringement claim, however, "'irreparable injury may be presumed from a showing of likelihood of success on the merits.'" <u>El Pollo Loco, Inc. v. Hashim</u>, 316 F.3d 1032, 1038 (9th Cir. 2003) (citation omitted); <u>see also</u> <u>Vision Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 612 n. 3 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."). "[A] plaintiff is therefore entitled to a preliminary injunction in a trademark case simply when it shows a likelihood of confusion." <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 n. 5 (9th Cir. 2000).

Further, public policy favors granting an injunction when an infringing product is likely to cause consumer confusion. See <u>Anti-Monopoly, Inc. v. General Mills Fun Group</u>, 611 F.2d 296, 300-02 (9th Cir.1979).  "Such an injunction may issue even if the plaintiff's mark has not been registered with the PTO." See <u>Nova Wines, Inc. v. Adler Fels Winery LLC</u>, No. C. 06-06149, 2006 WL 3498574, * 4 (N.D. Cal. Dec. 4, 2006) (granting TRO and preliminary injunction based on non-registered trade dress comprised of photographs of Marilyn Monroe); <u>New West Corp. v. NYM Co. of Cal., Inc.</u>, 595 F.2d 1194, 1198 (9th Cir. 1979) ("It is not necessary that a trademark be registered in order for it to qualify for protection under the Lanham Act"); <u>Prudhomme v. Procter & Gamble</u>, 800 F. Supp. 390, 395 (E.D. La. 1992) (holding that registration is not a prerequisite to protection under § 32(1) of the Lanham Act).  Consequently, the Court should grant Helio's request for a preliminary injunction so long as it demonstrates that its likelihood of confusion claims are meritorious.

**B.    Helio Will Likely Succeed In Showing A Likelihood of Confusion**

As noted in Helio's TRO Application, the Court should look to eight different factors in determining whether a likelihood of confusion exists. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199 at 1205 (citing the Sleekcraft factors: (1) the similarity of the marks; (2) the relatedness of the two companies services; (3) the marketing channel used; (4) the strength of the mark; (5) Palm's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers).

Helio does not need to prove that all eight factors, or even a majority, weigh in its favor in order to obtain a preliminary injunction. See Apple Computer, Inc. v. Formula Intern, Inc., 725 F.2d 521, 526 (9th Cir. 1984). Not all of the factors are weighed equally. Id. For example using a similar mark on related goods, is the "[m]ost important for purposes of the likelihood of confusion analysis…". E. & J. Gallo Winery, 782 F. Supp. at 459-60; see also Goto.com, 202 F.3d at 1205 (the most important Sleekcraft factors are (1) similarity of the marks, (2) relatedness of the goods or services, and (3) the simultaneous use of the [Internet] as a marketing channel"). In fact, these two factors are so important that the Ninth Circuit has held that it is clear error to find no likelihood of confusion when two products with similar marks are in the same market. Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 257 (9th Cir. 1986).

Because this Court has already ruled in favor of Helio on these two factors, as well as determined that Helio's mark is strong and that the parties use identical marketing channels for the products and services, it could grant Helio a preliminary injunction without any additional evidence.[6] Now that Helio has uncovered evidence to show Palm's prior knowledge of Helio's mark and its intentional selection and use of a slogan that Palm and its

---

[6] Of the eight factors, the Court felt that four factors weighed in Helio's favor:  1) Strength of the Mark, 2) similarity of the products, 3) similarity of the marketing channels, and 4) similarity of the marks.  The Court determined that three factors weighed in Palm's favor:  1) actual confusion, 2) degree of care, and 3) intent. The court determined that the likelihood expansion into other product lines was not relevant.  Tr. 75:9-14.

