# EXHIBIT 1

Dockets.Justia.com

PAGES 1 - 113

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

HELIO LLC,                        )
                                  )    **CERTIFIED COPY**
                                  )
          PLAINTIFF,              )    NO. C-06-7754 SBA
                                  )
  VS.                             )    THURSDAY, DECEMBER 21, 2006
                                  )
PALM, INC.,                       )    OAKLAND, CALIFORNIA
                                  )
          DEFENDANT.              )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          KIRKPATRICK & LOCKHART
                        NICHOLSON GRAHAM
                        FOUR EMBARCADERO CENTER, 10TH
                        SAN FRANCISCO, CALIFORNIA 94111
                   BY:  KEVIN C. TROCK, ESQUIRE
                        HAROLD H. DAVIS, JR., ESQUIRE
                        DEBORAH BAILEY-WELLS, ESQUIRE


FOR DEFENDANT:          QUINN EMANUEL
                        555 TWIN DOLPHIN DRIVE, STE. 560
                        REDWOOD SHORES, CALIFORNIA 94065
                   BY:  BRIAN C. CANNON, ESQUIRE
                        CHARLIE VERHOEVEN, ESQUIRE
                        DOUG COLT, ESQUIRE
                        CATHERINE COLE, ESQUIRE


REPORTED BY:            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                        OFFICIAL COURT REPORTER

THURSDAY, DECEMBER 21, 2006                    1:15 P.M.


          **THE CLERK:**  CALLING CIVIL 06-7754 HELIO, LLC VERSUS

PALM, INC.

          **THE COURT:**  GOOD AFTERNOON.

          **THE CLERK:**  COUNSEL, YOU WILL NEED TO STATE YOUR

APPEARANCES FOR THE RECORD.

          **MR. TROCK:**  GOOD AFTERNOON, YOUR HONOR, KEVIN TROCK

FOR THE PLAINTIFF HELIO.

          **THE COURT:**  KEVIN?

          **MR. TROCK:**  TROCK.

          **THE COURT:**  GOOD AFTERNOON, MR. TROCK.

          **MS. BAILEY-WELLS:**  GOOD AFTERNOON, YOUR HONOR,

DEBORAH BAILEY-WELLS FOR HELIO, PLAINTIFF.

          **THE COURT:**  GOOD AFTERNOON, MS. BAILEY-WELLS.

          **MR. DAVIS:**  GOOD AFTERNOON, YOUR HONOR, HAROLD DAVIS

FOR HELIO.

          **THE COURT:**  GOOD AFTERNOON, MR. DAVIS.

          **MR. CANNON:**  GOOD AFTERNOON, YOUR HONOR, THIS IS

BRIAN CANNON FOR DEFENDANT PALM.

          **THE COURT:**  GOOD AFTERNOON, MR. CANNON.

          **MR. VERHOEVEN:**  CHARLES VERHOEVEN FOR DEFENDANT.

          **THE COURT:**  CHARLES VERHOEVEN?

          **MR. VERHOEVEN:**  VERHOEVEN.

          **THE COURT:**  HOW DO YOU SPELL THAT?

1          **MR. VERHOEVEN:**  V- AS IN VICTOR, E-R-H-O-E-V- AS IN

2    VICTOR, E-N.

3          **THE COURT:**  OKAY.  GOOD AFTERNOON, MR. VERHOEVEN.

4          **MR. COLT:**  GOOD AFTERNOON, YOUR HONOR, DOUG COLT FOR

5    THE DEFENDANT.

6          **THE COURT:**  GOOD AFTERNOON, MR. COLT.

7          **MS. COLE:**  CATHERINE COLE FOR THE DEFENDANT.

8          **THE COURT:**  COLE?

9          **MS. COLE:**  C-O-L-E.

10          **THE COURT:**  OKAY.  GOOD AFTERNOON, MS. COLE.

11          OKAY.  IS THAT EVERYONE?

12          OKAY.  THIS MATTER IS ON THE COURT'S CALENDAR FOR A

13    TEMPORARY RESTRAINING ORDER THAT WAS FILED ON BEHALF OF HELIO

14    THE OTHER DAY, AND I RECEIVED THE PAPERS THAT YOU ALL HAVE

15    SUBMITTED AND SUPPORT IN OPPOSITION TO THE TRO.

16          AND I UNDERSTAND THAT SOMEONE REQUESTED TO HAVE THIS

17    REMAIN FOR ORAL ARGUMENT, WHICH IS WHY I KEPT IT ON.  I ALSO

18    UNDERSTAND THAT SOMEONE CALLED TODAY WANTING TO BRING IN

19    SOMETHING, AND FORTUNATELY I WAS IN A MEETING IN THE FEDERAL

20    BUILDING IN SAN FRANCISCO ALL DAY SO I DIDN'T GET BACK IN TIME,

21    BUT I HAVE NO OBJECTION TO THE PRESENTATION, WHATEVER IT IS.

22    MY CLERK WAS NOT ABLE TO GET IN CONTACT WITH ME.

23          WAS IT YOU THAT MADE THE PHONE CALL?

24          **MR. CANNON:**  WE MADE THE PHONE CALL AND WE HAVE --

25          **THE COURT:**  THAT IS MR. --

4

1          **MR. CANNON:**  MR. CANNON.

2          **THE COURT:**  MR. CANNON.

3          **MR. CANNON:**  AND WE HAVE THE EQUIPMENT IN THE

4   COURTROOM, ALTHOUGH I DON'T THINK WE WILL BE USING IT.

5          **THE COURT:**  OKAY.  OKAY.  THANK YOU.

6          **MR. CANNON:**  THANK YOU.

7          **THE COURT:**  SO, WHY DON'T WE START WITH -- PLAINTIFF

8   MADE THE REQUEST FOR THE ORAL ARGUMENT, RIGHT?

9          **MR. TROCK:**  THAT'S CORRECT.

10         **THE COURT:**  WE WILL START WITH YOU.

11         WHAT I WOULD LIKE TO DO, AND I WILL SAY I HAVE READ

12  THE PAPERS YOU ALL HAVE SUBMITTED AND I -- THIS IS A CLOSE

13  CALL.  I WILL BE -- VERY CLEARLY A CLOSE CALL.  SO, I WANT TO

14  LET YOU DISCUSS WHAT YOU WANT TO DISCUSS.  AND SINCE THE ISSUE

15  SEEMS TO BE -- THE HEART OF THE ISSUE SEEMS TO BE THE CONFUSION

16  HERE OF -- THROUGH ALL, EVERYTHING THAT HAS BEEN FILED, THE

17  CONFUSION SEEMS TO BE THE HEART OF THE ISSUE.  IF THAT IS, I

18  PROBABLY WILL THEN HAVE YOU ALL FOCUS AFTER YOU SAY WHATEVER

19  GENERAL COMMENTS YOU WANT TO SAY ON THE FACTORS THAT THE COURT

20  IS TO BE CONSIDERING IN DETERMINING WHETHER OR NOT THERE IS OR

21  IS NOT A LIKELIHOOD OF CONFUSION AND SUPPORTED BY WHATEVER

22  EVIDENCE YOU HAVE OR DON'T HAVE, AND THEN I WILL HOPEFULLY BE

23  ABLE TO MAKE A DECISION AT THAT TIME.

24         I WANT TO LET YOU START WITH WHATEVER YOUR

25  PRELIMINARY COMMENTS ARE THAT YOU WOULD LIKE TO MAKE.

1          THAT IS MR. TROCK, RIGHT?

2          **MR. TROCK:**  YES, THAT'S CORRECT.  THANK YOU, YOUR

3    HONOR.

4          **THE COURT:**  UH-HUH.

5          **MR. TROCK:**  I WANTED TO START OUT BY ADDRESSING TO

6    THE COURT EXACTLY WHAT WE'RE TRYING TO ACCOMPLISH HERE.

7          WE ARE LOOKING FOR A VERY NARROWLY TAILORED

8    RESTRAINING ORDER.  THE ONLY THING THAT CONCERNS US ABOUT THEIR

9    ADVERTISING CAMPAIGN IS THAT SLOGAN.  THE REST OF THEIR

10   ADVERTISING CAMPAIGN DOES NOT CONCERN US.

11         **THE COURT:**  WELL, THE SLOGAN IS THE ADVERTISING

12   CAMPAIGN, ISN'T IT?

13         **MR. TROCK:**  IT'S PART OF IT.  WHAT THEY HAVE -- IT'S

14   A LARGE ADVERTISING CAMPAIGN.  MY UNDERSTANDING IT'S

15   $25 MILLION.  THEY HAVE A LOT OF PRESS, A LOT OF BILLBOARDS, A

16   LOT OF OTHER THINGS GOING ON OUT THERE.  WE ARE NOT ASKING THE

17   COURT TO HAVE THEM TAKE DOWN OR PULL APART OR WITHDRAW THEIR

18   ENTIRE ADVERTISING --

19         **THE COURT:**  SO YOU'RE ASKING THEM TO GO THROUGH WITH

20   SOME BLACK TAPE OR SOMETHING AND JUST PUT TAPE OVER THAT PART

21   OF ALL THOSE ADS THAT -- ALL OVER THAT THEY'VE DISTRIBUTED ALL

22   OVER THE COUNTRY?

23         **MR. TROCK:**  THAT'S CORRECT.

24         **THE COURT:**  SO NO ONE CAN SEE THAT --

25         **MR. TROCK:**  THAT'S CORRECT.  THE REST OF THE

1    ADVERTISING DOESN'T BOTHER US AT ALL.

2             I WOULD LIKE TO START OUT BY SAYING WHO WE ARE.

3             **THE COURT:**  WHAT IS THE SIGNIFICANCE OF THAT?  I

4    MEAN, LEGALLY, YOU SAY THAT TO SAY WHAT?  TO SAY THAT THEIR

5    DAMAGES WOULD THEN BE MINIMIZED BECAUSE YOU ARE NOT ASKING THEM

6    TO TAKE THEM DOWN, YOU'RE ONLY ASKING THEM TO MODIFY ALL OF THE

7    ADS THAT THEY HAVE --

8             **MR. TROCK:**  THAT'S CORRECT.  AND WE'RE TRYING TO

9    FOCUS JUST ON THE RELIEF THAT WE NEED.  RELIEF THAT WE NEED IS

10   TO REMOVE THE SLOGAN FROM THE MARKETPLACE, NOT TO STOP THEIR

11   ADVERTISING CAMPAIGN.

12            **THE COURT:**  OKAY.

13            **MR. TROCK:**  WE THINK THAT THAT WOULD REDUCE ANY KIND

14   OF BURDEN ON THEM OR ANY KIND OF HARM TO THEM BECAUSE NOW WE

15   ARE JUST TALKING ABOUT SOME INCREMENTAL COSTS TO MODIFY THE

16   ADVERTISING THAT THEY CURRENTLY HAVE IN PLACE.

17            **THE COURT:**  THIS IS KIND OF ANTICIPATING QUESTIONS I

18   AM GOING TO BE ASKING.  LET ME JUST ASK YOU, WHY DIDN'T YOU

19   SEND THEM A LETTER OR MAKE A PHONE CALL BEFORE YOU FILED THIS

20   LAWSUIT?  WOULDN'T THAT HAVE MINIMIZED NOT ONLY YOUR POSSIBLE

21   HARM, BUT ALSO MINIMIZED WHAT -- DEPENDING ON WHEN YOU WERE

22   AWARE OF IT, I GUESS THAT'S THE CRITICAL THING.

23            I KNOW THAT THEY -- I DO WANT YOU TO GIVE YOUR

24   COMMENTS, BUT MAYBE YOU CAN ANSWER THIS QUESTION.  I KNOW THAT

25   THEY INDICATED THEY WERE, THEY HAD RELEASED THEIR ADVERTISING

1  CAMPAIGN OCTOBER 12TH OF THIS YEAR.  IF YOU DID NOTHING -- BUT

2  THEY DIDN'T SAY THAT YOU WERE THERE AND HAD KNOWLEDGE OF IT

3  OCTOBER 12TH, BUT I KNOW THEY ONLY RELEASED IT PUBLICLY WITHIN

4  THE LAST WEEK OR SO.

5        MR. TROCK:  THAT'S CORRECT.

6        THE COURT:  SO I GUESS THE QUESTION -- THE PREMISE

7  OF MY QUESTION AS TO WHY YOU DIDN'T SEND A CEASE AND DESIST

8  LETTER IS, MY ASSUMPTION, WHICH WAS IMPLICIT IN THEIR STATEMENT

9  THAT YOU WERE AWARE IN OCTOBER THAT THIS CAMPAIGN WAS BEING

10  LAUNCHED, AND DID NOTHING.

11        IS THAT FAIR?

12        MR. TROCK:  THAT'S THEIR POSITION.  AND WE HAD NO

13  KNOWLEDGE WHATSOEVER OF THEIR ADVERTISING CAMPAIGN UNTIL THEY

14  LAUNCHED THE CAMPAIGN ON DECEMBER 12TH OF THIS YEAR.

15        THE COURT:  A WEEK AGO.

16        MR. TROCK:  YES.  A WEEK AGO.

17        THE COURT:  GO ON WITH YOUR PRESENTATION.

18        MR. TROCK:  SO, HELIO IS A BRAND NEW COMPANY.  IT'S

19  VERY YOUNG.  IT'S ONLY TWO YEARS OLD.  WE ARE LOCATED IN LOS

20  ANGELES.

21        AND WE CAME UP WITH A SLOGAN AND A CAMPAIGN, AD

22  CAMPAIGN, OUR FIRST AD CAMPAIGN TO COME INTO THE MARKETPLACE TO

23  INTRODUCE US TO OUR MARKET AND TO SELL OUR DEVICES TO THEM.

24        AND WE FOCUS THIS AROUND A CAMPAIGN BASED UPON

25  "DON'T CALL IT A PHONE, DON'T CALL US A PHONE COMPANY."

