```
 1    AND THE PALM BRAND ON THERE, THOSE ARE STRONG BRAND MARKS.  AND

 2    THAT HAS THE PROBLEM OF OVERWHELMING US IN THE MARKETPLACE.

 3              WE ARE A BRAND NEW, YOUNG COMPANY.  WE ARE TRYING TO

 4    PENETRATE THIS MARKETPLACE SINCE MAY WITH OUR AD CAMPAIGN.  WE

 5    BELIEVE WE ARE BECOMING SUCCESSFUL.  WE ARE PUTTING OUR SLOGAN

 6    INTO THE MINDS OF THE CONSUMERS.

 7              THE COURT:  SO WHAT ABOUT THE DIFFERENCE IN THE

 8    COLOR SCHEMES AND THE FONTS?

 9              MR. TROCK:  THERE IS A DIFFERENCE BETWEEN THOSE TWO

10    THINGS, BUT THE PROBLEM WITH THIS CONFUSION IS THAT THE SLOGAN

11    MAKES PEOPLE THINK THAT THERE'S SOME RELATIONSHIP BETWEEN THESE

12    TWO COMPANIES, WHEN THERE IN FACT IS NONE; THAT EITHER WE ARE A

13    LICENSEE OF THEM OR THEY ARE A LICENSEE OF US, OR SOMEHOW

14    THERE'S SOME RELATIONSHIP, THE FACT WE USED TO SELL TREOS AND

15    WE SERVICE TREOS.

16              THE COURT:  YOU'RE SAYING THAT AS A MATTER OF FACT.

17              MR. TROCK:  YES.

18              THE COURT:  I AM ASKING YOU, ARE YOU JUST SAYING IT

19    OR IS THERE SOME EVIDENCE?

20              MR. TROCK:  THERE'S NO DISPUTE THAT WE USED TO SELL

21    THOSE.

22              THE COURT:  NO, NO.  READ BACK WHAT HE JUST SAID SO

23    HE CAN SEE WHAT I AM ASKING.

24              (READ BACK AS FOLLOWS:

25              THERE IS A DIFFERENCE BETWEEN THOSE TWO THINGS,
```

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

Dockets.Justia.com

1          BUT THE PROBLEM WITH THIS CONFUSION IS THAT THE

2          SLOGAN MAKES PEOPLE THINK THAT THERE'S SOME

3          RELATIONSHIP BETWEEN THESE TWO COMPANIES, WHEN

4          THERE IN FACT IS NONE; THAT EITHER WE ARE A

5          LICENSEE OF THEM OR THEY ARE A LICENSEE OF US,

6          OR SOMEHOW --)

7          **MR. TROCK:**  YES.

8          **THE COURT:**  THAT IS WHAT I AM ASKING YOU ABOUT, THAT

9    STATEMENT YOU JUST MADE, WHETHER THERE IS ANY -- WHETHER YOU

10   ARE JUST SAYING THAT BECAUSE THAT IS WHAT YOU ASSUME OR WHETHER

11   THERE REALLY IS SOME BASIS FOR THAT ASSERTION.

12         **MR. TROCK:**  THERE ARE COMMENTATORS IN THE MEDIA WHO

13   HAVE INDICATED IN PUBLICATIONS ABOUT THE SIMILARITY BETWEEN THE

14   AD CAMPAIGNS AND THE SLOGANS.  THAT SIMILARITY IS AN INDICATION

15   THAT THEY ARE CREATING AN AFFILIATION OR RELATIONSHIP IN THE

16   MARKETPLACE IN THE MINDS OF CONSUMERS BETWEEN US AND THEM

17   BECAUSE THEY HAVE PICKED A SLOGAN WHICH IS SO SIMILAR TO OURS.

18   THAT'S THIS ISSUE OF ASSOCIATION CONFUSION THAT'S GOING ON

19   HERE.  WE ARE NOT CLAIMING --

20         **THE COURT:**  YOU SUBMITTED SOME EVIDENCE OF THAT?

21         **MR. TROCK:**  THAT'S CORRECT.

22         **THE COURT:**  ACTUALLY MR. HANCOCK HIMSELF, FROM THE

23   DEFENDANT, ACKNOWLEDGED THE SIMILARITY.

24         **MR. CANNON:**  IN A VERY, VERY DIFFERENT FASHION, YOUR

25   HONOR.  IF --

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1          **THE COURT:**  HE BASICALLY -- WHAT HE SAID WAS HANCOCK

2    ACKNOWLEDGED -- OKAY -- THE SIMILARITY TO THE POSITIONING OF

3    RIVAL HELIO, WHICH IN ADS FROM IPG'S DEUTSCH BILLS ITSELF AS

4    MORE THAN JUST A CELL PHONE, BUT NOTED THAT THE TWO DEVICES

5    PURSUED DIFFERENT MARKETS.

6          SO, YOU'RE SAYING THAT HE DID NOT, IN FACT,

7    ACKNOWLEDGE A SIMILARITY BETWEEN THE TWO MARKS?

8          **MR. CANNON:**  THE MOST THAT HE DID WAS ACKNOWLEDGE

9    THAT THE CONCEPT OF A CELL PHONE HAVING MORE FEATURES IS WHAT

10   THEY WERE BOTH GOING AFTER.

11         THERE IS NO EVIDENCE OF ACTUAL CONFUSION.  FOR A

12   COUPLE OF COMMENTATORS TO DISTINGUISH TWO COMPANIES AND SAY,

13   HEY, THEY ARE USING THE SAME CONCEPT IS VERY DIFFERENT THAN

14   SAYING CONSUMERS WERE CONFUSED.  IF THE COMMENTATORS WERE

15   CONFUSED THAT WOULD BE EVIDENCE OF CONFUSION, BUT THE

16   COMMENTATORS GOT IT EXACTLY RIGHT.  THEY SAW THERE WAS TWO

17   DIFFERENT COMPANIES, AND THEY JUST ACKNOWLEDGED THAT THE TWO

18   COMPANIES RESUMED THE CONCEPT OF ADDITIONAL FEATURES TO SELL

19   THEIR PHONES.

20         AND IF YOU LOOK AT WHAT MR. HANCOCK ACTUALLY SAYS OR

21   AT LEAST WHAT THE REPORTER SAYS HE SAYS, HE NOTED THAT TWO

22   DEVICES PURSUED DIFFERENT MARKETS.

23         **THE COURT:**  WE ARE NOT TALKING ABOUT THE MARKETING.

24   I HAVE ALREADY MADE A FINDING ON THAT.  WE ARE TALKING ABOUT

25   WHETHER OR NOT DEFENDANTS HAVE MADE A STATEMENT THAT IS

1   ESSENTIALLY A CONCESSION WITH RESPECT TO THIS FACTOR.

2           **MR. CANNON:**   THE CONCESSION IS NOT TO CONFUSION,

3   YOUR HONOR.  I THINK I HAVE TO BE CRYSTAL CLEAR ON THAT.

4           **THE COURT:**   YOU KEEP WANTING TO GO TO THE ULTIMATE

5   ISSUE.  I AM WALKING THERE.  I AM DEALING WITH EACH PARTICULAR

6   FACTOR AS WE GO ALONG.

7           THE QUESTION IS WHETHER MR. HANCOCK, WHO WAS

8   ASSOCIATED WITH THE DEFENDANTS, HAS MADE A STATEMENT CONCERNING

9   THE SIMILARITY, THAT SINCE -- THE COURT SHOULD CONSIDER IN

10  DETERMINING WHETHER OR NOT THERE IS A SIMILARITY.

11          **MR. CANNON:**   I THINK THE MOST THAT CAN BE SAID IS

12  THAT HE DID SAY OR IT IS REPORTED THAT HE SAID THAT ADDRESSING

13  THE ADDITIONAL FEATURES IS A SIMILAR CONCEPT.

14          NOW, WHETHER THE MARK, WHETHER THESE, YOU KNOW,

15  WHETHER THE ADS THAT WE ARE TALKING ABOUT IS SIMILAR, THAT'S

16  NOT WHAT HE MADE A CONCESSION ABOUT.  SOMETHING DIFFERENT.

17          **MR. TROCK:**   IF I MIGHT ALSO --

18          **THE COURT:**   I AM SORRY.  HIS CONCESSION IS WHAT?

19          **MR. CANNON:**   IT IS NOT DIRECTED TO THE ADS.  HE DID

20  NOT SAY THE ADS ARE SIMILAR.  HE DID NOT SAY THAT --

21          **THE COURT:**   WE ARE NOT TALKING ABOUT SIMILARITY OF

22  THE ADS.  WE ARE TALKING ABOUT SIMILARITY OF THE MARKS.  THE

23  PHRASES THAT WE ARE TALKING ABOUT.

24          **MR. CANNON:**   YES, YOUR HONOR, BUT THE CASE LAW IS

25  CLEAR IN TRADEMARK, YOU HAVE TO LOOK AT HOW IT IS PRESENTED TO

1    THE PUBLIC.  YOU CAN'T PULL THE SLOGAN OUT OF CONTEXT.  THAT IS

2    ABSOLUTELY CRUCIAL.  WE CITED THE CASE ON THIS.  I DON'T HAVE

3    IT AT THE TIP OF MY TONGUE, BUT I CAN GET IT FROM THE BRIEF.

4    YOU HAVE TO LOOK AT HOW THE SLOGAN IS PRESENTED TO THE

5    MARKETPLACE.  HOW THE CONSUMER WOULD INTERPRET IT.

6              **THE COURT:**  RIGHT.

7              **MR. CANNON:**  YOU CAN'T PULL THAT SLOGAN OUT AND

8    COMPARE THE SLOGANS.  YOU HAVE TO LOOK AT IT IN CONTEXT.

9              **THE COURT:**  SO WHEN MR. HANCOCK ACKNOWLEDGES

10   SIMILARITY, THEN HE'S INCORPORATING ALL OF IT BASICALLY.

11             **MR. CANNON:**  WELL, HE'S ACKNOWLEDGING THAT THE

12   CONCEPT OF FOCUSING ON ADDITIONAL FEATURES IS SIMILAR.  AND IT

13   CERTAINLY IS.  LOTS OF CELL PHONE COMPANIES ARE DOING THAT NOW.

14             **MR. TROCK:**  I DON'T THINK HE REFERS TO FEATURES.

15   HE'S --

16             (SIMULTANEOUS COLLOQUY.)

17             **THE COURT:**  SIMILARITY TO THE POSITIONING OF RIVAL

18   HELIO.

19             WHERE ARE YOU GETTING YOUR INTERPRETATION OF WHAT

20   MR. HANCOCK --

21             **MR. CANNON:**  BECAUSE I AM INTERPRETING -- IT'S

22   REPORTED HERE WHAT HE SAID.

23             **THE COURT:**  WHEN YOU SAY "HERE", WHAT ARE YOU

24   LOOKING AT?

25             **MR. CANNON:**  THE EXHIBIT THEY PROVIDED.

1       THE COURT:  WHAT SPECIFICALLY?  WHAT IS THE EXHIBIT?

2       MR. CANNON:  IT IS EXHIBIT TO THE WEEKS'

3   DECLARATION.

4       THE COURT:  OKAY.  WHICH ONE?

5       MR. CANNON:  G, H.

6       THE COURT:  H?

7       MR. CANNON:  YES.

8       THE COURT:  THAT'S THE SAME THING.  "HANCOCK

9   ACKNOWLEDGED THE SIMILARITY TO THE POSITIONING OF RIVAL HELIO."

10      MR. CANNON:  BUT TO SAY THAT THE -- TO HAVE IT

11  STATED IN A BRAND PUBLICATION THAT THE SIMILAR POSITIONING IS

12  NOT TO SAY THAT THE ADS ARE CONFUSING.  IT IS NOT TO SAY THAT

13  THE ADS --

14      THE COURT:  THEY HAVE ACKNOWLEDGED THAT THERE IS NO

15  EVIDENCE OF ACTUAL CONFUSION.  THAT IS NOT -- I DON'T WANT TO

16  GET OFF TRACK.

17      MR. CANNON:  I AM SORRY.

18      THE COURT:  WHAT WE ARE LOOKING AT ARE THE FACTORS

19  SO I CAN DETERMINE WHETHER OR NOT THERE IS LIKELIHOOD OF

20  CONFUSION, BECAUSE THE PLAINTIFF HAS ADMITTED THAT THERE

21  BASICALLY IS NO EVIDENCE OF ACTUAL CONFUSION.

22      MR. CANNON:  YES.

23      THE COURT:  SO THAT'S NOT THE ISSUE HERE.

24      MR. CANNON:  YES.

25      THE COURT:  I AM AT THE SIMILARITY, IN WHICH I FOUND

1    KIND OF STRIKING THAT DEFENDANTS HAVE ALREADY BASICALLY MADE

2    PUBLIC STATEMENTS ACKNOWLEDGING THE SIMILARITY, AND UNLESS

3    MR. HANCOCK IS NOT ASSOCIATED WITH DEFENDANT --

4            **MR. CANNON:**  HE IS ASSOCIATED, BUT I THINK YOU HAVE

5    TO READ WHAT HE SAID AND THEN INTERPRET -- THEY INTERPRET IT A

6    CERTAIN WAY.  I WOULD INTERPRET IT A DIFFERENT WAY.  HE IS NOT

7    HERE.  WE CAN BRING HIM IN AND HAVE A PRELIMINARY INJUNCTION

8    HEARING AND ASK HIM ABOUT IT.

9            **THE COURT:**  SINCE THERE SEEMS TO BE NO DISPUTE THAT

10   HE IS IN A POSITION OF RESPONSIBILITY TO MAKE THAT STATEMENT --

11           **MR. CANNON:**  YES.

12           **THE COURT:**  -- LOOK AT THE ENTIRE CONTEXT OF ALL THE

13   WORDS HE USED HERE, WHY SHOULDN'T I ASSUME, BASED UPON ALL THE

14   WORDS HE USED, THAT HE HAD IN MIND THIS ANNOUNCEMENT THAT I AM

15   GOING THROUGH RIGHT NOW, JUST BY VIRTUE OF THE FACT THAT THE

16   LAST, THE DISTINGUISHING COMMENTS THAT HE MADE WAS DESIGNED TO

17   DISTINGUISH WHY IT'S OKAY TO BE SIMILAR BUT BECAUSE YOU ARE IN

18   DIFFERENT MARKETS.  WE ARE LOOKING AT THE SAME FACTORS.  HE'S

19   LOOKING AT THE SAME FACTORS WE'RE LOOKING AT IN THE SENTENCE

20   THAT HE'S GIVEN.

21           WHAT IT SUGGESTS TO ME IS A PERSON WHO IS

22   KNOWLEDGEABLE ABOUT TRADEMARK RESPONSIBILITIES HAS REACHED A

23   CONCLUSION THAT, YES, OUR MARKS ARE OUR POSITIONING OR OUR ADS,

24   OR WHATEVER, I ACKNOWLEDGE IS SIMILAR, BUT BECAUSE WE USE

25   DIFFERENT MARKETS, HE IS CONCLUDING, FOR WHATEVER REASON, THAT

1    PERHAPS IT'S NOT AN ISSUE.

2            NOW, IF IT WEREN'T FOR THE FACT THAT HE IS SAYING WE

3    PURSUE DIFFERENT MARKETS, I WOULD THINK MAYBE THE STATEMENT

4    TAKEN OUT OF CONTEXT IS NOT SOMETHING THAT WOULD BE OF ANY

5    SIGNIFICANCE FOR PURPOSES OF MY ANALYSIS, BUT WE HAVE A PERSON

6    WHO IS IN A POSITION OF RESPONSIBILITY IN YOUR COMPANY WHO IS

7    MAKING A STATEMENT, A TRADEMARK EVALUATION STATEMENT THAT IS

8    DISTINGUISHING WHY THE SIMILARITY IS NOT A PROBLEM BECAUSE ONE

9    OF THE OTHER FACTORS, FROM HIS PERSPECTIVE, IS NOT MET.

10            **MR. CANNON:**  YOUR HONOR, I RESPECTFULLY DISAGREE

11    THAT THAT ASSUMPTION CAN BE MADE, THAT HE WAS MAKING A

12    TRADEMARK ANALYSIS.

13            **THE COURT:**  WHAT'S THE IMPORT OF "BUT NOTED THAT THE

14    TWO DEVICES PURSUE DIFFERENT MARKETS"?  WHY WOULD A PERSON SAY

15    THAT IN CONJUNCTION WITH THE FIRST STATEMENT THAT HE MADE?

16            **MR. CANNON:**  I DON'T KNOW EVERYTHING HE SAID TO THIS

17    REPORTER, BUT IF YOU READ THE SENTENCE, "HANCOCK ACKNOWLEDGED

18    THE SIMILARITY TO THE POSITIONING OF RIVAL HELIO, WHICH IN ADS

19    FROM IPG DEUTSCH BILLS ITSELF AS MORE THAN JUST A CELL PHONE --

20            **THE COURT:**  RIGHT WHICH IS TAKING IN NOT ONLY THE

21    CONCEPT --

22            **MR. CANNON:**  BUT THE --

23            **THE COURT:**  BUT THE WORDS, AND THEN IT GOES ON TO

24    DISTINGUISH THE MARKETS.

25            **MR. CANNON:**  THE IDEA THAT YOU CAN OWN THE CONCEPT

1    OF ADVERTISING THE ADDITIONAL FEATURES ON YOUR PRODUCT, I THINK

2    IS EXTREME.  I DON'T THINK HE WAS DOING A TRADEMARK ANALYSIS.

3    HE WAS SAYING, YES, WE ARE ADVERTISING THE ADDITIONAL FEATURES

4    ON OUR PRODUCT.  YES, HELIO APPEARS TO BE ADVERTISING THE

5    ADDITIONAL FEATURES ON ITS PRODUCT.  WE ARE GOING AFTER

6    DIFFERENT MARKETS.  IT'S NOT --

7              **THE COURT:**  WHY WOULD -- OKAY.  GO ON.