14

1  advertising agency admit are similar to Helio's marks, there can be no doubt that a

2  preliminary injunction is appropriate.  Moreover, Palm's continued use of the slogan in

3  advertising after it represented to the Court that all outdoor advertising would terminate on

4  December 31, demonstrates the need for injunctive relief.

5           1.     The marks are similar in sight, sound and meaning

6           The similarity of the parties' marks "has always been considered a critical question in

7  the likelihood-of-confusion analysis." GoTo.com, 202 F.3d at 1205.  In comparing the

8  parties' marks, the Court must focus on how each of the marks is perceived by the ordinary

9  consumer in the marketplace. See Brookfield Commc'ns v. West Coast Entm't Corp., 174

10 F.3d 1036, 1054 (9th Cir. 1999); Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d

11 1127, 1131. The "greater the similarity between the two marks at issue, the greater the

12 likelihood of confusion." GoTo.com, 202 F.3d at 1206.  In this comparison, "similarities [are]

13 weighted more heavily than differences." Brookfield Commc'ns, 174 F.3d at 1054.  "The

14 proper test for likelihood of confusion is not whether consumers would be confused in a

15 side-by-side comparison of the products, but whether confusion is likely when a consumer,

16 familiar with the one party's mark, is presented with the other party's goods alone." E. & J.

17 Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 466 (N.D. Cal. 1991). Here,

18 the Court previously ruled that the marks are so similar in sound and meaning that this

19 factor weighs in favor of a finding of a likelihood of confusion. Ex. 1 – Tr. 21:1-12; 22:11-15;

20 24:23-3; 26:14-17; 55:25 – 56:3; 56:12 – 57:9; 59:9 – 60:3.  Preliminary discovery has

21 confirmed the Court's opinion.

22          First, both Palm and AKQA have conceded that the marks are similar.  See supra at

23 Section II.A.3.  AKQA thought the similarity was so striking that she a) had to call an internal

24 meeting of AKQA employees to develop a "strong POV" or talking points about Helio's

25 campaign to Palm and b) believed that the existence of Helio's DON'T CALL IT A PHONE

26 marks might convince Palm to adopt an entirely different advertising campaign all together.

27 Id.

28

1      Further, Palm admitted the similarity between the marks in public. <u>See</u> Ex. 10

2  (Weeks Decl. ¶¶ 22, 26), Ex. 30 (BrandWeek Article) and Ex. 31 (MediaPost Article).

3  According to one industry magazine, "**interestingly, the tagline -- Not just a cell phone. A**

4  **Treo -- is a little too much like Helio's "Don't call us a phone company. Don't call it a**

5  **phone"**. Ex. 32 (12/11/06 Mobile Magazine article by Michael Kwan).

6      Although Mr. Hancock now defensively asserts at deposition that he was "misquoted

7  in the article", when given the opportunity to respond to this article in the declaration he

8  submitted in opposition to Helio's TRO application, he did not dispute the fact that he

9  "acknowledged the similarity [of Palm] to the positioning of rival Helio." <u>See</u> Ex. 14 (S.

10  Hancock Decl.).  Moreover, Mr. Hancock did nothing to correct the reporter or have the

11  reporter retract the statement.[7]  Instead, as accurately reported by the media, Mr. Hancock

12  attempted to distinguish Palm and Helio as pursuing different markets.

13      As the Court previously recognized, there would have been no need for Mr. Hancock

14  to argue that the products were pursuing different markets if he hadn't previously conceded

15  that there was a similarity between Helio's DON'T CALL IT A PHONE marks and Palm's

16  "Not Just a Cell Phone" advertising campaign.  Ex. 1 - Tr. 57:12 – 58:9.

17      Despite Palm's self-serving attempt to disclaim its prior admission as to similarity of

18  the marks, the parallels between the slogans is striking.  Both Helio's DON'T CALL IT A

19  PHONE mark and Palm's "NOT JUST A CELL PHONE" sound the same and have the

20  same meter and cadence, but more importantly, they convey the same identical, critical

21  message to the target consumers, namely that the mobile media devices and service sold

22  by each company are not simply a telephone or wireless service.  The implication is that

23  there are value-added and unique aspects of each parties' goods and services that

24  transcend standard cellular phone devices and wireless telephony service.