1          WE SELL HANDHELD WIRELESS DEVICES, MULTIMEDIA

2    DEVICES.  OUR TARGET MARKET IS FOR -- IT'S A YOUNG LIFESTYLE

3    MARKET FOR PEOPLE WHO ARE INTERESTED IN VIDEO, AUDIO, MUSIC,

4    VOICE, GAMES, CAMERAS.  OUR DEVICES INCORPORATE ALL THOSE

5    ELEMENTS AS DOES THE DEFENDANTS.

6          SO WE HAVE THREE DEVICES THAT ARE CURRENTLY IN THE

7    MARKETPLACE, AND THIS CAMPAIGN WAS LAUNCHED BY US IN MAY OF

8    THIS YEAR, MAY 2ND.  IT'S A $30 MILLION CAMPAIGN.  IT IS A

9    SIGNIFICANT EXPENDITURE FOR US.  WE ARE ESSENTIALLY OUT THERE

10   IN THE MARKETPLACE TRYING TO DEVELOP GOODWILL WITH THIS

11   CAMPAIGN WITH OUR CONSUMERS.

12         WE THINK IT'S WORKING.  WE HAVE GONE THROUGH IN

13   PRINT MAGAZINES, SUCH AS GENTLEMAN'S QUARTERLY, ROLLING STONE,

14   ENTERTAINMENT WEEKLY, BILLBOARDS, TELEVISION, RADIO, AND

15   SPECIAL EVENTS.  WE HAVE STRATEGIC PARTNERSHIPS WITH COMPANIES

16   SUCH AS GOOGLE, YAHOO, ONION, FANDANGO AND MY SPACE.  WE

17   BELIEVE THAT OUR CAMPAIGN AND THE SLOGAN IS RESONATING WITH OUR

18   MARKETING, WITH OUR CONSUMERS.

19         WE HAD COMMISSIONED A STUDY IN OCTOBER OF 2006 THIS

20   YEAR, AND WE --

21         **THE COURT:**  BEFORE OCTOBER 12TH?

22         **MR. TROCK:**  I BELIEVE THAT WAS THE CASE.  BEFORE

23   THERE WAS ANY ANNOUNCEMENT.  I BELIEVE THE OCTOBER DATE THEY

24   ARE TALKING ABOUT IS A MERE ANNOUNCEMENT.

25         **THE COURT:**  INDUSTRY-WIDE, BUT NOT PUBLIC.

1        **MR. TROCK:**  I WOULDN'T CALL IT INDUSTRY-WIDE EITHER.

2  I WOULD TAKE ISSUE WITH THAT.  I BELIEVE IT WAS AT A TRADE SHOW

3  SOMEWHERE.  WE WERE NOT AT THAT TRADE SHOW.

4        **THE COURT:**  ANYWAY, THAT POINT, 61 PERCENT OF THE

5  PEOPLE RECOGNIZED --

6        **MR. TROCK:**  THAT'S CORRECT.  THAT'S RIGHT.  AND MORE

7  IMPORTANTLY THAN THE 60 PERCENT RECOGNIZING THE SLOGAN --

8        **THE COURT:**  I THOUGHT IT WAS 61.  IS IT 60?

9        **MR. TROCK:**  61, ROUGHLY.

10        **MR. CANNON:**  THERE ARE SEVERAL POINTS THAT I WOULD

11  LIKE TO ADDRESS.  I WANT TO LET HIM COMPLETE.  THERE ARE

12  OBVIOUSLY THINGS WE DISPUTE VIGOROUSLY.

13        **THE COURT:**  YOU WILL BE ABLE TO VIGOROUSLY DISPUTE

14  THEM WHEN THE TIME COMES.

15        **MR. TROCK:**  I THINK MORE IMPORTANTLY FROM THAT STUDY

16  WAS THE 45 PERCENT OF THE PEOPLE STUDIED WHO WERE ABLE TO

17  REITERATE A MESSAGE THAT THAT SLOGAN WAS GIVING THEM IN THEIR

18  OWN WORDS.  AND WHAT THEY WERE SAYING IS, IT'S NOT JUST A

19  PHONE.  THAT'S THE MESSAGE.

20        AND AS PART OF THE ANALYSIS IN A LIKELIHOOD OF

21  CONFUSION CASE, IT IS RELEVANT TO CONSIDER THE MESSAGE THAT

22  CONSUMERS ARE GETTING, NOT JUST THE SLOGAN ITSELF.

23        NOW, PALM'S CAMPAIGN IS BASED UPON THE SLOGAN "NOT

24  JUST A CELL PHONE."  WE FOUND OUT ABOUT THIS ON DECEMBER 12TH

25  WHEN THEIR OWN PRESS RELEASE ANNOUNCED THAT THEY WERE PUTTING

1    OUT THIS ADVERTISING CAMPAIGN INTO THE MARKETPLACE.

2            WE BELIEVE THAT THEY ADMITTED --

3            **THE COURT:**  HOW DID YOU FIND OUT ABOUT IT?  HOW DID

4    YOU LEARN?

5            **MR. TROCK:**  THERE WAS A PRESS RELEASE THAT WAS

6    ISSUED, AND I BELIEVE EITHER SOMEONE FROM OUR ADVERTISING

7    AGENCY OR ONE OF OUR PARTNERS NOTICED THIS ARTICLE THAT WAS

8    DISCUSSING THE PRESS RELEASE AND SENT IT TO US AND GAVE IT TO

9    OUR ATTENTION AND ASKED IF WE HAD HEARD ABOUT THIS.

10            THAT WAS THE FIRST THAT IT CAME TO OUR ATTENTION.  I

11    JUST FOUND OUT ABOUT IT MYSELF PERSONALLY JUST LAST THURSDAY.

12    SO IT'S VERY NEW TO ME.

13            WE BELIEVE THAT THEY -- ONE OF THEIR EXECUTIVES HAS

14    ADMITTED THAT THEIR ADVERTISING CAMPAIGN IS SIMILARLY

15    POSITIONED AS OURS IS.

16            **THE COURT:**  MR. HANCOCK.

17            **MR. TROCK:**  MR. HANCOCK, YES.

18            **THE COURT:**  I WANT TO ASK ABOUT THAT, TOO.

19            **MR. TROCK:**  WE BELIEVE THE SLOGANS ARE SIMILAR TO

20    EACH OTHER.  OURS IS "DON'T CALL IT A PHONE"; THEIRS IS "NOT

21    JUST A CELL PHONE."

22            **THE COURT:**  HIS POINT WAS THAT HE BELIEVED THAT YOU

23    ALL ARE FACING DIFFERENT MARKETING GROUPS.

24            **MR. TROCK:**  THAT'S CORRECT.

25            **THE COURT:**  SO THAT --

1      **MR. TROCK:**  THAT IS HIS POINT.  BUT WHEN YOU LOOK AT

2    THE REALITY, WHAT THEY ARE ACTUALLY DOING IS THEY ARE

3    ADVERTISING IN THE SAME MAGAZINES WE'RE ADVERTISING IN.

4    GENTLEMAN'S QUARTERLY, ROLLING STONE, ENTERTAINMENT WEEKLY,

5    LUCKY.  THEY HAVE THE SAME STRATEGIC PARTNERS AS US, GOOGLE,

6    YAHOO, ONION, FANDANGO, MY SPACE.

7          SO, THE GOODS AND SERVICES ARE ALMOST IDENTICAL TO

8    EACH OTHER.  THEY HAVE HANDHELD WIRELESS DEVICES; SO DO WE.

9      **THE COURT:**  LET ME JUST -- I DON'T WANT YOU TO HAVE

10   TO SPEND -- BE HERE ALL DAY LONG.  I AM GOING TO LET YOU BOTH

11   MAKE GENERAL COMMENTS, BUT I ACTUALLY DO WANT TO WALK YOU BOTH

12   THROUGH EACH OF THE FACTORS.  YOU'RE ADDRESSING THE FACTORS --

13     **MR. TROCK:**  THAT'S CORRECT.

14     **THE COURT:**  -- NOW, AND RATHER THAN HAVE YOU ADDRESS

15   THEM NOW AND THEN IN THE CONTEXT OF WHAT I ENGAGE YOU BOTH IN

16   DISCUSSION ON THE FACTORS, BECAUSE I HAVE SOME INCLINATIONS,

17   TOO, AND I WANT TO SHARE THOSE WITH YOU SO YOU CAN TELL ME WHAT

18   YOUR VIEWS ARE ONE WAY OR THE OTHER, AND THEN I CAN, IN MY OWN

19   MIND, MAKE A FINDING WITH RESPECT TO EACH OF THE FACTORS.

20         SINCE -- EVEN THOUGH I KNOW PLAINTIFF HAD A NUMBER

21   OF, YOU HAVE A NUMBER OF CAUSES OF ACTION THAT YOU RAISE HERE,

22   IT APPEARS THAT BASED UPON --

23     **MR. TROCK:**  IT'S ALL BASED --

24     **THE COURT:**  -- PAPERS, ALL ARE BASED ON THE LANHAM

25   ACT.

1          **MR. TROCK:**  TRADEMARK INFRINGEMENT OR UNFAIR

2    COMPETITION.

3          **THE COURT:**  SO, IT'S JUST THE LANHAM ACT VIOLATION

4    THAT YOU'RE FOCUSING ON AND IN THAT THE ONLY THING IS THE

5    CONFUSION THAT WE'RE CONCERNED ABOUT HERE.

6          **MR. TROCK:**  THAT IS CORRECT.

7          **THE COURT:**  SO I DO WANT TO JUST KIND OF WALK YOU

8    THROUGH THOSE EIGHT FACTORS THE NINTH CIRCUIT ESTABLISHED, SO

9    IF YOU WANT TO MAKE YOUR PRELIMINARY REMARKS, THEN I WILL LET

10   COUNSEL, MR. CANNON, MAKE HIS PRELIMINARY REMARKS, AND THEN

11   WE'LL KIND OF GO THROUGH THE FACTORS.

12         **MR. TROCK:**  SO BEFORE I GET TO GO THROUGH THE

13   ANALYSIS AND JUST IN GENERAL, I THINK WHAT IS IMPORTANT HERE

14   AND I NOTICED IN THEIR PAPERS IS THAT THEY TAKE THE POSITION

15   THAT THEY CREATED THIS SLOGAN OR THAT THEY INVENTED IT THREE

16   YEARS AGO.

17         THE PROBLEM I HAVE WITH THIS IS THAT THEY HAVE BEEN

18   SELLING TREOS FOR THREE YEARS.  IT WASN'T UNTIL DECEMBER OF

19   THIS YEAR THAT THEY USED THAT SLOGAN IN COMMERCE.  THAT'S THEIR

20   FIRST TRADEMARK USE OF THE SLOGAN.

21         THE FACT THAT THEY'RE ADVERTISING IN OUR -- IN THE

22   SAME MEDIA OUTLETS AS US AND HAVE THE SAME STRATEGIC PARTNERS

23   AS US AND THE SLOGANS ARE SO SIMILAR, STRIKES ME AS SOMETHING

24   THAT'S FAR MORE THAN JUST COINCIDENTAL.

25         IF THEY EXPECT US TO BE AWARE OF THEIR ADVERTISING

1    CAMPAIGN BECAUSE OF AN ANNOUNCEMENT THEY MADE AT A TRADE SHOW

2    IN NEW YORK IN OCTOBER, THEN I THINK IT'S FAIR FOR US TO EXPECT

3    THAT THEY KNOW ABOUT OUR ADVERTISING CAMPAIGNS SINCE WE HAVE

4    BEEN USING IT SINCE MAY OF THIS YEAR, AND HAVE SPENT

5    $25 MILLION ADVERTISING OUR SLOGAN.

6          IF THAT'S THE CASE AND IF THEY HAD THIS SLOGAN ON

7    THE SHELF FOR THE LAST THREE YEARS, WHY DIDN'T THEY USE IT

8    EARLIER?  WHY DIDN'T THEY FILE FOR A TRADEMARK APPLICATION AND

9    TO REGISTER THAT SLOGAN?  WHY DIDN'T THEY --

10          **THE COURT:**  OCTOBER OF '03?

11          **MR. TROCK:**  '06.

12          **THE COURT:**  HOW IS THAT THREE YEARS AGO?