8              DID YOU WANT TO RESPOND?

9              **MR. TROCK:**  THE OTHER THING, IN ADDITION TO

10   MR. HANCOCK'S STATEMENTS, IS THAT TO THE WHEBLE DECLARATION,

11   AND THEN EXHIBIT H, THIS SHOWS THAT OTHER PEOPLE BESIDES

12   MR. HANCOCK HAVE NOTED THE SIMILARITY OF NOT JUST THE

13   ADVERTISEMENTS AND NOT JUST THE CAMPAIGN, BUT THE SLOGANS

14   THEMSELVES.

15             THIS IS A PUBLICATION MOBILE MAGAZINE, PUBLISHED

16   DECEMBER 11TH, RIGHT IN THE MIDDLE OF -- THE MIDDLE PARAGRAPH,

17   IT SAYS:  INTERESTINGLY THE TAGLINE "NOT JUST THE CELL PHONE.

18   A TREO" IS A LITTLE TOO MUCH LIKE HELIO'S "DON'T CALL US A

19   PHONE COMPANY, DON'T CALL IT A PHONE."

20             **THE COURT:**  I SEE THAT.

21             DO YOU HAVE ANY RESPONSE TO THAT?

22             **MR. CANNON:**  WELL, YOUR HONOR, THIS PERSON CERTAINLY

23   WASN'T CONFUSED.  HE KNEW EXACTLY WHERE THE SOURCE WAS COMING

24   FROM.  I DON'T KNOW WHO THIS PERSON IS.  THEY SUPPLIED THIS OFF

25   OF THE INTERNET, APPARENTLY.  THIS PERSON WAS NOT CONFUSED.

1  YOU CAN HAVE SIMILAR SLOGANS.  IT'S OKAY UNDER THE LAW TO GO TO

2  USE THE SAME MARKETING CONCEPTS TO ADVERTISE YOUR FEATURES.

3  WHAT'S NOT ALLOWED IS TO CONFUSE CONSUMERS.  THIS CONSUMER WAS

4  NOT CONFUSED.

5       **MR. TROCK:**  SO, I TAKE IT THAT MIGHT BE AN ADMISSION

6  THAT THEY ARE SIMILAR BECAUSE THIS IS NOT AN ISSUE OF ULTIMATE

7  CONFUSION WE ARE ANALYZING RIGHT HERE IF THE ISSUE IS THIS

8  FACTOR, SIMILARITY OF SLOGANS.

9       **THE COURT:**  THIS FACTOR, SIMILARITY OF THE MARK, IS,

10  I THINK IT'S A CLOSE QUESTION, BUT -- ALTHOUGH THE APPEARANCE

11  OF THE MARKS IS DIFFERENT, PALM AND HELIO USE DIFFERENT COLOR

12  SCHEMES.  SINCE HELIO USES BLUE AND PALM USES ORANGE AND THE

13  FONTS ARE DIFFERENT, THEY SOUND VERY SIMILAR AND CONVEY SIMILAR

14  MESSAGES, THE PROPER TEST FOR DETERMINING THE LIKELIHOOD OF

15  CONFUSION IS NOT WHETHER CONSUMERS WOULD BE CONFUSED BY A

16  SIDE-BY-SIDE COMPARISON OF THE PRODUCTS, BUT WHETHER THE

17  CONFUSION IS LIKELY WHEN A CONSUMER FAMILIAR WITH ONE PARTY'S

18  MARK IS PRESENTED WITH THE OTHER PARTY'S GOODS ALONE.

19       AND SO I AM INCLINED TO AGREE WITH PLAINTIFF THAT

20  MARKS ARE SIMILAR ENOUGH TO CAUSE CONFUSION UNDER THIS TEST

21  PARTICULARLY GIVEN THE FACT THAT SEVERAL INDUSTRY COMMENTATORS

22  NOTED SIMILARITIES SHORTLY AFTER PALM LAUNCHED ITS CAMPAIGN IN

23  DECEMBER.

24       YOU KNOW, ALTHOUGH THE ULTIMATE QUESTION OF

25  SIMILARITY IS GOING TO BE APPROPRIATE FOR A JURY TO RESOLVE, I

1    TEND TO THE PLAINTIFF'S POINT THAT THE -- I CAN'T FIND THE

2    MARKS ARE SO DISSIMILAR THAT THERE IS LITTLE LIKELIHOOD OF

3    CONFUSION.  SO THIS FACTOR WEIGHS IN FAVOR OF PLAINTIFF.

4             BEFORE I MOVE TO NUMBER FOUR, THE MARKING CHANNELS,

5    MR. CANNON, DID YOU KNOW IN OCTOBER 2006 ABOUT HELIO'S CAMPAIGN

6    WHICH WAS LAUNCHED IN MAY OF 2006?

7             **MR. CANNON:**  I AM NOT AWARE THAT WE DID.  THERE IS

8    NO EVIDENCE THAT WE DID.  HELIO IS NOT CONSIDERED A COMPETITOR.

9             **THE COURT:**  SO YOU ALL -- YOU SAID YOU DON'T KNOW

10   ONE WAY OR THE OTHER, OR YOU DIDN'T KNOW IN OCTOBER OF 2006

11   ABOUT THEIR CAMPAIGN THAT WAS LAUNCHED IN MAY?

12            **MR. CANNON:**  I CANNOT REPRESENT TO THE COURT WITHOUT

13   EVIDENCE THAT NO ONE AT THE COMPANY KNEW ABOUT HELIO, JUST AS

14   COUNSEL CANNOT REPRESENT TO THE COURT THAT NO ONE FROM HELIO

15   WAS AT THE TRADE SHOW AND SAW THE TREO BOOTH.  I HAVE NO

16   EVIDENCE, NO DISCOVERY.  I HAVE NO ABILITY TO SAY --

17            **THE COURT:**  I AM NOT ASKING YOU TO ASK THEM FOR

18   DISCOVERY.  I AM ASKING WHETHER YOU KNEW WHETHER YOUR

19   COMPANY -- NOT YOU AS A PERSON, I MEAN WHETHER PALM KNEW IN

20   OCTOBER OF 2006 ABOUT HELIO'S CAMPAIGN WHICH WAS LAUNCHED IN

21   MAY OF 2006.

22            **MR. CANNON:**  I HAVE NO EVIDENCE ON THAT ONE WAY OR

23   THE OTHER.

24            **THE COURT:**  YOU HAVEN'T CHECKED WITH YOUR CLIENT ONE

25   WAY OR THE OTHER.

1          **MR. CANNON:**  ONE WAY OR THE OTHER I DON'T KNOW.  I

2    CAN'T REPRESENT.

3          **THE COURT:**  SO WHY WOULDN'T YOU KNOW?  YOU HAVEN'T

4    HAD TIME TO CHECK WITH THEM?

5          **MR. CANNON:**  YOUR HONOR, WE GOT THIS 24 HOURS AGO,

6    SO THERE SIMPLY WAS NOT TIME.

7          I HAVE CHECKED WITH THE CLIENT.  I ASKED THEM ARE

8    THESE COMPANIES COMPETITORS?  NO.  DO YOU TRACK THIS COMPANY?

9    NOT REALLY.  WE ARE AWARE OF THEM, WE'RE AWARE OF THE NAME, BUT

10   WE ARE NOT AWARE.  WE ARE NOT CONSIDERED RIVALS, WE DON'T TRACK

11   THEM.  WE'RE GOING AFTER DIFFERENT BUSINESS SEGMENTS.  THAT IS

12   THE INFORMATION I GOT FROM THE CLIENT.

13         **MR. TROCK:**  YOUR HONOR, IF THEY KNOW US, THEY KNOW

14   OUR NAME, THEN THEY HAVE TO KNOW OUR ADVERTISING CAMPAIGN.

15   THIS IS THE ONLY ADVERTISING CAMPAIGN WE HAVE.

16         **THE COURT:**  OKAY.  NUMBER FOUR, THE MARKETING

17   CHANNELS.

18         **MR. TROCK:**  HERE, YOUR HONOR, I THINK WE ACTUALLY

19   PRETTY MUCH DISCUSSED THE MARKETING CHANNELS WHEN WE TALKED

20   ABOUT RELATEDNESS TO SERVICE.  HERE, WE ARE TALKING ABOUT

21   ADVERTISING THE SAME MAGAZINES, USING THE SAME STRATEGIC

22   PARTNERS.

23         I THINK THAT IN TAKING A LOOK AT THAT, YOU KNOW,

24   THEY CLAIM WE ARE NOT A COMPETITOR, BUT WHEN MR. HANCOCK IS

25   CONFRONTED WITH THE SIMILARITY OF THE AD CAMPAIGNS AND THE

1   ARTICLE TALKS ABOUT RIVAL HELIO, HE DOESN'T WE'RE NOT RIVALS,

2   HE BASICALLY SAYS WE ARE AFTER A DIFFERENT MARKET.

3           SO, I THINK THE MARKETING CHANNELS, IN OTHER WORDS,

4   THE CHANNELS WE USE TO ADVERTISE TO OUR CONSUMERS ARE OBVIOUSLY

5   THE SAME BECAUSE I DON'T THINK THEY CAN DISPUTE THAT THEY ARE

6   ADVERTISING IN GENTLEMAN'S QUARTERLY, ROLLING STONE,

7   ENTERTAINMENT WEEKLY, LUCKY, AND THEIR STRATEGIC PARTNERS ARE

8   GOOGLE, YAHOO, ONION, FANDANGO AND MY SPACE.

9           **MR. CANNON:**  NOT MY SPACE.

10          **MR. TROCK:**  I AM SORRY, WE CAN TALK LATER ABOUT THE

11  RELATIONSHIP BETWEEN CINGULAR AND MY SPACE AND THE RELATIONSHIP

12  BETWEEN CINGULAR AND PALM.

13          **THE COURT:**  OKAY.  WE HAVE DISCUSSED THIS.

14          **MR. CANNON:**  I WOULD JUST ADD THAT THE DEVICES THAT

15  WE SELL, WE DO NOT -- THIS AD IS NOT ON TV.  IT'S NOT IN

16  NIGHTCLUBS.  IT'S NOT ASSOCIATED WITH CELEBRITIES.

17          THE STYLIZED STORES THAT THEY HAVE IS A DIFFERENT --

18  YES, WE ADVERTISE IN MAJOR PUBLICATIONS, BUT THOSE ARE -- THOSE

19  HAVE LOTS OF ADS IN THEM.  THOSE ARE THE TYPES OF PUBLICATIONS

20  THAT ARE IN DENTIST OFFICES.

21          I MEAN, THEY HAVE WIDE ACCESS.  THEY ARE NOT -- IT'S

22  NOT A SUPER FOCUSED SORT OF PUBLICATION.

23          **THE COURT:**  THE KIND OF PUBLICATIONS THAT ARE IN

24  DENTIST OFFICES?  I HAVE NEVER HEARD ANYONE SAY THAT.  WHAT

25  KIND OF PUBLICATIONS ARE IN DENTIST OFFICES?

1          **MR. CANNON:** YOU KNOW, PUBLICATIONS THAT ANYONE

2    MIGHT READ. THEY'RE WIDELY READ, APPLICABLE TO LOTS OF

3    DIFFERENT TYPES OF PEOPLE.

4          **THE COURT:** ARE THERE OTHER PUBLICATIONS LIKE

5    BUSINESS WEEK OR -- ADVERTISE IN BUSINESS WEEK OR --

6          **MR. CANNON:** I AM PRETTY SURE WE ADVERTISE IN ALL OF

7    THOSE, LIKE WALL STREET JOURNAL AND THOSE SORTS OF OUTLETS.

8          **THE COURT:** I AM TALKING ABOUT BUSINESS WEEK OR

9    BUSINESS KIND OF PUBLICATIONS.

10          **MR. CANNON:** I BELIEVE WE DO.

11          **MR. TROCK:** AND THE KEY WOULD BE THIS ADVERTISING

12    CAMPAIGN, NOT THEIR PRIOR ONES.

13          **MR. CANNON:** I DON'T HAVE THE EVIDENCE THAT WE DO.

14    I MEAN, I CAN CHECK WITH THE CLIENT ON THAT. IT IS A

15    BUSINESS-ORIENTED PRODUCT --

16          **THE COURT:** YOU WOULD THINK --

17          **MR. CANNON:** I WOULD THINK.

18          **THE COURT:** -- BUT YOU DON'T KNOW.

19          **MR. CANNON:** NOT BUSINESS WEEK. I JUST DON'T KNOW.

20          **THE COURT:** WE DISCUSSED ABOUT THIS ONE.

21          I THINK, OBVIOUSLY, WHERE THE PARTIES USE SIMILAR

22    MARKETING CHANNELS AND ADVERTISING METHODS THE LIKELIHOOD OF

23    CONFUSION IS INCREASED, AND THE MARKETING CHANNELS THAT YOU ALL

24    USE, MANY OF THEM ARE THE SAME, SAME MAGAZINES, AND EVEN THOUGH

25    THERE ARE A COUPLE THAT YOU DON'T SHARE, BUT FOR THE MOST PART,

1    I THINK THIS FACTOR WEIGHS IN FAVOR OF FINDING LIKELIHOOD OF

2    CONFUSION BECAUSE I DO BELIEVE THAT THE MARKETING CHANNELS USED

3    ARE SIMILAR AND THE ADVERTISING METHODS ARE SIMILAR.

4              SO THIS FACTOR NUMBER FOUR ALSO WEIGHS IN FAVOR --

5              **MR. CANNON:**  YOUR HONOR, I HAVE RECEIVED SOME

6    INFORMATION --

7              **THE COURT:**  EXCUSE ME -- OF THE LIKELIHOOD OF

8    CONFUSION.

9              AND SO NEXT IS NUMBER FIVE, DEFENDANT'S INTENT.

10             **MR. TROCK:**  HERE, YOUR HONOR, I DISCUSSED THIS A

11   LITTLE BIT, BUT I THINK I CAN -- I LIST THE FACTORS HERE THAT I

12   THINK ARE IMPORTANT --

13             **THE COURT:**  OH, I AM SORRY.  YOU SAID -- LISA?

14             (DISCUSSION HELD WITH CLERK.)

15             **THE COURT:**  JUST A SECOND.  LET ME SEE HOW MUCH

16   FURTHER WE HAVE TO GO.

17             WE ARE GOING TO NEED TO TAKE ABOUT A TEN-MINUTE

18   BREAK.  I NEED TO SEE SOMEONE IN CHAMBERS.

19             WE WILL BE IN RECESS FOR TEN MINUTES.

20                   (RECESS TAKEN AT 2:37 P.M.)

21              (PROCEEDINGS RESUMED AT 3:00 P.M.)

22             **THE CLERK:**  BACK ON THE RECORD IN CIVIL 06-7754,

23   HELIO LLC V. PALM, INC.

24             **THE COURT:**  THE RECORD WILL REFLECT THAT BOTH

25   COUNSEL ARE PRESENT, MR. TROCK AND MR. CANNON ARE AT THE

1    PODIUM.

2            WE ARE ON FACTOR NUMBER FIVE, DEFENDANT'S INTENT.

3            **MR. TROCK:**  THAT'S CORRECT, YOUR HONOR.

4            **THE COURT:**  OKAY.

5            **MR. TROCK:**  AND I WAS GOING TO LIST THE DIFFERENT

6    ELEMENTS THAT I SEE HERE IN THIS CASE, WHICH LEAD US TO BELIEVE

7    THAT THERE WAS NOT ONLY KNOWLEDGE OF OUR CAMPAIGN, BUT ALSO

8    KNOWLEDGE OF OUR SLOGAN AND AWARENESS BY PALM THAT THEIR SLOGAN

9    WAS SIMILAR TO OURS.

10            AND THIS GOES TO A NUMBER OF THINGS.  I THINK

11    BASICALLY WE CAN TAKE A LOOK AT, AND TAKE A LOOK AT THE

12    POSITION THAT THEY HAVE MADE THAT THEY INVENTED THIS SLOGAN TWO

13    YEARS AGO BEFORE WE WERE EVEN IN EXISTENCE.  I DON'T THINK THAT

14    THERE IS ANY DISPUTE IN THE RECORD THAT THEY ARE THE JUNIOR OR

15    THE SECOND USER IN COMMERCE OF THIS SLOGAN, WHICH MEANS THAT

16    THEY USED THIS IN THE MARKETPLACE AFTER WE WERE USING IT,

17    WHICH --

18            **THE COURT:**  THIS IS INTENT.  YOUR ASSERTION IS THEY

19    INTENTIONALLY ADOPTED THIS TAGLINE TO CONFUSE CONSUMERS.

20            **MR. TROCK:**  THAT'S CORRECT.

21            **THE COURT:**  SO WHAT EVIDENCE DO YOU HAVE TO SUGGEST

22    THAT THEY INTENTIONALLY ADOPTED THE TAGLINE TO CONFUSE

23    CONSUMERS?

24            **MR. TROCK:**  IF WE TAKE A LOOK AT THE SIMILARITY OF

25    THE SLOGANS, PALM COULD HAVE PICKED ANY SLOGAN IT WANTED, BUT

1    FOR SOME REASON IT PICKED A SLOGAN THAT WAS VERY SIMILAR TO

2    OURS.

3          THERE IS NO -- I HAVE NOT SEEN ANY EVIDENCE THAT

4    THEY DIDN'T KNOW ABOUT OUR CAMPAIGN.  FOR THEM TO TAKE THE

5    POSITION THAT WE SHOULD BE AWARE OF THEIR ANNOUNCEMENT IN

6    OCTOBER IN A SMALL TRADE SHOW IN NEW YORK, I THINK WOULD BE

7    DISINGENUOUS THAT IF WE CANNOT TURN THAT SAME AWARENESS AROUND,

8    AND SAY, THEN YOU SHOULD BE AWARE OF OUR ADVERTISING CAMPAIGN,

9    IN WHICH WE SPENT $25 MILLION ON OR $40 MILLION ON SINCE MAY OF

10   2006.

11         I BELIEVE COUNSEL HAS REPRESENTED THAT PALM WAS

12   AWARE OF US AND WHO WE WERE, AND I THINK THAT THE ONLY WAY THEY

13   CAN DO THAT IS TO UNDERSTAND -- IS TO KNOW OUR ADVERTISING

14   CAMPAIGN BECAUSE IT'S THE ONLY ONE WE HAVE EVER DONE.

15         IF WE TAKE A LOOK AT THE OVERALL POSITIONING AND

16   STRATEGY OF OUR MARKETING PROGRAM, WE CAN SEE THAT THERE ARE

17   ELEMENTS OF IT THAT WE BELIEVE THEY ADOPTED DELIBERATELY.  THE

18   SIMILARITY OF THE SLOGAN, THE CHOICE OF MAGAZINES AND MEDIA

19   CHANNELS THAT ARE IDENTICAL TO OURS, GENTLEMAN'S QUARTERLY AND

20   ENTERTAINMENT WEEKLY AND ROLLING STONE AND LUCKY.  THAT ALSO

21   INDICATES THAT THERE WAS AN INTENT TO COPY OUR MARKETING

22   CAMPAIGN.

23         WE ALSO THEN TAKE A LOOK AT THE STRATEGIC PARTNERS

24   THAT WE USE, GOOGLE, YAHOO, ONION, FANDANGO.  THEY CHOSE THE

25   EXACT SAME ONES.  THEY DON'T HAVE THOSE PARTNERS IN THEIR PRIOR

1   PHONES.

2           **THE COURT:**  IF THEY HAVE BEEN IN EXISTENCE A LOT

3   LONGER THAN YOU --

4           **MR. TROCK:**  YES.