25

26

27

28  ---

[7] Also, despite receiving copies of the article e-mailed to him, Mr. Hancock never disavowed the comments attributed to him.  <u>See</u> <u>e.g.</u> Ex. 33 (PALM 21495) (12/14/06 e-mail, Hancock cc'd, with article); (PALM 9254-9272, summary of Palm's Marketing Campaign Coverage with copy of article attached at PALM 9264); Ex. 22 (AKQA 3778 – copy of AdWeek article).

1    Palm's assertions that the marks do not appear identically (the advertisements

2  include different background colors) is of no moment because Courts may issue a

3  temporary restraining order and preliminary injunction even though marks at issue are not

4  identical, but still leave the consumer with a confusingly similar message.  See e.g.

5  Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd., No. C 06-00527, 2006 WL 1214859,

6  *3-4 (N.D. Cal. May 6, 2006) (granting preliminary injunction because defendant's use of

7  "The Black Chook" was similar in meaning and sound to "Black Chicken"); Nova Wines, Inc.

8  v. Adler Fels Winery LLC, 2006 WL 3498574, *11 (granting preliminary injunction for use of

9  similar photographs of Marilyn Monroe on wine bottles); Redmond Prods., Inc v. Amino

10  Sabre, Inc., 17 U.S.P.Q. 2d 1386 (C.D. Cal. 1990) (granting TRO and preliminary injunction

11  against defendant for using AUSSIE PRO in violation of plaintiff AUSSIE marks); Duncan

12  McIntosh Co., Inc. v. Newport Dunes Marina LLC, 324 F. Supp. 2d 1078, 1085 (C.D. 2004)

13  (issuing injunction because of confusing similarity in sight sound and meaning between

14  "Newport Boat Show" and "Newport Beach Boat Show at the Dunes"); Chemical Corp. of

15  America v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962) (finding a likelihood of

16  confusion caused by the use of the slogan "where there's life . . . there's bugs" for a floor

17  wax insecticide product where Anheuser Busch had for many years employed a the slogan

18  "where there's life  . . . there's Bud" to great effect); Palm Bay Imports, Inc. v. Veuve

19  Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 1376 (Fed. Cir. 2005)

20  (determining that Veuve Clicquot and VEUVE ROYALE were sufficiently similar in sight

21  sound and meaning); Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 1266-67

22  (Fed. Cir. 2002) (holding that PACKARD TECHNOLOGIES and HEWLETT PACKARD differ

23  in appearance and sound, but the marks convey a similar commercial impression because

24  consumers would be aware of Hewlett-Packard's heavy involvement in technology-based

25  goods, and therefore the marks are similar in their entireties); Kenner Parker Toys, Inc. v.

26  Rose Art Indus., Inc., 963 F.2d 350, 355 (Fed. Cir. 1992) (holding that in light of the

27  appearance, sound and meaning of the marks PLAY-DOH and FUNDOUGH, consumers

28

1    may receive the "same commercial impression" from the marks).

2    　　　Finally, in the context of reverse confusion the Court must also evaluate the strength

3    of Palm's mark so as to gauge its ability to overpower Helio's mark. See Dreamwerks, 142

4    F.3d at 1130, n. 5); see also Checkpoint Systems, Inc. v. Check Point Software Techs., Inc.,

5    269 F.3d 270, 303 (3d Cir. 2001) (holding that in a reverse confusion case, "[w]hile analysis

6    of the strength of the senior user's mark is relevant, the more important inquiry focuses on

7    the junior user's mark. [T]he lack of commercial strength of the smaller senior user's mark is

8    to be given less weight in the analysis because it is the strength of the larger, junior user's

9    mark which results in reverse confusion …" (internal quotation marks and citations omitted));

10    A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 231 (3d Cir. 2000) ("in

11    a reverse confusion claim, a court should analyze the … factor in terms of (1) the

12    commercial strength of the junior user as compared to the senior user; and (2) any

13    advertising or marketing campaign by the junior user that has resulted in a saturation in the

14    public awareness of the junior user's mark").