13          **MR. TROCK:**  THEY HAVE BEEN SELLING TREOS FOR THREE

14    YEARS.  THEY SAY THEY INVENTED THIS SLOGAN OVER TWO YEARS AGO

15    AT THE BEGINNING OF 2005.  THAT'S THEIR POSITION.

16          WHY DIDN'T THEY OPPOSE ANY OF OUR APPLICATIONS TO

17    REGISTER THIS SLOGAN WITH THE PATENT AND TRADEMARK OFFICE?  NOT

18    A SINGLE ONE DID THEY OPPOSE.

19          THEY HAVE NEVER DONE THAT BECAUSE THEY TOOK THE

20    SLOGAN, DUSTED IT OFF THE SHELF, THEY WERE AWARE OF OUR AD

21    CAMPAIGN WHEN THEY INITIATED THEIR CAMPAIGN IN DECEMBER, AND

22    THAT'S WHERE WE FIND OURSELVES TODAY.  I FIND THAT THOSE

23    SIMILARITIES ARE SO STRIKING THIS CANNOT BE COINCIDENCE.

24          **THE COURT:**  OKAY.  THANK YOU.

25          OKAY MR. CANNON.

1    **MR. CANNON:**  YOUR HONOR, WHAT'S INCREDIBLE TO ME IS

2    WE HAVE THREE DAYS BEFORE CHRISTMAS, THREE SHOPPING DAYS BEFORE

3    CHRISTMAS.  AND WE HAVE HEARD A LOT OF ATTORNEY ARGUMENT.  WE

4    HAD ABOUT 12 HOURS' NOTICE OF GETTING THESE PAPERS BEFORE

5    APPEARING -- BEFORE PREPARING OUR OPPOSITION.

6         THERE IS ABSOLUTELY NO EVIDENCE SUPPORTING WHAT

7    COUNSEL IS ARGUING.  THIS -- THE TRADE SHOW THAT HE DISMISSES,

8    THIS WAS THE MAJOR ANNUAL TRADE SHOW FOR CONSUMER ELECTRONICS

9    IN NEW YORK.  IT'S OCTOBER 12 IN NEW YORK CITY.  HUNDREDS OF

10   THOUSANDS OF PEOPLE WENT THROUGH IT.  WE HAVE SUBMITTED SOME

11   EVIDENCE THAT DESCRIBES THE AMOUNT OF PEOPLE THAT WERE GOING

12   THROUGH IT.

13        THIS SLOGAN THAT THEY ARE SO CONCERNED WITH WAS

14   ADVERTISED PUBLICLY, BOTH AT THE INDUSTRY SHOW AND PUBLIC --

15   PUBLIC CAN ATTEND THE SHOW.  IT WAS OUT THERE IN OCTOBER.  FOR

16   THEM TO SAY --

17        **THE COURT:**  LET'S BE SPECIFIC BECAUSE YOUR PAPERS --

18   YOU HAVE ONE SENTENCE YOU BASICALLY SAY THAT YOU RELEASED IT IN

19   OCTOBER AT A TRADE SHOW AND THEN THE NEXT SENTENCE IS YET

20   PLAINTIFF DID NOTHING.

21        AND WHAT IS STRIKING TO ME AS I READ IT WAS THAT

22   THERE WAS NO AFFIRMATIVE ASSERTION THAT PLAINTIFFS WERE THERE,

23   AND THAT I AM BEING ASKED TO BASICALLY FILL THE VOID WITH AN

24   ASSUMPTION THAT THEY WERE THERE AND THEY HAD KNOWLEDGE BECAUSE

25   OBVIOUSLY THEY CAN'T BE HELD CULPABLE FOR DOING NOTHING UNLESS

1    IT'S CLEAR THAT THEY WERE -- HAD KNOWLEDGE AND WERE IN A

2    POSITION TO DO SOMETHING.

3          SO, DO I HAVE ANY -- THEIR POSITION IS THEY DIDN'T

4    KNOW.

5          **MR. CANNON:**  WELL, YOUR HONOR, THAT'S NOT WHAT THEIR

6    PAPERS SAY.  THAT IS WHAT COUNSEL ARGUED.  THEIR PAPERS, IF YOU

7    ACTUALLY LOOK AT THE EVIDENCE THAT SUPPORTS THEIR PAPERS, THEY

8    SUBMITTED A DECLARATION FROM A SINGLE INDIVIDUAL AT HELIO, I

9    BELIEVE IT'S MS. WEEKS, AND SHE SAYS -- IT'S PARAGRAPH 22.  SHE

10   SAID, I FIRST BECAME AWARE OF TREOS CAMPAIGN ON SUCH AND SO

11   DATE --

12          **THE COURT:**  JUST A SECOND.  MS. WHEBLE YOU'RE

13   SAYING?

14          **MR. CANNON:**  MS. WEEKS.

15          **THE COURT:**  JESSICA WEEKS?

16          **MR. CANNON:**  YES.

17          **THE COURT:**  OKAY.

18          **MR. CANNON:**  IT'S PARAGRAPH 22.

19          YOUR HONOR, I MIGHT ADD THAT I PRESUME, I AM NOT

20   GOING TO MAKE STATEMENTS WITHOUT EVIDENCE, YOUR HONOR, BUT I

21   PRESUME THAT HELIO, IF THEY ARE A YOUNG COMPANY AND IF THEY ARE

22   IN THIS BUSINESS WHICH THEY CLAIM TO BE, THEY WOULD HAVE BEEN

23   AT THAT TRADE SHOW.

24          **THE COURT:**  I DON'T PRESUME THAT WHEN I AM BEING

25   ASKED TO ISSUE A TRO.  BUT THE ONLY THING I PRESUME THAT THE

1    PARTIES HAVE EVIDENCE FOR THEIR RESPECTIVE POSITION.  IF THEIR

2    POSITIONS ARE SOLIDLY BASED, THEN THEY ARE IN A POSITION TO

3    COME HERE AND SHOW ME THAT THE POSITIONS ARE SOLIDLY BASED.

4         **MR. CANNON:**  I UNDERSTAND.

5         **THE COURT:**  THAT'S ALL I AM CONCERNED ABOUT.

6         I'M LOOKING AT PARAGRAPH 22 AND IT SAYS:

7         "I FIRST BECAME AWARE OF PALM'S YOUTH TAGLINE

8         "NOT JUST A CELL PHONE" ON OR ABOUT

9         DECEMBER 12TH, 2006 WHEN I READ AN ARTICLE FROM

10        THAT DAY'S EDITION OF BRANDWEEK.COM ENTITLED

11        "FRESH PUSH BEGINS FOR PALM'S TREO 680."

12        NOW, THAT'S DECEMBER 12TH, 2006.  THAT'S ONLY A

13   COUPLE OF WEEKS AGO.

14        **MR. CANNON:**  I UNDERSTAND.  THAT'S ONE INDIVIDUAL.

15   SHE DOESN'T SAY -- THERE'S NO EVIDENCE THAT OTHER PEOPLE AT

16   HELIO WEREN'T AT THE -- HELIO DOES NOT PROVIDE EVIDENCE IN

17   THEIR PAPERS THAT OTHER PEOPLE AT HELIO WERE NOT AWARE OF THIS.

18        **THE COURT:**  NO, NO, NO, NO.  OKAY.  BACK UP.

19        I AM ASKING YOU FOR CLARIFICATION OF POSITIONS THAT

20   YOU HAVE TAKEN IN YOUR PAPERS.

21        **MR. CANNON:**  YES.

22        **THE COURT:**  A POSITION THAT YOU TOOK IN YOUR PAPERS

23   WAS -- WOULD BE PERSUASIVE IF WHAT IS IMPLIED IS REALITY.  AND

24   THAT IS, YOU INDICATE BASICALLY THAT THERE IS THE DELAY, AND

25   THE DELAY BASICALLY IN SOME WAY DETRACTS FROM THE SUGGESTION

1    THAT THERE IS IRREPARABLE HARM BECAUSE OBVIOUSLY IF PEOPLE ARE

2    GOING TO BE HARMED IRREPARABLY, THEY WOULD MOVE MORE

3    DILIGENTLY.

4              **MR. CANNON:**  YES.

5              **THE COURT:**  SO, YOUR POSITION IS THAT YOU ALL

6    ANNOUNCED YOUR POSITION IN OCTOBER OF THIS YEAR, YET THEY DID

7    NOTHING, WHICH I THINK IS PERSUASIVE.

8              BUT WHAT I DON'T KNOW IS WHETHER OR NOT YOUR -- THE

9    INFERENCE IS CORRECT.  AND THAT'S WHAT I AM ASKING YOU TO SHOW

10   ME, YOU KNOW, SOMETHING THAT WOULD SUGGEST THAT YOUR POSITION

11   IS WELL-TAKEN, THAT THEY DELIBERATELY DELAYED BY VIRTUE OF NOT

12   TAKING ACTION ON INFORMATION THAT THEY WERE AWARE OF.

13             WHAT YOU DIRECTED ME TO IS MS.  WEEKS' DEPOSITION

14   DOES NOT SUPPORT YOUR POSITION.

15             **MR. CANNON:**  I UNDERSTAND.  I WAS ADDRESSING A

16   DIFFERENT POINT.  I WAS ADDRESSING THE POINT THAT COUNSEL MADE

17   WHEN HE REPRESENTED TO THE COURT THAT NO ONE AT HELIO KNEW

18   ABOUT THIS CAMPAIGN UNTIL THIS, UNTIL MID-DECEMBER.

19             **THE COURT:**  A COUPLE OF WEEKS AGO.  THAT'S WHAT SHE

20   IS SAYING HERE.

21             **MR. CANNON:**  THAT'S ONE PERSON AT HELIO.

22             **THE COURT:**  WELL, YOU DIRECTED ME TO THIS PERSON.

23             **MR. CANNON:**  BECAUSE I WANTED TO EXPLAIN THAT THEY

24   DON'T HAVE THE EVIDENCE THAT -- THEY HAVE NOT SUBMITTED

25   EVIDENCE ON THIS REALLY EXTRAORDINARY REQUEST FOR EX PARTE

1   RELIEF.  THEY DON'T HAVE EVIDENCE THAT THEY WEREN'T AT THE

2   SHOW.  THEY'VE NEVER DENIED THAT THEY WERE NOT AT THE SHOW.

3           **THE COURT:**  MR. CANNON, YOU DON'T UNDERSTAND.  WE

4   OBVIOUSLY ARE NOT -- THERE'S NO MEETING OF THE MINDS HERE.  YOU

5   DON'T UNDERSTAND MY -- THEY HAVE FILED FOR A TRO.

6           **MR. CANNON:**  YES.

7           **THE COURT:**  OKAY?  AND THEIR TRO IS BASED UPON THE

8   FACT THAT APPARENTLY YOU ARE IN SOME WAY INFRINGING THEIR

9   PRODUCT AND CAUSING CONFUSION.  AND TO THE EXTENT THAT THOSE

10  FACTORS ARE MET, THEN, OF COURSE, THERE'S THE PRESUMPTION OF

11  HARM.

12          I UNDERSTOOD YOUR ARGUMENT TO BE EITHER IN THE

13  CONTEXT OF REBUTTING THEIR PRESUMPTION OF IRREPARABLE HARM OR

14  IN THE CONTEXT OF BALANCING OF HARM.  IN SOME WAY, YOU ARE

15  ARGUING THAT THE COURT SHOULD FIND THAT THERE IS NO IRREPARABLE

16  HARM BECAUSE REASONABLE PEOPLE WHO ARE MADE AWARE OF CERTAIN

17  CIRCUMSTANCES DON'T SIT ON THEIR LAURELS.  THEY GENERALLY WILL

18  MOVE MUCH MORE EXPEDITIOUSLY.

19          IN THIS CASE, WE, PALM, ANNOUNCED OUR POSITION IN

20  OCTOBER, YET THEY DID NOTHING.  NOW, THAT'S A PERSUASIVE

21  ARGUMENT IF THERE IS SOME EVIDENCE THAT YOU HAVE TO SUGGEST TO

22  ME THAT THEY WERE, IN FACT, THERE, THAT THEY DID, IN FACT, KNOW

23  ABOUT IT, AND THAT THEY CHOSE THEN EITHER THROUGH NEGLIGENCE OR

24  THROUGH DELIBERATE OMISSION NOT TO PURSUE IT UNTIL TODAY.  THAT

25  LINK IS MISSING HERE.

1      **MR. CANNON:**  YOUR HONOR, WE HAVE HAD NO DISCOVERY

2  FROM THEM.

3      **THE COURT:**  OKAY.  BUT WHETHER YOU HAVE DISCOVERY OR

4  NOT, WHEN YOU TAKE POSITIONS IN THE COURT, YOU SHOULD HAVE A

5  BASIS FOR THEM.

6      **MR. CANNON:**  THE BASIS, YOUR HONOR, IS THAT THIS WAS

7  A PUBLIC TRADE SHOW, THE ANNUAL INDUSTRY TRADE SHOW.  SO, THE

8  ASSUMPTION, BASED UPON THE TIME THAT WE HAD TO PUT THESE PAPERS

9  TOGETHER, WHAT OUR POSITION WAS AND I AM NOT TRYING TO MISLEAD

10  THE COURT --

11      **THE COURT:**  NO, I AM NOT SUGGESTING YOU ARE TRYING

12  TO MISLEAD THE COURT.

13      **MR. CANNON:**  OUR POSITION IS THIS SLOGAN, THIS AD

14  CAMPAIGN WAS OUT THERE.

15      **THE COURT:**  OKAY.

16      **MR. CANNON:**  THAT'S THE POSITION.