5           **THE COURT:**  -- THEN OSTENSIBLY THEY HAVE BEEN USING

6   THOSE CHANNELS LONG BEFORE YOU WERE.

7           **MR. TROCK:**  WELL, THERE'S NO EVIDENCE --

8           **THE COURT:**  SO I WOULDN'T -- OR WOULD I?  I MEAN, IS

9   THERE SOME WAY THAT I CAN NECESSARILY CONCLUDE THAT THEY HAVE

10  ADOPTED THESE PARTICULAR CHANNELS BECAUSE OF YOU?

11          **MR. TROCK:**  THERE IS NO EVIDENCE TO SHOW THAT THEY

12  USED THESE CHANNELS PRIOR TO OUR CAMPAIGN.  THERE IS NO

13  EVIDENCE --

14          **THE COURT:**  IS THERE ANY EVIDENCE TO SHOW THAT THEY

15  DID NOT USE THEM BEFORE YOUR CAMPAIGN?

16          **MR. TROCK:**  I DO NOT HAVE EVIDENCE ONE WAY OR THE

17  OTHER.

18          **THE COURT:**  I MEAN, CAN YOU REALLY IN GOOD FAITH

19  TAKE THE POSITION, I MEAN, REALLY, DO YOU FEEL THAT YOU CAN IN

20  GOOD FAITH TAKE THE POSITION THAT GIVEN THE AGE OF THEIR

21  COMPANY AND YOUR COMPANY, THAT THEY REALLY ONLY USED THOSE

22  CHANNELS BECAUSE YOU ALL WERE USING THOSE CHANNELS?

23          **MR. TROCK:**  I BELIEVE THAT'S VERY CLEAR AND TRUE

24  WITH THE STRATEGIC PARTNERS.  THERE IS ABSOLUTELY NO REASON ON

25  THIS PLANET WHY A BUSINESS COMPANY WOULD EVER HAVE A STRATEGIC

1    RELATIONSHIP WITH THE ONION.

2            **THE COURT:**  YEAH, BUT I MEAN IN TERMS OF ALL THE

3    OTHER CHANNELS.

4            **MR. TROCK:**  THAT'S CORRECT.  RIGHT.  IF I TAKE A

5    LOOK AT THE ENTIRE PICTURE, WHICH I THINK IS APPROPRIATE FOR

6    DETERMINING INTENT, AND I SEE A COMPANY WHICH SHOULD HAVE BEEN

7    AWARE OF OUR ADVERTISING CAMPAIGN, WHICH IS CHOOSING MARKETING

8    CHANNELS WHICH ARE IDENTICAL TO OURS, AND CHOOSING STRATEGIC

9    PARTNERS, WHICH THEY WOULD NEVER CHOOSE.

10           **THE COURT:**  THE MARKET, THAT'S THE QUESTION I ASKED

11   YOU, ABOUT THE MARKETING CHANNELS.  YOUR POSITION IS -- FROM

12   YOUR PERSPECTIVE, THEY ARE CHOOSING THESE MARKETING CHANNELS

13   THAT YOU ALL HAVE SELECTED, AND I AM ASKING YOU WHETHER YOU

14   REALLY BELIEVE THAT THEY ARE CHOOSING THESE MARKETING CHANNELS

15   BECAUSE OF YOU OR THEY HAVE ALREADY BEEN USING THOSE MARKETING

16   CHANNELS AND YOU USE THEM AS WELL, SO THERE IS A COINCIDENCE

17   THERE, BUT -- AS OPPOSED TO DOING IT BECAUSE YOU ALL ARE DOING

18   IT WITH THE INTENT TO CAUSE THE CONFUSION.

19           **MR. TROCK:**  MY CONCLUSION ON INTENT IS TO STEP BACK

20   AND TAKE A LOOK AT ALL OF THESE ELEMENTS.  WHEN I LOOK AT ALL

21   THE ELEMENTS, I COME TO THE CONCLUSION THAT THEY ARE DOING THIS

22   ON PURPOSE; THAT THIS IS MUCH MORE THAN MERE COINCIDENCE.

23           SO I INCLUDE THE SIMILARITY OF THE SLOGANS, THE SAME

24   MAGAZINES, AND ESPECIALLY THE SAME STRATEGIC PARTNERS.  IT'S AS

25   IF THEY SAW OUR ADVERTISING CAMPAIGN, THEY SAW HOW SUCCESSFUL

1   IT WAS, THEY SAID, WE WANT TO GO AND COMPETE AGAINST THESE

2   GUYS, SO LET'S COPY THEIR MARKETING PLAN, LET'S GO AFTER THE

3   SAME STRATEGIC PARTNERS, LET'S ADVERTISE IN THE SAME MEDIA

4   OUTLETS, LET'S GO AFTER THESE GUYS HEAD TO HEAD BECAUSE WE'VE

5   GOT A MULTIMEDIA DEVICE, TOO.

6          THAT'S WHAT IT TELLS ME WHEN I LOOK AT THIS, THAT

7   THAT'S THE LEVEL OF INTENT HERE.

8          **THE COURT:**  OKAY.

9          MR. CANNON?

10         **MR. CANNON:**  YOUR HONOR, THERE IS ABSOLUTELY NO

11  EVIDENCE OF INTENT HERE.  IN FACT, ON LESS THAN 24 HOURS'

12  NOTICE COMING UP TO CHRISTMAS WEEKEND, WE HAVE SUBMITTED

13  EVIDENCE OF THE OPPOSITE.

14         WE HAVE SUBMITTED THE EVIDENCE OF THE PERSON IN

15  CHARGE OF THIS AD CAMPAIGN, SCOTT HANCOCK WHO CATEGORICALLY

16  DENIES ANY INTENT TO COPY THIS AD CAMPAIGN.  IN FACT, HE

17  DEMONSTRATES THAT WE CAME UP WITH THIS, THIS PHRASE, THIS

18  DESCRIPTIVE PHRASE BEFORE THEY EVEN WERE IN EXISTENCE.

19         WE HAVE SUBMITTED A DECLARATION OF SCOTT HANCOCK,

20  WHICH WE GOT IN RESPONSE TO THIS TRO, WORKED THROUGH THE NIGHT

21  TO GET EVIDENCE IN FRONT OF YOUR HONOR, AND WE HAVE EVIDENCE

22  THAT THERE WAS NO INTENT.

23         COUNSEL HAS NO EVIDENCE OF INTENT.  HE IS TRYING TO

24  DRAW AN ARGUMENT OUT OF ELEMENTS THAT THEY HAVE CULLED

25  TOGETHER.  THEY HAVE THE BURDEN TO COME FORWARD AND PROVE THIS

1    CASE.  IT'S A TRO.  THEY HAVE NOT MET --

2         **THE COURT:**  I THINK YOU'RE RIGHT.  AT BEST THIS

3    FACTOR IS NEUTRAL, BUT I DON'T THINK THEY HAVE DEMONSTRATED ANY

4    INTENT.  SO THIS FACTOR FAVORS -- WEIGHS AGAINST A FINDING.

5         OBVIOUSLY, THIS IS -- THE NINTH CIRCUIT HAS

6    EMPHASIZED THAT THIS IS, I GUESS, AMENABLE -- IMPORTANCE OF

7    THIS PARTICULAR FACTOR, BUT IN ANY EVENT, I FIND THAT THIS

8    FACTOR WEIGHS AGAINST A FINDING OF INFRINGEMENT, CONFUSION.

9         THE NEXT ONE IS, THE SIXTH ONE IS EVIDENCE OF ACTUAL

10   CONFUSION.

11        **MR. TROCK:**  ON ACTUAL CONFUSION, YOUR HONOR, IN THE

12   VAST MAJORITY OF TRADEMARK INFRINGEMENT CASES, EVIDENCE OF

13   ACTUAL CONFUSION IS VERY RARE.

14        **THE COURT:**  RIGHT.

15        **MR. TROCK:**  I THINK IN THIS CASE IN PARTICULAR, IT'S

16   GOING TO BE ALMOST IMPOSSIBLE TO GET THIS RIGHT NOW BECAUSE

17   THEY HAVE ONLY BEEN ADVERTISING IN THE MARKETPLACE BASED UPON

18   THEIR PRESS RELEASE SINCE DECEMBER 12TH.

19        **THE COURT:**  SO IS THERE REALLY A CONCESSION ON BOTH

20   SIDES THAT THERE IS -- THIS FACTOR WEIGHS AGAINST THE FINDING

21   OF LIKELIHOOD OF CONFUSION BECAUSE THERE IS NO ACTUAL

22   CONFUSION?

23        **MR. TROCK:**  WE DO NOT HAVE ANY EVIDENCE OF ACTUAL

24   CONFUSION.  WE BELIEVE THEY HAVE BEEN ADVERTISING FAR TOO SHORT

25   FOR US TO ACTUALLY GATHER THAT EVIDENCE FROM THE MARKETPLACE.

1          **THE COURT:**  THIS FINDING WEIGHS AGAINST A FINDING OF

2     LIKELIHOOD OF CONFUSION.

3          THE NEXT ONE, NUMBER SEVEN, IS TYPE OF GOODS AND

4     DEGREE OF CARE LIKELY TO BE EXERCISED BY CONSUMERS.

5          **MR. TROCK:**  HERE, YOUR HONOR, THE ADVERTISING

6     CAMPAIGN THAT PALM BROUGHT OUT WAS -- IS POSITIONED TO COME OUT

7     JUST IN THE MIDDLE OF THE HOLIDAY BUYING SEASON.  THIS IS A

8     CRITICAL TIME OF YEAR FOR MOST CONSUMER GOODS MANUFACTURERS

9     ESPECIALLY US.  THIS IS THE TIME OF YEAR WHERE WE EXPECTED TO

10    INCREASE OUR SUBSCRIBER BASE BY 30 PERCENT.

11         CONSUMERS ARE RUSHED DURING THIS SEASON.  THEY HAVE

12    A LOT OF GIFT-BUYING NEEDS THAT THEY MUST FULFILL.  THEY GET

13    EASILY DISTRACTED.  THEY ARE BOMBARDED BY ADVERTISING, BY ALL

14    SORTS OF CONSUMERS.

15         AND BECAUSE OF THAT, IT IS VERY LIKELY THAT

16    CONSUMERS ARE NOT PAYING AS MUCH ATTENTION AS THEY NORMALLY

17    WOULD.  THEIR OWN EXECUTIVE HAS ADMITTED THAT THEIR DEVICE, THE

18    ONE THAT THEY ARE ADVERTISING, HAS NOW DROPPED TO THE PRICE

19    POINT OF A GIFT, UNDER $200.

20         SO, WE BELIEVE THAT THE DEGREE OF CARE THAT IS BEING

21    EXERCISED BY CONSUMERS AT THIS TIME OF YEAR FOR THESE TYPES OF

22    DEVICES IS A VERY LOW DEGREE OF CARE BECAUSE THEY ARE BEING

23    RUSHED, THEY ARE BEING DISTRACTED, THERE'S LOTS OF

24    ADVERTISEMENTS, THERE'S COMPETING ADVERTISEMENTS OUT THERE.

25    THESE DEVICES ARE PRICED AT A GIFT PRICE POINT.

1          **THE COURT:**  SO CONFUSION BETWEEN THE MARKET

2    GENERALLY WHERE THE GOODS AT ISSUE INVOLVE RELATIVELY

3    INEXPENSIVE IMPULSE PRODUCTS TO WHICH THE AVERAGE

4    UNSOPHISTICATED CONSUMER DOES NOT DEVOTE A GREAT DEAL OF CARE

5    IN CONSIDERATION OF PURCHASING.

6          MR. CANNON?

7          **MR. CANNON:**  YOUR HONOR, THAT WAS A VERY SPECULATIVE

8    ARGUMENT OF COUNSEL.  THERE IS NO EVIDENCE.  HE IS ASSUMING

9    WHAT CONSUMERS DO.  IN FACT, IF YOU LOOK AT THE -- IF YOU LOOK

10   AT THIS, IT IS THE OPPOSITE.  CONSUMERS ARE HYPERAWARE OF WHAT

11   THEY ARE BUYING WHEN THEY ARE BUYING CELL PHONES AND SIGNING UP

12   FOR COVERAGE.  REMEMBER, YOU'RE BUYING A DEVICE AND VERY OFTEN

13   SIGNING UP FOR A YEAR OR TWO OF COVERAGE.

14          PEOPLE DON'T GO IN AND ACCIDENTALLY BUY A TREO AS

15   OPPOSED TO BLACKBERRY OR ACCIDENTALLY BUY A SAMSUNG VERSUS

16   MOTOROLA.  PEOPLE ARE VERY AWARE OF WHAT THEY'RE BUYING.  THESE

17   ARE NOT CHEAP GIFTS.  THE LOWEST PRICE TREO IS 199.  THEY GO UP

18   TO OVER $500 EACH.  THEY ARE EXPENSIVE.  THEY ARE VERY

19   TECHNOLOGICALLY, YOU KNOW, ORIENTED AT THE TECH-SAVVY PEOPLE.

20          YOU HAVE EVIDENCE IN THE RECORD THAT HELIO IS GOING

21   AFTER TECH-SAVVY PEOPLE.  THESE ARE SOPHISTICATED CONSUMERS.

22   IT'S NOT LIKE BUYING A NONGADGET.  THESE ARE TECHNICAL DEVICES.

23   TO SAY THAT CONSUMERS ARE HECTIC AND WILL MAKE ACCIDENTS WHEN

24   THEY ARE BUYING, I THINK IS JUST THE WRONG APPROACH.

25          IF YOU ACTUALLY LOOK AT THE ADS, THERE ARE LOTS OF

1  BRANDS ON THESE ADS.  CONSUMERS KNOW WHAT THEY ARE DOING.  ON

2  THE HELIO AD, THE SAMSUNG BRAND IS RIGHT ON THE PHONE.  SAMSUNG

3  HEAVILY ADVERTISES ITS PHONES.  CONSUMERS ARE AWARE OF THE

4  BRANDS ON CELL PHONES.  THEY ARE AWARE OF THE SERVICES.  IT'S A

5  DECISION THAT THEY CAREFULLY MAKE.

6         THESE ARE NOT CHEAP PRODUCTS.  THESE ARE EXPENSIVE

7  INDIVIDUAL ITEMS.  YOU DON'T BUY THEM EVERY WEEK.  YOU USUALLY

8  HAVE ONE, MAYBE TWO.  IT'S A SIGNIFICANT PURCHASE FOR A

9  CONSUMER.  AND THE PEOPLE WHO ARE BUYING THESE ARE TECH-SAVVY

10  PEOPLE.  THERE IS EVIDENCE IN THE RECORD OF THAT.

11         **MR. TROCK:**  WE ARE SAYING IT'S THE HOLIDAY SEASON

12  WHICH IS CAUSING THE PROBLEM.  THEY ARE LAUNCHING IN THE MIDDLE

13  OF THE HOLIDAY SEASON WHEN CONSUMERS HAVE A LARGE AMOUNT OF

14  GIFT BUYING OBLIGATIONS TO FULFILL, THE STORES ARE CROWDED --

15         **THE COURT:**  PEOPLE DON'T USUALLY IMPULSE -- PEOPLE

16  DON'T GENERALLY IMPULSE BUY SOMETHING THAT COSTS ABOUT $200.

17  THAT'S SOMETHING THAT IS NOT INEXPENSIVE.

18         **MR. TROCK:**  I DON'T DISAGREE WITH THAT, YOUR HONOR,

19  THAT'S TRUE.  BUT WHAT WE ARE SAYING HERE IN THIS CASE IS THAT

20  THE DEGREE OF CARE THAT A CONSUMER WOULD NORMALLY EXHIBIT IS

21  REDUCED BECAUSE IT IS BEING ADVERTISED IN THE MIDDLE OF THE

22  HOLIDAY BUYING SEASON.  CONSUMERS ARE NOT EXERCISING THE DEGREE

23  OF CARE IN CHOICES AND AWARENESS OF WHAT'S GOING ON DURING THIS

24  SEASON THAT THEY NORMALLY WOULD IN JUNE OR JULY.

25         **THE COURT:**  I UNDERSTAND THE POSITION.  I DON'T

1   EMBRACE IT.  I THINK THE DEFENDANTS ARE CORRECT.  I DON'T THINK

2   THIS IS ONE OF THE CASES, IN MY VIEW, THE PRODUCTS ARE SO

3   INEXPENSIVE AS TO QUALIFY AS IMPULSE PURCHASES.  I THINK PEOPLE

4   WHO PAY THAT AMOUNT OF MONEY FOR THESE PRODUCTS OR ANY

5   PRODUCTS, EXERCISE A CERTAIN DEGREE OF CARE REGARDLESS OF WHEN

6   THEY ARE BEING SOLD.

7          SO THIS FACTOR WEIGHS AGAINST THE FINDING OF

8   LIKELIHOOD OF CONFUSION.

9          SO, THE NEXT ONE IS THE LIKELIHOOD OF EXPANSION ON

10  THE PRODUCT LINES, WHICH I GUESS IS NOT RELEVANT HERE SINCE IT

11  DOESN'T WEIGH IN EITHER PARTIES' FAVOR SINCE THE PARTIES SELL

12  DIRECTLY COMPETING PRODUCTS.  THAT IS WHAT I AM CONCLUDING.

13         SO, SINCE I HAVE CONCLUDED THE PARTIES' PRODUCTS ARE

14  CLOSE PROXIMITY IN THE MARKET, THIS FACTOR IS NOT RELEVANT.

15         EIGHT IS KIND OF NEUTRAL.

16         SO WE HAVE THREE AND THREE, AND THEN STRENGTH OF THE

17  MARK I HAVEN'T -- JUST A SECOND.

18         (PAUSE IN THE PROCEEDINGS.)