15    　　　"It is the essence of reverse confusion that the senior user's mark will be

16    comparatively weaker-and quite probably much weaker indeed-than that of the powerful

17    junior user. It is in such cases, where the visibility and strength of the junior user's mark

18    have occupied the field, that the consumer is likely to consider the senior user's product as

19    either emanating from the junior user or infringing upon the junior user's trademark rights."

20    Sunenblick v. Harrell, 895 F. Supp. 616, 627 (S.D.N.Y.1995).  The court must therefore

21    consider the commercial strength of Palm's mark in determining likelihood of confusion.

22    The stronger Palm's mark, the more likely that there is reverse confusion.  Id.

23    　　　Here, Palm is a well recognized and popular personal digital assistant manufacturer

24    that is now investing $25 million into its "Not Just A  Phone" holiday, advertising blitz.  By its

25    own estimation, Palm has "shipped more than 34 million mobile-computing products" to

26    consumers.  Ex. 9 (Exhibit D to Wheble Decl. (3/27/06 Press Release)).  Helio, by virtue of

27    being in existence for less than two years, and its public launch of the DON'T CALL IT A

28

HELIO'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-7754 SBA

1   PHONE branding campaign in May, is in serious danger that it will be overwhelmed by

2   Palm's confusingly similar and overpowering advertising.  Thus, this factor strongly weighs

3   in favor of Helio from a reverse confusion standpoint.

4          2.      The goods and services offered by the parties are nearly identical

5          Devices advertised under Helio's DON'T CALL IT A PHONE marks and Palm's "Not

6   Just a Cell Phone" line include lifestyle services such as video, music, and camera functions

7   as well as the ability to direct link to so-called "passion brand" websites.  Thus, there can be

8   no real dispute that the products provided by the parties are virtually identical for likelihood

9   of confusion analysis.

10         Palm publicly admitted that its Treo 680 device is designed to target a whole new

11  class of consumers.  Ex. 34 (11/28/06 e-mail from S. Hancock) and Ex. 35 (12/11/06 Palm

12  Press Release).  With the Treo 680, Palm is attempting to drive appeal to a younger and

13  broader customer base than ever before.  Hancock Dep. 94:9-15; 112:19 – 113:8; Ex. 36.

14  This marketing strategy has been recognized by at least one leading publication:

15         Palm seeks to widen the appeal of its Treo 680 smartphone **beyond its
           traditional customer base of business users** and narrow the competition
16         between itself and blackberry whose top-selling Pearl has **targeted the same
           hybrid business lifestyle wireless consumer for whom the Treo is
17         designed**.

18
    Exhibit 31 to Weeks Decl.
19
           The Court previously agreed that it was "clear" that Palm's "marketing strategy is not
20
    limited to businesses."  Ex. 1 - Tr. 43:24 – 44:4; 48:4-9 ("I am inclined to find that it is **clear**,
21
    at least from the Court's perspective and based on what I have in front of me that Helio and
22
    Palm offer very similar goods and services, and that Palm and Helio are direct market
23
    competitors, so the factor number two weighs in favor of finding consumer confusion.")
24
    (emphasis added).  As the Court astutely recognized, Palm's own submissions in opposition
25
    to Helio's TRO application, namely images of individuals in decidedly non-business
26
    applications, demonstrate that Palm's intent all along was to market and sell a non-business
27
    oriented device.  Id.  46:18 – 47 ("Because these are not businessmen.  They don't appear
28

1   to be. And certainly the language that's here is not – well, it doesn't appear to be designed

2   to reach a business person audience.").