17      **THE COURT:**  I AM NOT SUGGESTING YOU ARE TRYING TO

18  MISLEAD THE COURT.  I AM NOT EMBRACING THE ASSUMPTION THAT

19  YOU -- THAT UNDERLIES THAT POSITION, SO I GUESS WE SHOULD MOVE

20  ON TO THE NEXT ARGUMENT.

21      **MR. CANNON:**  RIGHT.

22      SO WE HAVE SUBMITTED A DECLARATION FROM PALM'S

23  DIRECTOR OF MARKETING THAT THIS CAMPAIGN, THE PRESS RELEASE IS

24  DECEMBER 11TH OR 12TH, BUT THE ACTUAL CAMPAIGN, THE BILLBOARDS

25  WENT OUT NOVEMBER 27TH.  SO, IT WAS PUBLICLY ON THE TAXIS, ON

1    THE SIDES OF BUILDINGS NOVEMBER THE 27TH.  SO THAT'S MORE THAN

2    JUST LAST WEEK.  WE HAVE SUBMITTED DECLARATION TO SUPPORT THAT

3    POSITION.

4            SO, BUT, YOUR HONOR, WHAT REALLY IS AT THE HEART OF

5    THIS IS CONFUSION.  ARE THE CONSUMERS GOING TO BE CONFUSED?

6    THAT IS WHAT TRADEMARK LAW IS ALL ABOUT.  THEY DON'T GET TO OWN

7    SLOGANS, THEY DON'T GET TO OWN DESCRIPTIONS THEY GET TO OWN

8    TRADEMARKS.  AND THE POINT OF TRADEMARK LAW IS TO AVOID

9    CONSUMERS BEING CONFUSED ABOUT THE ORIGINS OF THE PRODUCTS

10   BEING SOLD.

11           **THE COURT:**  YOU ARE ABSOLUTELY CORRECT.

12           **MR. CANNON:**  THAT, TO ME, IS THE TOUCHSTONE.  THAT'S

13   WHERE I THINK THIS CASE TRULY FALLS APART.

14           **THE COURT:**  OKAY.  SO YOU ALL --

15           **MR. CANNON:**  I HAVE A COUPLE MORE POINTS, YOUR

16   HONOR.

17           **THE COURT:**  OKAY.  GO ON.

18           **MR. CANNON:**  IN THEIR PAPERS, IT'S REALLY NOT FAIR

19   FOR THEM TO SAY THAT PALM'S CAMPAIGN IS "NOT JUST A CELL

20   PHONE."  PALM'S CAMPAIGN IS "NOT JUST A CELL PHONE.  A TREO."

21   THAT PHRASE IS CRUCIAL.  TREO IS THE PALM PRODUCT.  THE ORIGIN

22   OF THE GOODS IS IN THE PHRASE.  THE PALM PHRASE IS "NOT JUST A

23   CELL PHONE.  A TREO."  THOSE PHRASES ARE INEXTRICABLY LINKED.

24           YOUR HONOR, I HAVE A COUPLE OF THINGS I WOULD LIKE

25   TO SHOW YOUR HONOR.  THEY ARE IN THE RECORD.

1          **THE COURT:**  LET ME ASK YOU ABOUT THE POINT, THE

2     POINT YOU ARE JUST MAKING BECAUSE I ALSO FOUND IT KIND OF

3     INTERESTING.  IRRESPECTIVE OF THE -- THE PHRASE KIND OF HAVE

4     THE SAME SOUND, BUT I GUESS MORE IMPORTANTLY THE SUBSTANCE OR

5     THE CONCEPT THAT IS EMBRACED IN BOTH SEEMS TO BE THE SAME, SO

6     THAT THE CONSUMERS ARE, EVEN IF THEY DON'T REMEMBER THE PHRASE

7     ITSELF, THE DIFFERENCE IN THE PHRASE "DON'T CALL IT A PHONE AND

8     DON'T CALL US A PHONE COMPANY," OR, YOU KNOW, THE OTHER PHRASE,

9     THE POINT IS THAT THE TELEPHONE, CELL PHONES OFFER MANY

10     SERVICES THAT ARE NOT TRADITIONALLY OFFERED BY TELEPHONE

11     SERVICES.  AND BOTH OF THOSE -- BOTH OF THOSE PHRASES BASICALLY

12     MAKE THAT POINT.

13          SO, FROM YOUR PERSPECTIVE, WHY WOULDN'T THAT ALSO BE

14     SOMETHING THAT WOULD MILITATE IN FAVOR OF POSSIBLE CONFUSION OF

15     CONSUMERS?

16          **MR. CANNON:**  TWO POINTS, YOUR HONOR.  FIRST, THAT

17     PHRASE IS PURE DESCRIPTION.  YOU CAN'T OWN A DESCRIPTION.  A

18     CELL PHONE HAS FEATURES --

19          **THE COURT:**  IS THIS -- IS THEIR PHRASE STILL GOING

20     THROUGH THE TRADEMARK OFFICE BEING PROCESSED FOR --

21          **MR. CANNON:**  IT IS NOT REGISTERED, YOUR HONOR.

22          **THE COURT:**  I KNOW.  HAS THERE BE AN OBJECTION ON

23     THAT BASIS THAT IT'S DESCRIPTIVE?

24          **MR. TROCK:**  YOUR HONOR, THE ANSWER IS NO.  THEY HAVE

25     ALL CLEARED OPPOSITION.

1          **MR. CANNON:**  YOUR HONOR, THOSE MARKS HAVE NOT

2    REGISTERED.

3          **THE COURT:**  I KNOW THEY HAVEN'T REGISTERED.

4          **MR. CANNON:**  WHAT IS SIGNIFICANT TO ME --

5          **THE COURT:**  LET'S DEAL WITH YOUR FIRST POINT FIRST

6    AND THEN WE'LL DEAL WITH YOUR SIGNIFICANT POINT SECOND.

7          **MR. CANNON:**  OKAY.

8          **THE COURT:**  YOU MADE THE POINT TO ME THAT IT'S

9    DESCRIPTIVE --

10          **MR. CANNON:**  YES.

11          **THE COURT:**  -- IN RESPONSE TO MY ASKING YOU WOULD IT

12   MILITATE IN FAVOR OF CONFUSION OF THE CONSUMERS IF THE

13   CONSUMERS DIDN'T REMEMBER THE PRECISE WORDS THAT ARE EMPLOYED

14   BY EITHER ONE OF YOU BUT REMEMBER THE CONCEPT, WHICH THERE

15   SEEMS TO BE NO DISPUTE, AND IT IS THE SAME IN BOTH CASES.

16          **MR. CANNON:**  BUT, YOUR HONOR, EVERY -- THERE'S NO

17   CONNECTION BETWEEN THAT STUDY -- BY THE WAY, I'VE NEVER SEEN

18   THE STUDY.  THEY DID NOT SUBMIT IT IN EVIDENCE.  WE DON'T HAVE

19   IT.  THEY DIDN'T GIVE THE STUDY TO THE COURT OR TO US.

20          SO, I AM JUST GOING OFF OF WHAT COUNSEL ARGUED AND

21   WHAT SOMEONE SAID IN A DECLARATION THE STUDY SAID.  SO THAT

22   STUDY IS NOT IN EVIDENCE.

23          SECOND, THE STUDY DID NOT GO TO CONFUSION.  THERE IS

24   NO EVIDENCE THAT CONSUMERS WERE CONFUSED.  THEY HAVE SAID --

25          **THE COURT:**  WAIT, WAIT.  BACK UP.  OKAY.  I DON'T

1    KNOW WHICH POINT TO DEAL WITH FIRST.

2           YOU ARE NOT ANSWERING MY QUESTION.  SINCE WE ARE

3    DEALING WITH SOMETHING ELSE, THE STUDY, MY UNDERSTANDING WAS

4    THE STUDY THAT WAS MADE PRECEDED THIS DISPUTE.  AND THE STUDY

5    THAT WAS MADE WAS DESIGNED TO ASSESS THE RECOGNITION OF THE

6    CONSUMERS WITH RESPECT TO THEIR SLOGAN, NOT YOURS, OR NOT

7    COMPARATIVELY.

8           **MR. CANNON:**  RIGHT.

9           **THE COURT:**  AND SO MY UNDERSTANDING WAS THAT THE

10   STUDY THEN JUST DEMONSTRATED THAT 61 PERCENT OF THE CONSUMERS

11   RECOGNIZED THEIR SLOGAN ATTRIBUTABLE TO THEM.  IT WASN'T FOR

12   THE PURPOSE OF COMPARING, ALTHOUGH I HAVE TO TELL YOU, AS I WAS

13   REVIEWING THIS STUFF I WAS THINKING IT SURE WOULD HAVE BEEN

14   NICE IF THERE WAS TIME TO DO ANOTHER SURVEY NOW TO SEE IF THERE

15   WAS SOME DIFFERENCE, BUT OBVIOUSLY --

16           **MR. CANNON:**  I HAVEN'T SEEN THE SURVEY.

17           **THE COURT:**  I GUESS YOU CAN ASK FOR IT.  I DON'T

18   KNOW IF YOU ALL TALK.  THAT IS ONE POINT.

19           THE SECOND, I STILL WANT TO GET BACK TO THE POINT I

20   ASKED YOU.

21           **MR. CANNON:**  I AM SORRY, I WANT TO ANSWER YOUR

22   QUESTIONS.

23           **THE COURT:**  OH, I KNOW.  I WAS ASKING YOU WOULDN'T

24   IT MILITATE IN FAVOR OF CONSUMERS BEING CONFUSED SINCE THERE

25   SEEMS TO BE NO DISPUTE FROM EITHER OF YOU THAT THE CONCEPT THAT

1    WAS EMBRACED BY BOTH OF THE PHRASES THAT ARE USED BY YOUR

2    RESPECTIVE COMPANIES BASICALLY IS THE SAME, SO WHY WOULDN'T

3    THAT MILITATE IN FAVOR OF CONFUSION?

4         **MR. CANNON:**  BECAUSE THE PHRASES ARE DIFFERENT.  IF

5    YOU LOOK AT THE ADS --

6         **THE COURT:**  THEY SAY THEY DON'T REMEMBER THE

7    PHRASES, THE PRECISE WORDS THAT ARE BEING USED.

8         **MR. CANNON:**  THE TEST IS HOW DOES THE AD LOOK IN THE

9    MARKETPLACE TO THE CONSUMER.  THESE ARE THE ADS (INDICATING).

10   THEY ARE VERY, VERY DIFFERENT.  AND I CAN GET INTO THE DETAILS

11   OF THE COPY.

12        **THE COURT:**  AS WE GO THROUGH THE FACTORS?

13        **MR. CANNON:**  YES.  THERE WILL BE NO CONFUSION WITH

14   THESE ADS.  THERE IS NO EVIDENCE THERE HAS BEEN ANY CONFUSION.

15   SO TO TAKE OUR PRODUCT, TO TAKE OUR CAMPAIGN DOWN THREE DAYS

16   BEFORE CHRISTMAS WITHOUT ANY EVIDENCE OF ACTUAL CONFUSION OR A

17   SURVEY SUBMITTED IN EVIDENCE THAT SAYS THERE'S A LIKELIHOOD OF

18   CONFUSION, ON A TRO IS, I THINK, AN EXTRAORDINARY REQUEST.

19        **THE COURT:**  OKAY.  THANK YOU.

20        SO NOW, HOPEFULLY NOW WE HAVE THE PRELIMINARY

21   COMMENTS, WE CAN GO THROUGH THIS PRETTY QUICKLY.

22        SO, THE EIGHT FACTORS THAT THE NINTH CIRCUIT HAS

23   DETERMINED WILL GUIDE THE COURT'S ASSESSMENT OF THE LIKELIHOOD

24   OF CONFUSION.  START WITH -- THE EIGHT FACTORS INCLUDES THE

25   STRENGTH OF THE MARK, THE PROXIMITY OF THE GOODS OR RELATEDNESS

1    OF THE TWO COMPANY SERVICES, THE SIMILARITY OF THE MARKS, THE

2    MARKETING CHANNELS, THE DEFENDANT'S INTENT IN SELECTING THE

3    MARK, EVIDENCE OF ACTUAL CONFUSION, THE TYPES OF GOODS AND THE

4    DEGREE OF CARE LIKELY TO BE EXERCISED BY THE PURCHASER AND

5    LIKELIHOOD OF EXPANSION OF THE PRODUCT LINE.

6            SO LET'S START WITH STRENGTH OF THE MARK.  AND AS WE

7    GO THROUGH THIS, I WILL TELL YOU WHAT MY INCLINATION IS.  I AM

8    INTERESTED IN YOUR VIEW.

9            SO, THIS ONE, I AM INCLINED TO -- BECAUSE PLAINTIFF

10   HAS OFFERED EVIDENCE THAT ITS MARK HAS BEEN RECOGNIZED AND

11   ASSOCIATED WITH THIS PRODUCT, AND I THINK PERSUASIVELY ARGUES

12   THAT THE MARKET SUGGESTED.  I AM INCLINED TO FIND THAT THE MARK

13   IS STRONG WHICH WEIGHS IN FAVOR OF FINDING INFRINGEMENT.

14           YOU KNOW, THE MARK SEEM TO BE SIMILAR AND THE GOODS

15   ARE CLOSELY RELATED, SO THE STRENGTH OF THE MARK IS SOMEWHAT OF

16   IMPORTANCE, BUT I AM INCLINED TO FIND THAT IT'S -- THAT THE

17   MARK IS STRONG.

18           **MR. TROCK:**  IF I MIGHT ALSO ADD, YOUR HONOR, GOOD

19   INDICATION OF THE STRENGTH OF THE MARK IS THAT THE SLOGAN

20   ITSELF IS DISTINCTIVE.  THAT'S THE JOB THAT THE TRADEMARK

21   OFFICE DOES WHEN YOU FILE AN APPLICATION FOR REGISTRATION.

22           ONE OF THE ANALYSES THEY DO IS DETERMINE WHETHER OR

23   NOT THAT MARKET IS DISTINCTIVE BEFORE THEY WILL REGISTER IT.

24   AND ALL OF WHAT WE HAVE, WE HAVE SIX APPLICATIONS.

25           **THE COURT:**  IT HASN'T BEEN REGISTERED AT THIS POINT.