19         **THE COURT:**  LET'S MOVE ON TO THE IRREPARABLE HARM

20  BECAUSE OBVIOUSLY, RIGHT NOW, AS I SAID, THIS IS A CLOSE CASE

21  AND I AM STILL -- I HAVEN'T REACHED THE POINT WHERE I CAN FIND

22  A LIKELIHOOD OF CONFUSION THAT WOULD TRIGGER THE REBUTTABLE

23  PRESUMPTION.

24         LET ME ASK YOU, ONE OF THE -- IN TERMS OF DELAY,

25  THERE IS AUTHORITY THAT SUPPORTS THE -- A FINDING THAT WHEN THE

1   CEASE AND DESIST LETTERS ARE SENT, THAT THAT WOULD ARGUE

2   AGAINST THE DELAY IN THE CONTEXT OF IRREPARABLE HARM, BUT IN

3   THIS CASE, DEFENDANT'S ARGUMENT IS THAT THERE WAS NO CEASE AND

4   DESIST LETTER SENT, THERE WAS NO EFFORT ON THE PART OF THE

5   PLAINTIFFS TO COMMUNICATE DIRECTLY WITH PALM TO TRY TO TAKE

6   CHARGE OF OR RESOLVE THIS MATTER SOONER THAN LATER.  THERE WAS

7   NO COMMUNICATION AT ALL BEFORE THIS LAWSUIT WAS FILED.

8          AND SO, I KNOW I ASKED THE QUESTION BEFORE, I DON'T

9   REMEMBER WHAT YOUR ANSWER WAS, BUT WHY IS IT THAT YOU DIDN'T

10  SEND A CEASE AND DESIST LETTER AS SOON AS YOU BECAME AWARE OF

11  THE PROBLEM TO SEE IF YOU WERE ABLE TO EVEN AVOID THE TIME

12  INHERENT IN THIS PROCESS?

13         **MR. TROCK:**  BECAUSE THE CEASE AND DESIST LETTER

14  WOULD DO ABSOLUTELY NO GOOD IN THE REAL MARKETPLACE.  THEIR

15  CAMPAIGN WAS ALREADY GONE.  IT WAS ALREADY OUT THERE.  THEY HAD

16  SPENT THE MONEY.  THE BILLBOARDS WERE UP.  THE MAGAZINE ADS

17  WERE PLACED --

18         **THE COURT:**  HOW DO YOU KNOW IT WOULDN'T HAVE DONE

19  ANY GOOD?

20         **MR. TROCK:**  COMPANIES NEVER PULL THEIR ENTIRE

21  ADVERTISING CAMPAIGN OUT OF THE MARKETPLACE ON THE BASIS OF A

22  LETTER FROM A LAWYER.  IT JUST DOESN'T HAPPEN.  AND WE JUST

23  FOUND OUT ABOUT THIS A WEEK AGO.

24         **THE COURT:**  WHAT PROBLEM WOULD IT HAVE DONE FOR YOU

25  TO AT LEAST TRY?

1        **MR. TROCK:**  TO TRY?  IT WOULD HAVE DONE NO GOOD.

2        **THE COURT:**  YOU FOUND OUT ABOUT --

3        **MR. TROCK:**  IT WAS A FUTILE EFFORT.

4        **THE COURT:**  YOU FOUND OUT ABOUT IT A WEEK AGO.

5        **MR. TROCK:**  THAT'S CORRECT.

6        **THE COURT:**  WHAT DATE?

7        **MR. TROCK:**  I BELIEVE IT WAS AFTER THE PUBLICATION

8   OF THIS BUSINESS WEEK ARTICLE ON THE 12TH OF DECEMBER.

9        **THE COURT:**  SO THE 12TH OF DECEMBER YOU FOUND OUT

10  ABOUT THIS?

11       **MR. TROCK:**  THAT'S CORRECT.

12       **THE COURT:**  AND ON THE -- WHAT DAY IN DECEMBER DID

13  YOU FILE THIS?

14       **MR. TROCK:**  LAST THURSDAY I FOUND ABOUT IT

15  PERSONALLY, AND I BELIEVE IT WAS FILED ON MONDAY.

16       **THE COURT:**  WHAT'S THE DATE ON MONDAY?

17       **MR. CANNON:**  TUESDAY IS THE 19TH.

18       **MR. TROCK:**  THE 19TH?

19       **THE COURT:**  THE 19TH.

20       YOU FOUND OUT ABOUT IT ON THE 12TH, YOU FILED THIS

21  ON THE 19TH, YOU DIDN'T -- I STILL DON'T UNDERSTAND WHY YOU

22  COULDN'T HAVE SENT A CEASE -- FRANKLY, I HAVE TO SAY IN THE 15

23  YEARS PLUS I HAVE BEEN HERE, I HAVE NEVER HAD A CASE, AT LEAST

24  IN MY COURT, WHERE A CEASE AND -- AT LEAST ONE -- I MEAN, MOST

25  OF THE TIME YOU HAVE LOTS OF LETTERS AND LOTS OF ANGRY

1    COMMUNICATIONS BACK AND FORTH, AND FINALLY THEY END UP FILING

2    SUIT OUT OF EXASPERATION.

3              BUT THIS IS THE FIRST CASE, FRANKLY, THAT I HAVE

4    EVER HAD THAT THERE HAS BEEN NO ATTEMPT AT ALL TO AVOID THE

5    LITIGATION PROCESS, AND JUST KIND OF WALK INTO COURT.

6              SO I AM JUST INTERESTED IN KNOWING WHY, PARTICULARLY

7    GIVEN THE FACT THAT YOU FOUND OUT ABOUT IT DECEMBER 12TH YOU

8    DIDN'T FILE THIS TRO UNTIL THE 19TH, AND THERE WAS SEVEN DAYS

9    IN BETWEEN.  SOMETHING COULD HAVE HAPPENED IF FOR NOTHING MORE

10   THAN A TELEPHONE CALL SAYING, YOU KNOW WHAT?  THIS IS A PROBLEM

11   FOR US.  IS THERE SOMETHING YOU CAN DO; OTHERWISE SEVEN DAYS

12   FROM NOW WE ARE GOING TO FILE A LAWSUIT.

13             **MR. TROCK:**  WE HAVE -- HELIO HAS NEVER FILED ANOTHER

14   LAWSUIT BEFORE.  THIS IS THE FIRST TIME THEY HAVE DONE THIS IN

15   THE TRADEMARK CONTEXT.  THIS IS NOT WHAT WE WANT TO DO.

16             **THE COURT:**  RIGHT.  WHICH IS WHY I WANT YOU TO

17   ANSWER THE QUESTION I JUST ASKED YOU.  WHY WOULDN'T YOU PICK UP

18   THE TELEPHONE AND SAY, LOOK, THIS IS A PROBLEM.  WE'VE NEVER

19   FILED A LAWSUIT BEFORE.  WE DON'T WANT TO FILE THIS LAWSUIT

20   NOW.  WE REALLY WOULD LIKE YOU TO TAKE THIS OFF THE MARKET, BUT

21   IF YOU DON'T, WE ARE GOING TO FILE A LAWSUIT.

22             **MR. TROCK:**  AND THE ANSWER TO THEM WAS, WILL ALWAYS

23   BE, WE ARE NOT TAKING THIS OFF THE MARKETPLACE.

24             **THE COURT:**  HOW DO YOU KNOW?

25             **MR. TROCK:**  BECAUSE I HAVE BEEN IN THIS SITUATION

1    BEFORE WITH A NATIONAL CORPORATION FINDING AN ADVERTISING

2    CAMPAIGN THAT JUST CAME OUT BEFORE CHRISTMAS, SAME SCENARIO, WE

3    CONTACTED THEM AND THEIR ANSWER WAS, YOU'VE GOT TO BE KIDDING.

4    THIS IS THE CHRISTMAS BUYING SEASON, WE'RE NOT PULLING A SINGLE

5    AD.  YOU'VE GOT A PROBLEM WITH IT?  GO TALK TO A JUDGE.

6              THAT'S EXACTLY WHAT THE RESPONSE WOULD HAVE BEEN.

7              **THE COURT:**  THAT'S RIDICULOUS.  THAT IS ABSOLUTELY

8    RIDICULOUS TO ME.  I FIND THAT ARGUMENT RIDICULOUS BECAUSE

9    LITIGATION, LITIGATION, YOU KNOW, REALLY REQUIRES LAWYERS TO

10   BEHAVE AS LAWYERS, REGARDLESS OF WHETHER OR NOT YOU THINK IT IS

11   GOING TO BE PRODUCTIVE.  I MEAN, THERE OFTENTIMES WHEN COURTS

12   EXPECT YOU TO MEET AND CONFER AND TRY TO DO SOMETHING EVEN IF

13   YOU HAVE NO CONFIDENCE IN YOUR ABILITY TO DO IT.  WE EXPECT YOU

14   TO UNDERSTAND THAT THESE ARE YOUR ISSUES AND YOUR PROBLEMS, AND

15   IN THE FIRST INSTANCE, IT IS YOUR RESPONSIBILITY TO TRY TO

16   RESOLVE YOUR PROBLEMS PRIOR TO SEEKING THE INTERVENTION OF THE

17   COURT.  THAT IS AN EXPECTATION WHETHER OR NOT YOU HAVE

18   CONFIDENCE THAT YOU WILL BE ABLE TO DO IT BECAUSE ULTIMATELY

19   YOU ALWAYS HAVE THIS AS A RESORT IF YOU CAN'T RESOLVE YOUR OWN

20   PROBLEMS, THE COURT IS OBLIGATED TO RESOLVE THEM.

21             YOU OBVIOUSLY WAITED A WEEK --

22             **MR. TROCK:**  WE DIDN'T WAIT.  WE WERE --

23             **THE COURT:**  YOU MUST HAVE IF YOU LEARNED ON THE 12TH

24   AND YOU FILED THIS ON THE 19TH, BETWEEN THE 12TH AND 19TH THERE

25   IS SEVEN DAYS.

1      **MR. TROCK:** IT DOES TAKE TIME TO PREPARE THE

2   MATERIALS FOR THE COURT.

3      **THE COURT:** AND IT WOULD HAVE TAKEN LESS TIME TO

4   MAKE A TELEPHONE CALL AND PROBABLY EVEN LESS TIME THAN THAT TO

5   DRAFT A LETTER.

6      **MR. TROCK:** YOU ARE CORRECT, YOUR HONOR, AND IN

7   HINDSIGHT MAYBE WE SHOULD HAVE DONE THAT. BUT THE REALITY IS

8   WE DIDN'T. NOW THEY KNOW ABOUT THE DISPUTE. ARE THEY WILLING

9   TO PULL THEIR ADVERTISING CAMPAIGN NOW? ARE THEY WILLING TO

10  TAKE THE ADS OFF AND REMOVE THE SLOGAN NOW? I THINK THEY HAVE

11  TOLD US THAT THEIR ANSWER IS NO.

12     **THE COURT:** THAT STILL DOES NOT JUSTIFY YOUR

13  POSITION JUST BECAUSE AT THIS POINT YOU CAN LOOK BACK AND SAY,

14  WELL, THEY WOULDN'T HAVE DONE IT THEN BECAUSE THEY ARE NOT

15  DOING IT NOW. BECAUSE RIGHT NOW WHAT THEY'RE DOING IS SAYING

16  YOU DON'T HAVE A BASIS FOR A TRO AND THE REASON YOU DON'T IS

17  BECAUSE THERE'S NO IRREPARABLE HARM. THE REASON WE CAN TELL

18  YOU THERE'S NO IRREPARABLE HARM IS BECAUSE THEY DIDN'T VIEW IT

19  AS IRREPARABLE HARM BECAUSE IF THEY HAD, THEY WOULDN'T HAVE SAT

20  ON THEIR LAURELS AND WAITED ALL THIS TIME RATHER THAN TRYING TO

21  TAKE CHARGE OF THE SITUATION IMMEDIATELY UPON LEARNING OF THE

22  PROBLEM.

23        THE JUDGE, THEY SAT AND WAITED FOR SEVEN DAYS, SO

24  WHY SHOULD YOU, THE JUDGE, DROP EVERYTHING YOU SHOULD BE DOING

25  RIGHT NOW, WHICH IS WHAT WE HAVE DONE, AND TRY TO RESOLVE IN

1  TWO DAYS SOMETHING THAT THEY WAITED SEVEN DAYS BEFORE THEY EVEN

2  BROUGHT TO YOUR ATTENTION AND NEVER TOLD US ABOUT.

3        **MR. TROCK:**  YOUR HONOR, WE DID NOT WAIT SEVEN DAYS.

4  SEVEN DAYS --

5        **THE COURT:**  WHAT HAPPENED THEN IF YOU DIDN'T WAIT

6  SEVEN DAYS?  IF YOU LEARNED ON THE 12TH AND YOU FILED ON THE

7  19TH, YOU DIDN'T WAIT SEVEN DAYS, SO WHAT DID YOU DO?

8        **MR. TROCK:**  WE GATHERED THE EVIDENCE OF WHAT WE

9  BELIEVE WAS THE CASE AGAINST PALM; THAT WE HAD TO DISCOVER WHAT

10 WE HAVE DONE.  WE HAD TO GATHER THE EXHIBITS YOU SEE HERE,

11 PREPARE THE DECLARATIONS, MAKE A DECISION AS TO WHETHER OR NOT

12 WE HAD A CLAIM AGAINST PALM.

13        WE KNEW WE WERE BEING HARMED IN THE MARKETPLACE.

14 THAT'S WHY WE ARE HERE SO QUICKLY.

15        **THE COURT:**  THAT'S NOT QUICK IF IT IS REALLY THAT

16 URGENT.  AND, ACTUALLY, THROUGH THIS GATHERING PROCESS, IT

17 WOULD HAVE TAKEN YOU LESS TIME TO MAKE A TELEPHONE CALL.

18        **MR. TROCK:**  REALITY IS, YOUR HONOR, WE DID NOT.

19 PERHAPS IN HINDSIGHT WE SHOULD HAVE.

20        **THE COURT:**  I DON'T KNOW WHAT PERHAPS.

21        LET ME -- MR. CANNON?  IN TERMS OF THIS

22 PARTICULAR -- I MEAN, THE AUTHORITY THAT TALKS ABOUT CEASE AND

23 DESIST, THEY MAKE IT CLEAR THAT WHEN THOSE LETTERS ARE SENT

24 THAT OBVIOUSLY DELAY IS NOT A BIG ISSUE, BUT WHY -- MR. TROCK,

25 I DON'T KNOW.  I AM LISTENING TO WHAT YOU ARE SAYING, MAYBE I

1    AM NOT HEARING YOU.

2            I DON'T KNOW WHAT THE ANSWER IS.  WHY SHOULDN'T I

3    CONSIDER THAT DELAY IN NOT SENDING A CEASE AND DESIST LETTER

4    AND EVEN THE SEVEN-DAY DELAY IN FILING FOR THIS TRO IN THE

5    CONTEXT OF WHETHER OR NOT I SHOULD HAVE A FINDING THAT THERE IS

6    IRREPARABLE HARM.

7            **MR. TROCK:**  BECAUSE I BELIEVE THE CASE LAW INDICATES

8    THAT TIME PERIODS LAPSING OF 30 TO 60 DAYS DO NOT INDICATE A

9    SITUATION WHERE SOMEBODY IS WAITING TOO LONG TO ADDRESS THE

10   COURT ON IRREPARABLE HARM.

11           **THE COURT:**  I WOULDN'T AGREE WITH THAT AT ALL.  IT

12   CERTAINLY HAS TO BE FACT SPECIFIC BECAUSE I CERTAINLY WOULD NOT

13   AGREE THAT SOMEBODY WAITING 60 DAYS OR MAYBE EVEN 30 DAYS,

14   DEPENDING ON WHAT THE EMERGENCY IS, WOULD NOT BE A DELAY THAT

15   WOULD SUGGEST THAT THERE IS NOT IRREPARABLE HARM.

16           **MR. TROCK:**  WE CAN PROVIDE THOSE CASES TO YOUR

17   HONOR.

18           **THE COURT:**  IT WOULD HAVE TO BE FACT SPECIFIC.

19           **MR. TROCK:**  THE POINT IS, WE GOT HERE SO THAT WE

20   COULD PUT THE CASE TOGETHER FOR YOU TO CONSIDER AS QUICKLY AS

21   WE POSSIBLY COULD, BECAUSE WE ARE BEING IRREPARABLY HARMED IN

22   THE MARKETPLACE.  WE ARE A BRAND NEW COMPANY, WE'RE SMALL,

23   RELATIVELY UNKNOWN, ONLY TWO YEARS OLD.  WE ARE STRUGGLING TO

24   BE PROFITABLE HERE.

25           THIS SLOGAN IS THE HEART AND SOUL OF OUR COMPANY.

1    IT'S THE IDENTITY OF OUR IMAGE.  WE SPENT $30 MILLION CREATING

2    CONSUMER GOODWILL.  AND PALM IS A MUCH LARGER, OLDER, BETTER

3    FINANCED COMPANY.  THE REVENUES THIS LAST YEAR WERE

4    $1.6 BILLION.  THEY HAVE VERY STRONG BRAND IDENTITY.  THEY CAN

5    CRUSH US IN THIS MARKETPLACE.  THIS IS A CRITICAL BUYING SEASON

6    FOR US.  WE ARE LOOKING TO INCREASE OUR SUBSCRIBER BASE BY

7    30 PERCENT THIS BUYING SEASON.