3          In an effort to attract a younger, more diverse crowd, Palm decided to focus on what

4   it called "Passion Brands" – "**consumer-friendly** brands that had a loyal following – [a]

5   user-based sort of following…." Patterson Dep. 34:9 – 35:24 and 95:19 – 96:22 (emphasis

6   added); Hancock Dep. 60:3-20. Palm touted the Treo 680's non-business related features

7   such as the ability to "Google" objects, purchase movie tickets on Fandango, send humor

8   stories from the Onion to friends, share photographs with friends on Flickr, or purchase

9   items on Ebay. Ex. 37 and www.ontreo.com, and Ex. 7 (PowerPoint presentation).  Palm

10  even manufactured its Treo 680 in different colors (blue, red, gold, etc.) to suit consumer's

11  lifestyle choices. Ex. 38 (Palm's website offering phone in "Artic, Copper, Graphite, and

12  Crimson").

13         In fact, Palm chose these "passion brand" partners with direct knowledge and in an

14  attempt to mimic Helio's groundbreaking strategy of partnering with such brands. See infra.

15  at Ex. 18 (August 24 email asking whether to approach Friendster, a social networking

16  website, to create a partnership with Palm along the lines of the "deal MySpace did with

17  Helio").

18         Finally, Helio recently sold Treo devices, and still services a significant portion of

19  Treos, making Helio and Palm direct competitors. Ex. 8 (Weeks Decl. ¶ 35). Consequently,

20  this factor strongly weighs in favor of a preliminary injunction.

21         3.    The parties use identical marketing channels

22         Again there is no serious question that the parties used similar marketing channels.

23  The Court's previously found that "the marketing channels used [by the parties] are similar

24  and the advertising methods are similar" and there are no facts to suggest otherwise. Ex. 1

25  - Tr. 64:21-65:3. The parties advertise in the same magazines (such as Rolling Stone, GQ,

26  Entertainment Weekly, Lucky and Real Simple), have partnered with virtually identical

27  "passion brands", use similar outdoor advertising, and market over the internet. Ex. 8

28

1  (Weeks Decl. ¶¶ 9-14, 23, 36-38).

2      Moreover, both Helio and Palm sell their product through similar retail

3  establishments, including, but not limited to, Fry's Electronics, Best Buy and various other

4  retailers.  Consequently, this factor weighs heavily in favor of Helio.

5      4.    Helio's DON'T CALL IT A PHONE Marks Are Strong

6      The Court previously found that Helio's DON'T CALL IT A PHONE marks have been

7  recognized and associated with its products, and thus weighs in favor of Helio. Ex. 1 - Tr.

8  25:9-13; 32:10-17.  Nothing has changed since the Court's initial ruling on Helio's

9  application for the TRO.  Helio has offered evidence that its DON'T CALL IT A PHONE

10 marks have been recognized and associated with its products and services.  See Ex. 1 - Tr.

11 26:9:17 and Exhibit 39 (brand equity study showing 61% consumer recognition); Ex. 8

12 (Weeks Decl. ¶ 19); Ex. 7 (Helio's TRO Application at 8:3-11).  Further, the PTO has not

13 determined that any of Helio's DON'T CALL IT A PHONE marks are not distinctive and no

14 examiner has required any limitation or required a showing of consumer recognition of the

15 marks during prosecution of Helio's trademark applications. Ex. 9 (Wheble Decl. ¶¶ 5-10).

16 Since the TRO hearing, the USPTO continues to approve of Helio's DON'T CALL IT A

17 PHONE trademark applications.  Declaration of Kathryn Wheble in Support of Helio's

18 Preliminary Injunction Motion, ¶¶ 2-13.

19      In contrast, Palm has not offered any evidence, other than attorney argument, to

20 dispute the reality that Helio's DON'T CALL IT A PHONE marks are distinctive and have

21 developed substantial consumer recognition among members of the public.  Thus, Helio's

22 marks should still be considered strong.