1    **MR. TROCK:** THAT IS CORRECT. THEY HAVE ALL BEEN

2    EXAMINED. NOT ONE EXAMINER HAS EVER INDICATED THAT THE MARKS

3    WERE ANYTHING BUT DISTINCTIVE.

4    **THE COURT:** WELL --

5    **MR. TROCK:** THEY HAVE ALL CLEARED OPPOSITION AS

6    WELL. SO, THE PATENT AND TRADEMARK OFFICE --

7    **THE COURT:** DID YOU SUBMIT EVIDENCE OF THAT?

8    **MR. TROCK:** YES, THERE IS.

9    **THE COURT:** HIS POINT IS HE HAS RECEIVED NO

10   DISCOVERY, SO HE'S KIND OF TAKING YOU AT YOUR WORD.

11   **MR. TROCK:** IT'S ATTACHED TO MS. WHEBLE'S

12   DECLARATION.

13   **MR. CANNON:** WHAT IS ATTACHED TO THE DECLARATION IS

14   A PRINTOUT FROM A WEBSITE THAT SAYS THAT A NOTICE OF ALLOWANCE

15   IS ISSUED. WHAT IS NOT SUBMITTED IN EVIDENCE IS THE ACTUAL

16   APPLICATION.

17   THE CONFUSION HERE IS PLAINTIFF IS TRYING TO OWN THE

18   WORDS, BUT REALLY WHAT WE ARE TALKING ABOUT IS A MARK. IF

19   THERE'S WORDS THAT ARE VERY DISTINCTIVE STYLIZED WAY -- THIS IS

20   WHAT WE ARE TALKING ABOUT (INDICATING). THIS IS HELIO'S AD.

21   NOW, IT'S GOT A WORD ON IT, IT'S GOT PHRASES ON IT. TRADEMARK

22   LAW YOU DON'T OWN THE WORDS PER SE. WE HAVE NOT SEEN THEIR

23   TRADEMARK APPLICATION. WE --

24   **THE COURT:** IN TERMS OF THE FORMULATION OF THE

25   WORDS.

1          **MR. CANNON:**  THE STYLE, THE FONT, THE COLOR, THOSE

2    SORTS OF THINGS.  WE HAVEN'T SEEN THE APPLICATION.  IT IS NOT

3    IN EVIDENCE.  SO WE DON'T -- THEY ARE MAKING REPRESENTATIONS

4    ABOUT HOW THE EXAMINER HAS INTERPRETED THE MARK.  WE DON'T KNOW

5    WHAT THE EXAMINER HAS INTERPRETED.

6          **THE COURT:**  THAT PUTS YOU AT A DISADVANTAGE.

7          **MR. TROCK:**  YOUR HONOR, THOSE WERE FILED AS WORD

8    MARKS.  WORD MARKS ARE NOT FILED AS DESIGNS --

9          **THE COURT:**  DO YOU HAVE THE APPLICATION?

10         **MR. TROCK:**  ON THE WHEBLE DECLARATION, THE MARK THAT

11   HAS BEEN SUBMITTED FOR REGISTRATION IS INDICATED AS PART OF THE

12   RECORD ON THE PATENT AND TRADEMARK OFFICE.  IF YOU TAKE A LOOK

13   AT EXHIBIT A, I BELIEVE IT IS, TO THE WHEBLE DECLARATION.

14         YOU WILL SEE AN INDICATION OF THE MARK RIGHT THERE

15   IN THE RECORD.  IT'S IN LARGE CAPS "DON'T CALL IT A PHONE."

16         SO THE WORDS ARE BEING REGISTERED AS A SLOGAN.

17   NOTICE THAT JUST BELOW IT IT SAYS, "WORDS ONLY."  THAT MEANS

18   THERE'S NO DESIGN, NO STYLIZATION, NO LOGOS, NOTHING OTHER THAN

19   THAT SLOGAN.

20         AND THE PATENT AND TRADEMARK OFFICE DOES NOT ISSUE

21   AN ALLOWANCE UNLESS THEY HAVE DETERMINED THAT THAT MARK IS

22   REGISTRABLE, MEANING THAT IT IS DISTINCTIVE.  AND THAT'S THE

23   INDICATION THAT IT'S A STRONG MARK.

24         **THE COURT:**  OKAY.  THANK YOU.

25         IS THAT ALL YOU HAD TO SAY WITH RESPECT TO THE

1  STRENGTH OF THE MARK BEFORE WE MOVE TO MR. CANNON AND THEN WE

2  CAN MOVE ON TO THE NEXT ONE?

3           **MR. TROCK:**  THAT'S CORRECT.

4           **THE COURT:**  OKAY.

5           **MR. CANNON:**  I WOULD LIKE TO ADDRESS THE STRENGTH OF

6  THE MARK.

7           YOUR HONOR, THIS IS A DESCRIPTIVE MARK AT BEST.  IT

8  DESCRIBES FEATURES.  THERE IS A LOT OF CELL PHONES OUT THERE

9  THAT HAVE FEATURES.  IN FACT, PRACTICALLY EVERY CELL PHONE

10  MAKER OUT THERE IS TOUTING THE FEATURES OTHER THAN PHONE

11  SERVICE, SUCH AS FEATURING A CAMERA, VIDEO TECHNOLOGY, THINGS

12  LIKE THAT.

13          WE HAVE SUBMITTED EVIDENCE THAT SHOWS THAT THIS IS

14  USED.  TO CALL SOMETHING -- TO DESCRIBE THE CELL PHONE AS

15  HAVING FEATURES MORE THAN PHONE SERVICE IS NOT A FANCIFUL AND

16  ARBITRARY OR A SUGGESTIVE MARK.  IT SIMPLY DESCRIBES THE

17  PRODUCT.

18          AND THERE'S A COUPLE OF CASES -- GIVEN -- THAT I

19  WOULD LIKE TO CITE TO YOUR HONOR THAT REALLY GO TO THE HEART OF

20  THIS ISSUE, WHICH IS, IF YOU HAVE A SLOGAN THAT DESCRIBES THE

21  SERVICES OR THE FEATURES THAT YOU HAVE, IT IS A WEAK MARK AND

22  SHOULD NOT BE THE GROUNDS FOR INJUNCTION.

23          WITH YOUR HONOR'S PERMISSION, I WOULD LIKE TO CITE

24  TWO CASES FOR YOU THAT WE HAD FOUND AFTER WE GOT OUR PAPERS IN.

25          **THE COURT:**  UH-HUH.

1    **MR. CANNON:** THAT REALLY GO TO THE HEART OF THIS.

2    FIRST IS THE UNITED STATES SHOE CORPORATION V. BROWN

3 GROUP. THAT'S 740 F.SUPP. 196 --

4    **THE COURT:** WHAT DISTRICT COURT IS THAT?

5    **MR. CANNON:** THAT IS SOUTHERN DISTRICT OF NEW YORK.

6 AND IN THAT CASE, THE MARK WAS FEELS -- "LOOKS LIKE A PUMP,

7 FEELS LIKE A SNEAKER." THE DEFENDANT'S MARK, THE DEFENDANT'S

8 ADVERTISEMENT INCLUDES THE PHRASE "FEELS LIKE A SNEAKER". SO

9 IT WAS A SLOGAN THAT DESCRIBED THE PRODUCT BEING OFFERED AND

10 NO --

11    **THE COURT:** WHAT WAS THE PRODUCT? WAS ONE A TENNIS

12 SHOE AND ONE WAS SOMETHING ELSE?

13    **MR. CANNON:** THEY WERE BOTH SHOES.

14    **THE COURT:** BOTH SHOES?

15    **MR. CANNON:** BOTH SHOES.

16    SO IT WAS A SLOGAN CASE, WHICH IS WHAT THIS IS, A

17 SLOGAN CASE WHERE THE MARKS WERE DESCRIBED. THE MARKS

18 DESCRIBED ESSENTIALLY THE POSITIVE FEATURES OF THE PRODUCT.

19 AND IN THAT CASE --

20    **THE COURT:** I AM SORRY, WHAT WERE THE SLOGANS AGAIN?

21    **MR. CANNON:** THE SLOGANS WERE -- THE PLAINTIFF'S WAS

22 "LOOKS LIKE A PUMP, FEELS LIKE A SNEAKER" AND THE DEFENDANT'S

23 WAS, "FEELS LIKE A SNEAKER."

24    **THE COURT:** WHAT KIND OF SHOES WERE THEY?

25    **MR. CANNON:** THEY WERE COMFORTABLE DRESS SHOES, I

1    BELIEVE.

2              **THE COURT:**  SO NEITHER ONE OF THEM WERE SNEAKERS?

3              **MR. CANNON:**  NO.  "FEELS LIKE A SNEAKER" WAS THE

4    ISSUE.

5              **THE COURT:**  SO THE ONE THAT LOOKED LIKE THE PUMP

6    LOOKED LIKE A SNEAKER WAS ALSO A DRESS SHOE?

7              **MR. CANNON:**  I BELIEVE THEY WERE BOTH DRESS SHOES,

8    PUMPS.

9              AND THE COURT -- AND IT'S A VERY INTERESTING AND

10   THOUGHTFUL OPINION TALKING ABOUT THAT SOCIETY WOULD BE DEPRIVED

11   OF USEFUL INFORMATION ABOUT COMPETING PRODUCTS IF SOMEONE COULD

12   JUST REMOVE A DESCRIPTIVE SLOGAN IN THIS FASHION FROM THE

13   MARKETPLACE.

14             AND ONE OF THE COURT SAYS, THERE IS NO JUSTIFICATION

15   FOR PERMITTING PLAINTIFF TO MONOPOLIZE AN ESSENTIALLY

16   DESCRIPTIVE PHRASE WHICH CLAIMS VIRTUES SIMPLY BECAUSE

17   PLAINTIFF MAY HAVE BEEN THE FIRST TO EMPLOY IT IN A WIDELY

18   DISTRIBUTING ADVERTISEMENT.

19             AND THEN THERE'S --

20             **MR. TROCK:**  I DON'T DISAGREE WITH THAT LAW, YOUR

21   HONOR, BUT I WILL TELL YOU THIS.  THE PATENT AND TRADEMARK

22   OFFICE ARE EXPERTS IN DETERMINING WHETHER OR NOT SLOGANS OR

23   MARKS ARE DESCRIPTIVE.  THEY HAVE RULED ON OUR APPLICATION.

24   THEY HAVE ALLOWED IT.  THAT MEANS IT'S NOT DESCRIPTIVE.  THEY

25   CANNOT REGISTER A DESCRIPTIVE MARK.

1      **MR. CANNON:**  YOUR HONOR, THIS IS NOT A PATENT

2  EXAMINATION.  A PATENT EXAMINATION IS VERY DIFFERENT FROM A

3  TRADEMARK EXAMINATION.  THIS IS NOT AN INVENTION THAT COMES OUT

4  OF THE PATENT OFFICE LIKE A PATENT WOULD.  THIS IS A TRADEMARK.

5      WE CAN -- IT'S A VERY LOW THRESHOLD.  WE CAN PROVE

6  THIS IN COURT.  WE CAN COME IN AND SAY, HEY, THAT'S A

7  DESCRIPTIVE MARK.  IT'S NOT LIKE A PATENT THAT COMES OUT OF THE

8  PATENT OFFICE.  A VERY DIFFERENT PROCESS.

9      I HAVE ANOTHER CASE WITH A VERY SIMILAR FACT PATTERN

10  I WOULD LIKE TO CALL TO YOUR HONOR'S ATTENTION, AND THIS CASE

11  IS TRUSTCO BANK V. GLEN FALLS NATIONAL BANK.  AND THE CITATION

12  HERE IS 903 F.SUPP. 335.

13      **THE COURT:**  WHAT DISTRICT COURT IS THAT?

14      **MR. CANNON:**  ALSO THE NORTHERN DISTRICT OF NEW YORK.

15  AND THE MARK --

16      **THE COURT:**  NORTHERN AS OPPOSED TO SOUTHERN?

17      **MR. CANNON:**  NORTHERN DISTRICT OF NEW YORK.  1995.