8            **THE COURT:**  AT THIS POINT, I HAVE NOT -- I HAVE NOT

9    MADE FINDINGS ON THE FACTORS THAT WOULD TRIGGER THE PRESUMPTION

10   SINCE I HAVE NOT MADE A FINDING WITH RESPECT ONE WAY OR THE

11   OTHER WITH RESPECT TO LACK OF SUCCESS ON THE MERITS, AND RIGHT

12   NOW, YOU GUYS ARE EVENLY BALANCED.  SO, JUST LOOKING AT THE

13   BALANCE OF HARDSHIPS -- SO LET'S DISCUSS THE BALANCE.

14           **MR. TROCK:**  WE BELIEVE HERE THAT THE HARDSHIP FOR

15   THEM IS MINIMAL BECAUSE WE ARE SEEKING ONLY VERY NARROWLY

16   TAILORED RELIEF.

17           **THE COURT:**  YOU SAY THAT, YOU SAY NARROWLY TAILORED

18   RELIEF, BUT IF YOU'RE NARROWLY TAILORED RELIEF DOESN'T

19   REQUIRE -- YOU SAY TAKE DOWN THE ADS, BUT EVERY PLACE THEY HAVE

20   AN AD, ANYWHERE THAT HAS THIS SLOGAN, THEY HAVE TO EITHER IN

21   SOME WAY PUT SOMETHING OVER IT OR GET RID OF IT.  SO HOW IS

22   THAT NARROWLY TAILORED?

23           **MR. TROCK:**  BECAUSE IT ONLY GIVES US THE RELIEF THAT

24   WE NEED.  WE ARE NOT ASKING THEM TO PULL THEIR ADVERTISEMENTS.

25   WE ARE NOT ASKING THEM TO TAKE THEM DOWN.  WE ARE NOT ASKING

1   THEM TO RECALL THEM.  THOSE ARE MEASURES THAT WE ARE NOT

2   REQUESTING.

3           FOR EXAMPLE, THE ELECTRONIC ADVERTISEMENTS THAT THEY

4   HAVE ON THE INTERNET.  A FEW PHONE CALLS, A FEW KEY STROKES,

5   THAT'S GOING TO COME DOWN.  THAT'S NOT GOING TO BE A HUGE

6   EXPENSE.

7           **THE COURT:**  YOU ARE ASKING THEM TO TAKE IT DOWN

8   THEN.

9           **MR. TROCK:**  NO, NO.  THE SLOGAN.  THEY CAN GO RIGHT

10  ON TO THOSE WEBSITES, AND SIMPLY GO INTO THE COMMANDS THAT ARE

11  THERE FOR DISPLAYING THAT SLOGAN ON THE WEBSITE AND JUST KNOCK

12  THAT LINE OF TEXT OUT, AND IT'S GONE.

13          **THE COURT:**  I AM LOOKING AT THE BALANCE OF THE

14  HARDSHIPS, FROM YOUR PERSPECTIVE, HOW -- WHAT DOES THAT DO?

15  YOU'RE SAYING THAT'S NARROWLY TAILORED.  YOU WANT THEM TO GO

16  THROUGH THE INTERNET AND THROUGH ALL OF THEIR ADS WHEREVER THEY

17  ARE LOCATED IN THE PUBLICATIONS, MAGAZINES, BILLBOARDS, BUSES,

18  TRAINS, AND WHEREVER ELSE --

19          **MR. TROCK:**  THAT'S CORRECT.

20          **THE COURT:**  -- AND GO FIND THEM AND PUT SOMETHING

21  OVER --

22          **MR. TROCK:**  MASKING TAPE, PAINT, WHATEVER IS

23  NECESSARY.

24          **THE COURT:**  HOW DOES THAT EFFECT THE BALANCE OF

25  HARDSHIPS?

1          **MR. TROCK:**   BECAUSE IT'S AN INCREMENTAL COST FOR

2    THEM RIGHT NOW.

3          **THE COURT:**   WHAT DO YOU MEAN "INCREMENTAL COST"?

4          **MR. TROCK:**   IN OTHER WORDS, THEY ARE NOT HARMED BY

5    NOT BEING ABLE TO SELL THEIR DEVICES OR THEIR PHONES OR BEING

6    ABLE TO ADVERTISE THEM.

7          SO WE ARE NOT ASKING TO HARM THEM ECONOMICALLY HERE.

8    THERE WILL BE A COST ASSOCIATED WITH THIS.  WE BELIEVE IT WILL

9    BE A SMALL INCREMENTAL COST COMPARED TO THE $25 MILLION THEY

10   ARE SPENDING ON THIS ADVERTISING CAMPAIGN.  IT WILL BE MINOR

11   COMPARED TO THAT.

12         BUT, YES, THERE WILL BE SOME EFFORT REQUIRED.  THEY

13   WILL HAVE TO MAKE SOME PHONE CALLS.  AND THEIR MEDIA BUYERS

14   WILL HAVE TO CONTACT THE MEDIA OUTLETS AND COME UP WITH A

15   REMEDY IN WHICH THEY CAN COVER OVER THE SLOGAN.  THAT'S GOING

16   TO BE A VERY TINY COST COMPARED TO THE SIZE OF THIS CAMPAIGN.

17   SO THEY CONTINUE TO BENEFIT FROM THEIR ADS.  THE ADS ARE NOT

18   TAKEN DOWN.  THE SPACE IS NOT REMOVED.  NONE OF THOSE THINGS

19   OCCUR.  THE ONLY THING THAT HAPPENS IS THE CONSUMER CAN NO

20   LONGER SEE THAT SLOGAN.  THAT'S IT.

21         **THE COURT:**   SO HOW IS THAT BALANCED AGAINST WHAT

22   WITH RESPECT TO YOU?

23         **MR. TROCK:**   WE ARE LOOKING AT THE COMPLETE LOSS OF

24   THE HEART AND SOUL OF OUR COMPANY HERE.  WE'VE JUST SPENT

25   $30 MILLION TRYING TO ACQUIRE CONSUMER GOODWILL, AN INTANGIBLE

1    ASSET THAT ONCE IT'S GONE, WE CAN'T EVER GET BACK.  NO AMOUNT

2    OF MONEY IS GOING TO GET THAT BACK FOR US.

3              THAT'S WHY THAT KIND OF HARM THAT'S GOING TO OCCUR

4    HERE IS GOING TO BE IRREPARABLE TO US.  WE NEED TO HAVE THAT

5    CONSUMER GOODWILL IN ORDER TO SURVIVE IN THIS MARKETPLACE.  WE

6    ARE STRUGGLING TO BECOME PROFITABLE.  THEIR COMPANY IS SO

7    LARGE, SO WELL-KNOWN, SO MUCH MORE BETTER FINANCED THAN WE ARE,

8    THEY WILL CRUSH US IN THE MARKETPLACE IF THEY'RE ALLOWED TO

9    CONTINUE TO DO THIS.

10             **THE COURT:**  THEIR POSITION IS THAT YOUR CLAIM OF

11   IRREPARABLE INJURY IS SPECULATIVE.

12             **MR. TROCK:**  WHEN THERE'S A LIKELIHOOD OF CONFUSION

13   IT'S NOT SPECULATIVE, IT'S PRESUMED.

14             **THE COURT:**  I HAVE NOT FOUND THAT.  I HAVE NOT FOUND

15   THAT.

16             **MR. TROCK:**  I UNDERSTAND.

17             **THE COURT:**  SO THERE IS NO PRESUMPTION.

18             **MR. TROCK:**  I UNDERSTAND THAT.

19             **THE COURT:**  THAT'S WHY I ASKED YOU TO DISCUSS THE

20   RELATIVE BALANCE OF HARDSHIP --

21             **MR. TROCK:**  I UNDERSTAND THAT.  BECAUSE OF THE

22   SIZE --

23             **THE COURT:**  IF YOU UNDERSTAND IT, THEN JUST DO IT.

24             **MR. TROCK:**  OKAY.

25             THE SIZE OF THEIR COMPANY, THE QUANTITY OF

1    ADVERTISEMENTS THEY HAVE OUT THERE, THE USE OF THAT SLOGAN IS

2    GOING TO TAKE CONSUMERS AWAY FROM US AND BRING THEM INTO THEIR

3    STORES, AND THEY ARE GOING TO PURCHASE THEIR SERVICES AND THEIR

4    DEVICES INSTEAD OF OURS.  THAT'S GOING TO BE THE HARM.  WE ARE

5    GOING TO LOSE THAT.  WE'RE GOING TO LOSE OUR CONSUMER GOODWILL

6    BECAUSE WE ARE TRYING TO --

7             **THE COURT:**  DO YOU KNOW THAT YOU HAVE CONSUMER

8    GOODWILL?

9             **MR. TROCK:**  YES.  WE DID A SURVEY IN OCTOBER THAT

10   INDICATED 60 PERCENT OF THOSE WHO WE TALKED TO COULD IDENTIFY

11   OUR SLOGAN AS US, AND THEY COULD GIVE US BACK WHAT THE MESSAGE

12   MEANT TO THEM.

13            **THE COURT:**  THAT'S WHAT YOU CONSIDER GOODWILL?

14            **MR. TROCK:**  THAT'S CORRECT.

15            **THE COURT:**  RECOGNITION?

16            **MR. TROCK:**  THAT'S CORRECT.

17            THAT'S WHAT WE ARE GOING TO LOSE HERE BECAUSE THEY

18   HAVE CREATED THE CONFUSION IN THE MARKETPLACE, THIS ASSOCIATION

19   BETWEEN THEM AND US.  WE ARE GOING TO LOSE THOSE CONSUMERS.

20   WE'RE GOING TO LOSE THAT GOODWILL THAT WE ARE TRYING TO GET

21   DEVELOPED.  WE'RE GOING TO LOSE THAT MOMENTUM IN THE MOST

22   CRITICAL PART OF THE SEASON FOR US.

23            WE WANTED TO INCREASE OUR SUBSCRIBER BASE BY

24   30 PERCENT THIS BUYING SEASON.  IT IS NOT GOING TO HAPPEN

25   BECAUSE OF THIS.

1          **THE COURT:**  OKAY.  THANK YOU.

2          MR. CANNON, BALANCE OF HARDSHIPS.

3          **MR. CANNON:**  YOUR HONOR, THE REMEDY THAT THEY SEEK

4   IS DEVASTATING --

5          **THE COURT:**  IRREPARABLE HARM, TOO, I GUESS.  HE

6   DISCUSSED BOTH.

7          **MR. CANNON:**  COMBINED BOTH.  WHICH WOULD YOU LIKE --

8          **THE COURT:**  EITHER ONE.  IT DOESN'T MATTER.

9          **MR. CANNON:**  THE IRREPARABLE HARM YOU HAVE TO LOOK

10  AT THE BALANCE HERE.  AND THE BALANCE TO US TIPS IN OUR FAVOR

11  SIGNIFICANTLY.  EVERY DAY THEY DELAYED, EVERY DAY THEY DIDN'T

12  PICK UP THE PHONE, IT GOT CLOSER AND CLOSER TO CHRISTMAS DAY,

13  THE ADS WENT OUT THROUGHOUT THE COUNTRY, THERE IS SOMETHING

14  LIKE 20,000 --

15         **THE COURT:**  THE ADS AREN'T OUT ALREADY.

16         **MR. CANNON:**  THEY FILTERED OUT.  IT TAKES TIME TO

17  PUT THEM UP.  THEY'RE OUT THERE NOW.  EVERY DAY -- THEY WERE

18  SPREAD OUT COMING UP TO CHRISTMAS DAY.  THERE'S SOMETHING LIKE

19  20,000 ADS OUT THERE.  HE'S ASKING --

20         **THE COURT:**  HE DIDN'T BECOME AWARE OF IT UNTIL

21  DECEMBER 12TH, WHICH IS AFTER YOU ALL HAD --

22         **MR. CANNON:**  THAT'S WHEN -- IT WAS LAUNCHED

23  NOVEMBER 27TH.  THE PRESS RELEASE WAS DECEMBER 12TH.  BUT IT

24  TAKES PHYSICAL TIME TO PAINT POSTERS ON BUILDINGS, PUT THEM ON

25  THE TOP OF TAXI CABS, PUT THEM ON THE SIDES OF BUSES.

1        **THE COURT:**  IT WAS STILL GOING ON AT THE TIME.

2        **MR. CANNON:**  IT WAS STILL GOING ON AT THE TIME AND

3    IT CONTINUED TO GO ON BECAUSE WHAT WE DO IS WE HIRE COMPANIES

4    TO HELP US, MEDIA COMPANIES TO PUT THIS UP, SO WE DON'T HAVE

5    CONTROL OVER THEM.  SO THAT FILTERED OUT INTO THE MARKET.

6    EVERY DAY MORE AND MORE FILTERED OUT INTO THE MARKET.

7        NOW, ON THE EVE OF CHRISTMAS WITH LESS THAN 24

8    HOURS' NOTICE, THEY WANT US TO SOMEHOW GET MASKING TAPE AND

9    PAINT AND GO UP ON THE SIDES OF BUILDINGS IN NEW YORK CITY TO

10   PAINT OUT A LINE, IT IS JUST, IT IS AN IMPOSSIBLE TASK.  AND IT

11   WOULD BE --

12       **THE COURT:**  HE SAID IT WOULD ONLY BE TAILORED TO

13   ADDRESS THEIR CONCERN, YET MINIMIZE YOUR PREJUDICE, I GUESS.

14       **MR. CANNON:**  I JUST DON'T SEE HOW THAT IS POSSIBLE.

15   THEY ARE ASKING FOR A PHYSICAL -- THEY'RE ASKING US TO GO OUT

16   THERE TO 20,000 KIOSKS, BUILDINGS, AND CABS, FIND THE CABS AND

17   THEN SOMEHOW REMOVE A LINE.

18       AND, YOUR HONOR, THAT IS A TREMENDOUS BURDEN THAT I

19   THINK WILL ALMOST BE IMPOSSIBLE TO COMPLY WITH IN ANY

20   REASONABLE AMOUNT OF TIME.

21       I THINK THE OTHER KEY ISSUE IS THE OUTDOOR ADS END

22   DECEMBER 31ST.  THIS ENDS DECEMBER 31ST.  SO THE BALANCE OF

23   HARDSHIPS HERE IS THESE ADS ARE OUT THERE.  THEY WAITED DAY

24   AFTER DAY AFTER DAY.  AS YOUR HONOR POINTED OUT, THIS IS A

25   CRITICAL TIME PERIOD COMING UP TO CHRISTMAS --

1      **THE COURT:**  I DIDN'T SAY THAT.  HE DID.

2      **MR. CANNON:**  OKAY.  WELL, YOU SAID THAT -- WHEN HE

3  SAID 30 DAYS IS A PRESUMPTION, HE SAID IT IS VERY FACT

4  SPECIFIC, AND THE FACTS HERE ARE WE HAVE CHRISTMAS DAY COMING

5  UP.  EVERY DAY THE BALANCE TIPPED IN OUR FAVOR.

6      **THE COURT:**  I DIDN'T SAY THAT.  HE DID.

7      **MR. CANNON:**  I AM ARGUING THAT.  I AM NOT TRYING TO

8  PUT WORDS IN YOUR HONOR'S MOUTH.  THE IRREPARABLE HARM TO US IS

9  VERY GREAT TO HAVE TO TRY TO FIX THIS CAMPAIGN --

10      **THE COURT:**  I DID SAY IT WAS FACT SPECIFIC.

11      **MR. CANNON:**  YES.

12      **THE COURT:**  SO WHAT HAPPENS ON DECEMBER 31ST?  YOU

13  SAID ON DECEMBER 31ST YOUR OUTSIDE ADS COME DOWN.  WHAT DOES

14  THAT MEAN?

15      **MR. CANNON:**  WHAT THAT MEANS IS WE LEASED THE SPACE

16  UNTIL DECEMBER 31ST.  SO THE WAY IT WORKS, WE DON'T OWN THE

17  SPACE ON TOP OF THE TAXI CAB.  WE DON'T OWN THE SPACE ON THE

18  SIDE OF THE BUS.  WE LEASE THAT.  SO ON DECEMBER 31ST, THE

19  OWNER OF THAT SPACE PUTS UP A NEW AD.  SO OUR LEASE FOR THAT

20  SPACE RUNS THROUGH DECEMBER 31ST.

21      **MR. TROCK:**  SOMEHOW OR OTHER THEY WERE ABLE TO GET

22  THE ADS UP --

23      **MR. CANNON:**  AND, YOUR HONOR --

24      **MR. TROCK:**  WE THINK --

25      (SIMULTANEOUS COLLOQUY.)