23      5.    Palm intentionally chose it's "NOT JUST A CELL PHONE" slogan after it knew
24            of Helio's DON'T CALL IT A PHONE marks

25      At the TRO hearing, the Court ruled that this factor was at best "neutral" because it

26 determined that Helio had not presented enough evidence of Palm's knowledge of Helio's

27 advertising campaign.  Ex. 1 - Tr. 70:2-4.  Through limited preliminary discovery, however,

28 Helio has uncovered overwhelming evidence that Palm both knew of Helio's campaign prior

21

1   to adopting its confusingly similar slogan, and deliberately chose the "Not Just a Cell Phone"

2   advertising slogan even though it recognized the similarity to Helio's DON'T CALL IT A

3   PHONE marks. See supra Section II.

4          It is indisputable that both Palm and its advertising agency, AKQA, were aware of

5   Helio's DON'T CALL IT A PHONE marks and advertising campaign before Palm decided on

6   the final slogan that is used to launch the Treo 680 advertising campaign in November

7   2006. Supra Section II. In fact, Palm directed AKQA to use the "Not Just a Cell Phone"

8   slogan **despite** the similarities to Helio's DON'T CALL IT A PHONE marks. Ex. 25. AKQA

9   felt so uncomfortable with Palm's decision to move forward with the confusingly similar

10  slogan that it decided to develop other options to the "Not Just a Cell Phone" slogan. Id.

11  Thus, both Palm and AKQA's actions at the time Palm was still debating the precise slogan

12  to use with its slogan demonstrate Palm's intent to infringe of Helio's marks.

13         Further, through discovery Helio revealed that Palm selected certain advertising

14  channels and publications that it had not previously targeted whereas Helio had already

15  made such partnerships the centerpiece of its campaign. For example, for the first time,

16  Palm decided to focus on what it called "passion brands." Patterson Dep. 34:9 – 35:24 and

17  95:19 – 96:22; Hancock Dep. 60:3-20.    For the first time, Palm partnered with Google,

18  Ebay, Flickr, the Onion, Fandago, non-business oriented sites intended to play on the

19  lifestyle desires of consumers. Hancock Dep. 62:25 – 63:4; 66:2 – 66:14; Patterson Dep.

20  110:5 – 111:20. As revealed in at least one document, AKQA looked at Helio's partnership

21  models such as with MySpace for its own partnerships. Ex. 18 to Patterson Decl. (August

22  23, 2006 e-mail).

23         In short, Palm and AKQA learned of Helio and its DON'T CALL IT A PHONE marks in

24  the midst of designing Palm's unreleased advertising campaign for Camino. Both Palm and

25  AKQA concede that they arrived at this understanding at a point where Palm could have

26  chosen an entirely different theme line for its campaign. In fact, Palm was considering

27  several alternatives but instead chose to use the slogan that was similar to Helio's DON'T

28

1    CALL IT A PHONE mark.  Consequently, the Court must conclude that Palm intentionally

2    chose to use similar advertising knowing that Helio was already using it in the marketplace.

3         6.    The "Likelihood of Expansion" factor is irrelevant where, as here, the parties
4               already compete.

5         The "likelihood of expansion" factor is a non-issue and the Court ruled that this factor

6    did not weigh in either parties' favor since the parties sell directly competing products.  Tr.

7    74:9-12.  This factor is relatively unimportant where the parties compete to a significant

8    extent.  See Brookfield Comm'cns, 174 F.3d at 1058; see also Vigneron Partners, LLC v.

9    Woop Woop Wines Pty Ltd., 2006 WL 1214859, *10 (when parties "'already sell directly

10   competing products,' this factor does not weigh in either party's favor").

11        Here, Palm and Treo are competitors.  The parties' sale of similar devices and

12   services, Palm's advertising in the same magazines, use of the same media channels,

13   partnership with Helio's largest and most influential strategic partners all show that Palm is

14   focused in the same market and is a direct competitor with Helio.

15        7.    The degree of care factor weighs in Helio's favor

16        Here, because of the rapidly decreasing costs of mobile media devices, and the

17   frequency consumers switch to different devices, consumers do not exercise a significant

18   amount of care in choosing such devices due to the perceived fungiblity in functionality.

19   Even Palm has admitted that the price of the devices has fallen to the "gift" price point.  Ex.

20   30.  Moreover, because Helio offered for sale and continues to support Treo devices, the

21   degree of care factor solidly weighs in Helio's favor.  Consumers who have purchased Treo

22   devices from Helio would necessarily have to be sophisticated enough to distinguish

23   between a reseller and the original manufacturer of the mobile media devices, and then

24   further be able to discern that the two are separate corporate entities.  Even under the best

25   case scenario, this level of sophistication is unlikely.