18  TRADEMARK INFRINGEMENT ACTION, VERY SIMILAR, VERY SIMILAR TO

19  THIS, PRELIMINARY INJUNCTION HEARING.  THE PLAINTIFF'S MARK WAS

20  "HOMETOWN BANK."  AND IT WAS FOR A BANK.  THE DEFENDANT'S MARK,

21  DEFENDANT'S ADVERTISEMENT SLOGAN WAS "THE ORIGINAL HOMETOWN

22  BANK."

23      SO, IT'S A SLOGAN, TWO SLOGANS "HOMETOWN BANK" AND

24  "THE ORIGINAL HOMETOWN BANK".  AND THE COURT RULED THAT IT WAS

25  DESCRIPTION.  PLAINTIFF -- DEFENDANT COULD USE THE MARK BECAUSE

1    THAT'S WHAT THEY WERE DOING.  THEY HAD A HOMETOWN BANK.  THEY

2    WERE IN THE TOWN.  AND IT WAS A DESCRIPTIVE MARK.  IT WAS NOT

3    LIKE A STYLIZED SORT OF ADVERTISEMENT.

4          SO, THOSE ARE TWO CASES I WOULD LIKE TO BRING TO

5    YOUR HONOR'S ATTENTION, THEY'RE SLOGAN CASES, AND THAT'S WHAT

6    PLAINTIFF IS FOCUSING ON.

7          AND IN TERMS OF THE MARK THAT IS ACTUALLY USED, YOUR

8    HONOR, AGAIN, I WOULD REALLY EMPHASIZE HOW THIS LOOKS TO

9    CONSUMERS BECAUSE THAT'S THE TOUCHSTONE FOR THIS.

10          **THE COURT:**  I AM LOOKING AT THE STRENGTH OF THE MARK

11    NOW.  AND IN TERMS OF THAT FACTOR, OBVIOUSLY THE STRENGTH OF

12    THE MARK IS JUDGED BY THE LIKELIHOOD THAT IT WILL BE REMEMBERED

13    AND ASSOCIATED IN THE PUBLIC MIND WITH THE MARK'S OWNERS,

14    RIGHT?

15          IN THIS CASE, I DO HAVE EVIDENCE THAT PLAINTIFFS

16    HAVE PRESENTED THAT THE -- THAT ITS MARK HAS AT LEAST BEEN

17    RECOGNIZED AND ASSOCIATED WITH THIS PRODUCT.

18          **MR. CANNON:**  YOUR HONOR, I WOULD SUBMIT THAT IS

19    HEARSAY EVIDENCE SINCE THE STUDY HAS NOT BEEN SUBMITTED TO THE

20    COURT.  THERE IS NO ADMISSIBLE EVIDENCE ON THAT.  WE DON'T HAVE

21    THE SURVEY.

22          **THE COURT:**  I DON'T RECALL SEEING ANY OBJECTIONS YOU

23    SUBMITTED.

24          **MR. CANNON:**  WELL, YOUR HONOR, WE GOT THESE PAPERS

25    AT 5:00 O'CLOCK ON TUESDAY.  OUR OPPOSITION WENT IN WEDNESDAY

1    MORNING AT 9:00.

2          **THE COURT:**  WE DIDN'T GET IT WEDNESDAY MORNING AT

3    9:00 BECAUSE I WAS LOOKING FOR IT WEDNESDAY MORNING AT 9:00.

4          **MR. TROCK:**  EVEN IF IT IS HEARSAY, YOUR HONOR, THE

5    COURT CAN CONSIDER HEARSAY EVIDENCE.

6          **THE COURT:**  IN THE CONTEXT OF THE TRO, YOU ARE

7    SAYING?

8          **MR. TROCK:**  THAT'S CORRECT, YOUR HONOR.

9          **THE COURT:**  IN ANY EVENT --

10         **MR. TROCK:**  I BELIEVE THE STRONGEST EVIDENCE IS THE

11   ALLOWANCE BY THE PATENT AND TRADEMARK OFFICE OF THESE SLOGANS

12   FOR REGISTRATION WITH NO OBJECTION AS TO DESCRIPTIVENESS

13   WHATSOEVER.

14         **THE COURT:**  OKAY.  JUST A SECOND.

15         (PAUSE IN THE PROCEEDINGS.)

16         **MR. CANNON:**  YOUR HONOR, I HAVE BEEN INFORMED THAT

17   OUR PAPERS DID OBJECT TO THE STUDY AS HEARSAY.  IT WAS IN THE

18   PAPERS THAT WE FILED.

19         **THE COURT:**  IT WASN'T A SEPARATE OBJECTION.

20         **MR. CANNON:**  IT WAS IN THE PAPERS THAT WERE FILED,

21   YES.

22         **THE COURT:**  OKAY.

23         JUST A SECOND.

24         (PAUSE IN THE PROCEEDINGS.)

25         **THE COURT:**  OKAY.  I AM GOING TO CONSIDER THIS, THE

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    FIRST FACTOR, SO I AM GOING TO MOVE TO THE SECOND FACTOR.

2            THE PROXIMITY, THE RELATEDNESS OF THE GOODS AND

3    SERVICES.  ARE EITHER OF YOU ARGUING THAT HELIO AND PALM OFFER

4    DIFFERENT SERVICES?  IT SEEMS TO ME THAT THEY ARE VERY SIMILAR.

5            **MR. CANNON:**  WE DISPUTE THEY ARE EVEN COMPETITORS.

6            **THE COURT:**  OKAY.  TELL ME WHAT YOUR POSITION IS.

7            DON'T YOU BOTH -- IT APPEARS THAT YOU BOTH

8    MANUFACTURE AND MARKET DEVICES, WHICH, IN ADDITION TO THE

9    WIRELESS TELEPHONE SERVICES THAT YOU OFFER, YOU OFFER AUDIO,

10   VIDEO, DATA, INTERNET SERVICES TO CONSUMERS.  AND BASED ON WHAT

11   I HAVE IN FRONT OF ME, THERE DOESN'T SEEM TO BE ANY REAL

12   QUESTION AS TO WHETHER PALM AND HELIO ARE DIRECT MARKET

13   COMPETITORS, AND IN YOUR PAPERS YOU DON'T -- I DIDN'T SEE ANY

14   ARGUMENT OTHERWISE.

15           **MR. CANNON:**  YOUR HONOR, I WOULD LIKE TO ADDRESS

16   THAT DIRECTLY.

17           HELIO DOES NOT MANUFACTURE DEVICES.  PALM IS A

18   DEVICE MANUFACTURER.  IF YOU LOOK AT HELIO'S AD, THIS IS THE

19   AD, YOUR HONOR (INDICATING).  THEY SELL A SERVICE AND THE

20   DEVICE HAS THE SAMSUNG BRAND ON IT.  HELIO PURCHASES DEVICES

21   FROM MANUFACTURERS, HAS -- AND CO-BRANDS THEM WITH THEIR OWN

22   WIRELESS SERVICE.  THIS IS THE AD.  IT'S GOT SAMSUNG BRAND ON

23   IT.

24           THIS IS THE TREO AD FROM PALM (INDICATING).  PALM IS

25   A MANUFACTURER.

1      **THE COURT:**  FROM YOUR PERSPECTIVE, WHAT IS THE COURT

2  TO ASSESS IN DETERMINING THE RELATEDNESS OR THE PROXIMITY OF

3  THE GOODS AND SERVICES BETWEEN THE TWO?  WHAT DO YOU THINK I AM

4  EVALUATING?

5      **MR. CANNON:**  I THINK IT ALL RELATES BACK TO THE

6  CONSUMER.  ARE WE TALKING ABOUT THE SAME CONSUMERS?  ARE THEY

7  LIKELY TO BE CONFUSED BY THE ORIGIN.  YOU LOOK AT WHAT'S

8  GETTING SOLD, WHAT THE TARGET IS FOR THIS.  I WOULD LIKE TO

9  ADDRESS THE TARGET AUDIENCE.

10      **THE COURT:**  UNDER THE SECOND FACTOR, THE PROXIMITY

11  AND RELATEDNESS OF THE GOODS AND SERVICES.  THAT'S THE FACTOR.

12      **MR. CANNON:**  YES.  BECAUSE ARE THEY COMPETING?  ARE

13  THEY GOING TO THE SAME TARGET CONSUMERS?

14      **THE COURT:**  OKAY.

15      **MR. CANNON:**  COULD I ADDRESS --

16      **THE COURT:**  IN YOUR PAPERS YOU DIDN'T ARGUE, YOU

17  DIDN'T ARGUE OTHERWISE THAT YOU'RE NOT DIRECT MARKET

18  COMPETITORS.

19      **MR. CANNON:**  I BELIEVE WE DID SAY THAT WE HAVE A

20  DIFFERENT -- WE ARE A BUSINESS -- OUR PRODUCTS ARE

21  BUSINESS-ORIENTED PRODUCTS.  THEIR PRODUCTS ARE YOUTH SERVICE

22  TYPE PRODUCTS.  MY SPACE.  WE DON'T DEAL WITH MY SPACE, WHICH

23  IS A TEENAGER'S WEBSITE.

24      **THE COURT:**  THAT'S JUST ONE FEATURE.

25      **MR. CANNON:**  THAT'S A KEY FEATURE FOR THEM.

1      AND THEY SUBMITTED THEIR MARKETING PLAN, AND WITH

2  YOUR HONOR'S PERMISSION, I WOULD LIKE TO REFER YOU TO IT AND

3  THEY DESCRIBE WHO THEIR TARGET AUDIENCE IS.

4      IF YOU READ WHAT THEY SAY THEIR TARGET AUDIENCE IS

5  AND COMPARE IT TO OUR AD, I THINK YOUR HONOR WILL AGREE THAT

6  THESE ARE MARKETED TO VERY DIFFERENT PEOPLE.

7      LET ME JUST READ -- THIS IS THEIR DEVICE.  IT'S ALL

8  WHITE.  I MEAN, THIS IS THEIR MARK.  IT'S ALL WHITE,

9  CHARACTERISTIC BLUE, AND THIS IS THE COPY.  SO THIS IS HOW THEY

10  ARE ADVERTISING IT.

11      THIS IS OBVIOUSLY AIMED AT A MUCH YOUNGER CROWD.

12  "DROP YOURSELF SOME KNOWLEDGE WITH OUR EXCLUSIVE NEW DRIFT."

13          **THE COURT:**  SPEAK SLOWLY.

14          **MR. CANNON:**  I'M SORRY.

15      "DROP YOURSELF SOME KNOWLEDGE WITH OUR EXCLUSIVE NEW

16  DRIFT.  OUR ONE-OF-A-KIND BUDDY BEACON.  JUST FLIP ON THE

17  BEACON WHEN YOU WANT YOUR PEOPLE TO FIND YOU AND THE DANCE

18  FLOOR.  THEN TURN IT OFF WHEN YOU SLIP AWAY TO THE V.I.P."

19      THAT'S A VERY YOUTH-ORIENTED TARGET.  AND, IN FACT,

20  IN THE WEEKS' DECLARATION, THERE'S ATTACHMENTS THAT DEMONSTRATE

21  THAT HELIO'S ENTIRE PLAN WAS TO TARGET THE YOUTH MARKET.  AND I

22  CAN DIRECT YOUR HONOR TO THOSE, IF YOU WISH.

23          **THE COURT:**  OKAY.

24          **MR. CANNON:**  THIS IS EXHIBIT A TO THE WEEKS'

25  DECLARATION, AND IT IS HELIO'S MARKETING PLAN.  AND ON --

1          THE COURT:  YES.

2          MR. CANNON:  IF YOU GO TO PAGE 9 OF THE MARKETING

3    PLAN.

4          THE COURT:  OKAY.  OKAY.

5          MR. CANNON:  I AM SORRY, PAGE 8 TO BEGIN WITH?

6          THE COURT:  UH-HUH.

7          MR. CANNON:  PAGE 8 STATES THE PLAN IS WHERE

8    LIFESTYLE/FASHION MEET TECHNOLOGY.

9          THE COURT:  POSITIONING.

10          MR. CANNON:  THAT IS THEIR POSITIONING.  THEN

11    PAGE 9, WHO THEY ARE TARGETING, YOUNG, TECH-SAVVY CONSUMERS,

12    NOT SOCCER MOM'S, BUSINESSMEN AND GRANDPAS.

13          THE COURT:  PAGE 9?

14          MR. CANNON:  PAGE 9 OF EXHIBIT A TO THE WEEKS'

15    DECLARATION.  THAT'S WHO THEY'RE TARGETING.

16          THE COURT:  OH, UNDER FOCUS.

17          MR. CANNON:  YES.  I AM SORRY.  THE TOP BLUE BULLET

18    POINT THERE.

19          SO THEY ARE TARGETING YOUNG, TECH-SAVVY CONSUMERS,

20    NOT BUSINESSMEN OR SOCCER MOM'S.  AND THAT COPY THAT I JUST

21    READ TO YOU IS TARGETED VERY MUCH AT A YOUTH NIGHT CLUB TYPE OF

22    SCENE.

23          THE COURT:  SO YOU DISPUTE THAT THEY ARE A DIRECT

24    MARKET COMPETITOR OF YOURS?

25          MR. CANNON:  CAN I READ THE COPY FROM TREO?  I THINK

1    THIS WILL MAKE IT CRYSTAL CLEAR.  THIS IS OUR PRODUCT.  THIS IS

2    THE TREO (INDICATING).

3          SO AS YOU CAN SEE, HERE IS THE SLOGAN, AND IT ALWAYS

4    DEPICTS THE ORIGIN.  "NOT JUST A CELL PHONE.  A TREO."  HERE IS

5    THE COPY.  HERE IS WHAT THE AD SAYS.

6          "OPEN AN E-MAIL ATTACHMENT, UPDATE A MEETING TIME,

7    OR EDIT AN EXCEL SPREADSHEET.  ACCESS MULTIPLE E-MAIL

8    ACCOUNTS."  THIS IS A BUSINESS-ORIENTED DEVICE.  THIS --

9          **THE COURT:**  IT DOESN'T SAY THAT.  IT SAYS WHAT YOU

10   JUST READ.

11         **MR. CANNON:**  YES.