1          THE REPORTER:  EXCUSE ME, COUNSEL.

2          MR. CANNON:  I'M SORRY.

3          CAN I JUST FINISH?  WE HAVE NO INTENTION OF

4    CONTINUING THIS PASSED DECEMBER 31ST.

5          THE COURT:  "THIS" MEANING?

6          MR. CANNON:  THE SLOGAN, THIS AD CAMPAIGN FOR THE

7    TREO 680.  THIS IS TO A SPECIFIC NEW PRODUCT.  SO WE HAVE NO

8    INTENTION OF MOVING THIS CAMPAIGN PASSED DECEMBER 31ST.

9          THERE ARE SOME MAGAZINES THAT WILL COME OUT IN, I

10   BELIEVE, JANUARY AND FEBRUARY AND MARCH, BUT THOSE PUBLICATIONS

11   HAVE ALREADY BEEN BOOKED.  THE COPY HAS ALREADY BEEN PROVIDED

12   TO THE PUBLICATIONS.

13         THE COURT:  OKAY.

14         MR. CANNON:  AGAIN, YOUR HONOR, I WOULD COME BACK TO

15   THE EQUITIES OF THIS, ON A TRO TO COME IN, AND THEY HAVE NOT

16   PROVIDED EVIDENCE OF INJURY.  WE HAVE SEEN NO EVIDENCE OF

17   SALES, WE'VE SEEN NO EVIDENCE OF ANY DROP OF SALES WHEN OUR

18   CAMPAIGN CAME OUT.

19         THEY NEED TO, I THINK, COME IN WITH SOME EVIDENCE

20   THAT THEIR SALES WERE EFFECTED.  WE HAVE ATTORNEY SPECULATION

21   AND ARGUMENT ABOUT THEIR GOODWILL, BUT THERE IS REALLY NO

22   EVIDENCE.  THERE'S A HEARSAY STUDY THAT WAS REFERRED TO IN

23   THEIR DECLARATION, WHICH WE HAVEN'T SEEN.  BUT APART FROM THAT,

24   THERE IS NO EVIDENCE OF INJURY.

25         THE COURT:  OKAY.

1    **MR. TROCK:**  THEN THE INJURY OCCURS, IT'S TOO LATE TO

2    REPAIR.  THAT'S THE REASON WHY WE ARE HERE.

3         AND THAT'S THE SERIOUS NATURE OF THIS PROBLEM

4    BECAUSE CONSUMER GOODWILL IS AN INTANGIBLE ASSET THAT WE JUST

5    SPENT $30 MILLION TRYING TO CREATE.  ONCE IT'S GONE --

6         **THE COURT:**  HE HAS A HEARSAY OBJECTION TO YOUR

7    CONSUMER SURVEY, WHICH YOU SAY THE COURT SHOULD CONSIDER, BUT

8    EVEN ASSUMING THAT -- I AM SORRY, GO ON.

9         **MR. TROCK:**  THE COURT CAN CONSIDER THE SURVEY.  THE

10   HEARSAY ISSUE IS NOT A PROBLEM FOR THE COURT.

11        BUT WAITING UNTIL AFTER CHRISTMAS, THE HARM IS DONE.

12   IT'S OVER WITH.  IT WILL NEVER BE REPAIRABLE.  THAT'S THE WHOLE

13   EMERGENCY NATURE OF THIS SITUATION.  SO THAT'S WHY WE ARE HERE

14   TO TRY TO FIND THIS SOLUTION, TO GET A SOLUTION IN THE

15   MARKETPLACE SO THAT THE CONFUSION THAT'S OCCURRING OUT THERE

16   GETS STOPPED AND GETS STOPPED NOW.

17        THIS CAMPAIGN IS NOT OVER FOR THEM.  HE'S SAYING

18   THAT SOME OF THIS STUFF IS GOING TO EXPIRE AT THE END OF THE

19   MONTH, BUT THERE'S A LOT OF IT THAT'S NOT GOING TO EXPIRE.

20   THEY'VE GOT BUYS IN MAGAZINES THAT ARE GOING TO CONTINUE ON IN

21   JANUARY, FEBRUARY, MARCH AND SO ON.

22        THAT STUFF IS NOT STOPPING.  THEY ARE GOING TO

23   CONTINUE TO DO THAT UNLESS YOUR HONOR DIRECTS THEM TO REMOVE

24   THE SLOGANS FROM THOSE ADVERTISEMENTS THAT ARE OUT THERE IN THE

25   MARKETPLACE.

1          AND, YOUR HONOR, I DID WANT TO GIVE THE COURT THIS

2    ONE CITATION ON THE ISSUE OF DELAY IN ISSUING A TEMPORARY

3    RESTRAINING ORDER.  THE CASE IS NOVA WINES VERSUS ALDERFELS

4    WINERY.  IT'S THE NORTHERN DISTRICT OF CALIFORNIA 2006.  THE

5    CITATION IS WESTLAW CITATION, 2006, WESTLAW 3498574, WHERE THE

6    COURT FOUND THAT THERE WAS NO UNDUE DELAY WHERE THE PLAINTIFF

7    SOUGHT A TEMPORARY RESTRAINING ORDER OVER THREE MONTHS AFTER

8    THE DEFENDANT USED CONFUSINGLY SIMILAR MARK, AND OVER ONE MONTH

9    AFTER THE PLAINTIFF ACTUALLY LEARNED OF THE USE.

10          **THE COURT:**  YOU WERE READING KIND OF FAST.  SAY THAT

11   AGAIN?

12          WHO WAS THE JUDGE IN THE NORTHERN DISTRICT?

13          **MR. TROCK:**  I DO NOT KNOW.  I DO NOT HAVE THAT IN

14   FRONT OF ME, YOUR HONOR.

15          **THE COURT:**  OKAY.

16          **MR. TROCK:**  BUT THE HOLDING OF THE CASE IS THAT

17   THERE WAS NO UNDUE DELAY WHERE THE PLAINTIFF SOUGHT A TEMPORARY

18   RESTRAINING ORDER OVER THREE MONTHS AFTER DEFENDANT USED A

19   CONFUSINGLY SIMILAR MARK AND OVER ONE MONTH AFTER THE PLAINTIFF

20   ACTUALLY LEARNED OF THE USE.

21          **THE COURT:**  SO, WHAT WAS THE USE OF WHAT?  WHAT WAS

22   THE FACTS?  WHAT WERE THE ISSUES?  WHAT WAS THE CONTEXT?

23          **MR. TROCK:**  THIS IS AN OPINION BY JUDGE PATEL,

24   DECEMBER 4TH.

25          **THE COURT:**  WHAT WAS THE FACTS?

1        **MR. TROCK:**  I DON'T KNOW SPECIFICALLY, YOUR HONOR.

2        **THE COURT:**  I MEAN, ISN'T THAT IMPORTANT?  I MEAN,

3   IF YOU ARE DEALING WITH SUPPOSEDLY SOMETHING THAT IS

4   SUFFICIENTLY URGENT TO REQUEST A TRO, DOESN'T IT MATTER WHAT

5   THE FACTS ARE?

6        I MEAN, THERE ARE CERTAIN THINGS THAT CERTAINLY LEND

7   THEMSELVES TO MAYBE BEING URGENT IN THREE MONTHS AND THERE ARE

8   SOME THINGS THAT IF YOU WAIT TWO DAYS IT'S CLEAR THAT YOU'RE

9   NOT HANDLING IT AS AN URGENT MATTER.

10       YOU DON'T KNOW WHAT THE FACTS OF THE CASE ARE?

11       **MR. TROCK:**  NOT SPECIFICALLY, YOUR HONOR.

12       **THE COURT:**  NOT SPECIFICALLY, GENERALLY?

13       **MR. TROCK:**  NOT GENERALLY EITHER.

14       **THE COURT:**  WHAT VALUE ARE YOU -- YOU ARE GOING TO

15  CITE TO ME A HOLDING OUT OF CONTEXT, WHAT AM I TO DO WITH THAT?

16  I MEAN, I AM NOT GOING TO MAKE ANY ASSUMPTION.  IF I KNEW WHAT

17  THE FACTS ARE, I WOULD BE ABLE TO TELL WHETHER THE FACTS ARE

18  SIMILAR TO THIS OR WHETHER THEY ARE DISSIMILAR TO THIS, AND

19  THEN I COULD GIVE THAT HOLDING THE DEGREE OF --

20       **MR. TROCK:**  I UNDERSTAND.

21       **THE COURT:**  -- CONSIDERATION IT DESERVES.

22       **MR. TROCK:**  THE ONLY THING I KNOW ABOUT THE CASE IS

23  THAT JUDGE PATEL DECIDED THAT A PLAINTIFF WHO CAME IN 30 DAYS

24  AFTER THEY HAD KNOWLEDGE OF THE DEFENDANT'S INFRINGING USE DID

25  NOT THINK THAT THAT WAS UNDUE DELAY.

1          **THE COURT:**  THAT GIVES ME NOTHING.   ZERO.

2          **MR. TROCK:**  MR. DAVIS APPARENTLY KNOWS THE SPECIFIC

3     FACTS.

4          **THE COURT:**  OKAY.   THAT WILL BE HELPFUL.   THANK YOU,

5     MR. DAVIS.

6          **MR. DAVIS:**  THANK YOU, YOUR HONOR.

7          THE FACTS IN THIS CASE WAS A CASE INVOLVING IMAGES

8     AND LOGOS ON WINE BOTTLES.   IT WAS A MARILYN MONROE IMAGE IN

9     THIS SITUATION.   THERE WAS NOTICE GIVEN TO THE OWNER, THE

10    TRADEMARK HOLDER, AND THE TRADEMARK HOLDER --

11         **THE COURT:**  NOTICE FROM THE PLAINTIFF?

12         **MR. DAVIS:**  THE PLAINTIFF FOUND OUT, DISCOVERED THAT

13    THERE WAS AN INFRINGING USE, A SIMILAR MARK ON WINE BOTTLES.

14    DURING -- IT TOOK A MONTH-LONG PERIOD FOR THEM TO ACTUALLY FILE

15    THEIR TEMPORARY RESTRAINING ORDER --

16         **THE COURT:**  IN THE INTERIM, WERE THEY COMMUNICATING

17    WITH THE INFRINGER TRYING TO SEE IF THEY COULD RESOLVE IT?

18         **MR. DAVIS:**  THERE WAS NO DISCUSSION AS FAR AS CEASE

19    AND DESIST LETTERS GO --

20         **THE COURT:**  OR COMMUNICATION?

21         **MR. DAVIS:**  THERE MAY HAVE BEEN COMMUNICATION.   THE

22    CASE IS, I THINK, UNCLEAR DIRECTLY ON THAT POINT, YOUR HONOR,

23    BUT IT IS CLEAR THAT THERE WAS AN ENTIRE MONTH PERIOD BEFORE

24    THEY ACTUALLY FILED THEIR TRO.   AND, IN FACT, THERE WAS A

25    THREE-MONTH DELAY FROM WHEN THE DEFENDANT'S USE BEGAN IN THAT

1    CASE.

2              THE COURT:  A THREE-MONTH DELAY --

3              MR. DAVIS:  FOR WHEN THE DEFENDANT'S FIRST USED --

4    WITH THEIR FIRST INFRINGING USE AND THE FILING OF THE TRO.

5              THE COURT:  THAT'S WHY I AM ASKING YOU A QUESTION

6    BECAUSE IT IS NOT UNUSUAL FOR THERE TO BE A DELAY, BUT MY

7    EXPERIENCE, AT LEAST IN THE CASES I HAVE HAD HERE, IS THAT

8    SOMETIMES THERE IS A DELAY BECAUSE THE PARTIES ARE TRYING IN

9    GOOD FAITH TO SEE IF THEY CAN AVOID FILING THE TRO.  AND

10   SOMETIMES THE COMMUNICATIONS ARE APPARENTLY SUCCESSFUL AND THEN

11   THEY TURN TO BE OTHERWISE, WHICH MEANS THAT THE DELAY IS NOT

12   NECESSARILY ATTRIBUTABLE TO THE PERSON WHO FILED THE SUIT

13   BECAUSE THEY ARE TRYING TO RESOLVE IT SHORT OF THAT.

14              I DON'T KNOW IF THAT HAPPENED IN THIS CASE.

15              MR. DAVIS:  RIGHT.  THE BEST INDICATION IS ON PAGE 3

16   OF THIS CASE.  AND WHAT IT SAYS IS THAT THE PLAINTIFF'S

17   RECEIVED NOTICE FROM AN ADVERTISEMENT, LIKE A PRESS RELEASE IN

18   THIS CASE, AND THEN THEY FILED THE COMPLAINT.  THAT IS ALL THAT

19   IS NOTED IN THE FACTS OF THIS CASE.

20              THE COURT:  WAIT.  THAT MUST NOT HAVE HAPPENED

21   BECAUSE YOU SAID THERE WAS A 30-DAY DELAY.

22              MS. BAILEY-WELLS:

23              MR. DAVIS:  IT SAYS IN SEPTEMBER 2006, PLAINTIFF'S

24   RECEIVED AN ANNOUNCEMENT THAT THE DEFENDANT'S WERE USING THE

25   MARK.  AND THEN 30 DAYS LATER IN NOVEMBER, THEY FILED A

1    COMPLAINT -- OR SEPTEMBER 29TH, EXCUSE ME, NOT NOVEMBER.

2    BEGINNING OF SEPTEMBER THEY RECEIVED AN ANNOUNCEMENT,

3    SEPTEMBER 29TH THEY FILED A COMPLAINT.

4             **THE COURT:**  AND NOTHING HAPPENED IN BETWEEN?

5             **MR. DAVIS:**  IT'S NOT INDICATED IN THE FACTS OF THIS

6    CASE.  I CAN'T REPRESENT ONE WAY OR THE OTHER BECAUSE THE CASE

7    DOESN'T REPORT EITHER WAY.

8             **MR. TROCK:**  YOUR HONOR, COULD I MAKE ONE LAST POINT

9    ABOUT THE COMMENT MR. HANCOCK MADE, WHO IS THE

10   REPRESENTATIVE -- MARKETING REPRESENTATIVE FOR PALM.

11            IF YOU RECALL THE ARTICLE IN WHICH HE WAS CONFRONTED

12   WITH THE SIMILARITY OF PALM'S CAMPAIGN TO HELIO'S CAMPAIGN, HE

13   RESPONDED TO THAT REPORTER'S QUESTIONS.  MR. HANCOCK AT THAT

14   POINT HAD ALREADY LAUNCHED THE CAMPAIGN.  HE WAS THEN NOTIFIED

15   BY THIS REPORTER OF THE SIMILARITY OF THE CAMPAIGN, SO

16   MR. HANCOCK KNEW ABOUT IT.

17            WHAT WAS HIS RESPONSE?  HIS RESPONSE WAS, WELL, I

18   AGREE THAT THERE ARE SIMILARLY POSITIONED, BUT I THINK WE ARE

19   IN DIFFERENT MARKETS, THEREFORE, IT IS NOT A PROBLEM.

20            SO, PALM HAS ALREADY DECIDED THAT IT'S NOT A

21   PROBLEM.

22            AND SO, I UNDERSTAND, YOUR HONOR, IT'S, YOU KNOW, WE

23   SHOULD HAVE SENT THEM A CEASE AND DESIST LETTER, BUT I THINK

24   GIVEN THE FACT HERE THAT WE ARE HERE TODAY AND I THINK IT IS

25   CLEAR THAT THEY DO NOT WANT TO PULL THEIR ADVERTISING CAMPAIGN,

1          **MR. CANNON:**  -- MAKE TWO POINTS?

2          BRIEFLY, WITH RESPECT TO THE CASE THAT COUNSEL

3    CITED, I HAD A CHANCE TO TAKE A LOOK AT IT, AND THERE'S

4    ABSOLUTELY A CEASE AND DESIST LETTER SENT IN THAT CASE.  IT IS

5    CLEAR FROM THE FACTS OF THE CASE THAT THERE WERE, IN FACT, TWO

6    COMMUNICATIONS BETWEEN THE PLAINTIFF AND DEFENDANT BEFORE THE

7    COMPLAINT WAS FILED.

8          **THE COURT:**  OKAY.

9          **MR. CANNON:**  THAT'S THE FACTS OF THAT CASE.

10         **THE COURT:**  SO IT IS UNDERSTANDABLE THERE IS GOING

11   TO BE A DELAY.

12         **MR. DAVIS:**  YOUR HONOR, IT'S A LITTLE BIT DIFFERENT

13   THAN THAT, AND THAT'S WHAT I WAS TRYING TO CLARIFY.

14         **THE COURT:**  NO.  YOU SAID YOU DIDN'T KNOW ONE WAY OR

15   THE OTHER BECAUSE THE CASE DIDN'T SAY.

16         **MR. DAVIS:**  IT SAYS, AFTER THEY COMMUNICATED

17   INITIALLY ABOUT IT, THERE WAS NOT A CEASE AND DESIST LETTER,

18   THERE WAS A COMMENT TO ASKING THEM TO STOP AFTER THEY --

19         **THE COURT:**  I ASKED YOU IF THERE WERE COMMUNICATIONS

20   DURING THE INTERIM.  BECAUSE MY EXPERIENCE IS THAT SOMETIMES

21   THERE IS A DELAY, BUT THE DELAY IS ATTRIBUTABLE TO THE PARTIES

22   TRYING TO RESOLVE THE MATTER THEMSELVES.  COMMUNICATING THROUGH

23   CEASE AND DESIST LETTERS OR COMMUNICATING BY PHONE.  THAT

24   HAPPENS ALL THE TIME.

25         WHEN THE COMMUNICATIONS BREAK DOWN OR FAIL, THEN A

1    PERSON HAVING TO FILE A LAWSUIT, IT IS NOT HELD AGAINST THEM IN

2    TERMS OF THE DELAY BECAUSE THEY HAVE BEEN IN GOOD FAITH TRYING

3    TO RESOLVE THE MATTER.

4            THAT WAS WHAT I ASKED YOU.

5            **MR. DAVIS:**  RIGHT.  YOUR HONOR, AFTER THEY HAD THESE

6    COMMUNICATIONS, AFTER THE DEFENDANTS THEN WENT AND USED THE

7    MARK AFTER THEY HAD SOME INITIAL COMMUNICATIONS BACK AND FORTH,

8    DEFENDANTS WENT AND USED THE MARK.  THESE COMMUNICATIONS

9    OCCURRED DURING WHEN THERE WAS A MARKETING PLAN, BEFORE THE USE

10   OCCURRED, USE OCCURS, AND THEN THERE IS NO COMMUNICATION FROM

11   THE MOMENT OF USE BY THE DEFENDANTS UNTIL THE FILING OF THE

12   LAWSUIT.

13            IN FACT, THE LINE SAYS, THIS WAS THE LAST --

14            **THE REPORTER:**  EXCUSE ME, COUNSEL.

15            **THE COURT:**  YOU'RE READING TOO FAST.

16            **MR. DAVIS:**  I APOLOGIZE.

17            IT SAYS, THIS WAS THE LAST COMMUNICATION BETWEEN THE

18   PARTIES BEFORE PLAINTIFF FILED ITS COMPLAINT ON SEPTEMBER 29TH.

19            NOW, THAT COMMUNICATION THAT IT'S REFERRING TO IS

20   JULY 5TH COMMUNICATION.  THE USE OCCURRED IN SEPTEMBER 2006

21   PLAINTIFF RECEIVED AN ANNOUNCEMENT THAT THE DEFENDANTS IN THAT

22   CASE HAD STARTED USING, AND THEN THERE WAS NO COMMUNICATION

23   FROM THE MOMENT THE DEFENDANTS DECIDED TO ACTUALLY USE THE

24   INFRINGING MARK UNTIL THE POINT THAT THEY FILED THE LAWSUIT.

25            **THE COURT:**  THAT'S WHY I AM ALWAYS BACK TO THE FACTS

1    OF THE CASE REALLY DETERMINE WHETHER OR NOT THERE HAS BEEN A

2    DELAY THAT SHOULD BE ATTRIBUTABLE TO THE -- EQUITABLY TO THE

3    PERSON WHO FILED SUIT.

4            SINCE THERE HAD BEEN COMMUNICATIONS IN AN EFFORT TO

5    TRY TO AVOID THIS, THE NEXT THING THAT COMES TO MIND, AS I

6    LISTEN TO YOU, IN TERMS OF SCENARIO IS THE QUESTION WHETHER OR

7    NOT THERE WAS AN INVESTIGATION THAT PRECEDED THE FILING OF THE

8    TRO BECAUSE I'M -- I MEAN, IT'S NOT INFREQUENT THAT WHEN

9    PARTIES ENGAGE IN COMMUNICATIONS IN AN ATTEMPT TO RESOLVE A

10   PROBLEM, THAT THEY WANT TO MAKE SURE THAT SINCE THEY HAD THOSE

11   DISCUSSIONS AND BEFORE THEY PURSUE ANY ACTIONS, THAT THEY

12   CONFIRM THAT WHAT IS OCCURRING REALLY IS IN CONTRAVENTION TO

13   WHAT THEY HAVE BEEN DISCUSSING.  AND EVEN AN INVESTIGATION TO

14   ENSURE GOOD FAITH BEFORE THEY FILE SUIT THAT THEY ARE CORRECT

15   TAKES TIME.

16           SO MY NEXT QUESTION THEN IS, SINCE THERE WERE

17   PRELIMINARY DISCUSSIONS THAT FAILED, THEN DEFENDANTS BEGAN

18   USING THIS PRODUCT, WAS THERE -- DID THE PLAINTIFFS, PRIOR TO

19   FILING SUIT, UNDERTAKE ANY KIND OF AN INVESTIGATION OF WHAT THE

20   DEFENDANTS WERE DOING TO DETERMINE WHETHER OR NOT TO CONFIRM OR

21   NEGATE THEIR UNDERSTANDING THAT THERE WAS SOME VOLATILE

22   CONDUCT?

23           **MR. DAVIS:**  THAT'S WHAT I CAN DEFINITIVELY STATE.