26        Even if consumers of the mobile media devices in this case are paying closer

27   attention, Palm's actions cause initial interest confusion weighing this factor in Helio's favor.

28   In Starbucks Corp. v. Lundberg, No. Civ. 02-948, 2005 WL 3183858, *6, *10 (D. Or. Nov.

23

1   29, 2005), the Court enjoined defendant's use of the term "Sambuck's" because it created

2   initial interest confusion with Starbucks' marks.  Even though the Court realized that a

3   consumer might distinguish the two producers as to source of origin at the time of purchase,

4   the use of the "Sambuck's" name attracted customers to defendant's products by using

5   Starbuck's prior established goodwill.  Here, even if consumers may ultimately distinguish

6   between the parties' different products, confusion has still occurred.  Palm's

7   misappropriation of the sight, sound and meaning of Helio's DON'T CALL IT A PHONE

8   marks creates initial interest confusion and diverts consumers to Palm's Treo line of

9   devices.

10          Evidence of this confusion already exists.  At least one internet commentator has

11  already written about his confusion between the marks:  "Palm has launched its Treo

12  smartphone campaign under the tagline "Not just a cell phone. A Treo.", **I've noted that**

13  **Helio is running a similar campaign** under the mantra "Don't call us a phone company.""

14  Ex. 40 (12/120/06 Lozito article).  Here, the consumer/journalist mistakenly notes that Helio

15  is running a campaign similar to Palm, when in reality it is Palm who has just started running

16  a campaign similar to Helio's previously established branding initiative.

17          Mr. Hancock also admitted that it was important for Palm to target its campaign for

18  the Christmas season because it is Palm's biggest selling period.  Hancock Dep. 59:15-

19  60:2.  Further, he was likely aware that during this time period and beyond consumers

20  would be less likely to exercise extreme care in differentiating the goods and services from

21  each of the parties.  Thus, the consuming public is likely to be initially led away from Helio's

22  devices because of Palm's exploitation of the goodwill generated by Helio's DON'T CALL IT

23  A PHONE marks.

24          8.     Actual confusion factor should weigh in Helio's favor

25          The Court may issue a preliminary injunction even where a plaintiff does not show

26  actual confusion.  GoTo.com, 202.F3d at 1208 ("even if Disney could show GoTo's study

27  was pure fantasy and that no one was actually confused, **it would by no means refute a**

28

1  **likelihood of confusion.**") (emphasis added); <u>Brookfield Comm'cs Inc. v. West Coast</u>

2  <u>Entm't Corp.</u>, 174 F.3d 1036, 1050 ("the *failure* to prove instances of actual confusion is *not*

3  dispositive against a trademark plaintiff, because actual confusion is hard to prove;

4  difficulties in gathering evidence of actual confusion make its absence generally

5  unnoteworthy.") (emphasis in original); <u>Academy of Motion Picture Arts and Sciences v.</u>

6  <u>Creative House Promotions, Inc.</u>, 944 F.2d 1446, 1456 (9th Cir. 1991) ("in this circuit, actual

7  confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.").

8       The longer that Palm is allowed to continue with its "Not Just a Cell Phone"

9  campaign, the greater risk that there will be widespread actual confusion among members

10  of the consuming public.

### V.    CONCLUSION

12       For the forgoing reasons, Helio respectfully requests this Court to issue a preliminary

13  injunction in a form similar to the proposed order filed with this memorandum.

Dated:  March 6, 2007                KIRKPATRICK & LOCKHART PRESTON
                                     GATES ELLIS LLP


                           By:  KEVIN C. TROCK [HHD]
                                _____
                                Deborah Bailey-Wells
                                Kevin C. Trock
                                Harold H. Davis, Jr.

                                ATTORNEYS FOR PLAINTIFF HELIO LLC

HELIO'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 06-7754 SBA