12         **THE COURT:**  JUST A SECOND.

13         (PAUSE IN THE PROCEEDINGS.)

14         **THE COURT:**  GO ON.

15         **MR. CANNON:**  YOUR HONOR, IF YOU LOOK AT THESE ADS,

16   AND BY THE WAY, THEY HAVE NOT SUBMITTED A DECLARATION FROM AN

17   EXPERT THAT SAYS HERE IS HOW A CONSUMER WOULD INTERPRET THEM.

18   BUT IF YOU LOOK AT THESE ADS, I THINK IT'S PRETTY APPARENT ON

19   THEIR FACE THAT THESE ARE DIRECTED -- THAT TREO IS A

20   BUSINESS-ORIENTED PHONE.  IT'S AIMED AT MOBILE PROFESSIONALS AT

21   AN OLDER SEGMENT THEN THE HELIO.

22         THE HELIO SERVICE, REMEMBER, HELIO DOESN'T MAKE

23   PRODUCTS.  HELIO SELLS A SERVICE.  THEY CO-BRAND EACH OTHERS --

24   THEY CO-BRAND OTHER MANUFACTURERS.  AND, IN FACT, TREO USED TO

25   SELL ITS DEVICES TO HELIO AND HELIO CO-BRANDED WITH TREO.  THAT

1    HAS SINCE ENDED.

2         TREO MAKES PRODUCTS THAT ARE DESIGNED FOR BUSINESS

3    PEOPLE.  THEY HAVE FULL KEYBOARDS.  NONE OF THE HELIO PRODUCTS,

4    THE PRODUCTS USED WITH THE HELIO SERVICE HAVE KEYBOARDS.

5    THEY'RE CELL PHONES THAT HAVE OTHER FEATURES.  THEY'RE VERY

6    DIFFERENT PRODUCTS.  THEY'RE AIMED AT DIFFERENT MARKETS.  THIS

7    IS SORT OF THE YOUNG, HIP IMAGE CONSCIOUS MARKET.  TREO IS A

8    BUSINESS MARKET.  IT TALKS ABOUT EXCEL SPREADSHEETS, IT TALKS

9    ABOUT BUSINESS PLANS, OPENING ATTACHMENTS.

10         **THE COURT:**  OKAY.

11         SO, MR. TROCK, WOULD YOU RESPOND TO HIS COMMENTS

12    THAT THE HELIO DEVICE IS DIFFERENT FROM THE TREO?

13         **MR. TROCK:**  I THINK PART OF WHAT COUNSEL JUST SAID

14    IS VERY INSTRUCTIVE AND IT MIGHT GET LOST IN ALL OF THESE

15    PAPERS.

16         HELIO USED TO SELL TREOS.  TEN PERCENT OF OUR

17    SUBSCRIBER BASE, WE STILL SUPPORT IT, ARE TREOS.  THAT'S PART

18    OF THE SINISTER PROBLEM THAT'S GOING ON HERE.

19         LET ME READ YOU AN OBSERVATION.  THIS IS

20    EXHIBIT K --

21         **THE COURT:**  SO WHAT'S THE SIGNIFICANCE OF THAT, THE

22    FACT YOU USED TO SELL TREOS?

23         **MR. TROCK:**  THAT WE'RE SELLING OUR DEVICES IN THE

24    SAME MARKET.  ANYBODY WHO'S GOT TO COME IN TO A HELIO STORE IS

25    THAT TARGET MARKET, AND THEY'RE GOING TO BE BUYING A TREO FROM

1    US, TOO.

2            **THE COURT:**  ARE YOU STILL SELLING TREO?

3            **MR. TROCK:**  WE DON'T SELL IT ANYMORE.  IT STOPPED A

4    FEW MONTHS BACK, BUT WE STILL SERVICE THE TREO.  10 PERCENT OF

5    OUR SUBSCRIBER BASE STILL USES TREO.

6            **THE COURT:**  OH, I SEE.

7            **MR. TROCK:**  SO, EXHIBIT K --

8            **THE COURT:**  LET ME MAKE SURE I FOLLOW YOUR ARGUMENT.

9            SO BECAUSE YOU USED TO SELL TREOS, YOU'RE SAYING

10   YOUR SUBSCRIBER BASE, THE PEOPLE THAT COME IN TO PURCHASE YOUR

11   TELEPHONES ARE THE SAME PEOPLE THAT YOU WERE SELLING TREOS

12   TO --

13           **MR. TROCK:**  THAT'S CORRECT.

14           **THE COURT:**  -- SO THE MARKETING BASE IS THE SAME.

15           **MR. TROCK:**  THAT'S CORRECT.

16           SO, EXHIBIT K TO THE WEEKS' DECLARATION HAS AN

17   OBSERVATION ON AN ARTICLE FROM MEDIAPOST PUBLICATIONS.  AND I

18   THINK THE LAST PARAGRAPH THAT THIS MEDIA WRITER DISCUSSES HERE

19   IS QUITE INSTRUCTIVE.  EXHIBIT K.  DOWN AT THE BOTTOM IT SAYS:

20           "PALM SEEKS TO WIDEN THE APPEAL OF ITS TREO 680

21           SMARTPHONE BEYOND ITS TRADITIONAL CUSTOMER BASE

22           OF BUSINESS USERS AND NARROW THE COMPETITION

23           BETWEEN ITSELF AND BLACKBERRY WHOSE TOP-SELLING

24           PEARL HAS TARGETED THE SAME HYBRID BUSINESS

25           LIFESTYLE WIRELESS CONSUMER FOR WHOM THE TREO

1          680 IS DESIGNED."

2          SO THIS IS A LIFESTYLE PHONE FOR THEM.  THAT'S WHY

3    IT INCLUDES VIDEO.  THAT'S WHY IT INCLUDES MUSIC.  THAT'S WHY

4    IT INCLUDES A CAMERA BECAUSE THOSE ARE LIFESTYLE SERVICES THAT

5    THEY ARE PROVIDING WITH THIS PARTICULAR DEVICE.

6          I DON'T DISPUTE THAT THE PRIOR TREOS, WHICH ARE NOT

7    PART OF THIS ADVERTISING CAMPAIGN, WERE FOCUSED ON THE BUSINESS

8    USER, BUT THIS IS A LIFESTYLE DEVICE.  THEY ARE MOVING INTO

9    THIS LIFESTYLE MARKET.

10         AND ACTIONS SPEAK LOUDER THAN WORDS.  WHAT MAGAZINES

11   ARE THEY ADVERTISING THIS DEVICE IN?  THEY ARE ADVERTISING THE

12   DEVICE IN THE EXACT SAME MAGAZINES WE ARE ADVERTISING.  IN SOME

13   CASES, THE ADS ARE ONLY THREE PAGES APART.  THEY ADVERTISE IN

14   ROLLING STONE.  THEY ADVERTISE IN ENTERTAINMENT WEEKLY.  THEY

15   ADVERTISE IN LUCKY.  THOSE ARE NOT BUSINESS TRADES.  THEY ARE

16   FOCUSED ON LIFESTYLE.  GENTLEMEN'S QUARTERLY.

17         LOOK AT THEIR STRATEGIC PARTNERS.  THE SAME

18   STRATEGIC PARTNERS THAT WE HAVE.  FANDANGO, MY SPACE, ONION.

19   WHY WOULD A BUSINESS ENTITY PARTNER UP WITH THE ONION?  IT'S A

20   LIFESTYLE PUBLICATION.  THAT'S WHERE THEY ARE GOING WITH THIS

21   ADVERTISING CAMPAIGN.  YOU CAN TELL BY THE MEDIA THEY HAVE

22   CHOSEN TO ADVERTISE IN.

23         **THE COURT**:  WHAT IS ONION?

24         **MR. TROCK**:  IT'S A SATIRICAL MAGAZINE.  IT'S

25   TYPICALLY READ BY YOUNG, HIP, URBAN PEOPLE.  AND THAT'S WHERE

1    THEY ARE GOING WITH THIS PHONE.  THAT'S WHY THEY HAVE A

2    PARTNERSHIP WITH THE ONION.  THEY HAVE A PARTNERSHIP WITH MY

3    SPACE NOW WITH THEIR SUBSCRIBERS.

4            **MR. CANNON:**  THAT IS COMPLETELY WRONG.

5            **MR. TROCK:**  CINGULAR JUST SIGNED A DEAL TWO DAYS AGO

6    WITH MY SPACE.  THAT'S THEIR SERVICE PROVIDER.  AND WE HAD A

7    DEAL WITH MY SPACE WHERE OUR DEVICES YOU COULD CONNECT

8    IMMEDIATELY TO MY SPACE AND PUT YOUR FRIENDS UP THERE AND SO ON

9    AND SO FORTH.  THEY HAVE ADOPTED THE EXACT SAME MARKETING

10   STRATEGY WE HAVE BECAUSE THEY ARE GOING AFTER OUR CONSUMERS.

11           **THE COURT:**  YOU SAID CINGULAR JUST SIGNED AND --

12           **MR. TROCK:**  THAT'S CORRECT.  IF YOU TAKE A LOOK AT

13   THE CO-BRANDED ADS HE'S GOT, IT'S TREO, CINGULAR.  THAT'S THEIR

14   SERVICE PROVIDER.

15           **MR. CANNON:**  WE HAVE ABSOLUTELY NO RELATIONSHIP WITH

16   MY SPACE.  CINGULAR IS A MAJOR, MAJOR U.S. PHONE CARRIER.  WHAT

17   THEY DO -- WE ARE NOT CINGULAR.

18           **THE COURT:**  OKAY.  MY DECISION IS NOT GOING TO REST

19   ON THIS PARTICULAR MY SPACE ISSUE.

20           **MR. CANNON:**  THE CHANNELING, THOUGH, IS IMPORTANT

21   BECAUSE WE ARE NOT USING THEIR CAMPAIGN.  YES, WE ADVERTISE ON

22   THE INTERNET.  YES, WE ADVERTISE IN MAJOR, MAJOR

23   U.S. PUBLICATIONS.

24           **THE COURT:**  AND IT'S CLEAR THAT THESE

25   PUBLICATIONS -- YOUR MARKETING STRATEGY IS NOT LIMITED TO

1  BUSINESSES.  I MEAN, JUST BASED ON WHAT YOU ALL HAVE SUBMITTED.

2  AND WHAT HE SAID, IT SEEMS TO BE IN THE SAME SORT OF THE SAME

3  MARKET.  MY SPACE MAY BE THE EXCEPTION, BUT ALL THE OTHER ONES

4  ARE --

5         **MR. CANNON:**  WE ARE NOT ON MTV.  WE ARE NOT ON ANY

6  TV.  WE ARE NOT IN NIGHTCLUBS.  WE DON'T HAVE CELEBRITIES.

7  THEY PUSH THE CELEBRITIES THAT THEY ASSOCIATE WITH THEIR PHONE.

8  THAT'S NOT WHAT WE'RE DOING.

9         GQ, LUCKY, ROLLING STONE, THOSE ARE MAJOR NATIONALLY

10  PUBLISHED MAGAZINES.  AND FOR US TO HAVE AN AD IN ENTERTAINMENT

11  WEEKLY, THAT DOESN'T MAKE US GOING AFTER THE YOUTH COOL IMAGE

12  MARKET.

13         **THE COURT:**  IT'S NOT WHAT YOU ARE GOING AFTER MAYBE

14  WHEN YOU USE ONION AND THOSE KIND OF DEVICES.  IT'S WHAT YOU

15  ARE LIKELY TO GET.

16         SO, IF YOU DECIDE THAT YOU WANT TO ADVERTISE IN

17  THOSE PUBLICATIONS, THE PUBLICATIONS ARE NOT DESIGNED FOR A

18  POPULATION OTHER THAN, YOU KNOW, A GROUP BETWEEN 12 AND 32, ARE

19  PEOPLE WHO ARE NOT BUSINESS PEOPLE, THEN WHETHER YOU INTEND TO

20  FOCUS ON THAT GROUP OR NOT IS NOT NECESSARILY DISPOSITIVE OF

21  WHETHER YOU ARE IN DIRECT MARKETING COMPETITION WITH OTHERS

22  WHOM ARE ALSO USING THAT SAME VENUE FOR PURPOSES OF MARKETING

23  THEIR PRODUCT.

24         **MR. CANNON:**  YOUR HONOR, THOSE VENUES ARE MAJOR

25  VENUES.  WE ARE NOT IN NIGHTCLUBS, WE ARE NOT IN THE SORTS OF

1  THINGS THAT WOULD GO DIRECTLY -- GENTLEMAN'S QUARTERLY,

2  ENTERTAINMENT WEEKLY ARE MAJOR MAGAZINES.

3        **THE COURT:**  LET'S TAKE ONION, THE ONE HE JUST

4  MENTIONED.

5        **MR. CANNON:**  YES.