24   THE OPINION JUST SAYS IN THE SINGLE PARAGRAPH THAT THE

25   PLAINTIFF RECEIVED NOTICE OF USE IN SEPTEMBER OF 2006 AND THAT

1    NOTICE OF USE SAID ENCOURAGED CUSTOMERS TO BUY THE PRODUCT BY

2    SEPTEMBER 15TH.   AFTER RECEIVING THAT NOTICE OF USE, THE

3    PLAINTIFF THEN WAITED 30 DAYS, OR 29 DAYS, CLOSE TO 30 DAYS IN

4    THAT CASE BEFORE IT THEN FILED ITS TRO.   EVEN THOUGH IT KNEW

5    VERY WELL AND HAD PRIOR DISCUSSIONS IN THAT CASE BEFORE TAKING

6    ANY ACTION, USE OCCURRED IN THE MARKET FOR 30 DAYS.

7          IN THIS CASE WE HAVE A SITUATION WHERE USE HAS ONLY

8    OCCURRED FOR A WEEK.   AND WE TRIED TO COME OUT WITHIN A WEEK

9    AND TRIED TO TAKE ACTION.   IN THAT CASE, THE PLAINTIFF WAITED

10   30 DAYS BEFORE IT DECIDED TO TAKE ACTION AGAINST INFRINGING USE

11   AND HAD NO COMMUNICATION WITH COUNSEL FROM THE MOMENT IT

12   LEARNED OF THE USE.

13         **MR. TROCK:**   YOUR HONOR BRINGS UP A GOOD POINT

14   BECAUSE WE DO HAVE AN OBLIGATION TO INVESTIGATE AND FIND OUT

15   WHETHER OR NOT WHAT'S ACTUALLY OCCURRING IN THE MARKETPLACE

16   IS -- GIVES US A CAUSE OF ACTION.

17         THE ARTICLE THAT WE SAW IN BRAND WEEK WHICH ALERTED

18   US TO THEIR ADVERTISING CAMPAIGN SIMPLY SAYS THAT THEY LAUNCHED

19   IT ON DECEMBER 12TH OR DECEMBER 11TH.   WE THEN HAD TO GO AND

20   FIND OUT WHAT ARE THEY ACTUALLY DOING IN THE MARKETPLACE.   WE

21   HAD TO FIND THEIR BILLBOARDS, PHOTOGRAPH THEIR BILLBOARDS, FIND

22   THEIR ADS IN MAGAZINES, GET COPIES OF THOSE ADS IN MAGAZINES TO

23   SEE WHAT THEY'RE DOING, WHAT THE SLOGAN LOOKS LIKE, HOW IT IS

24   BEING POSITIONED IN THE MARKETPLACE.   TO FIND OUT WHO THEIR

25   STRATEGIC PARTNERS ARE, AND ALL THIS OTHER INFORMATION.

1   REALLY THIS ARGUMENT IS ABOUT THIS CASE.  IT'S ABOUT THE TRO

2   THAT THEY BROUGHT WITH THREE DAYS BEFORE CHRISTMAS ASKING FOR

3   US AN ESSENTIALLY IMPOSSIBLE REMEDY.

4          AND THE ARGUMENT ABOUT INVESTIGATION, THERE IS

5   NOTHING IN THE BRIEFS OR THE DECLARATIONS.  THERE IS NO

6   EVIDENCE THAT AN INVESTIGATION WAS UNDERTAKEN WHATSOEVER.

7          SIMPLY PUT, THEY WAITED SEVEN DAYS WHILE THEY

8   PREPARED THEIR PAPERS, NOT A PHONE CALL, NOT AN E-MAIL, OUT OF

9   THE BLUE, LITERALLY OUT OF THE BLUE, A TRO LANDED ON PALM'S

10  DESK ON DECEMBER 19TH WITH JUST A FEW SHORT DAYS TO GO BEFORE

11  CHRISTMAS, AND THAT IS THE SITUATION WE FIND OURSELVES IN.

12         THE TIMING COULD NOT BE WORSE.  THE BALANCE OF THE

13  HARDSHIPS COULD NOT TIP MORE STRONGLY IN FAVOR OF US IN TERMS

14  OF US TRYING TO COMPLY WITH IT.  IF THEY HAD CALLED, THEY MIGHT

15  HAVE -- THEY WOULD HAVE FOUND OUT, THIS CAMPAIGN ENDS

16  DECEMBER 31ST.  THEY DIDN'T CALL.  THERE WAS NO COMMUNICATION.

17  EVERY DAY THAT WENT BY BELIES THEIR ARGUMENT THAT THEY ARE

18  SUFFERING IRREPARABLE HARM.

19         **THE COURT:**  YOU SAID "AN IMPOSSIBLE TASK."  WHEN YOU

20  SAY "IMPOSSIBLE", WHAT DO YOU MEAN?

21         **MR. CANNON:**  WELL, THERE'S 20,000, AT LEAST 20,000

22  OUTDOOR ADS OUT THERE.  NOW, THEY ARE ON THE TOP OF TAXIS,

23  THEY'RE ON BUSES, CHRISTMAS DAY IS JUST A FEW SHORT DAYS AWAY.

24  TO GET MASKING TAPE AND PAINT, AND TRY TO COVER THOSE UP IS

25  PHYSICALLY AND LOGISTICALLY CLOSE TO IMPOSSIBLE.

1      THAT'S ESSENTIALLY WHAT I UNDERSTAND THE REMEDY THEY

2 ARE ASKING FOR, IS TO GO OUT THERE AND TRY AND DO THIS --

3          **THE COURT:**  THAT'S WHAT HE SAID.

4          **MR. CANNON:**  IT IS IMPOSSIBLE TO -- GIVEN THAT

5 PEOPLE ARE ON VACATION.  WE HAVE -- WE WOULD HAVE AN INCREDIBLY

6 SHORT AMOUNT OF TIME TO TRY TO COMPLY WITH WHAT THEY ARE

7 REQUESTING.

8          **THE COURT:**  COUNSEL, MR. TROCK, I DO OBSERVE THAT

9 HIS ARGUMENT IS CORRECT.  THIS IS THE FIRST TIME YOU SAID

10 ANYTHING ABOUT INVESTIGATION.  I HAVE ASKED YOU SEVERAL

11 QUESTIONS THAT WOULD HAVE ELICITED THAT HAD THAT INVESTIGATION

12 PRECEDED THIS, BUT IT IS ONLY IN THE CONTEXT OF MY INDICATING

13 IN RESPONSE TO THIS CASE THAT MR. DAVIS WAS CITING THAT NOW ALL

14 OF A SUDDEN THERE IS THIS INVESTIGATION THAT IS FILLING THE

15 SEVEN-DAY VOID.  I AM NOT SURE WHAT I AM TO MAKE OF THAT.

16          **MR. TROCK:**  WELL, I THOUGHT THAT THE FACT THAT WE

17 DID OUR WORK, DID OUR JOB BEFORE WE FILED THIS IS OBVIOUS FROM

18 THE MATERIALS WE PROVIDED TO OPPOSING COUNSEL AND THE COURT.

19      THE PHOTOGRAPHS THAT ARE IN HERE ON THE DECLARATIONS

20 JUST DIDN'T MATERIALIZE OUT OF THIN AIR.  WE TOOK THOSE

21 PHOTOGRAPHS.  PEOPLE IN TIME SQUARE TOOK THOSE PHOTOGRAPHS AND

22 SENT THEM TO US.  WE, THE MAGAZINE ADS THAT WE PROVIDED TO THE

23 COURT CAME OUT OF MAGAZINES THAT WE GOT AHOLD OF SO THAT WE CAN

24 SATISFY OUR OBLIGATIONS TO DETERMINE WHETHER OR NOT THERE IS A

25 LEGITIMATE CAUSE OF ACTION HERE.

1         THIS STUFF DOESN'T MATERIALIZE OUT OF THIN AIR.

2    PEOPLE HAVE TO GO TO THE STORES, THEY HAVE TO TAKE THE

3    PHOTOGRAPHS, THEY HAVE TO FIND THE BILLBOARDS, TAKE THE

4    PHOTOGRAPHS.  THEY HAVE TO FIND THE MAGAZINES, GET COPIES OF

5    THE ADS AND PULL ALL THIS STUFF TOGETHER.

6         DURING THAT TIME PERIOD WE SATISFIED OURSELVES THAT

7    THERE IS A LEGITIMATE CAUSE OF ACTION HERE.  SO, IF I USED THE

8    TERM "INVESTIGATION," CLEARLY YOUR HONOR'S TERM, BUT I THOUGHT

9    IT WAS IMPLICIT IN THE MATERIALS THAT WE PROVIDED TO THE COURT

10   THAT WE DIDN'T GET THIS STUFF FROM PALM, WE HAD TO GO AND FIND

11   THIS STUFF OURSELVES.

12        **THE COURT:**  OKAY.  THANK YOU.

13        MR. CANNON.

14        **MR. CANNON:**  THEY DIDN'T ASK.  THEY DIDN'T CALL.

15   THEY DID NOTHING.  THEY LET IT SIT UNTIL THE LAST POSSIBLE

16   MOMENT, WHICH MAXIMIZES THE DIFFICULTY AND THE INJURY, THE

17   IRREPARABLE HARM THAT WE WILL HAVE TO SUFFER IN ORDER TO TRY TO

18   RESPOND TO THIS.

19        **THE COURT:**  YOU KNOW, THIS HAS BEEN VERY HELPFUL, I

20   WILL TELL YOU.

21        AS I TOLD YOU, I READ THE PAPERS THAT YOU ALL

22   SUBMITTED AND IT WAS A VERY CLOSE QUESTION FOR ME, AND WHICH IS

23   WHY I DECIDED TO KEEP IT ON.  I THOUGHT IT WOULD BE HELPFUL TO

24   ME TO LISTEN TO YOU AND TO WALK THROUGH THE FACTORS AND SEE IF

25   MAYBE IT IS ANY EASIER, PARTICULARLY GIVEN THE FACT THAT I WAS

1    GOING TO BE IN A MEETING, WHICH WOULD BE THROUGH BY THIS

2    AFTERNOON WHICH WAS FREE FOR ME TO HAVE THIS MEETING.

3              AND I UNDERSTAND BOTH OF YOUR POSITIONS VERY CLEARLY

4    FROM THE PAPERS AND FROM YOUR ARGUMENTS, AND IT IS STILL VERY

5    CLOSE FOR ME.

6              THE FACTORS ARE THREE, THREE AND TWO NEUTRAL, SO THE

7    PRESUMPTION IS NOT TRIGGERED FROM MY PERSPECTIVE.  LOOKING AT

8    THE BALANCE OF HARDSHIPS, BASED ON THE BALANCE OF HARDSHIPS,

9    THE WHOLE CONCEPT THAT THE GOODWILL VERSUS THE IRREPARABLE

10   DAMAGE IS NOT PERSUASIVE TO ME.

11             I DON'T THINK THAT THEIR DAMAGES ARE MINIMIZED AT

12   ALL BY WHAT YOU ARE SUGGESTING, MR. TROCK.  I JUST, I JUST -- I

13   MEAN, IT'S CLOSE.  IT'S JUST CLOSE.  AND SINCE THE PLAINTIFF

14   HAS REQUESTED THE TRO, I CAN ONLY SAY YOU JUST HAVE NOT MET

15   YOUR BURDEN.

16             I AM JUST NOT PERSUADED THAT THE BALANCE OF

17   HARDSHIPS TIPS IN YOUR FAVOR GIVEN THE FINDINGS THAT I MADE

18   BASED UPON THE EVIDENCE THAT YOU ALL HAVE PRESENTED THIS FAR.

19             THE ONLY OTHER OPTION IS SETTING A HEARING FOR

20   PRELIMINARY INJUNCTION WHEN YOU BOTH CAN COME FORWARD WITH MORE

21   EVIDENCE.  RIGHT NOW IT'S JUST A CLOSE QUESTION FOR ME.  AND

22   CLOSE QUESTIONS, PARTICULARLY WHEN I -- WHEN THERE IS NO

23   PRESUMPTION THAT HAS BEEN TRIGGERED BECAUSE OF THE FINDINGS

24   THAT I AM COMFORTABLE MAKING, YOU KNOW, IT'S JUST WHO HAS THE

25   BURDEN.

1          **MR. TROCK:**  YOUR HONOR --

2          **THE COURT:**  YOU HAVEN'T MET IT.

3          **MR. TROCK:**  JUST TWO POINTS.

4          NUMBER ONE, THE COURT DOES NOT HAVE TO TREAT EACH OF

5    THE FACTORS WITH EQUAL WEIGHT.

6          **THE COURT:**  THAT'S TRUE.

7          **MR. TROCK:**  THE COURT CAN USE WHATEVER WEIGHT IT

8    BELIEVES IS APPROPRIATE --

9          **THE COURT:**  EVEN THE ONES THAT I FOUND ARE WEAK.

10   THEY ARE NOT STRONG.  THE WHOLE CASE IS JUST CLOSE.

11         **MR. TROCK:**  SECONDLY, THE EXPENSES, WE BELIEVE,

12   THAT'S THE REAL HARM WE ARE TALKING ABOUT HERE TO THEM.  NOT

13   IRREPARABLE, BUT EXPENSES CAN BE COVERED BY A BOND.

14         **THE COURT:**  I UNDERSTAND WHAT YOU ARE SAYING.  I AM

15   JUST SAYING THAT MY ANALYSIS OF WHAT YOU ALL HAVE SUBMITTED AND

16   THE ARGUMENTS THAT YOU HAVE MADE JUST LEAVE ME IN A POSITION

17   WHICH I DON'T FIND MYSELF IN VERY OFTEN IN THAT THIS IS JUST,

18   IT'S JUST A CLOSE QUESTION, AND I CAN'T SAY THAT YOU MET YOUR

19   BURDEN.

20         I JUST DON'T KNOW THAT THE EVIDENCE THAT I HAVE IN

21   FRONT OF ME ALLOWS ME TO COMFORTABLY ISSUE A TRO BASED UPON

22   WHAT I HAVE RIGHT NOW.

23         SO, THE TEMPORARY RESTRAINING ORDER IS DENIED.

24         AND WE CAN SET A HEARING FOR THE PRELIMINARY

25   INJUNCTION IF YOU ALL WANT, AT WHICH POINT YOU ALL WILL PERHAPS

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

1    HAVE EVIDENCE THAT WILL BE A LITTLE MORE PERSUASIVE AND

2    CLARIFYING FOR THE COURT TO MAKE A DECISION.

3              BUT WITH RESPECT TO THE TRO, GIVEN MY FINDINGS AND

4    DISCUSSION THAT WE HAVE HAD, I JUST AM NOT ABLE TO FIND THAT

5    PLAINTIFFS HAVE MET THE BURDEN OF DEMONSTRATING TO THE COURT

6    THE LIKELIHOOD -- THERE MAY BE SOME LIKELIHOOD OF SUCCESS, I

7    JUST HAVE NOT -- I MEAN, ULTIMATELY, BASED UPON THE EVIDENCE

8    THAT YOU ALL MAY COME FORWARD WITH, I AM JUST NOT ABLE AT THIS

9    POINT TO MAKE THE ASSESSMENT THAT THERE IS NECESSARILY A BASIS

10   FOR THE ISSUANCE OF A TRO AT THIS JUNCTURE.

11             **MR. TROCK:**  AT THIS POINT WE WOULD LIKE TO GET A

12   DATE FOR PRELIMINARY INJUNCTION AS WELL AS AN OPPORTUNITY TO

13   TAKE SOME EXPEDITED DISCOVERY.

14             **THE COURT:**  OKAY.  YOU ALL WANT TO TALK AND SEE WHEN

15   YOU WANT THE PRELIMINARY INJUNCTION HEARING?

16             **MR. CANNON:**  JUST TALK?

17             **THE COURT:**  YES.

18             (PAUSE IN THE PROCEEDINGS WHILE COUNSEL CONFER.)

19             **MR. TROCK:**  SO, YOUR HONOR, OUR SUGGESTION WOULD BE

20   THAT WE HAVE A HEARING ON YOUR, I BELIEVE YOU HAVE A MOTION

21   DATE ON THE 30TH OF JANUARY; IS THAT CORRECT?

22             **THE COURT:**  I DON'T KNOW IF THE 30TH IS AVAILABLE.

23   IS IT?

24             **THE CLERK:**  NO.

25             **THE COURT:**  SO WHAT'S THE NEXT --

1    **THE CLERK:** THE NEXT AVAILABLE DATE IS FEBRUARY 6TH.

2    **MR. TROCK:** OKAY. SO THAT WOULD BE TUESDAY, THE

3    6TH. THEN WE HAVE BRIEFS FILED WITH THE COURT A WEEK PRIOR TO

4    THAT --

5    **THE COURT:** TELL THEM WHAT THE BRIEFING SCHEDULE

6    WOULD BE FOR A HEARING ON FEBRUARY 6TH, LISA.

7    **THE CLERK:** OKAY. THE REPLY BRIEF WOULD BE DUE ON

8    JANUARY 23RD. THE OPPOSITION BRIEF WOULD BE DUE ON

9    JANUARY 16TH, AND THE MOVING BRIEF WOULD BE DUE ON JANUARY 2ND.

10   **THE COURT:** THAT'S IF YOU WANT THE HEARING ON

11   FEBRUARY --

12   **MR. TROCK:** RIGHT.

13   **THE COURT:** JANUARY 7TH, IF YOU ARE TALKING ABOUT

14   GETTING DISCOVERY, THAT'S NOT GOING TO GIVE YOU ENOUGH TIME.

15   **THE CLERK:** JANUARY 2ND.