6        **THE COURT:**  NOW, DID YOU -- I DIDN'T HEAR YOU OBJECT

7  TO --

8        **MR. CANNON:**  THERE IS A RELATIONSHIP WITH ONION.

9  THAT, TOO, IS A PRETTY SIGNIFICANT PUBLICATION.

10        **THE COURT:**  IT IS?

11        **MR. CANNON:**  IT IS.

12        **THE COURT:**  FOR BUSINESSMEN OR WOMEN?

13        **MR. CANNON:**  I READ THE ONION OCCASIONALLY.

14        **THE COURT:**  YOU SAID A PRETTY SIGNIFICANT -- SO

15  READING IT OCCASIONALLY AND BEING A SIGNIFICANT PUBLICATION

16  DON'T SEEM TO ME TO BE THE SAME THING.

17        **MR. CANNON:**  I THINK THAT THAT PUBLICATION IS NOT ON

18  THE LEVEL OF ENTERTAINMENT WEEKLY, BUT IT IS THE SORT OF

19  PUBLICATION THAT IS NATIONALLY DISTRIBUTED.  IT'S GOT AN

20  INTERNET SITE.

21        **THE COURT:**  YOU CAN FIND RAGS THAT ARE NATIONALLY

22  DISTRIBUTED.  THAT DOESN'T MEAN THAT THEY ARE FOR BUSINESS

23  PEOPLE AND IT DOESN'T MEAN BUSINESS PEOPLE USE THEM.

24        **MR. CANNON:**  YOUR HONOR, I THINK WHAT THIS REALLY

25  COMES DOWN TO IS WE ARE NOT ON TV, OKAY.  WE ARE NOT IN

1  NIGHTCLUBS.  WE DON'T HAVE THAT SORT OF EXPOSURE.

2          BUT IF YOU LOOK AT THE ADS, IF YOU LOOK AT THE

3  SCREEN SHOT ON THESE ADS OF THE TREO, THESE SCREEN SHOTS ARE

4  ALMOST ALL BUSINESS-ORIENTED SCREEN SHOTS.  Q1 PRESENTATIONS,

5  BUDGETS, THINGS LIKE THAT.  THE HELIO ADS ARE VERY DIFFERENT.

6          AGAIN, YOUR HONOR, I BRING YOU BACK TO WHAT THESE

7  LOOK LIKE.  THE WHOLE TOUCHSTONE OF THIS IS ARE THE CONSUMERS

8  CONFUSED?

9          IF THEY LOOK AT THE ADS, TREO IS ALWAYS WITH THIS

10 ORANGE COLOR.  IT ALWAYS SHOWS THIS DEVICE, WHICH IS DIFFERENT

11 FROM THEIR DEVICE.  WE MAKE THE DEVICE.  THEY DON'T MAKE THE

12 DEVICE.  IT ALWAYS USES THE ORIGIN A TREO, WHICH THEY OMIT IN

13 THEIR PAPERS.  THESE ARE VERY DIFFERENT ADS.

14         **THE COURT:**  RIGHT NOW WE ARE AT THE PROXIMITY,

15 RELATEDNESS OF THE GOODS AND SERVICES.

16         **MR. CANNON:**  YES.

17         (PAUSE IN THE PROCEEDINGS.)

18         **THE COURT:**  LET'S -- IN TERMS OF THE NUMBER TWO,

19 AGAIN, PROXIMITY, RELATEDNESS OF THE GOODS OF SERVICES, LET'S

20 LOOK AT MR. HANCOCK'S DECLARATION, EXHIBIT B, WHICH ARE SOME OF

21 YOUR ADS WHICH ARE OSTENSIBLY DESIGNED TO REACH THE BUSINESS

22 AUDIENCE, AS YOU SAY.  AND START WITH NUMBER ONE.

23         YOU HAVE TWO, LOOKS LIKE --

24         **MR. CANNON:**  YOUR HONOR, THESE WERE NEVER PUBLICLY

25 DISSEMINATED.  THESE WERE MARKUPS FROM THE AD AGENCY.

1    **MR. TROCK:**  IT DOES SHOW YOU THEIR INTENT AND WHERE

2    THEY WANT TO GO.

3        **THE COURT:**  YEAH, BECAUSE THESE ARE NOT BUSINESSMEN.

4    THEY DON'T APPEAR TO BE.  AND CERTAINLY THE LANGUAGE THAT'S

5    HERE IS NOT -- WELL, IT DOESN'T APPEAR TO BE DESIGNED TO REACH

6    A BUSINESS PERSON AUDIENCE.

7        **MR. CANNON:**  YOUR HONOR, THE POINT OF THIS, THE

8    POINT OF THIS EXHIBIT WAS NOT TO SAY THIS WAS A -- THE IMAGES

9    WERE A PLANNED MARKETING CAMPAIGN.

10       THE POINT OF THIS WAS TO SHOW THERE WAS NO INTENT TO

11   TAKE THIS SLOGAN.  AND THIS SLOGAN IS NOT THAT ORIGINAL BECAUSE

12   WE HAD IT BACK IN TWO YEARS AGO.  SO THESE IMAGES WERE NEVER

13   PUBLICLY DISSEMINATED.  IT'S NOT CLEAR TO ME THESE IMAGES WERE

14   EVER INTENDED TO BE PUBLICLY DISSEMINATED.

15       **THE COURT:**  IT IS NOT CLEAR --

16       **MR. CANNON:**  THIS WAS NEVER RELEASED.

17       **THE COURT:**  WHY DID YOU SUBMIT THIS?  WHY WAS THIS

18   SUBMITTED?

19       **MR. CANNON:**  BECAUSE OF THE SLOGAN AT THE BOTTOM.

20   TO SHOW THAT OUR AD AGENCY CAME UP WITH THIS SLOGAN SEVERAL

21   YEARS AGO.

22       **THE COURT:**  WHY?

23       **MR. CANNON:**  BECAUSE INTENT IS A FACTOR.  AND THEY

24   CLAIM -- IN THEIR OPENING PAPERS, THEY CLAIM OUR INTENT WAS TO

25   COPY THEIR SLOGAN.  AND WE WANTED TO BRING EVIDENCE TO YOUR

1    HONOR THAT OUR AD AGENCY PROVIDED A SLOGAN TO US BEFORE THEY

2    EVEN EXISTED.  THE SLOGAN THAT THEY COMPLAIN ABOUT THAT WE

3    COPIED FROM THEM.

4          **THE COURT:**  WITH RESPECT TO THE SECOND FACTOR, I AM

5    INCLINED TO FIND THAT IT IS CLEAR, AT LEAST FROM THE COURT'S

6    PERSPECTIVE AND BASED ON WHAT I HAVE IN FRONT OF ME THAT HELIO

7    AND PALM OFFER VERY SIMILAR GOODS AND SERVICES, AND THAT PALM

8    AND HELIO ARE DIRECT MARKET COMPETITORS, SO THE FACTOR NUMBER

9    TWO WEIGHS IN FAVOR OF FINDING CONSUMER CONFUSION.

10          LET'S GO TO FACTOR NUMBER THREE, SIMILARITY OF THE

11   MARKS.

12          **MR. TROCK:**  I THINK HERE, YOUR HONOR, ALL WE HAVE TO

13   DO IS TAKE A LOOK AT THE SLOGANS.  "DON'T CALL IT A PHONE",

14   "NOT JUST A CELL PHONE."  PERSONALLY, I HAVE BEEN STRUGGLING

15   FOR THE LAST WEEK TO KEEP THESE TWO THINGS SEPARATED IN MY

16   MIND.  "DON'T CALL IT A PHONE", "NOT JUST A CELL PHONE."

17          AND WHEN WE LOOK AT THE SIMILARITY, THE THINGS WE

18   WANT TO LOOK AT IS HOW IT APPEARS --

19          **THE COURT:**  YOU ARE LEAVING OUT "A TREO".

20          **MR. TROCK:**  WE CAN ADD THAT ON BECAUSE THAT HAS A

21   WHOLE DIFFERENT CONTEXT AND A WHOLE DIFFERENT PROBLEM FOR THEM

22   ON REVERSE CONFUSION, AND WE CAN GET TO THAT.

23          BUT THE SIMILARITY OF SLOGANS, WE LOOK AT THE

24   APPEARANCE, WE LOOK AT THE SOUND, AND WE LOOK AT THE MEANING TO

25   THE CONSUMER.

1          AND WHEN WE LOOK AT THOSE THINGS, I THINK IT'S

2    PRETTY OBVIOUS TO ANYBODY WHO TAKES A LOOK AT THESE SLOGANS AND

3    HOW THEY APPEAR TO THE CONSUMER IN THE MARKETPLACE, THAT THEY

4    HAVE A SIMILAR APPEARANCE, THAT THEY HAVE A SIMILAR SOUND, AND

5    THEY HAVE AN ALMOST IDENTICAL MEANING TO EACH OTHER; THAT THE

6    DEVICE THAT YOU ARE GOING TO GET TO PURCHASE OR WANT IS

7    SOMETHING THAT IS NOT JUST A CELL PHONE.  IT IS SOMETHING

8    DIFFERENT THAN A CELL PHONE.  IT HAS THESE ADDITIONAL FEATURES

9    THAT TYPICAL CELL PHONES DON'T HAVE.  MUSIC, VIDEO, DATA, WEB,

10   CAMERA, SO ON AND SO FORTH.

11         I THINK WHEN YOU TAKE A LOOK AT THIS, THAT YOU NEED

12   TO COME OUT TO THE POINT WHERE THEY ARE SIMILAR TO EACH OTHER.

13   AND, NOW LET'S ADDRESS THE POINT THEY MAKE IN THEIR BRIEF, THAT

14   WHEN THEY USE THE SLOGAN, THEY CALL IT A TREO.  THAT'S GREAT.

15         THIS IS NOT A SOURCE CONFUSION CASE.  THIS IS A CASE

16   OF ASSOCIATION.  THIS IS A CASE OF CONFUSION OF ASSOCIATION AND

17   AFFILIATION.  AND, BECAUSE THEY HAVE PUT THE TREO BRAND ON

18   THERE AND THE PALM BRAND ON THERE, THEY HAVE TURNED IT INTO A

19   REVERSE CONFUSION CASE.

20         SO NOW PEOPLE WHO HAVE A RECOLLECTION OR MEMORY OF

21   OUR SLOGAN AND THEY ARE FACED WITH THEIR ADVERTISEMENTS, NOW

22   THINK THAT WE'RE THE ONES WHO ARE THE INFRINGERS EVEN THOUGH WE

23   ARE THE SENIOR USERS OF THE SLOGAN.  THEY ARE THE JUNIOR USERS.

24   FACT, THE STRENGTH OF THAT MARK, THE STRENGTH OF THE TREO AND

25   THE PALM WEIGHS AGAINST THEM.

1              **THE COURT:**  WHAT EVIDENCE ARE YOU SUGGESTING THAT

2    PEOPLE THINK YOU ARE THE JUNIOR USERS AND THEY ARE THE SENIOR

3    USERS?

4              **MR. TROCK:**  NO, NO.  WE'RE THE SENIOR USERS.

5              **THE COURT:**  YOU JUST SAID --

6              **MR. TROCK:**  IN FACT, WE ARE BECAUSE THEY'RE --

7              **THE COURT:**  NO.  YOU ARE SAYING, YOU JUST INDICATED,

8    I THINK YOU SAID IN YOUR PAPERS, TOO, THAT THERE IS SOME

9    CONFUSION THAT PEOPLE THINK THAT YOU'RE THE JUNIOR USERS AND

10   THEY ARE THE SENIOR USERS.

11             **MR. TROCK:**  CORRECT.  THIS IS HOW THE CONFUSION

12   OPERATES.

13             **THE COURT:**  NO.  BUT WHAT EVIDENCE ARE YOU POINTING

14   TO THAT WOULD SUGGEST TO ME THAT THAT'S OCCURRING HERE?

15             **MR. TROCK:**  THEY ARE OLDER.  THEY ARE 15 YEARS OLD.

16   THEY ARE A DOMINANT PLAYER IN THIS MARKETPLACE.

17             **THE COURT:**  WHAT EVIDENCE DO YOU HAVE TO SUGGEST TO

18   ME THAT THAT IS OCCURRING HERE?

19             **MR. TROCK:**  THERE IS NO EVIDENCE OF ACTUAL CONFUSION

20   IN THIS CASE.  I WILL ADMIT THAT.  ACTUAL CONFUSION IS VERY,

21   VERY RARE.

22             **THE COURT:**  I THOUGHT YOU HAD --

23             **MR. TROCK:**  THERE ARE SOME EXAMPLES OF PEOPLE

24   TALKING ABOUT THE SIMILARITIES OF THE SLOGANS, AND I WILL GET

25   TO THAT IN A SECOND, BUT THE FACT THAT THEY ARE USING THE TREO