16   **THE COURT:** JANUARY 2ND?

17   **THE CLERK:** 2ND.

18   **MR. TROCK:** MY SUGGESTION, YOUR HONOR, AND I DON'T

19   KNOW IF THE COURT IS AMENABLE TO THIS, BUT BECAUSE OF THE

20   EMERGENCY NATURE OF THIS --

21   **THE COURT:** THERE'S NOT AN EMERGENCY. I JUST RULED

22   ON THE EMERGENCY.

23   **MR. TROCK:** I UNDERSTAND, BUT THE FACT IS THAT THEIR

24   ADVERTISEMENTS ARE GOING TO CONTINUE TO GO OUT, AND I REQUESTED

25   FROM COUNSEL IF THEY WOULD MODIFY THEIR ADS IN SOME WAY TO GIVE

1    US SOME ADDITIONAL LEEWAY HERE, AND APPARENTLY THEY NEED --

2           **THE COURT:**  WE NEED TO WRAP THIS UP.  I HAVE A

3    4:00 O'CLOCK THAT'S GOING TO BE CALLING --

4           **MR. TROCK:**  MY SUGGESTION --

5           **THE COURT:**  NO, NO.  I DON'T CARE WHAT YOUR

6    SUGGESTION IS RIGHT NOW.

7           LET ME JUST SAY THIS:  I HAVE EVALUATED FOR THE LAST

8    THREE HOURS THE EMERGENCY NATURE OF THIS AND I FOUND THERE IS

9    NO EMERGENCY AT THIS POINT.  NOW, YOU CAN'T HAVE IT BOTH WAYS.

10   IF YOU ARE GOING TO SUGGEST WE ARE GOING TO HAVE A HEARING IN

11   FEBRUARY, THEN YOU HAVE TO FILE YOUR BRIEFS IN JANUARY.

12          IF YOU EXPECT ME TO BEAR THE BURDEN OF YOUR ISSUE AT

13   THIS POINT, I HAVE TO TELL YOU THAT THIS IS NOT THE ONLY CASE

14   ON MY DOCKET.  I HAVE PRIORITIZED MY SCHEDULE TODAY TO

15   ACCOMMODATE WHAT I THOUGHT WAS AN EMERGENCY NATURE.  I'VE SPENT

16   THE LAST THREE HOURS EVALUATING IT.

17          IT IS NOT AN EMERGENCY FOR ME AT THIS JUNCTURE, NOT

18   TO THE POINT WHERE I AM GOING TO SUBORDINATE OTHER THINGS FOR

19   IT, PARTICULARLY WHEN YOU ARE TALKING ABOUT, I AM ASSUMING WHAT

20   YOU ARE ABOUT TO SAY IS TO HAVE AN ABBREVIATED BRIEFING SO THAT

21   I AM GOING TO BEAR THE BURDEN OF HAVING YOU ALL FILE EVERYTHING

22   AT ONE TIME AND THEN HAVE A HEARING IMMEDIATELY.

23          I AM NOT GOING TO DO THAT.  OKAY?  WE DID IT FOR THE

24   TRO BECAUSE IT'S IMPORTANT, BUT I HAVE EVALUATED THE EMERGENCY

25   NATURE.  IT'S NOT AN EMERGENCY ANYMORE.  AS A MATTER OF FACT, I

1  AM WONDERING IF THE WHOLE ISSUE IS MOOT.  MAYBE IT IS NOT IF

2  YOU ALL DISCUSSED IT AND YOU STILL WANT TO HAVE A HEARING,

3  PARTICULARLY GIVEN THE FACT THAT COUNSEL INDICATED THEY ARE

4  GOING TO STOP THE WHOLE CAMPAIGN DECEMBER 31ST, BUT YOU DID SAY

5  ON THE CABS AND BUSES, AND SO I DON'T KNOW WHETHER THAT APPLIES

6  TO THE PUBLICATIONS OR NOT.

7  TO THE EXTENT THE ISSUE IS STILL ALIVE, WE CAN SET A

8  DATE FOR PRELIMINARY HEARING INJUNCTION, BUT IT IS GOING TO BE

9  A REGULAR BRIEFING SCHEDULE.  SO, IF YOU WANT FEBRUARY 6TH,

10 IT'S AVAILABLE, BUT THEN THAT'S THE BRIEFING SCHEDULE THAT YOU

11 HAVE.

12 SO, THE BRIEFING SCHEDULE IS THE PAPERS ARE FILED,

13 THE OPPOSITION TWO WEEKS LATER, THE REPLY ONE WEEK LATER, AND

14 THEN TWO WEEKS AFTER THAT IS THE HEARING.

15 WHEN DO YOU WANT TO HAVE THIS PRELIMINARY INJUNCTION

16 HEARING?

17 **MR. TROCK:**  IS FEBRUARY 27TH AVAILABLE?

18 **THE CLERK:**  NO, ACTUALLY IT IS NOT.  THE NEXT ONE

19 WOULD BE MARCH 6TH.

20 **MR. TROCK:**  AFTER FEBRUARY 6, THE NEXT AVAILABILITY

21 IS MARCH 6TH?

22 **THE COURT:**  AFTER FEBRUARY 6, THAT'S THE NEXT ONE?

23 **THE CLERK:**  YES.

24 **MR. TROCK:**  MARCH 6TH IT IS.

25 **THE COURT:**  GIVE THEM THE BRIEFING SCHEDULE, LISA.

113

1          THE COURT:  IT'S FINE WITH ME.

2      OKAY.  ANY OTHER ISSUES?

3          MR. TROCK:  I BELIEVE THAT IS IT, YOUR HONOR.

4          THE COURT:  OKAY.  GREAT.  THANK YOU.

5          MR. CANNON:  THANK YOU, YOUR HONOR.

6          MR. TROCK:  THANK YOU FOR THE COURT'S TIME.

7          THE COURT:  YOU ARE WELCOME.  IT HAS BEEN HELPFUL.

8      IS THAT OUR 4:00 O'CLOCK ON THE LINE?

9          THE CLERK:  YES.

10

11          (PROCEEDINGS CONCLUDED AT 4:10 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-06-7754 SBA, HELIO LLC V. PALM, INC.,  PAGES NUMBERED 1 THROUGH 113, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

# EXHIBIT 2

# Golden Gate Reporting

1

2          UNITED STATES DISTRICT COURT FOR THE

3     NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

4                      --oOo--

5     HELIO LLC,                          )
                                          )
6                    Plaintiffs,          )
                                          )
7          vs.                            )   No. C 06-7754
                                          )
8                                         )
      PALM INC.,                          )
9                                         )
                     Defendants.          )
10    _____)

11

12

13               DEPOSITION OF SCOTT HANCOCK

14    DATE:        Tuesday, February 27, 2007

15    TIME:        9:54 a.m.

16    LOCATION:    Kirkpatrick & Lockhart
                   55 Second Street
17                 Suite 1700
                   San Francisco, CA 94105-3493

18

19

20

21

22    REPORTED BY:  Kenneth T. Brill
                    Registered Professional Reporter
23                  Certified Shorthand Reporter No. 12797

24

25

                                          Page 1

## Golden Gate Reporting

1  Helio.
2        MR. STERN: Paul Stern of Quinn Emanual,
3  on behalf of the defendant Palm, and along with me
4  is Associate General Counsel Bob Booth.
5        THE VIDEOGRAPHER: Thank you. Would the
6  court reporter please administer the oath.
7        SCOTT HANCOCK, after having been
8        first duly sworn, was examined and
9        testified as follows:
10        - - -
11        EXAMINATION
12        - - -
13  BY MR. TROCK:
14      Q.  Mr. Hancock, could you spell your name for
15  the record?
16      A.  Sure. H-A-N-C-O-C-K is my last name.
17      Q.  I'm not feeling very well today, so I'm
18  kind of hoarse. So if you have difficulty
19  understanding any of my questions, just let me know,
20  I'll do my best to try to rearticulate that.
21        Have you been deposed before?
22      A.  No.
23      Q.  Just to go over a couple of ground rules,
24  I'm sure your attorneys have already done this with
25  you, we're taking this deposition outside of court,

Page 6

1      A.  It's a Bachelor of Science in Business.
2      Q.  What's your current position at Palm?
3      A.  I'm director of Marketing Communications.
4      Q.  What are your duties at that position?
5      A.  I have several duties.
6      Q.  Can you explain them to us?
7      A.  Well, one of which is to oversee the
8  advertising for Palm as well as for printed
9  materials in support of product launches.
10      Q.  Anything other than overseeing the
11  advertising that you're responsible for?
12      A.  Collateral support for product launches.
13      Q.  What does that mean, collateral support?
14      A.  Packaging, data sheets, marketing
15  materials in support of product launches.
16      Q.  Who do you report to at Palm Palm?
17      A.  I report to Rose Rodd.
18      Q.  What is her position, or is it him?
19      A.  Her.
20      Q.  Sorry.
21      A.  She's a senior director for corporate
22  marketing.
23      Q.  When did you obtain the position of
24  director of marketing communications?
25      A.  I was promoted to director, I'm not sure

Page 8

1  but it serves the same purpose as if you were
2  testifying in court, given — you've been given an
3  oath, the court reporter is taking down everything
4  everybody is saying in the room. So it's important
5  that only one person speak at a time.
6        So if you give me a chance to complete my
7  question, give your attorney a chance to interject
8  an objection, and then if you could make your
9  answers audible, nodding your head, shaking your
10  head, the court reporter can't take those down as
11  answers. So if you would say yes or no, or give
12  your full answer verbally, we'd appreciate that.
13        If you need a break during any time of the
14  day, just let us know, we can take a break. If you
15  don't understand my question, or you need me to
16  explain it further, just let me know, and I'll try
17  to do that. Okay?
18      A.  Okay.
19      Q.  Could you give us your educational
20  background after high school?
21      A.  I attended a junior college in Sacramento,
22  and then attended Cal Poly in San Luis Obispo.
23      Q.  Do you have any degree from those?
24      A.  I have a degree from Cal Poly.
25      Q.  What is it in?

Page 7

1  exactly when.
2      Q.  What's your best estimate?
3      A.  Eight months ago.
4      Q.  So sometime during the summer of 2006?
5      A.  Or early fall, yeah.
6      Q.  Early fall, okay. What was your position
7  prior to that?
8      A.  Senior manager, marketing communications.
9      Q.  And what were your duties as senior
10  manager?
11      A.  Very similar to what they are now, oversaw
12  the advertising.
13      Q.  How have your duties changed between the
14  two positions?
15      A.  I have additional responsibilities beyond
16  advertising now.
17      Q.  Is that the collateral support?
18      A.  Correct.
19      Q.  I take it you're familiar with the phrase
20  "Not just a cell phone, a Treo"; is that correct?
21      A.  Yes.
22      Q.  And that's a phrase that Palm has used in
23  its advertising; is that right?
24      A.  Yes.
25      Q.  Now, in the advertised materials that you

Page 9

3 (Pages 6 to 9)

## Golden Gate Reporting

1  publish in the marketplace, is there a term of art
2  that you use to describe that phrase?
3     A.  I'm sorry, I don't understand.
4     Q.  Well, do you call it something other than
5  a phrase?
6     A.  We call it either a theme line, something
7  called a campaign line.
8     Q.  How about a tag line, are you familiar
9  with that term?
10    A.  I am familiar with that term.
11    Q.  What does that mean to you, tag line?
12    A.  A tag line means something that's a
13 sign-off for a company.  It's a sign-off for a
14 company.
15    Q.  Would you consider the phrase "Not just a
16 cell phone, a Treo" when used in Palm's advertising
17 to be a tag line?
18    A.  No.
19    Q.  Are you familiar with the term "slogan"?
20    A.  Yes.
21    Q.  Would you consider the phrase "Not just a
22 cell phone, a Treo" when used in Palm's advertising
23 to be a slogan?
24    A.  Some people equate a slogan with a
25 campaign line or a theme line, so yes.

Page 10

1     Q.  So you would consider it to be a slogan;
2  is that right?
3     A.  Sure.
4     Q.  Okay.  I take it you're also familiar with
5  a company by the designation AKQA; is that right?
6     A.  Yes.
7     Q.  Could you explain to me who they are?
8     A.  They are our former advertising agency.
9     Q.  During what period of time did Palm use
10 AKQA as its advertising agency?
11    A.  I'm not sure of the exact start date.
12    Q.  What's your best estimate?
13    A.  I believe it was over six years.
14    Q.  When did you first start working at Palm?
15    A.  October of 2001.
16    Q.  What was your first position at Palm?
17    A.  I was a contractor.
18    Q.  What does that mean?
19    A.  It means I was not an employee of Palm.  I
20 was a — employed through a third party.
21    Q.  What were your duties for Palm at that
22 time?  In other words, what kind of work were you
23 doing for them?
24    A.  Managing the advertising development.
25    Q.  And when did you first become an employee

Page 11

1  at Palm?
2     A.  I'm not sure of the exact date.
3     Q.  What's your best estimate?
4     A.  Early 2004.
5     Q.  Did you ever work directly with AKQA while
6  you were at Palm?
7        MR. STERN:  Objection.  The question is
8  vague.
9        THE WITNESS:  What do you mean by "work
10 with"?
11 BY MR. TROCK:
12    Q.  Well, you're familiar with them as — as
13 Palm's former advertising agent, is that right, and
14 part of your duties at Palm involve overseeing
15 Palm's advertising; is that right?
16    A.  Yes.
17    Q.  So did you ever work with anyone at AKQA
18 directly?
19    A.  Yes.
20    Q.  Okay.  When did you first start doing
21 that?
22    A.  At the time I started at Palm as a
23 contractor.
24    Q.  In 2001; is that right?
25    A.  Correct.

Page 12

1     Q.  When did you first become aware of the
2  slogan "Not just a cell phone, a Treo"?
3     A.  The slogan or theme line was used as part
4  of a creative presentation, not in those exact
5  words, but the idea behind that, in January of 2005.
6     Q.  What were the exact words in January of
7  2005?
8     A.  "Not a cell phone, a Treo".
9     Q.  And when did you first hear the slogan,
10 "Not just a cell phone, a Treo"?
11    A.  I'm not sure of the exact date.
12    Q.  What's your best estimate?
13    A.  June or July of 2006.
14       THE COURT REPORTER:  I'm sorry, June or
15 July of?
16       THE WITNESS:  2006.
17       MR. STERN:  Let me just, if I could
18 interject to the court reporter.  So I don't know if
19 this is court reporter code or not, but the witness
20 said that in response to the question what were the
21 exact words in January of 2005, his response was
22 "Not a cell phone, a Treo".
23       I just want to make sure that we have that
24 down, because that's not what I am looking at, and
25 it may just be code issues.

Page 13

4 (Pages 10 to 13)

# Golden Gate Reporting

1    You don't have to respond; I'm just making
2 a record.
3    (Discussion off the record.)
4 BY MR. TROCK:
5    Q.  Did you participate in this presentation
6 in January of 2005?
7    A.  Yes.
8    Q.  Who gave the presentation?
9    A.  I'm not sure exactly who.
10    Q.  Well, who else besides yourself was
11 present?
12    A.  I'm not sure of all the parties.
13    Q.  Well, are you sure of anyone other than
14 yourself being there?
15    A.  Yes.
16    Q.  Okay.  Who are you sure was there, or who
17 can you recall being there, that's the better
18 question.
19    A.  Page Murray and Rose Rodd.
20    Q.  Anyone else?
21    A.  And the agency personnel.
22    Q.  By agency, who are you referring to?
23    A.  I don't know exactly who from the agency
24 was there.
25    Q.  No, but you used the term agency.  Who —

Page 14

1 what agency are you referring to?
2    A.  AKQA.
3    Q.  Okay.  So am I correct in my assumption
4 that AKQA gave the presentation?
5    A.  Correct.
6    Q.  All right.  Can you recall anyone from
7 AKQA who was at the presentation?
8    A.  Yes.
9    Q.  Who?
10    A.  Julie Patterson, Bob Pullum, Adam Lau, and
11 I believe there is one other, but I can't remember
12 who.
13    Q.  This phrase, "Not a cell phone, a Treo",
14 do you know who conceived it?
15    A.  As an individual?
16    Q.  Yes.
17    A.  No.
18    Q.  Do you know whether anyone at AKQA
19 conceived it?
20    A.  We were told that someone from AKQA did
21 conceive it.
22    Q.  Who told you that?
23    A.  It was presented as such.
24    Q.  By whom?
25    A.  The team that was mentioned from AKQA.

Page 15

1    Q.  But you can't recall an individual who
2 made that statement to you, or was that just an
3 assumption that you took away from the presentation?
4    A.  It was an assumption.
5    Q.  What was this a presentation about in
6 January of 2005?
7    A.  A ad campaign that was — that they were
8 developing for us.
9    Q.  Were any other slogans presented to Palm
10 at that time by AKQA?
11    A.  I believe so.
12    Q.  Can you recall what they were?
13    A.  No.
14    Q.  At that time did Palm give its approval to
15 AKQA to move forward with the development of this ad
16 campaign?
17    MR. STERN:  Objection, foundation.
18    THE WITNESS:  At which time?
19 BY MR. TROCK:
20    Q.  At that time in January of 2005 when it
21 was presented, did Palm give its approval to AKQA to
22 go forward with developing the campaign?
23    MR. STERN:  Same objection.
24    THE WITNESS:  Not at that time.
25 BY MR. TROCK:

Page 16

1    Q.  When did Palm give its approval to go
2 forward with developing the ad campaign?
3    A.  I'm not exactly sure when.
4    Q.  What's your best estimate?
5    A.  I believe it was in the Spring of 2006.
6    Q.  Why didn't Palm give its approval to go
7 forward with the development of the ad campaign back
8 in January of 2005?
9    MR. STERN:  Objection, foundation.
10    THE WITNESS:  Can you repeat that
11 question, I'm sorry?
12    MR. TROCK:  Sure, can you repeat it.
13    - - -
14    (The court reporter read back as
15    follows:
16    "QUESTION:  Why didn't Palm give
17    its approval to go forward with the
18    development of the ad campaign back in
19    January of 2005?")
20    - - -
21    THE WITNESS:  At that time the team felt
22 that the products that we had upcoming didn't match
23 that line.
24 BY MR. TROCK:
25    Q.  When you're referring to the team, who are

Page 17

5 (Pages 14 to 17)