# Golden Gate Reporting

1  you referring to?
2      A.  Page Murray, Rose Rodd and myself.
3      Q.  And why did Palm give its approval to
4  develop the ad campaign in Spring of 2006?
5      MR. STERN:  Objection, foundation.
6      THE WITNESS:  At that time, I felt it was
7  appropriate given the launch of an upcoming product
8  called the Treo 680.
9  BY MR. TROCK:
10     Q.  Who -- who at Palm was involved in the
11  decision to make -- to give approval to develop the
12  ad campaign in the Spring of 2006?
13     A.  The team that was mentioned.
14     Q.  That would be you, Rose and Page; is that
15  correct?
16     A.  Correct.
17     Q.  Is Page a man or woman?
18     A.  Man.
19     Q.  Okay.  Forgive me if I've asked this
20  question before, but what is Rose's position at
21  Palm?
22     A.  She's a senior director of corporate
23  communications now.
24     Q.  And she -- you report to her; is that
25  correct?

Page 18

1      THE WITNESS:  I'm a little bit confused,
2  I'm sorry.
3  BY MR. TROCK:
4      Q.  Well, I'm assuming that they're not going
5  to spend your money unless you give them approval;
6  is that correct?
7      A.  Correct.
8      Q.  Okay.  Who did you give the approval to to
9  develop the ad campaign in the Spring of 2006?
10     A.  We engaged them to develop a new ad
11  campaign for us in the Spring of 2006.
12     Q.  Right?
13     A.  Julie Patterson.
14     Q.  Julie -- so you communicated it to Julie
15  Patterson; is that right?
16     A.  Yes.
17     MR. STERN:  My objection is, I don't think
18  it's established that this person was the person who
19  communicated it, but maybe you have established
20  that.
21  BY MR. TROCK:
22     Q.  Yeah, my question was more general, who at
23  AKQA did they communicate it to, whether it was
24  Scott or somebody else at Palm.
25     Do you know who at Palm communicated that

Page 20

1      A.  Correct.
2      Q.  Okay.  What is Page's position?
3      A.  He was at the time vice president of
4  marketing.
5      Q.  And did Rose report to him?
6      A.  Yes.
7      Q.  So the two of you, you and Rose were both
8  supervised by Page; is that correct?
9      A.  Yes.
10     Q.  Who at AKQA did you communicate Palm's
11  approval to develop the ad campaign in Spring of
12  2006?
13     MR. STERN:  No foundation, objection.
14     THE WITNESS:  Can you repeat that
15  question?
16  BY MR. TROCK:
17     Q.  Sure.  We're talking about Palm making the
18  decision to develop the ad campaign in Spring of
19  2006; correct?
20     A.  We -- we're talking about developing an ad
21  campaign in Spring of 2006, correct.
22     Q.  Okay.  Now, who at AKQA did you
23  communicate that decision to, to give them the
24  authority to go ahead and develop the ad campaign?
25     MR. STERN:  Same objection.

Page 19

1  to AKQA, that decision?
2      A.  I don't recall if it was either Rose or I.
3      Can I ask for some water?
4      THE VIDEOGRAPHER:  Go off the record for a
5  moment?
6      MR. TROCK:  Sure.
7      THE VIDEOGRAPHER:  Going off record.  The
8  time is 10:15 a.m.
9      (Brief recess.)
10     THE VIDEOGRAPHER:  We're going back on
11  record.  The time is 10:16 a.m.  We're ready to
12  proceed.
13  BY MR. TROCK:
14     Q.  So in the Spring of 2006, when AKQA got
15  approval to begin developing Palm's ad campaign,
16  were there any other slogans besides "Not a cell
17  phone, a Treo" being considered for the campaign?
18     A.  Besides "Not a cell phone, a Treo" you
19  said?
20     Q.  Yes.
21     A.  I don't recall.
22     Q.  Who at Palm had the final approval for use
23  of a slogan in its ad campaign?
24     A.  Final approval would rest with probably
25  that team, but Page Murray was the senior-most

Page 21

6 (Pages 18 to 21)

Dockets.Justia.com

## Golden Gate Reporting

1 person.
2    Q.   So is it fair to say that until Page
3 Murray gave his approval for the slogan, that it
4 wouldn't be used in the campaign?
5        MR. STERN: Objection, no foundation.
6        THE WITNESS: Is it – I'm sorry?
7 BY MR. TROCK:
8    Q.   Is it fair to say, in other words, until
9 you got Page's approval, is it fair to say that the
10 slogan in the ad campaign wouldn't be used?
11        MR. STERN: Same objection.
12        THE WITNESS: I had to get approval from
13 Page before we proceeded, yes.
14 BY MR. TROCK:
15    Q.   Okay. Do you know – well, did you talk
16 with Page about the slogan that was finally approved
17 for the campaign?
18        MR. STERN: Objection, vague as to time.
19        THE WITNESS: Yes, I spoke to Page about
20 the theme line that we were using in the
21 advertising.
22 BY MR. TROCK:
23    Q.   Do you recall when Page finally gave his
24 approval for the use of that slogan?
25    A.   Which slogan?

Page 22

1    Q.   Well, the one that was finally used in the
2 campaign, "Not just a cell phone, a Treo"?
3    A.   I don't recall the exact date.
4    Q.   But you and Page had a conversation about
5 that; is that right?
6    A.   Yes.
7    Q.   Do you recall whether or not that
8 conversation took place on the phone or through
9 e-mail or in person?
10    A.   There were several conversations about it,
11 some via e-mail, some in, you know, discussions.
12    Q.   Now, correct me if I'm wrong about this,
13 but I believe the reason that you stated that Palm
14 didn't go forward with the campaign that AKQA had
15 presented in January 2 – 2005 was that Palm didn't
16 believe that it had an appropriate product that was
17 ready for that campaign. Is that about right?
18    A.   Yes.
19    Q.   What is it about the Treo 680 that led
20 Palm to believe that that product was appropriate
21 for that ad campaign?
22        MR. STERN: Objection, question is vague.
23 The question lacks foundation.
24        THE WITNESS: Can you be more specific?
25 BY MR. TROCK:

Page 23

1    Q.   Well, we'll take it a step at a time.
2 Palm didn't give approval to AKQA to the ad campaign
3 that it had presented in January of 2005; is that
4 correct?
5    A.   Correct.
6    Q.   And I believe part of the rationale for
7 not giving approval at the time was that Palm didn't
8 believe it had a product that was suitable for that
9 campaign; is that right?
10    A.   Yes.
11    Q.   Okay. Then sometime in the Spring of
12 2006, Palm gives AKQA approval for developing that
13 ad campaign because Palm is getting ready to launch
14 the Treo 680; is that right?
15    A.   We felt that that line was appropriate for
16 the Treo 680, yes.
17    Q.   Okay. What is it about the Treo 680 that
18 made it more appropriate for that ad campaign than
19 Palm's prior products?
20    A.   It's an improved product.
21    Q.   It's, sorry?
22    A.   An improved product.
23    Q.   How is it improved?
24    A.   There's a number of improvements that were
25 embedded in that product.

Page 24

1    Q.   What are they?
2    A.   Better user interface, a little bit
3 slimmer.
4    Q.   Anything else?
5    A.   No antenna.
6    Q.   Sorry?
7    A.   No antenna.
8    Q.   Anything else?
9    A.   No. No, I'm sorry.
10    Q.   How is the user interface better?
11    A.   There are just a couple of improvements to
12 some of the applications.
13    Q.   What are the improvements — well, first,
14 let me ask you this, what applications were
15 improved?
16    A.   I believe Versamail, which allows you to
17 get e-mail wirelessly.
18    Q.   What else?
19    A.   I believe the camera functionality.
20    Q.   What is it about the interface which was
21 improved for Versamail or for the camera utility?
22    A.   I don't know the specifics, it's just a
23 better experience.
24    Q.   Well, how is it better?
25    A.   It's easier to use.

Page 25

7 (Pages 22 to 25)

## Golden Gate Reporting

1  Q. Can you give me example of how it's easier
2  to use?
3  A. On the photo function you can view your
4  photos a little bit easier now.
5  Q. How is it easier to view the photos?
6  A. I'm not sure, but I think there are fewer
7  steps.
8  Q. And what about the Versamail, how is that
9  easier to use?
10  A. Same, I think that there are fewer steps.
11  Q. So other than the -- the better interface,
12  the fact that it's slimmer, and the fact that there
13  is no antenna, can you think of anything else that
14  made this an im -- an improved product which made
15  the 680 more appropriate for this ad campaign?
16  A. It's also the length of time that Treos
17  have been offered in the marketplace.
18  Q. How is that relevant?
19  A. Treo has more of a presence in the
20  smartphone market -- smartphone category.
21  Q. And how does that make that relevant to
22  this ad campaign?
23  A. We weren't -- as I said, we just weren't
24  ready for that line, "Not just a cell phone, a Treo"
25  in 2005, but we felt we were in 2006.

Page 26

1  word "just" into that slogan that AKQA had first
2  presented to Palm in January of 2005?
3  A. I believe it was Page Murray.
4  Q. Did Page ever express to you why he wanted
5  to include that word in the phrase?
6  A. Yeah, he did.
7  Q. What did he tell you?
8  A. I'm not sure exactly what he had said.
9  Q. What's your recollection?
10  A. There are a number of reasons, one of
11  which was, you know, Palm's heritage in the handheld
12  category and not in the cell phone or smartphone
13  category.
14  Q. Any other reasons that he told you?
15  A. At the time when he first had mentioned
16  it, I don't recall exactly, but that and subsequent
17  conversations, there were -- there was mention of
18  the Treo 680 not having an antenna could be
19  confusing to the customers that could actually take
20  "Not a cell phone, a Treo" literally that it wasn't
21  a cell phone.
22  Q. Any other reasons?
23  A. Not that I can recall.
24  Q. By the way, what is a smartphone?
25  A. My definition of a smartphone is a cell

Page 28

1  Q. And the reasons that you felt you were
2  ready in 2006 were because the 680 was an improved
3  product?
4  A. As well as time and market -- well, as
5  well as the time that Treos have been in market.
6  Q. How long had Treos been in the market up
7  to that point in January of 2005?
8  A. I'm not sure of the first launch date of
9  the Treo.
10  Q. What's your best estimate?
11  A. Treo was launched by a company that was
12  acquired by Palm, so I don't know exactly when they
13  were in the market.
14  Q. Okay. I'm not asking you exactly. I'm
15  just asking for your best estimate. I don't want you
16  to guess, but if you have some information that
17  would lead you to believe a certain time period, I'd
18  appreciate that.
19  A. It would be about a year and a half,
20  perhaps. I'm not exactly sure.
21  Q. So somewhere in the middle of 2003; is
22  that right?
23  A. Again, I'm not sure of the exact date, but
24  that would be my best guess.
25  Q. Do you recall who suggested adding the

Page 27

1  phone that has a Qwerty keyboard, that has web
2  capabilities, wireless e-mail capabilities, and
3  multimedia capabilities.
4  Q. Are all Treos smartphones?
5  A. Yes, I believe so.
6  Q. Are there any products on the marketplace
7  that compete against the Treo which are not
8  smartphones?
9  MR. STERN: Objection, no foundation.
10  THE WITNESS: I'm not sure.
11  BY MR. TROCK:
12  Q. Well, what's your belief?
13  A. That there are -- are there cell phones
14  out there that compete with us that are not
15  considered smartphones, you're asking?
16  Q. Let me rephrase the question. Are there
17  any product in the marketplace that you believe
18  compete with the Treo which are not smartphones?
19  MR. STERN: Same objection, no foundation.
20  THE WITNESS: Not that I know of.
21  BY MR. TROCK:
22  Q. Are there any products on the marketplace
23  that compete with the Treo that do not have Qwerty
24  keyboards?
25  MR. STERN: Same objection, no foundation.

Page 29

8 (Pages 26 to 29)

## Golden Gate Reporting

1 THE WITNESS: I'm not sure.
2 BY MR. TROCK:
3 Q. What's your belief?
4 MR. STERN: Same objection.
5 THE WITNESS: I'm not sure.
6 BY MR. TROCK:
7 Q. Do you have a belief, or don't you have a
8 belief?
9 A. Can you repeat the question?
10 Q. Do you believe there are any products in
11 the marketplace that compete against the Treo that
12 do not have Qwerty keyboards?
13 MR. STERN: Objection, no foundation.
14 THE WITNESS: The only one I can think of
15 may be the Blackberry Pearl.
16 BY MR. TROCK:
17 Q. The Blackberry Pearl does not have a
18 Qwerty keyboard; is that correct?
19 A. Correct.
20 Q. But you believe it still competes against
21 the Treo; is that correct?
22 A. Correct.
23 Q. Have you ever heard the word Camino being
24 used in one of Palm's advertising campaigns?
25 A. I'm sorry, in the context?

Page 30

1 Q. Of Palm's advertising campaigns?
2 A. Camino is a code name for the Treo 680.
3 MR. STERN: I have an objection to the
4 question as vague. Did you mean the word Camino was
5 used in the ad campaign?
6 MR. TROCK: Is that your objection,
7 Claude?
8 MR. STERN: I just want to make sure that
9 my — I understood the question differently.
10 MR. TROCK: You can make an objection if
11 you'd like.
12 MR. STERN: I did.
13 MR. TROCK: Okay.
14 BY MR. TROCK:
15 Q. When did Palm launch — let me rephrase
16 the question. When did Palm first publish
17 advertisements using the slogan "Not just a cell
18 phone, a Treo"?
19 A. I'm not sure of the exact date.
20 Q. What's your best estimate?
21 A. Late summer, early fall of 2006, I believe
22 is when it was launched.
23 Q. What geographic markets was it launched
24 in?
25 A. I believe the first use of it was in New

Page 31

1 York at a conference.
2 Q. Do you know the name of the conference?
3 A. Digital Life.
4 Q. Do you know when that occurred?
5 A. No.
6 Q. Did you attend?
7 A. No.
8 Q. Why not?
9 A. I believe Page went instead.
10 Q. When did Palm first publish outdoor
11 advertising using the slogan "Not just a cell phone,
12 a Treo"?
13 MR. STERN: Objection, the question is
14 vague.
15 THE WITNESS: I'm not sure of the exact
16 date.
17 BY MR. TROCK:
18 Q. What's your best estimate?
19 A. If you mean outdoor as in billboards, or
20 can you explain what you mean by outdoor?
21 Q. What do you — what do you take the phrase
22 outdoor advertising to mean?
23 A. Billboards, wild postings, taxi tops.
24 Q. Using your definition, when did Palm first
25 publish the slogan or the phrase, "Not just a cell

Page 32

1 phone, a Treo" in outdoor advertising?
2 A. That was in late November of 2006.
3 Q. What geographic markets was that
4 publication done in?
5 MR. STERN: I'm sorry, I missed that.
6 BY MR. TROCK:
7 Q. What geographic markets was that
8 publication done in?
9 A. The publications are —
10 Q. Well, when I'm using the phrase publish, I
11 mean some media that you use — that you distribute
12 that advertising to the public in, does that make
13 sense to you?
14 A. No.
15 Q. No?
16 A. We're talking about outdoor a second ago,
17 is this still about outdoor, or about other mediums?
18 Q. Outdoor is to the public; is it not?
19 A. Yes.
20 Q. Okay. So in late November 2006, which
21 geographic markets did Palm publish the advertising
22 using the slogan, "Not just a cell phone, a Treo" in
23 outdoor advertising?
24 A. There are several markets. I don't know
25 all of them off the top of my head.

Page 33

9 (Pages 30 to 33)

## Golden Gate Reporting

1    Q.   What information is that?
2    A.   Demographics of those buyers' age, income
3  level.
4    Q.   So is the ad — the market that you
5  targeted for the 680 the same as the market that you
6  previously targeted for Treo devices?
7    A.   It was that market plus a little bit
8  broader.
9    Q.   All right.  How is it a little bit
10  broader?
11    A.   We — for this buy, we dropped the age
12  slightly and dropped the household income slightly.
13    Q.   How much did you drop the age by?
14    A.   I'm not sure of the exact previous
15  demographics, if it was — I'm not sure.
16    Q.   What's your best recollection?
17    A.   I believe we dropped it by five years.
18    Q.   How much did you drop the household income
19  by?
20    A.   I'm not sure.
21    Q.   What's your best recollection?
22    A.   It varied, we had several other media buys
23  before this one.  I'm not sure.
24    Q.   I know you're not sure.  But I'm asking
25  for your best recollection.  If you — if you don't

Page 38

1  have a recollection, it's okay to tell me that.
2    A.   It may be — it may be dropping it from 75
3  to 60.
4    Q.   So your — you have a recollection that
5  you may have dropped it by about $15,000; is that
6  correct?
7    A.   Yes.
8    Q.   Okay.
9    A.   Essentially it's the same audience as
10  before from a psychographic, but not necessarily a
11  demographic.
12    Q.   Can you explain the difference between
13  psychographic and demographic for me?
14    MR. STERN:  I knew that was coming up.
15    THE WITNESS:  Psychographic is terms you
16  would use to describe a person versus — that's not
17  a demographic.  A demographic are more factual, I
18  guess.  And psychographics are more interests, you
19  know, lifestyle interests, business interests.
20  BY MR. TROCK:
21    Q.   Had Palm advertised in Sports Illustrated
22  prior to this campaign?
23    MR. STERN:  Objection, no foundation.
24    THE WITNESS:  I don't recall.
25  BY MR. TROCK:

Page 39

1    Q.   Had Palm advertised in Gentlemen's
2  Quarterly prior to this campaign?
3    MR. STERN:  Same objection.
4    THE WITNESS:  I believe.
5  BY MR. TROCK:
6    Q.   Do you recall which products Palm
7  advertised in Gentlemen's Quarterly?
8    A.   I don't recall.
9    Q.   You had mentioned that AKQA is your former
10  advertising agency; is that right?
11    A.   Yes.
12    Q.   When was your relationship with them
13  terminated?
14    A.   The official end date was in mid January
15  of 2007.
16    Q.   Why did the relationship end?
17    A.   We've simply outgrown them.  We needed a
18  global agency, and they didn't have the — that
19  offering.
20    Q.   When did you first advise them that you
21  were considering going with another agency?
22    A.   I don't know the exact date.
23    Q.   What's your —
24    A.   It would be —
25    Q.   What's your best recollection?

Page 40

1    A.   October-ish.
2    Q.   October 2006?
3    A.   Correct.
4    Q.   So am I correct in my belief that you
5  advised them that you were going to be looking for a
6  new advertising agency before you published this
7  outdoor advertising in November of 2006; is that
8  right?
9    A.   I don't know if it was before or after.
10    Q.   Well, I believe your testimony was that in
11  late November of 2006 you began publishing your
12  outdoor advertising in New York, Los Angeles, San
13  Francisco, Chicago and Atlanta, is that about right?
14    A.   Yes.
15    Q.   And I believe you just said that you had
16  advised them that you were going to consider using
17  another advertising agency in October of 2006; is
18  that right?
19    A.   Yes.
20    Q.   So am I correct in concluding that you
21  had advised them you were going to use — consider
22  using another advertising agency before you began
23  publishing this outdoor advertising in late November
24  of 2006?
25    A.   Yes.

Page 41

11 (Pages 38 to 41)

# Golden Gate Reporting

1    Q.   Have you ever heard of a company by the
2    name of Helio?
3    A.   Yes.
4    Q.   When did you first hear of them?
5    A.   I'm not sure when.
6    Q.   What's your best recollection?
7    A.   Fall of 2006.
8    Q.   Under what context did you first hear of
9    them?
10   A.   I believe is a T.V. commercial I saw.
11   Q.   Which T.V. commercial was it?
12   A.   I'm not sure what -- which one.
13   Q.   What do you recall about the T.V.
14   commercial?
15   A.   It was about a young couple, and she was
16   introducing her boyfriend to her family.
17   Q.   Have you ever seen any Helio print
18   advertising?
19   A.   Yes.
20   Q.   When is the first time you saw any Helio
21   print advertising?
22   A.   I'm not sure.
23   Q.   What's your best recollection?
24   A.   I'm not sure when I first saw it.  It
25   would be after that -- after seeing that T.V. spot,

Page 42

1    Q.   What did you discuss about the T.V. spot?
2    A.   That they were -- we kind of laughed it
3    off that they were using some -- you know, the line
4    "Don't call it a phone, don't call us a phone
5    company" was -- was used.
6    Q.   What do you mean by you laughed it off?
7    What does that mean?
8    A.   Well, given that we had discussed "Not a
9    cell phone, a Treo" and they were using "Don't call
10   it a phone, don't call us a phone company",
11   conceptually the -- you know, the -- the high level
12   concept can -- could have been seen as similar if we
13   were coming from the same types of companies.
14   Q.   Did you have any discussions about Helio
15   with anyone other than Julie Patterson at AKQA?
16   A.   Not to my knowledge.
17   Q.   Did you have any discussions with -- about
18   Helio with anyone at Palm?
19   A.   Not to my knowledge.
20   Q.   Did you ever become familiar with any of
21   the products that Helio was offering?
22   A.   What do you mean by "familiar with"?
23   Q.   Well, do you know what products they
24   offer?
25   A.   They are -- they're a service provider.

Page 44

1    though.
2    Q.   Did you ever become familiar with any of
3    the slogans that Helio had used in its
4    advertising -- advertisements?
5    A.   I saw what they were using.
6    Q.   Do you recall what it was?
7    A.   "Don't call it a phone, don't call us a
8    phone company" I believe is what they were saying.
9    Q.   Did you ever have an occasion to discuss
10   either of those slogans with anyone at Palm?
11   A.   No.
12   Q.   Did you ever have occasion to discuss
13   either of those slogans with anyone at AKQA?
14   A.   Yes.
15   Q.   Who did you discuss them with?
16   A.   Julie Patterson.
17   Q.   When did you have that discussion with
18   her?
19   A.   I'm not sure.
20   Q.   What's your best recollection?
21   A.   Again, the Fall of 2006.
22   Q.   What did you and Ms. Patterson discuss
23   about those slogans?
24   A.   We didn't discuss the slogan; we discussed
25   the T.V. spot in general.

Page 43

1    Q.   What do they provide?
2    A.   Based on the T.V. spot that I saw, they
3    provide services like Beacon Buddy, multimedia, you
4    know, MP3 capabilities, I don't recall the others.
5    Q.   Do they provide cell phone services?
6    A.   They provide wireless service, yes, for
7    cell phone.
8    Q.   How is it that you know this phrase Beacon
9    Buddy?  Where did you hear that?
10   A.   I don't recall where I heard it from.
11   Q.   Was that in the T.V. spot you saw?
12   A.   I'm not sure if it was in the T.V. spot.
13   Q.   So what print advertising did you see
14   about Helio?
15       MR. STERN:  That includes during the
16   lawsuit, or after the lawsuit was filed?
17       MR. TROCK:  Before the lawsuit was filed.
18       THE WITNESS:  I don't recall exactly what
19   it was.
20   BY MR. TROCK:
21   Q.   Do you recall in general?
22   A.   A lot of white space and their logo with
23   the services that they were offering.
24   Q.   Do you recall what media that was
25   published in?

Page 45

12 (Pages 42 to 45)

## Golden Gate Reporting

1    A.  What media?
2    Q.  Yeah.
3    A.  No.
4    Q.  Is it something that somebody gave you
5  while you were at Palm, or is it something you came
6  across on your own?
7    A.  Something I came across on my own.
8    Q.  Do you recall where you were when you came
9  across this, or what the context was when you came
10  across it?
11    A.  I believe I was just flipping through a
12  magazine.
13    Q.  Do you recall what magazine it was?
14    A.  I don't.
15    Q.  Do you recall whether or not Palm
16  advertised in that magazine?
17    A.  I don't recall the magazine, I get tons of
18  magazines sent to me.
19    Q.  Do you know whether or not Helio and Palm
20  advertise in some of the same magazines?
21    A.  I don't know.
22    Q.  You don't know?
23    A.  I don't know what Helio -- where Helio
24  advertises.
25    Q.  Well, I thought you just said you saw a

Page 46

1  print advertising in a magazine for Helio?
2    A.  I don't recall what the publication was.
3    Q.  But you don't recall whether or not there
4  was a Palm ad in there; do you?
5    A.  No, I don't.
6    Q.  Would it surprise you to learn that Palm
7  and Helio advertise in some of the same print
8  magazines?
9      MR. STERN:  Objection, foundation.
10      THE WITNESS:  I didn't say that we did.
11  BY MR. TROCK:
12    Q.  I didn't say that.  But I'm asking you
13  would it surprise you?
14    A.  You're saying, sorry, would it?
15    Q.  Would it surprise you?
16    A.  Would it surprise me?
17    Q.  Yes.
18    A.  No.
19    Q.  No, why not?
20    A.  There are so few good publications out
21  there to reach these audiences.
22    Q.  Which audience is Helio trying to reach?
23      MR. STERN:  Objection, no foundation.
24      THE WITNESS:  I'm not familiar.
25  BY MR. TROCK:

Page 47

1    Q.  You're not sure.  What's your best
2  estimate as to what audience they're trying to
3  reach?
4      MR. STERN:  Objection, no foundation.
5      THE WITNESS:  I'm not sure what they're
6  trying to reach -- who they're trying to reach.
7  BY MR. TROCK:
8    Q.  Well, you've seen some of their
9  advertisements; haven't you?
10    A.  I have, yes.
11    Q.  What is your belief as to which audience
12  they're trying to reach?
13    A.  The -- based on my impressions, it's the
14  younger -- younger crowd, 18 to early 20s.
15    Q.  Do you know whether or not Helio publishes
16  in the Onion?
17    A.  I'm sorry, can --
18    Q.  Do you know whether or not Helio publishes
19  in the Onion?
20    A.  I don't know.
21    Q.  Palm publishes in the ov -- Onion; isn't
22  that right?
23    A.  We placed a media -- we did an advertising
24  buy in The Onion, yes.
25      Do you mind if I get more water, please.

Page 48

1      MR. STERN:  Why don't we take a break.
2      MR. TROCK:  Let's stay on the record.
3  We've been going about an hour, do you want to take
4  a break?  Do you want to take a break?
5      THE WITNESS:  Yeah, if we could.
6      MR. TROCK:  Going off the record,
7  the time is 11:00 a.m.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  We're going back on
10  record.  The time is 11:15 a.m.  We're ready to
11  proceed.
12      MR. TROCK:  Let's go with 27 for that.
13      - - -
14      (Whereupon the document was marked,
15      for identification purposes, as Exhibit
16      Number Twenty-Seven.)
17      - - -
18  BY MR. TROCK:
19    Q.  I'm going to hand you what the court
20  reporter has marked Exhibit 27.  Have you take a
21  look at that and tell me whether or not you
22  recognize that.
23    A.  It looks like an org chart.  Yes, I do.
24    Q.  Is this an organization chart for Palm in
25  the year 2006?

Page 49

13 (Pages 46 to 49)

## Golden Gate Reporting

1  A. Yes.
2  Q. Is it accurate, based upon your --
3      MR. STERN: Objection, foundation.
4  BY MR. TROCK:
5  Q. -- understanding of the organization of
6  the marketing department at Palm?
7  A. As far as I know, yeah, this would -- this
8  would have been Page's organization.
9  Q. So Page Murray is listed there at the top
10 as the vice president of marketing; is that right?
11 A. Correct.
12 Q. And then one of the individuals reporting
13 to Mr. Murray is Rose Rodd who you had mentioned
14 before; is that right?
15 A. Right.
16 Q. And then down underneath the individuals
17 reporting to Rose, you're listed there; is that
18 correct?
19 A. Yes.
20 Q. And that's under marketing communications;
21 is that right?
22 A. Marcom, yes, marketing communications.
23 Q. Okay. Now, were there any other
24 individuals other than you, Rose and Page who were
25 part of the team that was working with AKQA?

Page 50

1  Bates numbers Palm 20458 through 20493.
2      MR. STERN: By the way, have the parties
3  in the case been doing deposition exhibits seriatim
4  so we each take --
5      MR. TROCK: You start, I think, at a
6  thousand.
7  BY MR. TROCK:
8  Q. Do you recognize Exhibit 28?
9  A. No.
10 Q. Are you familiar with this publication,
11 Mobile Services Watch?
12 A. No.
13 Q. This one -- this issue is dated, looks
14 like May of 2006. Do you see that in the upper
15 right-hand corner?
16 A. Yes.
17 Q. And in the center of the page there are
18 three columns with what look -- appear to be little
19 headlines of articles.
20     In the center column, the second entry
21 down there under Industry, it says "Helio, the U.S.
22 youth oriented MVNO, officially launched, but there
23 were questions over the high price of its bundled
24 tariffs."
25     Do you see that?

Page 52

1      MR. STERN: Objection, vague.
2  BY MR. TROCK:
3  Q. For this advertising campaign we've been
4  discussing?
5  A. You mean working with as in --
6  Q. Well, because you had -- remember when we
7  were discussing the communications between AKQA and
8  Palm, you had used the word "team" in reference to
9  individuals at Palm who were involved with the
10 advertising campaign.
11     So I am wondering whether or not aside
12 from the three of you, there were other people at
13 Palm who were working with AKQA on the advertising
14 campaign?
15 A. Not to my knowledge.
16     MR. TROCK: Let's mark that as 28.
17     - - -
18     (Whereupon the document was marked,
19     for identification purposes, as Exhibit
20     Number Twenty-Eight.)
21     - - -
22 BY MR. TROCK:
23 Q. I'm going to hand you what the court
24 reporter has marked as Exhibit 28, which is a
25 document titled "Mobile Services Watch" which bears

Page 51

1  A. Yes.
2  Q. And that's referring, I think, to Pages 14
3  and 15. So if I could get you to turn to Page 14,
4  which has in the lower right-hand corner the numbers
5  20471, do you see this page? Have you ever seen
6  this page before?
7  A. No.
8  Q. No. Do you know whether anyone at Palm
9  subscribes to this publication Mobile Services
10 Watch?
11 A. I don't know.
12 Q. Were you aware that Palm was launching its
13 advertising campaign in the United States in May of
14 2006?
15     MR. STERN: I'm sorry, you just said Palm.
16 BY MR. TROCK:
17 Q. Oh, sorry, Helio.
18     MR. STERN: The same question with the
19 word Helio in it.
20     THE WITNESS: No.
21 BY MR. TROCK:
22 Q. Did you ever become aware prior to this
23 lawsuit when Helio had first launched its
24 advertising campaign in the United States?
25 A. No.

Page 53

14 (Pages 50 to 53)

## Golden Gate Reporting

| | |
|---|---|
| 1  Q. Did you ever discuss Helio with Rose Rodd?<br>2      MR. STERN: This is all before the lawsuit<br>3  commenced?<br>4      MR. TROCK: Yes, everything is before the<br>5  lawsuit.<br>6      THE WITNESS: It's everything before the<br>7  lawsuit.<br>8  BY MR. TROCK:<br>9  Q. Yes.<br>10  A. Not to my knowledge.<br>11  Q. Did you ever discuss Helio with Page<br>12  Murray?<br>13  A. Not to my knowledge.<br>14      MR. STERN: This is also before the<br>15  lawsuit obviously.<br>16  BY MR. TROCK:<br>17  Q. So is it your belief that prior to --<br>18  well, let me ask you this question: Prior to your<br>19  seeing the television advertisement, the Helio<br>20  television advertisement we were talking about<br>21  earlier, was that your first -- let me rephrase that<br>22  question.<br>23      Prior to the television advertise -- the<br>24  Helio television advertisement we were discussing<br>25  earlier, had you heard of the -- of Helio before<br>Page 54 | 1  vague.<br>2      THE WITNESS: What do you mean by big<br>3  push?<br>4  BY MR. TROCK:<br>5  Q. Well, when did you spend your most media<br>6  dollars publishing the advertisement?<br>7      MR. STERN: Same objection.<br>8      THE WITNESS: When did we spend our media<br>9  dollars?<br>10  BY MR. TROCK:<br>11  Q. Yes.<br>12  A. I'm not sure of the exact date.<br>13  Q. Well, what's your best estimate?<br>14  A. Well, we started the UK.<br>15  Q. Let's just restrict it to the United<br>16  States.<br>17  A. November.<br>18  Q. Okay. So do you believe that prior to<br>19  November of 2006 you saw this Helio television<br>20  advertisement?<br>21  A. I believe so, yes.<br>22  Q. Let me show you what's been previously<br>23  marked as Exhibit Number 2.<br>24      MR. TROCK: This is the only copy I have.<br>25  BY MR. TROCK:<br>Page 56 |
| 1  then?<br>2  A. No.<br>3  Q. Do you have a recollection as to when, I<br>4  believe you said it was the Fall of 2006 that you<br>5  saw that television commercial?<br>6  A. Late summer or early fall.<br>7  Q. Late summer?<br>8  A. I'm not sure exactly.<br>9  Q. Now, was this before or after Palm had<br>10  launched its advertising campaign?<br>11  A. Which, I'm sorry?<br>12  Q. The television commercial that you saw<br>13  from Helio?<br>14  A. Mm-hmm.<br>15  Q. Did you see that before or after Palm had<br>16  launched its advertising campaign?<br>17  A. I honestly don't recall.<br>18  Q. Now, putting aside the Digital Live<br>19  Conference, is it fair to say that Palm made its --<br>20  its big push in advertising of this campaign in<br>21  November of 2006?<br>22      MR. STERN: Objection.<br>23  BY MR. TROCK:<br>24  Q. Is that a fair statement?<br>25      MR. STERN: Objection. The question is<br>Page 55 | 1  Q. And ask you whether or not you recognize<br>2  that?<br>3      MR. STERN: Excuse me, can I just see that<br>4  before you --<br>5      Okay. Go ahead.<br>6      THE WITNESS: I remember seeing some of<br>7  these concepts, yes.<br>8  BY MR. TROCK:<br>9  Q. When do you recall seeing them?<br>10  A. I don't know the exact date.<br>11  Q. What's your best recollection? When I ask<br>12  you these questions, Scott --<br>13  A. Mm-hmm.<br>14  Q. -- when you recall, I'm not asking for<br>15  exact dates. I'm asking for your best recollection.<br>16  In fact, on all the questions that I ask you, I'm<br>17  asking for your best recollection.<br>18  A. Got it.<br>19  Q. It's okay if you can't be exact. But you<br>20  can just tell me whatever it is you recall.<br>21  A. I believe early 2005.<br>22  Q. Was this part of the proposal that AKQA<br>23  gave to Palm in January of 2005, if you can recall?<br>24  A. These concepts came from AKQA.<br>25  Q. Let me show you what's been previously<br>Page 57 |

15 (Pages 54 to 57)

## Golden Gate Reporting

1 marked as Exhibit 3, and ask you whether or not you
2 recognize that.
3    A. Yes, I remember seeing this.
4    Q. Can you tell us what this is?
5    A. It's part of a concept presentation that
6 AKQA presented to myself and Rose and Page.
7    Q. And that was -- did it make the
8 presentation roughly on the date of the first page,
9 June 21st, 2006?
10    A. I believe so.
11    Q. Now, if you'll turn to the page that has
12 Palm 41 in the lower right-hand corner, so you'll
13 notice that here in the presentation the slogan is
14 "Not a cell phone, a Treo"; correct?
15    A. Correct.
16    Q. So is it fair to say that as of June 24,
17 2006, this was the slogan that AKQA was working on
18 at the time for the advertising campaign?
19    A. Yes.
20    MR. STERN: When you've finished with the
21 document, you can just fold it up and put it on top
22 of that stack right next to you. Right there.
23 BY MR. TROCK:
24    Q. Let me show you what's been previously
25 marked as Exhibit 4, if you can take a look at that

Page 58

1 and tell me whether or not you recognize it.
2    A. Yes.
3    Q. Can you tell me what this is?
4    A. It's a presentation from AKQA.
5    Q. And did they give this presentation to
6 you?
7    A. Yes.
8    Q. On or about the date that it bears,
9 July 19th, 2006?
10    A. I believe so.
11    Q. If you'll turn to the Page Palm 128. In
12 the middle of the Campaign Parameters under the
13 bullet point Timing, do you see that?
14    A. Yes.
15    Q. It says, A launch of November 1st, to
16 begin building awareness prior to the holiday.
17    Did the campaign launch on November 1st,
18 or was it afterwards?
19    A. The media was purchased for the month of
20 November. I'm not sure of the exact start date.
21    Q. Okay. And then it says "To begin building
22 awareness prior to the holiday." What was the
23 purpose of that?
24    A. Make prospects aware of the Treo 680 prior
25 to Christmas.

Page 59

1    Q. Why was Christmas important?
2    A. It's our most significant selling season.
3    Q. If I could get you to turn to the Page
4 Palm 131. This page discusses partner strategy.
5 Could you explain to us what partner strategy is?
6    MR. STERN: Objection, foundation.
7    THE WITNESS: For the campaign we
8 identified passion brands that became partners as
9 part of the advertising.
10 BY MR. TROCK:
11    Q. What do you mean by "passion brands"?
12    A. Passion brands are those companies who
13 have loyal users or customers.
14    Q. Was there some reason that Palm wanted to
15 partner with those kinds of brands?
16    A. Yes.
17    Q. What were the reasons?
18    A. We wanted to tap into that passion and
19 demonstrate that you can do these things that you're
20 passionate about while you're mobile.
21    Q. Now, they list Tier I, Tier II and Tier
22 III partner groupings here. Do you see that?
23    A. Correct.
24    Q. Can you explain to me what the difference
25 between the three tiers is?

Page 60

1    A. Tier I are really those customer -- those
2 potential partners that have a large loyal
3 following.
4    Tier II is one that I guess would be kind
5 of medium.
6    And then Tier III could be the smaller
7 players that still have passionate followers, just
8 not as many maybe.
9    Q. So is that based upon -- what factor is
10 that size based upon? I mean, are you talking about
11 the number of customers each of these brands has, or
12 the number of -- the amount of their revenue, how
13 are you distinguishing between the size here?
14    A. There were a number of things that we took
15 into consideration. Those that are given favorable
16 press as well as those that have quite a bit of
17 traffic if it's a website, lots of traffic to their
18 site.
19    Q. So of the ones in Tier I, do you recall
20 which of these that you partnered with?
21    A. Yes.
22    Q. Which ones?
23    A. EBay and Google.
24    Q. Prior to this advertising campaign, had
25 you ever partnered with eBay or Google as part of an

Page 61

16 (Pages 58 to 61)

# Golden Gate Reporting

1  ad campaign?
2       MR. STERN: Objection, foundation.
3       THE WITNESS: What do you mean by partner
4  in the same —
5  BY MR. TROCK:
6       Q.  Well, this — this page says partner
7  strategy.
8       A.  Right.
9       Q.  Whatever context you understand it to
10 mean.
11      A.  We have worked with eBay and Google in the
12 past, not in this exact same capacity.
13      Q.  All right. So my question to you is had
14 you partnered with eBay or Google in the past for
15 purposes of a Palm advertising campaign?
16      A.  Yes, for Google and I believe so for eBay.
17      Q.  Right. How did you partner with Google in
18 the past for purposes of a Palm advertising
19 campaign?
20      A.  Purchased space on their site.
21      Q.  You call that a partnership?
22      A.  No.
23      Q.  Okay. How about eBay?
24      A.  Same.
25      Q.  How have you — okay. So is it fair to

Page 62

1       A.  Up to this point, or —
2       Q.  For the entire campaign, how much has Palm
3  spent on this campaign?
4       A.  We've spent approximately 10 million.
5       Q.  If I could get you to turn to page Palm
6  327. Palm 327, I believe, has a list of print
7  publications Palm was considering for advertising;
8  is that correct?
9       A.  Correct.
10      Q.  Do you know which of these publications
11 Palm ended up advertising in?
12      A.  Not all of them, but some of them, yes.
13      Q.  Okay. Could you tell me the ones that you
14 know Palm advertised in, why don't we start with
15 Men's Lifestyle?
16      A.  I don't believe any of those.
17      Q.  So of the ones listed under Men's
18 Lifestyle, you don't believe that Palm advertised in
19 any of these?
20      A.  Are these for the current campaign we're
21 speaking of?
22      Q.  Yes. Is that correct?
23      A.  To my knowledge, no.
24      Q.  Okay. How about under Women's Lifestyle?
25      A.  I believe Real Simple made the cut.

Page 64

1  say, then, that prior to the launch of this
2  advertising campaign, that Palm had not partnered
3  with eBay or Google in the past in the same sense?
4       A.  Partnered, correct.
5       Q.  Let me show you what's been previously
6  marked as Exhibit 13. Have you take a look at that,
7  tell me whether or not you recognize it.
8       A.  Yes.
9       Q.  Can you tell me what this is?
10      A.  Media recommendation from AKQA.
11      Q.  Was this a presentation that was given to
12 you?
13      A.  Yes.
14      Q.  On or about the date it bears,
15 October 23rd, 2006?
16      A.  I believe so.
17      Q.  Do you recall what the total amount of
18 media spend was by Palm for this campaign?
19      MR. STERN: You mean through the end of
20 the campaign or up to this period of time? The
21 question is vague as to time.
22      THE WITNESS: What is — what's the time
23 frame?
24 BY MR. TROCK:
25      Q.  For the entire campaign.

Page 63

1       Q.  And under entertainment, which ones did
2  Palm advertise in?
3       A.  Entertainment Weekly.
4       Q.  Any others?
5       A.  I believe Rolling Stone.
6       Q.  Okay. Any others?
7       A.  Not that I can remember.
8       Q.  Had Palm — had, prior to this advertising
9  campaign, had Palm advertised in Entertainment
10 Weekly before?
11      A.  Yes.
12      Q.  Okay. Prior to this advertising campaign,
13 had Palm advertised in Rolling Stone before?
14      A.  I believe so.
15      Q.  If I could get you to turn to Palm 338, I
16 believe Palm 338 is a list of online sites that AKQA
17 was recommending that Palm advertise on; is that
18 correct?
19      A.  To consider, yes.
20      Q.  Yes. Do you recall whether any of the
21 sites listed on this page ended up being used for
22 advertising for this campaign by Palm?
23      A.  Yes.
24      Q.  Can you tell me which ones?
25      A.  The Onion, the Yelp, I believe

Page 65

17 (Pages 62 to 65)

## Golden Gate Reporting

1 Weather.com, Orbitz, Flickr. That's it.
2   Q. Okay. Prior to this advertising campaign,
3 had Palm ever advertised online at the Onion?
4     MR. STERN: Objection, no foundation.
5     THE WITNESS: I don't believe so.
6 BY MR. TROCK:
7   Q. And prior to this advertising campaign,
8 had Palm ever advertised online with Yelp?
9     MR. STERN: Same objection.
10     THE WITNESS: No, I don't think so.
11 BY MR. TROCK:
12   Q. Prior to this advertising campaign, had
13 Palm ever advertised online with Flickr?
14   A. I don't recall.
15   Q. If you'll take a look at page Palm 339,
16 there are some additional candidate sites.
17   A. Mm-hmm.
18   Q. Did Palm ever end up advertising on any of
19 these sites for this campaign?
20   A. Yes.
21   Q. Which ones?
22   A. SI.com.
23   Q. Any others?
24   A. I can't remember which exactly were —
25 which ones made the cut.

Page 66

1   Q. Prior to this advertising campaign, had
2 Palm ever advertised on SI.com?
3   A. I don't recall.
4   Q. Is the market that you were trying to
5 reach with the Palm 680 the same market that you had
6 been trying to reach with the prior Palm products?
7   A. It's the same core but just expanded a
8 bit. In other words, it's targeting people who
9 value, you know, their wireless e-mail from work and
10 their personal e-mail as well as the other features
11 the phone offers.
12     THE VIDEOGRAPHER: Would this be a good
13 time to change the tape?
14     MR. TROCK: What I got, five?
15     THE VIDEOGRAPHER: Yeah.
16     MR. TROCK: How long do you think your
17 conference call is going to take?
18     MR. STERN: If — well, whenever the
19 lunch, what are you thinking?
20     MR. TROCK: I don't know how much -- how
21 long you think your call could have been. Just
22 trying to --
23     MR. STERN: Probably a half hour, 45. I'm
24 not going to go to lunch in addition to that. I'm
25 just --

Page 67

1     MR. TROCK: Okay.
2     MR. STERN: — conference call --
3     MR. TROCK: Give me a couple more minutes.
4     THE VIDEOGRAPHER: That's fine.
5     MR. TROCK: Would you mark this one the
6 next exhibit.
7     - - -
8     (Whereupon the document was marked,
9     for identification purposes, as Exhibit
10     Number Twenty-Nine.)
11     - - -
12 BY MR. TROCK:
13   Q. I'm going to hand you what the reporter
14 has marked as Exhibit 29, which is an e-mail from
15 Julie Patterson to you dated June 14th, 2006
16 bearing Bates numbers Palm 3329 through 3333, ask
17 you to take a look at that and see whether or not
18 you recognize it.
19   A. Yes.
20   Q. Do you recall receiving this e-mail from
21 Julie Patterson on or about the date that it bears?
22   A. Yes.
23   Q. If you look through the document, it
24 appears to be a series of -- it's a string of
25 e-mails.

Page 68

1   A. Right.
2   Q. And I believe the earliest one is the one
3 that starts last in the document, which appears to
4 be an e-mail where you're inviting people to an
5 E-conference on June 8th, 2006. Do you see that?
6   A. Yep.
7   Q. A web conference?
8   A. Yes.
9   Q. Do you recall what the purpose of that
10 conference was?
11   A. AKQA is going to present the fall concepts
12 to this team.
13   Q. Okay. Now, did you have people from Palm
14 participating in this conference from outside the
15 United States?
16   A. Yes.
17   Q. Who were those people?
18   A. Avril Murphy, Lorraine Legros, Sergine
19 Dupuy, or Dupuy, Lorrie Bedlow, and within the
20 regional marketing managers, there was Sharon Ee.
21   Q. Now, we had -- we discussed earlier
22 that -- or you had discussed earlier that there was
23 some advertising that was — that was used for this
24 campaign that was outside the United States; is that
25 correct?

Page 69

18 (Pages 66 to 69)

## Golden Gate Reporting

1    A.  Correct.
2    Q.  Which countries was that advertising
3  taking place in?
4    A.  UK, Germany, Canada, parts of Latin
5  America, I'm not sure of the exact countries.
6    Q.  Now, with respect to the slogan, was the
7  only difference in the slogan that was used outside
8  of the United States the fact that the word "phone"
9  was replaced by the word "mobile"?
10    A.  The ads were leveraged in those countries.
11  They didn't just, you know --
12    Q.  But I'm just -- I'm just referring to the
13  slogan itself now.
14        What was the difference between the slogan
15  as opposed to the slogan used in the United States?
16    A.  In the UK and Germany, they used "Not just
17  a mobile, a Treo."
18    Q.  In the other countries it was the same?
19    A.  Latin America may have also used "mobile".
20    Q.  What was the reason for changing that?
21    A.  It's just in those countries they don't
22  refer to Treos as cell phones.  They refer to them
23  as mobiles, or mobile devices.
24    MR. TROCK:  Okay.  Let's change the tape.
25    THE VIDEOGRAPHER:  We're going to go off

Page 70

1  record.  Again today's date is February 27th, the
2  year 2007.  We're completing tape number one, Volume
3  Number I in the deposition of Scott Hancock in the
4  matter of Helio LLC versus Palm Inc., the time on
5  the monitor is 11:55 a.m.  We're going off the
6  record concluding tape number one.
7        ---
8        (Discussion held off the record.)
9        ---
10    THE VIDEOGRAPHER:  We're going back on
11  record.  Again today's date is February 27th, the
12  year 2007.  We're beginning tape number two in
13  Volume Number I in the deposition of Scott Hancock
14  in the matter of Helio LLC versus Palm, Inc., the
15  time on the monitor is 11:59 a.m.  We're back on
16  record right now.
17  BY MR. TROCK:
18    Q.  If you go to Palm 3, 3330 in Exhibit 29,
19  there is an e-mail there from Frederico --
20    A.  Mm-hmm.
21    Q.  -- to Rose and yourself, do you see that
22  one that's sent Friday, June 9th?
23    A.  Yes.
24    Q.  And which -- what is Frederico's
25  relationship with Palm?

Page 71

1    A.  He's a marketing manager for Latin
2  America.
3    Q.  Latin America, okay.  If you turn to Palm
4  3331, there's a paragraph in his e-mail that says,
5  "I agree on the tag line issue."
6        Do you know what he was referring to
7  there?
8    A.  I believe it was during this discussion
9  about whether or not we should incorporate the word
10  "just".
11    Q.  So that was a discussion that was
12  occurring sometime in June of 2006; is that right?
13    A.  I believe so.
14    Q.  Now, you see how he goes on and says:  "I
15  would also prefer to include something like, Not
16  just a cell phone."
17        Do you see how he capitalizes the word
18  "just"?
19    A.  Uh-huh, yes.
20    Q.  Do you have -- do you have an
21  understanding as to why he did that?
22    A.  He preferred to incorporate the word
23  "just" in the tag line.
24    Q.  Okay.  So prior to this time, the working
25  tag line was "Not a cell phone, a Treo"; is that

Page 72

1  right?
2    A.  I'm not sure of the dates of when we were
3  debating the, you know, the need to incorporate
4  "just," but it was around this time.
5    Q.  So if you'll look at the next paragraph
6  down, he says, "The idea behind not a cell phone, a
7  Treo," do you see that?
8    A.  I believe that is not from him, though.
9  This was in line with the -- with the discussion.
10  So that -- it's hard to tell from this printout.
11    Q.  Are you -- do you believe that he may be
12  inserting comments here in somebody else's e-mail?
13    A.  Yes.
14    Q.  I see, okay.  Well, is it fair to say,
15  then, at least as of the date of his e-mail which is
16  June 9th, 2006, that Palm had not yet decided
17  whether to go with tag line "Not a cell phone, a
18  Treo," or the tag line "Not just a cell phone, a
19  Treo"?
20    MR. STERN:  Hold on a second.  Objection,
21  foundation.
22    THE WITNESS:  So just to be clear,
23  although it says tag line, it's used interchangeably
24  with slogan and theme line and things like that.
25  BY MR. TROCK:

Page 73

19 (Pages 70 to 73)

# Golden Gate Reporting

1   Q. I know you don't think of the tag line,
2   but —
3   A. Right.
4   Q. — I just used that phrase, that word
5   because he did here.
6   A. Mm-hmm.
7   Q. So back to my question, then, is it fair
8   to say that as of the date of his e-mail,
9   June 9th, 2006 that Palm had not just decided
10  which of the two slogans or tag lines it was going
11  to use?
12  A. Correct.
13  Q. Okay. And then if you go back up to the
14  first page, which is Palm 3329, Julie's —
15  Patterson's comment to you on June 14th is: FYI
16  we've discussed this as a team and feel that the
17  line still works if it says "Not a mobile, a Treo."
18      Do you see that?
19  A. Yes.
20  Q. Okay.
21      MR. STERN: I think it's the leather of
22  the chair rubbing up against the table.
23  BY MR. TROCK:
24  Q. Do you know a person by the name of Fiona
25  Knowles?

Page 74

1   that right?
2   A. Right.
3   Q. So the e-mail that Julie sent says: All,
4   we've made a few changes through Camino revised
5   creative deck which you can find in the Camino
6   folder on the FTP site. Speak to you shortly.
7       Do you know what she was referring to when
8   she refers to the Camino folder on the FTP site?
9   A. It's a file — or folder full of files on
10  the FTP site.
11  Q. What's an FTP site?
12  A. It's a site where they house large files
13  for us, or AKQA housed large files for us.
14  Q. So is this an online site that you have
15  access to at Palm that AKQA provides?
16  A. Yes.
17  Q. And does it contain documents and other
18  materials relating to the Palm advertising campaign
19  that AKQA created?
20  A. Yes.
21  Q. When Julie is referring to the Camino
22  creative deck, do you know what she is referring to?
23  A. The presentation that goes through a
24  revised creative concepts for Camino.
25  Q. And Camino, again, just for the record,

Page 76

1   A. Yes.
2   Q. Do you know who that is, could you explain
3   to me who that is?
4   A. She's a woman that works at Gyro in the
5   UK, who was the agency for our London office.
6           - - -
7       (Whereupon the document was marked,
8       for identification purposes, as Exhibit
9       Number Thirty.)
10          - - -
11  BY MR. TROCK:
12  Q. I'm going to hand you what the court
13  reporter has marked as Plaintiff's Exhibit 30. Ask
14  you to take a look at it and tell me whether or not
15  you recognize it.
16  A. Yes.
17  Q. Can you tell me what this is?
18  A. Part of an e-mail.
19  Q. The last e-mail here appears to be sent
20  Friday, July 14th, from Rose Rodd to you and Page
21  Murray; is that right?
22  A. Yes.
23  Q. And underneath it, it appears that Rose is
24  forwarding on and commenting on an e-mail she
25  received from Julie Patterson on July 13th; is

Page 75

1   that's the code word you were using for the Treo
2   680; is that right?
3   A. Correct.
4   Q. Now, Rose forwards on this e-mail to both
5   you and Page and has some comments on July 14th.
6   And she says, Okay. "Now I finally was able to
7   download the revised preso."
8       Does she mean presentation?
9       MR. STERN: Objection.
10      THE WITNESS: I'm assuming.
11  BY MR. TROCK:
12  Q. That's your understanding? Is that a yes
13  or a no?
14  A. I'm assuming yes.
15  Q. Okay. She says, "I really like where
16  we're headed on this. Few comments: I like the
17  treatment on slide three for Treo and Palm, but I'd
18  prefer to add a qualifier: Not just a cell phone, a
19  Treo. {Palm logo} What are your thoughts on this
20  treatment versus the others?"
21      What's your recollection as to what other
22  treatments were being considered on July 14th,
23  2006?
24  A. I believe at that time we were looking at
25  how "Not just a cell phone, a Treo" would be

Page 77

20 (Pages 74 to 77)

**Golden Gate Reporting**

1  presented in connection with the Palm logo.
2      Q. Well, how is that different than what
3  she's referring to here? She refers to that as "Not
4  just a cell phone, a Treo" with a Palm logo. How
5  was her treatment in this e-mail different from ones
6  that -- other ones that were being considered, if
7  you recall?
8          MR. STERN: Foundation.
9          THE WITNESS: I'm sorry, I'm not sure I
10  follow.
11  BY MR. TROCK:
12      Q. Well, let's look at what she says. She
13  says: "I'd prefer to add a qualifier, Not just a
14  cell phone, a Treo." And then in parentheticals, it
15  has "Palm logo".
16          But now she asks you the question, what
17  are your thoughts on this treatment? Obviously it
18  must be the one just preceding here, versus the
19  others.
20          So my question to you is, how is the
21  treatment that she's describing in this e-mail
22  different from the others that were being considered
23  at the time?
24      A. It's the relation of the Palm logo with
25  the -- with the slogan. So whether the Palm logo

Page 78

1  to incorporate the word "just" in this theme line,
2  yes.
3      Q. Okay. Then she goes on and says, I like
4  the treatment they did with Treo by Palm but I worry
5  about losing the "not just..." line which feels so
6  much stronger.
7          Which treatment is she referring to in
8  that sentence?
9      A. I'm not sure.
10      Q. Do you recall a treatment that AKQA
11  created using the slogan "Treo by Palm"?
12      A. I believe we investigated that.
13      Q. Is it your understanding that that was
14  part of the Camino creative deck as of July 14th,
15  2006?
16      A. I don't know if it was in that deck or the
17  several other ones that I've seen.
18      Q. She goes on and says: That being said,
19  one challenge of including not just in many of the
20  executions will be the size of that line relative to
21  the headline.
22          Do you see that?
23      A. Yes.
24      Q. Do you have an understanding of what she
25  was referring to there?

Page 80

1  is, you know, above it, and the words below it or to
2  the right of it.
3      Q. So it was just a positional issue?
4      A. She was combining the positional issue
5  with the qual -- adding a qualifier of "just".
6      Q. Okay, okay. So as of July 14th, then,
7  is it fair to say that Rose was considering adding
8  the qualifier, or the word "just" into the slogan,
9  "Not a cell phone, a Treo"?
10          MR. STERN: Objection, no foundation.
11          THE WITNESS: That's what she's saying
12  here, yes.
13  BY MR. TROCK:
14      Q. Okay. And then she says: "Would be great
15  for us to lock in on a preference quickly."
16          Does this help refresh your recollection
17  as to when the preference was locked in on as to
18  which slogan to go with for the campaign?
19      A. It would be around this time, I mean,
20  everything is quick.
21      Q. So is it fair to say that as of
22  July 14th, Palm had not yet locked in on which
23  slogan it was ultimately going to use in this
24  advertising campaign?
25      A. It was -- we were debating whether or not

Page 79

1      A. I take that to mean as the line itself,
2  "Not just a cell phone, a Treo", is relatively long.
3      Q. And how does that effect the execution of
4  the advertisement, if at all?
5      A. It's just memorability, you know, from
6  prospects, whether they remember the headline,
7  whether they remember this theme line.
8      Q. Does it also have an effect on the size of
9  the type that can be used?
10          MR. STERN: Objection, foundation.
11          THE WITNESS: What do you mean?
12  BY MR. TROCK:
13      Q. Well, does the number of words in a slogan
14  affect the size of the type that can be used on the
15  advertising?
16      A. Sure, yes.
17      Q. How does it affect it?
18      A. Well, it -- if it's longer, then you have
19  a, you know, finite amount of space, then the font
20  size has to be reduced to accommodate that.
21          MR. TROCK: Mark this one next.
22                --- ---
23          (Whereupon the document was marked,
24  for identification purposes, as Exhibit
25  Number Thirty-One.)

Page 81

21 (Pages 78 to 81)

# Golden Gate Reporting

1           - - -
2    BY MR. TROCK:
3        Q.  I show you what's been marked as
4    Plaintiff's Exhibit 31.
5            MR. STERN:  Do you have a copy for me?
6    Great, thanks.
7    BY MR. TROCK:
8        Q.  Which is a document bears Bates numbers
9    AKQA 4661 through 4663.  And ask you if you
10   recognize this document?
11       A.  Yes.
12       Q.  This appears to be an e-mail from Julie
13   Patterson to you dated July 17th, 2006; is that
14   correct?
15       A.  Yes.
16       Q.  Now, if you'll look on the second page of
17   this exhibit, this appears to be a further e-mail
18   string of the Exhibit 30 which we just took a look
19   at, because you'll see that down here at the bottom
20   of Page 4662, there is the e-mail from Rose to both
21   you and Page in which she's got the same text that
22   we just referred to.
23       A.  Correct.
24       Q.  I'd like to start with the e-mail that's
25   on Page 1 from Page to both Rose and yourself dated

Page 82

1    discussing next steps and the first line says:
2    Launch ad for Groovy II.  Do you see that?
3        A.  Yes.
4        Q.  What is that referring to?
5        A.  Groovy II is a code name for the product
6    that launched in Europe.
7        Q.  And then the next line says:  First phase
8    of You Can Campaign.  What is the You Can Campaign?
9        A.  As part of the -- some of the ads in the
10   Camino campaign where you can -- blank -- on Treo.
11   And that's where -- when we insert a partner, like
12   You can Yahoo on Treo.
13       Q.  And then the last e-mail in the string is
14   from Julie Patterson to you dated July 17th, 2006.
15   And the last paragraph she writes as follows:
16   Regarding the Treo branding issue in the tag line, I
17   thought you were all going to omit "just" in the
18   U.S. versions of the creative.
19           Do you see that?
20       A.  Yes.
21       Q.  Is that your understanding of what the
22   situation was as of July 17th, 2006?
23       A.  Yes.
24       Q.  And then she goes on and says:  However,
25   Rose and Page's feedback below dictates otherwise.

Page 84

1    July 17th.  And Page writes, Hi Rose, then has
2    some comments in here.
3            And on the next page, 4662, about the
4    third paragraph from the end, it says:  We should
5    hammer out the line, the weighting of the brand, and
6    the short list and meet with Ed.
7            Who is Ed?
8        A.  Ed Culligan, our CEO.
9        Q.  Does Ed have to approve of the advertising
10   campaign before it gets published by Palm?
11           MR. STERN:  Objection, foundation.
12           THE WITNESS:  No.
13   BY MR. TROCK:
14       Q.  Do you know what Page was referring to
15   when he wrote here, We should hammer out the line?
16       A.  I don't know specifically what he was
17   referring to, but it appears he would be focused on
18   whether or not we should incorporate the word "just"
19   in the theme line.
20       Q.  Now, you then send Page's e-mail and the
21   previous ones to Julie Patterson on July 17th, do
22   you see that?  That's in the middle of the first
23   page?
24       A.  Yes.
25       Q.  And then in the second paragraph, you're

Page 83

1            So is it fair to say that as of
2    July 17th, 2006, AKQA understood that the word
3    "just" was not going to be in the U.S. versions of
4    the creative?
5            MR. STERN:  Objection, foundation.
6            THE WITNESS:  I'm not sure of when AKQA
7    was brought into the conversation about
8    incorporating the word "just", but I believe it was
9    before this.
10   BY MR. TROCK:
11       Q.  Do you know when before this?
12       A.  I don't know exactly.
13       Q.  Well, is Julie Patterson mistaken when she
14   says:  I thought you all were pushing to omit "just"
15   in the U.S. versions of the creative?
16       A.  No.
17       Q.  And then she goes on and says:  Please
18   clarify which line we should be using because I had
19   Bob start changing them to read "Not a cell phone, a
20   Treo" per your direction on Friday.
21           Do you see that?
22       A.  Yes.
23       Q.  So did you provide Julie with the
24   direction on Friday that the slogan was going to be
25   "Not a cell phone, a Treo"?

Page 85

22 (Pages 82 to 85)

# Golden Gate Reporting

1    A.  According to this, yes.
2    Q.  Okay.  You don't dispute that; do you?
3    A.  No.
4    Q.  Then she goes on at the bottom and says:
5  FYI, I know I had a concern with the inclusion of
6  "just" in part because it impacted how big the type
7  could get since the line became so long it competed
8  with the space near the product shot.  Please just
9  be aware that the longer the line is, the harder it
10  is to make the type bigger.
11        That's what you were referring to just a
12  little while ago; is that right?
13    A.  Right, just to clarify, she's saying, FYI
14  I know he had a concern, she wasn't saying that
15  she —
16    Q.  Oh, I see.  I know, right.  And "he",
17  she's referring to Bob; right?
18        MR. STERN:  Objection, foundation.
19        THE WITNESS:  I'm not sure which he.
20  BY MR. TROCK:
21    Q.  Well, is there any other he — is there
22  any other he in the paragraph that she's talking
23  about here, other than this guy by the name of Bob?
24    A.  It probably was Bob.
25    Q.  Do you know who Bob is?

Page 86

1    A.  Yes.
2    Q.  Okay.
3        MR. TROCK:  Okay.  Why don't we break for
4  lunch.
5        THE VIDEOGRAPHER:  We're going to go off
6  record.  The time is 12:25 p.m.
7        MR. TROCK:  1:30.
8        MR. STERN:  That's great.
9        (Luncheon recess.)
10        THE VIDEOGRAPHER:  We're going back on
11  record.  The time is 1:40 p.m.  We're ready to
12  proceed.
13        MR. TROCK:  Mark that as our next in
14  order.
15          - - -
16        (Whereupon the document was marked,
17        for identification purposes, as Exhibit
18        Number Thirty-Two.)
19          - - -
20  BY MR. TROCK:
21    Q.  I'm handing you what the court reporter
22  has marked as Exhibit 32, which is a series of
23  e-mails bearing Bates numbers Palm 917 through 919.
24  Ask you to take a look at this and see whether or
25  not you recognize it.

Page 87

1    A.  It looks familiar.
2    Q.  It looks like what's happening here is
3  that you received an e-mail from Fiona Knowles on
4  Tuesday, June 27th, and then you're forwarding
5  that on to Julie Patterson on the same day.
6        Is that about right?
7    A.  Yes.
8    Q.  So if we go to Fiona's e-mail to you, she
9  says:  Hi, Scott, thanks for your patience.  We have
10  consolidated our feedback with the Palm team and
11  I've detailed the salient points below.
12        And two paragraphs down, she says:  I've
13  split our feedback out under various headings, but
14  first, I have a couple of questions.  Are you no
15  longer using "It's time for Treo"?
16        Do you see that?
17    A.  Yes.
18    Q.  Is that a slogan that Palm had used in its
19  advertising?
20    A.  Yes.
21    Q.  In what advertising campaigns had Palm
22  used that slogan?
23    A.  I'm sorry, in what — in what?
24    Q.  Advertising campaigns?
25    A.  It was in a ad campaign that we had done

Page 88

1  before.
2    Q.  When?
3    A.  I don't know exactly when, I don't know.
4    Q.  Do you know what devices —
5        MR. STERN:  Excuse me, I'm sorry.
6  BY MR. TROCK:
7    Q.  — what devices it involved?
8    A.  I believe Treo 650.
9    Q.  Can you give me an estimate as to during
10  what time period that came -- ad campaign was being
11  used?
12    A.  I believe it was in the Fall of 2005,
13  perhaps the summer, I'm not -- I'm not exactly sure
14  when.
15    Q.  Of 2005?
16    A.  Correct.
17    Q.  Had you — during what time period were
18  you working with Fiona Knowles?
19    A.  I wasn't working directly with her.  She
20  worked — she reported to Avril Murphy in the UK
21  office.
22    Q.  And she would on occasion send you
23  e-mails?
24    A.  Yes.
25    Q.  I take it that this e-mail she sent you in

Page 89

23 (Pages 86 to 89)

# Golden Gate Reporting

1  June was in response to the presentation that AKQA
2  gave on the advertising campaign they were
3  developing for Palm?
4      A.  I believe so, yes.
5          MR. STERN:  Oh, my God.  What happened?
6  BY MR. TROCK:
7      Q.  Did Palm develop a relationship with
8  YouTube for purposes of this advertising campaign?
9      A.  A relationship?
10     Q.  Yeah.
11     A.  No.
12     Q.  No?  No partnership?
13     A.  No partnership.
14     Q.  Did you explore a partnership with
15 YouTube?
16     A.  Briefly.
17     Q.  Briefly?
18     A.  Yes.
19     Q.  Can you -- can you explain what you recall
20 about that exploration?
21     A.  There -- I believe they were one of the
22 partners considered but quickly dismissed because at
23 the time YouTube didn't work on our devices.
24     Q.  Do you know what time period you explored
25 this partnership?

Page 90

1      A.  Same as the other partners, but I don't
2  know exactly when, late summer.
3      Q.  Of 2006?
4      A.  Of 2006, yes.
5          MR. TROCK:  Let's mark this one.
6                      - - -
7          (Whereupon the document was marked,
8          for identification purposes, as Exhibit
9          Number Thirty-Three.)
10                     - - -
11 BY MR. TROCK:
12     Q.  Handing you what's been marked as Exhibit
13 33?
14         MR. STERN:  This is a disaster.
15         Thank you very much.
16 BY MR. TROCK:
17     Q.  Which is a series of e-mails bearing Bates
18 numbers Palm 2826 through 2827.
19         If you take could take a look at this and
20 tell me whether or not you recognize it.
21     A.  I do.
22     Q.  The e-mail string appears to start on the
23 second page via e-mail sent from Dave Daetz,
24 D-A-E-T-Z, to Page Murray on July 24th.
25         Do you see that?

Page 91

1      A.  Mm-hmm.
2      Q.  Do you know who Dave is?
3      A.  Dave Daetz.
4      Q.  Yes.
5      A.  Yes.
6      Q.  Who is he?
7      A.  He works at Palm.
8      Q.  What does he do?
9      A.  I don't know his exact title.
10         MR. STERN:  Don't guess if you don't know.
11         THE WITNESS:  I honestly don't know his
12 title.
13 BY MR. TROCK:
14     Q.  What does he do at Palm?
15     A.  I don't know.
16     Q.  How is it that you know him, then?
17     A.  I see him in the hallways.
18     Q.  Have you ever worked with him?
19         MR. STERN:  Objection.  The question is
20 vague.
21         THE WITNESS:  Not directly.
22 BY MR. TROCK:
23     Q.  Well, if you look at his e-mail to Page,
24 he says, I'm working with Matt Crowley on an
25 interesting opportunity that could have some

Page 92

1  marketing and PR sizzle, and wanted to get the right
2  creative marketing person from your team involved as
3  soon as possible.  We've been in contact with
4  YouTube over the last couple of weeks, which as you
5  know has emerged as a top site for Internet video
6  downloads.
7          So this July 24th, 2006 time period, is
8  that the time you were exploring a potential
9  relationship with YouTube?
10     A.  I believe so.
11     Q.  If you look at the third paragraph in the
12 e-mail to Page, the last sentence says:  If we are
13 able to pull this off, we'd have a great marketing
14 opportunity to creatively promote this perhaps even
15 on Camino.  And given the nature of the content,
16 help drive our appeal and consideration to a
17 broader, younger customer base.
18         Do you see that?
19     A.  Yes.
20     Q.  Is that the customer base that you were
21 trying to reach with the 680?
22         MR. STERN:  Objection, vague.  Also no
23 foundation.
24         THE WITNESS:  Which customer base?
25 BY MR. TROCK:

Page 93

24 (Pages 90 to 93)

## Golden Gate Reporting

1    Q.  Whatever one Dave is referring to here.
2    A.  It would be appealing to an audience that
3  I'd previously mentioned that would be the core
4  mobile -- mobile professionals with a slight
5  expansion. So going from, you know, someone in
6  the -- or the previous buyers of Treo were in their
7  high 40s on average, so we were looking to go a
8  little bit younger than high 40s.
9    Q.  So is his statement here correct that
10  you're trying to drive -- with the 680 you're trying
11  to drive your appeal and consideration to a broader,
12  younger customer base?
13    A.  Younger than that, yes.
14    Q.  Broader as well; is that right?
15    A.  Correct.
16    Q.  And your comments to Dave on the first
17  page of Exhibit 33 says: Dave, this is great to
18  hear.
19         Why was that great to hear?
20    A.  They -- YouTube would be -- would have
21  been a great property.
22    Q.  And why is that?
23    A.  They have a lots of eyeballs on their
24  sites. They got a lot of -- a lot of visits to
25  their site.

Page 94

1    Q.  It says: I spoke to Matt about YouTube a
2  week and a half ago and briefed him on our desire to
3  work with them.
4         And who is Matt that you're referring to
5  here?
6    A.  Matt Crowley.
7    Q.  Our agency, AKQA is in contact with
8  YouTube about our fall ad campaign already.
9         Do you see that?
10    A.  Mm-hmm.
11    Q.  How did you know that?
12    A.  We spoke about YouTube when we were
13  talking about partners. It was in consideration.
14    Q.  You spoke to AKQA about it?
15    A.  About YouTube?
16    Q.  Yes.
17    A.  Yes.
18         - - -
19         (Whereupon the document was marked,
20         for identification purposes, as Exhibit
21         Number Thirty-Four.)
22         - - -
23  BY MR. TROCK:
24    Q.  Handing you a document which has been
25  marked by the reporter as Exhibit 34.

Page 95

1    MR. STERN:  Thirty-three?
2    MR. TROCK:  Thirty-four.
3    MR. STERN:  Thirty-four, thank you.
4  BY MR. TROCK:
5    Q.  Which is titled Palm Fall 2006 Ad Campaign
6  Review.
7         Would you please take a look at this
8  document and tell me whether or not you recognize
9  it.
10    A.  Yes.
11    Q.  Can you tell me what this is?
12    A.  It's a summary of the ad campaign that we
13  were reviewing at the time.
14    Q.  Do you know who prepared this?
15    A.  I don't.
16    Q.  Was it prepared by Palm?
17    A.  Yes.
18    Q.  If you look at the first -- I mean, the
19  second page, Page 1791, under the Treo ad campaign,
20  the first bullet point on the global campaign, the
21  second entry there says the U.S. launch was
22  October 30th or 11/6.
23         Do you see that?
24    A.  Yes.
25    Q.  Is that your understanding as to when the

Page 96

1  U.S. launch was to occur?
2    MR. STERN:  Objection -- well, as phrased,
3  it's all right.
4    THE WITNESS:  I'm not sure the time of
5  this particular presentation, it was somewhat of a
6  moving target given the launch date of the product
7  was moving.
8  BY MR. TROCK:
9    Q.  Why was the launch date of the product
10  moving?
11    A.  There was many factors, and I'm not sure
12  of all the specifics around why the launch was
13  push -- pushed back, but it was.
14    Q.  What was your understanding of why the
15  launch was pushed back?
16    A.  There were several reasons, the product
17  just wasn't ready yet.
18    Q.  Well, what were the reasons?
19    A.  Again, there were several, one of which
20  was the carrier certification.
21    Q.  Anything else?
22    A.  I'm sure there were more, but I don't know
23  off the top of my head.
24    Q.  If you go on to Page 1796, you'll see an
25  ad example here that says "You can get eBay on it,"

Page 97

25 (Pages 94 to 97)

## Golden Gate Reporting

1  and it indicates a slogan "Treo by Palm" in the
2  lower right-hand corner.
3      Do you see that?
4      A.  Yeah, I see that.
5      Q.  Yeah.  And it says:  Tag line to be
6  replaced with, "Not a cell phone, a Treo."
7      Do you see that?
8      A.  Correct.
9      Q.  So if this is created by Palm, somebody at
10  Palm is using the word "tag line" to refer to that,
11  do you see that?
12      A.  Yes.
13      Q.  But you don't agree that that's a tag
14  line; is that right?
15      A.  Right.
16          - - -
17      (Whereupon the document was marked,
18      for identification purposes, as Exhibit
19      Number Thirty-Five.)
20          - - -
21  BY MR. TROCK:
22      Q.  Handing you what the court reporter has
23  marked as Exhibit 35, which is a document titled
24  "Treo Online Advertising" dated August 2nd, 2006,
25  would you please take a moment to briefly look

Page 98

1  assumption is this a mock-up that AKQA created to
2  show you what your partnership or advertisement
3  would look like on this Netflix website.  Is that
4  right, or am I mistaken?
5      MR. STERN:  Objection, foundation.
6      THE WITNESS:  The -- it is a mock-up of
7  what it could potentially look like on Netflix's
8  website.
9  BY MR. TROCK:
10      Q.  Okay.  You'll notice there that the slogan
11  that's being used here is "Not a cell phone, a
12  Treo", do you see that?
13      A.  Yes.
14      Q.  In the right-hand corner?
15      A.  Yes.
16      Q.  You'll notice that even -- this is
17  presented in August 2nd, 2006, but the slogan
18  they're using has not incorporated the word "just"
19  into it; is that right?
20      MR. STERN:  Objection, foundation,
21  mischaracterizes the document.
22      THE WITNESS:  This was part of the
23  presentation on August the 2nd.
24  BY MR. TROCK:
25      Q.  Mm-hmm.  Do you see the slogan on Page

Page 100

1  through this and tell me whether or not you
2  recognize it.
3      A.  Do you want me to go through all of it or
4  just tell you in general?
5      Q.  Just in general tell me whether or not it
6  appears familiar to you.
7      A.  Yes, it does.
8      Q.  Can you tell me what this is?
9      A.  It's a presentation given to -- given to
10  us from AKQA.
11      Q.  And was it given to you on or about the
12  date that it bears, August 2nd, 2006?
13      A.  I believe so.
14      Q.  This presentation involves the advertising
15  campaign that we've been discussing; is that right?
16      A.  Yes.
17      Q.  If you take a look at the Page 1651, which
18  is a couple pages in --
19      A.  Mm-hmm.
20      Q.  -- this appears to be a mock-up of a
21  Netflix website.  Do you see that?
22      A.  I see that, I see the page that you're
23  talking about, the screen shot on the device is
24  Netflix.
25      Q.  Can you explain to me what this is, my

Page 99

1  1651?
2      A.  Yes.
3      Q.  It's "Not a cell phone, a Treo"; right?
4      A.  I see that, yeah.
5      Q.  The word "just" has not been incorporated
6  into the slogan there; has it?
7      MR. STERN:  Objection, mischaracterizes
8  the document.
9      THE WITNESS:  What is on the page, it
10  says, "It's not a cell phone, a Treo".
11  BY MR. TROCK:
12      Q.  You don't see the word "just" there; do
13  you?
14      A.  It's not on there.
15      Q.  Okay.  If you go to Page 1657.  Can you
16  tell me what's been shown on Page 1657?
17      A.  It's a mock-up of what a -- an ad could
18  look like on a site.
19      Q.  If you look at the center of the top of
20  the web page, the slogan reads, "Not a cell phone, a
21  Treo"; is that right?
22      A.  Yes.
23      Q.  And that's a Sports Illustrated website;
24  is that right?
25      A.  I believe so, yes.

Page 101

26 (Pages 98 to 101)

## Golden Gate Reporting

| | |
|---|---|
| 1  Q.  If you go to Page 1658, can you tell us<br>2 what's being shown on this page?<br>3  A.  This is what an ad could look like on<br>4 another site.<br>5  Q.  And this is an Orbitz website; is that<br>6 correct?<br>7  A.  Yes.<br>8  Q.  And the slogan that's being used there is,<br>9 "Not a cell phone, a Treo"; is that right?<br>10  A.  The theme line is "Not a cell phone, a<br>11 Treo" in this particular one, yes.<br>12        - - -<br>13       (Whereupon the document was marked,<br>14       for identification purposes, as Exhibit<br>15       Number Thirty-Six.)<br>16        - - -<br>17 BY MR. TROCK:<br>18  Q.  Let me show you what's been marked as<br>19 Exhibit 36 by the court reporter, which is a<br>20 document titled, "Not just a Cell Phone Campaign,<br>21 Fall '06, October 9th, 2006."<br>22       Take a look at this, tell me whether or<br>23 not you recognize it.<br>24  A.  Yes, I recognize it.<br>25  Q.  Can you tell me what this is?<br><div align="right">Page 102</div> | 1  A.  I'm sorry, can you repeat that?<br>2  Q.  When was this out of home advertising<br>3 that's indicated here going to stop?<br>4  A.  The majority of it were — was stopping at<br>5 the end of — or almost all of it stopping the end<br>6 of December, so December 31st.<br>7  Q.  What happens to the outdoor advertisements<br>8 when it stops?<br>9     MR. STERN:  Objection, foundation.<br>10     THE WITNESS:  We no longer — we're no<br>11 longer paying for it.<br>12 BY MR. TROCK:<br>13  Q.  What happens to the advertisement?<br>14  A.  The actual material?<br>15  Q.  Yes.<br>16  A.  It's removed.<br>17  Q.  Okay.  Do you know when it gets removed?<br>18  A.  No.  My assumption is that it's removed<br>19 when the media company sells that space again.<br>20  Q.  So it's your understanding that it could<br>21 stay up until the space is sold for — again<br>22 afterwards; is that right?<br>23  A.  Yes.<br>24  Q.  So that could be for another month, two<br>25 months, or however long it takes that company to<br><div align="right">Page 104</div> |
| 1  A.  It's another presentation on the — on the<br>2 campaign.<br>3  Q.  Do you know who prepared this<br>4 presentation?<br>5  A.  I don't know who prepared this version, it<br>6 was worked on by myself and Page.<br>7  Q.  Okay.  So you worked on this one?<br>8  A.  Yes.<br>9  Q.  Okay.  If you look at Page 1434 for a<br>10 second.  It has Budget and Timing.  And under<br>11 November it says:  U.S. online and print to start<br>12 11/16/06 through 4/30/07.<br>13       Do you see that?<br>14  A.  Yes.<br>15  Q.  Is that your understanding as the time of<br>16 when the online and print advertising was to run for<br>17 this campaign?<br>18  A.  That was the plan at that time, yes.<br>19  Q.  Okay.  And then in December, it indicates<br>20 that the U.S. out of home advertising in these<br>21 various markets was to start on December 1st.<br>22       Do you see that?<br>23  A.  Yes.<br>24  Q.  When was this out of home advertising<br>25 going to stop?<br><div align="right">Page 103</div> | 1 sell that space; is that right?<br>2  A.  I'm not sure how long.<br>3  Q.  It's your understanding that that's<br>4 possible; is that right?<br>5  A.  Yes.<br>6  Q.  Were you aware of any advertising in the<br>7 outdoor San Francisco market that remained up after<br>8 December 31st, 2006?<br>9  A.  Can you repeat the question?<br>10  Q.  Were you aware of any Palm outdoor<br>11 advertising in the San Francisco market that<br>12 remained up after December 31st, 2006?<br>13     MR. STERN:  Relating to this campaign.<br>14 Objection, question is vague.<br>15     THE WITNESS:  Specific to this campaign,<br>16 not to my knowledge.<br>17 BY MR. TROCK:<br>18  Q.  Did you ever see any of the Palm outdoor<br>19 advertising in the San Francisco area for this<br>20 campaign?<br>21  A.  Yes.<br>22  Q.  When did you see it?<br>23  A.  I'm not sure.<br>24  Q.  Do you recall?<br>25  A.  In December.<br><div align="right">Page 105</div> |

<div align="right">27 (Pages 102 to 105)</div>

## Golden Gate Reporting

1    Q.  Do you recall seeing any in January?
2    A.  Yeah.
3    Q.  What do you recall that you saw in
4  January?
5    A.  I saw a — what we call a wall scape
6  outside our new agency's office.
7    Q.  Where is that located?
8    A.  Actually, I don't know where the wall is,
9  but their office is on 2nd Street.
10    Q.  Did you see any other Palm outdoor
11  advertising for this campaign in January, other than
12  that wall scape?
13    A.  I don't recall.
14    Q.  Do you know whether or not any of the Palm
15  outdoor advertising for this campaign in the
16  San Francisco market is still up?
17    A.  As of right now, I'm not sure.
18    Q.  Are you aware of any that is, in any of
19  the markets in which you've advertised?
20    A.  I'm not sure.
21    Q.  Has anybody brought any of those to your
22  attention since December 31st?
23    A.  That they're still running?
24    Q.  Yes.
25    MR. STERN:  You mean —

Page 106

1    BY MR. TROCK:
2    Q.  I'm talking about outdoor advertising.
3    MR. STERN:  Objection to the extent that
4  it calls for communications with counsel.  Well,
5  actually, I'll let him answer the question yes or no
6  without talking about source at this point.
7    THE WITNESS:  I'm sorry, can you repeat
8  the question?
9  BY MR. TROCK:
10    Q.  Has anybody brought to your attention any
11  Palm outdoor advertisement with respect to this
12  campaign in any of the markets in the United States
13  that's still up after December 31st?
14    A.  Yes.
15    Q.  Which markets were those in?
16    A.  I heard about one in New York.
17    Q.  Any other markets besides New York?
18    A.  That were brought to my attention, no.
19    Q.  So other than the New York one that was
20  brought to your attention and the one that you saw
21  in San Francisco, are you aware of any other Palm
22  outdoor advertising for this campaign that was still
23  up after December 31st?
24    A.  No.
25    - - -

Page 107

1    (Whereupon the document was marked,
2    for identification purposes, as Exhibit
3    Number Thirty-Seven.)
4    - - -
5  BY MR. TROCK:
6    Q.  Handing you what's been marked as Exhibit
7  37, which is a publication at Brandweek.com dated
8  December 12th, 2006, and ask you whether or not
9  you recognize this document?
10    A.  Yes.
11    Q.  Can you tell me what this is?
12    A.  It's an article from Brandweek.
13    Q.  Did you read this when it was published?
14    A.  I think soon thereafter.
15    Q.  The author here, Gregory Solman, starts
16  out and says: "Palm is launching a $25 million
17  campaign today featuring the Treo 680, according to
18  Scott Hancock, director of marketing communications
19  for the company."
20    Do you see that?
21    A.  Yes.
22    Q.  Did you speak with Mr. Solman?
23    A.  I spoke to a reporter from Brandweek, I do
24  not recall his name.
25    Q.  So it's possible it could have been

Page 108

1  Mr. Solman; is that right?
2    A.  Yes.
3    Q.  He says here in the middle of the article:
4  The tag line is "Not just a cell phone, a Treo", do
5  you see that?
6    MR. STERN:  Objection.  Where — where are
7  you pointing?
8    MR. TROCK:  (Indicating).
9    THE WITNESS:  I see that.
10  BY MR. TROCK:
11    Q.  And then he goes and says: "Hancock
12  acknowledges similarity to the positioning of rival
13  Helio."
14    Did you do that?
15    A.  No.
16    Q.  So Mr. Solman is incorrect with that
17  statement?
18    A.  Yes.
19    Q.  And then he says you noted that the two
20  devices pursued different markets. We're going
21  after the multimedia player.
22    Do you see that?
23    A.  I do.
24    Q.  And that's in quotes, do you see that?
25    A.  I do.

Page 109

28 (Pages 106 to 109)

## Golden Gate Reporting

1      Q.  Did you say that?
2      A.  I'm not sure I said those exact words.
3      Q.  Well, if you didn't say those exact words,
4  what words did you say?
5      A.  I don't know specifically.
6      Q.  You can't recall?
7      A.  No.
8      Q.  Well, do you believe that you're pursuing
9  different markets from Helio?
10     A.  Yes.
11     Q.  Okay.  Which market do you believe Helio
12  is pursuing?
13     A.  The younger, you know, late teens, early
14  20s crowd.
15     Q.  And you believe that market is different
16  than the one that Palm is pursuing?
17     A.  With our campaign, our media buys were
18  addressed to an audience that was different than
19  that, yes.
20     Q.  And who is this multimedia player you're
21  going after?
22     MR. STERN:  Objection, foundation.
23     THE WITNESS:  I don't remember saying
24  that, so I don't know.
25  BY MR. TROCK:

Page 110

1      Q.  So you don't know one way or the other,
2  you can't recall one way or the other?
3      MR. STERN:  Objection, vague.
4      THE WITNESS:  What do you mean "one way or
5  the other"?
6  BY MR. TROCK:
7      Q.  Well, you don't recall saying this to him;
8  is that right?
9      A.  Right.
10              - - -
11     (Whereupon the document was marked,
12     for identification purposes, as Exhibit
13     Number Thirty-Eight.)
14              - - -
15  BY MR. TROCK:
16     Q.  Showing you what's marked Exhibit 38 which
17  is an article from Mediapost Publications dated
18  December 14th, 2006, take a look at this and tell
19  me whether or not you recognize it?
20     A.  I don't recall seeing this.
21     Q.  Did you ever have any discussions with
22  Emily Burg, the author of this article?
23     A.  I don't recall.  I spoke to a lot of
24  reporters.
25     Q.  How many reporters did you speak to?

Page 111

1      A.  I don't know exactly.
2      Q.  What's your best estimate?
3      A.  A dozen.
4      Q.  It says in the last full paragraph on that
5  first page:  Palm seeks to widen the appeal of its
6  Treo 680 smartphone beyond a traditional customer
7  base of business users.
8      Do you see that?
9      A.  Correct.
10     Q.  Is that Palm's traditional base for its
11  Treo product?
12     MR. STERN:  You're referring to business
13  users?
14     THE WITNESS:  So the question is?
15  BY MR. TROCK:
16     Q.  Are business users the traditional
17  customer base for the Treo product?
18     A.  Yes.
19     Q.  And is it true that with the Treo 680,
20  Palm was seeking to widen the appeal of the -- that
21  product beyond its traditional customer base?
22     A.  Beyond and including those -- those folks.
23     Q.  Fair enough.  It goes on and says:  And
24  narrow the competition between itself and Blackberry
25  whose top selling Pearl has targeted the same hybrid

Page 112

1  business lifestyle wireless consumer for who the
2  Treo 680 is designed.
3      Do you agree with that statement that the
4  Treo 680 is designed for a hybrid business
5  life-style wireless consumer?
6      MR. STERN:  Objection, foundation.
7      THE WITNESS:  I believe that, yeah,
8  that --
9  BY MR. TROCK:
10     Q.  Okay.  The next paragraph goes on and
11  says:  The tag line "Not just a cell phone, a Treo"
12  rings familiar to that of wireless upstart Helio,
13  whose tag line is "Don't call it a phone."
14      Do you see that?
15     A.  I see that.
16     Q.  Do you agree with that statement?
17     A.  No.
18     MR. STERN:  Objection.  Well, I was going
19  to say foundation, but --
20              - - -
21     (Whereupon the document was marked,
22     for identification purposes, as Exhibit
23     Number Thirty-Nine.)
24              - - -
25  BY MR. TROCK:

Page 113

29 (Pages 110 to 113)

## Golden Gate Reporting

1    Q.  I show you what's been marked as Exhibit
2  39, which is a series of e-mails bearing Bates
3  numbers Palm 2540 through 2544.  Take a look at this
4  and tell me whether or not you recognize it.
5        MR. STERN:  Do you want to get some
6  tissues?
7        MR. TROCK:  It's not going to help.
8        THE WITNESS:  I recognize this, yeah.
9  BY MR. TROCK:
10    Q.  Can you tell me what this is?
11    A.  It's an e-mail thread.
12    Q.  Did you receive this on or about the date
13  that it bears, December 14th, 2006?
14    A.  I believe so.
15    Q.  This is an e-mail from Colleen Werner to
16  Robin Witty and you're being copied on it.  Who is
17  Colleen Werner?
18    A.  Colleen works on my team.
19    Q.  She works at Palm?
20    A.  Correct.
21    Q.  And who is Robin Witty?
22    A.  She also works at Palm.
23    Q.  Colleen starts and writes out:  While it
24  sounds like there was some confusion, Scott may be
25  better able -- sorry, Scott may be able to better

Page 114

1  address this since it was his baby, but here are a
2  few facts.
3        She goes and says in that third paragraph,
4  with 25 million being the -- being put behind this
5  effort, this is the biggest piece of your marketing
6  plan.
7        Do you know what $25 million she was
8  referring to here?
9    A.  The reported budget we had for this
10  campaign.
11    Q.  Was that the budget?
12    A.  Originally.
13    Q.  And what did you end up spending on the
14  entire campaign?
15    A.  To date it's been about ten million.
16    Q.  Do you know why it was less than what the
17  original budget was?
18    A.  We got budget cuts.
19    Q.  If you go back to Exhibit 37 for a second,
20  you'll see in the opening line of Mr. Solman's
21  article, he says:  "Palm is launching a $25 million
22  campaign today featuring a Treo 680."
23        Do you see that?
24    A.  Yes.
25    Q.  Was that figure in the press release that

Page 115

1  Palm issued?
2    A.  I believe so.
3    Q.  When did you learn that the budget for the
4  advertising campaign was going to be cut?
5    A.  I don't remember the exact date.
6    Q.  What's your best estimate?
7    A.  I honestly don't know.  It's -- I don't
8  know.
9    Q.  You have no recollection whatsoever when
10  you learned there was going to be a cut in the
11  advertising budget for this campaign?
12    A.  It was -- it was discussed several times.
13  I just don't know when that conversation first
14  started.
15    Q.  Okay.  When was it discussed?
16        MR. STERN:  Objection, foundation.  Vague.
17        THE WITNESS:  I'm not sure.
18  BY MR. TROCK:
19    Q.  Well, was it discussed in the summer of
20  2006?
21    A.  Not that I really know.
22    Q.  Was it discussed in the Fall of 2006?
23    A.  Depends on the definition of fall, but
24  it's fall or winter of 2006.
25    Q.  Was it discussed before the campaign was

Page 116

1  launched in November of 2006?
2    A.  I don't believe so.
3    Q.  Who made the decision to cut the budget
4  for the advertising campaign?
5        MR. STERN:  Objection, foundation.
6        THE WITNESS:  I'm not sure.
7  BY MR. TROCK:
8    Q.  Well, who did you have discussions with
9  about cutting the budget in the advertising
10  campaign?
11    A.  I believe it was Rose.
12    Q.  Did you have these discussions in her
13  office?
14    A.  I'm not sure where it was.
15    Q.  Do you recall in what context you had the
16  discussions?
17    A.  Probably during a discussion about the
18  campaign.
19    Q.  Other than this advertising campaign, were
20  you working on any other advertising campaigns for
21  Palm during that time period?
22    A.  Which time period, sorry?
23    Q.  This time period here, the fall of 2006,
24  winter of 2006?
25    A.  No, not at the time.

Page 117

30 (Pages 114 to 117)

# Golden Gate Reporting

1                    CERTIFICATE OF REPORTER

2

3          I, KENNETH T. BRILL, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth, and nothing but the truth in

7   the within-entitled cause;

8          That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time

10  and place therein stated, and that the testimony of

11  the said witness was thereafter reduced to

12  typewriting, by computer, under my direction and

13  supervision;

14         I further certify that I am not of counsel

15  or attorney for either or any of the parties to the

16  said deposition, nor in any way interested in the

17  event of this cause, and that I am not related to any

18  of the parties hereto.

19

20

21

22

23

24                  _____
                    KENNETH T. BRILL
25                  CSR 12797

                                            Page 128

# EXHIBIT 3

JULIE PATTERSON - FEBRUARY 2, 2007

1

2            UNITED STATES DISTRICT COURT FOR THE

3    NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

4

5   HELIO LLC,                    )
                     Plaintiff,   )
6                                 )   Case No.:   C06-7754 SBA
    vs.                           )
7                                 )      VOLUME I
    PALM, INC.,                   )
8                    Defendant.   )   Pages 1 to 183
    _____ )

9

10

11

12            VIDEOTAPED DEPOSITION OF JULIE PATTERSON

13                  Friday, February 2, 2007

14

15

16

17

18

19   Reported by:

20   HEIDI BELTON, CSR #12885, RPR

21   _____

22               JAN BROWN & ASSOCIATES

23            CERTIFIED SHORTHAND REPORTERS

24    701 Battery Street, 3rd Floor, San Francisco, CA 94111

25                   (415) 981-3498

                                                           1

18:38      1          (Whereupon, the witness, JULIE PATTERSON,

09:18:38   2       having been duly sworn, testified as follows:)

09:18:38   3                      EXAMINATION

09:18:46   4   BY MR. TROCK:

09:18:46   5       Q.    Good morning.  Could you please state and spell

09:18:49   6   your name for the record?

09:18:50   7       A.    Yes.  It's Julie Patterson.  J-U-L-I-E,

09:18:52   8   P-A-T-T-E-R-S-O-N.

09:18:56   9       Q.    Have you ever been deposed before, Julie?

09:18:58   10      A.    No, I have not.

09:19:00   11      Q.    Let me just explain the deposition process for

09:19:02   12   you a little bit just so you can understand.  Your

19:05      13   attorney may have already talked to you about it.

09:19:08   14          So we're taking this deposition so that we can

09:19:14   15   preserve your testimony for trial in the case.  And it's

09:19:18   16   an informal proceeding, although you should treat it as if

09:19:22   17   you were testifying in a court.  I will ask you questions,

09:19:27   18   give your attorney time to make objections for the record,

09:19:30   19   and answer the questions to the best of your ability.

09:19:33   20          The court reporter takes down everything that's

09:19:35   21   said in the room.  So it's important that only one of us

09:19:38   22   speak at a time.  If you have difficulty understanding a

09:19:41   23   question, don't hesitate to ask me to clarify it and I'll

09:19:45   24   try and do my best for you.

19:47      25          If at any time you need to take a break, just

                                                                      7

| | | |
|---|---|---|
| 19:49 | 1 | let us know and we'll take a break. |
| 09:19:53 | 2 | Could you tell me what your position is at -- do |
| 09:19:56 | 3 | you refer to this as AKQA -- |
| 09:19:58 | 4 | A.   Yes. |
| 09:19:59 | 5 | Q.   So there's no way to say it as a name? |
| 09:20:01 | 6 | A.   It's AKQA. |
| 09:20:02 | 7 | Q.   So I can't refer to it as Aqua [sic]? |
| 09:20:05 | 8 | A.   No, you cannot. |
| 09:20:06 | 9 | Q.   Can you tell me what your position is at AKQA? |
| 09:20:09 | 10 | A.   Yes.   I'm an account director. |
| 09:20:11 | 11 | Q.   What are your responsibilities as an account |
| 09:20:15 | 12 | director? |
| 20:15 | 13 | A.   As an account director you lead on a piece of |
| 09:20:18 | 14 | business for -- on behalf of the agency, you lead a |
| 09:20:21 | 15 | client's business and you basically act as the liaison |
| 09:20:24 | 16 | between the client and the agency. |
| 09:20:27 | 17 | Q.   Do you report to anybody at AKQA? |
| 09:20:30 | 18 | A.   Yes, I do. |
| 09:20:31 | 19 | Q.   Who do you report to? |
| 09:20:32 | 20 | A.   I report to Stuart Sproule. |
| 09:20:35 | 21 | Q.   How do you spell his last name? |
| 09:20:37 | 22 | A.   S-P-R-O-U-L-E. |
| 09:20:44 | 23 | Q.   How do you spell his first name? |
| 09:20:45 | 24 | A.   S-T-U-A-R-T. |
| 20:47 | 25 | Q.   Do you report to anyone else other than Stuart |

8

20:51   1   Sproule?

09:20:52   2       A.   To date Stuart has been my primary manager.  Now

09:20:55   3   that I'm moving on to another account, I have a new

09:20:58   4   supervisor.  But it's specific to my new account which is

09:21:01   5   McDonald's.

09:21:03   6       Q.   How long -- when did you first become employed

09:21:05   7   at AKQA?

09:21:07   8       A.   In September of 2002.

09:21:13   9       Q.   Have you always been an account director there?

09:21:15   10       A.   No, I have not.

09:21:16   11       Q.   What was your first position there?

09:21:17   12       A.   Account executive.

21:22   13       Q.   What are the responsibilities of an account

09:21:23   14   executive at AKQA?

09:21:27   15       A.   Responsibilities of an account executive are to

09:21:30   16   again act as a liaison between client and agency but your

09:21:34   17   primarily responsibility is for individual projects.  So

09:21:38   18   basically manning a specific campaign and not as

09:21:42   19   responsible for the overall well-being of the account.

09:21:57   20       Q.   During what time period were you an account

09:21:59   21   executive at AKQA?

09:22:06   22       A.   I don't know the exact date which I was

09:22:08   23   promoted, but I want to say it was roughly 9 to 12 months

09:22:13   24   after I began.  And then I was promoted to account

22:18   25   supervisor.

9

26:25    1      Q.    Is it your understanding that you're here to

09:26:26    2    testify on behalf of AKQA with regard to the subject

09:26:29    3    matter of those requests?

09:26:31    4            MR. COLT:   If I could interrupt for a moment,

09:26:32    5    Kevin.  I'm glad you brought this up.  The subpoena that

09:26:35    6    was served in the notice of deposition requested testimony

09:26:38    7    from AKQA on a supposed Schedule A.  The only documents

09:26:43    8    that were attached to the subpoena is this Exhibit A,

09:26:46    9    which, as you just noted, is a series of document

09:26:50    10    requests.

09:26:51    11            In AKQA's responses and objections, AKQA stated

09:26:55    12    that it was unclear as to the topics on which testimony

26:58    13    was being requested.  And if the document requests were

09:27:01    14    indeed to be treated as the deposition topics, they did

09:27:05    15    not state with reasonable particularity the topics on

09:27:08    16    which testimony was requested.  We asked Helio to meet and

09:27:11    17    confer on the issue.  We did not hear anything from Helio.

09:27:14    18            So for the purposes of today's deposition, this

09:27:17    19    witness is being presented on behalf of AKQA to testify

09:27:20    20    regarding the development and implementation of Palm's Not

09:27:25    21    Just a Cell Phone campaign and no additional topics at

09:27:29    22    that time.  However, I believe that this is a very broad

09:27:31    23    topic and I think you would be hard-pressed to look at any

09:27:36    24    of the -- of these document requests that would not fall

27:38    25    under the umbrella of that topic.

12

JULIE PATTERSON - FEBRUARY 2, 2007

27:40   1   BY MR. TROCK:

09:27:41  2      Q.  So could you respond to my question.

09:27:46  3      A.  Can you please repeat it?

09:27:49  4        MR. TROCK:  Sure.  She'll read it back for you.

09:28:02  5                 (Record read.)

09:28:02  6        THE WITNESS:  Yes, it is.

09:28:07  7   BY MR. TROCK:

09:28:07  8      Q.  Are you --

09:28:09  9        MR. COLT:  I'm sorry, Kevin.  If we could take a

09:28:11 10   quick break.

09:28:12 11        THE VIDEOGRAPHER:  The time is 9:28 a.m.  And

09:28:15 12   we're going off the record.

29:54 13       (Recess taken from 9:28 a.m. to 9:31 a.m.)

09:31:07 14        THE VIDEOGRAPHER:  The time is 9:31 a.m.  And

09:31:09 15   we're going back on the record.

09:31:13 16        THE WITNESS:  Can I please clarify my last

09:31:16 17   response?

09:31:17 18        MR. TROCK:  Sure.

09:31:18 19        THE WITNESS:  It's my understanding that I'm

09:31:19 20   here to represent AKQA regarding the development and

09:31:22 21   implementation of the Not Just a Cell Phone at Treo

09:31:27 22   campaign.

09:31:28 23   BY MR. TROCK:

09:31:28 24      Q.  When did you come to that understanding?

31:29 25        MR. COLT:  Objection to the extent this calls

13

| | | |
|---|---|---|
| 31:31 | 1 | for attorney-client communications. |
| 09:31:35 | 2 | THE WITNESS: I came to this understanding |
| 09:31:38 | 3 | initially when discussing this documentation with the |
| 09:31:42 | 4 | legal team and then was reminded during a break. |
| 09:31:47 | 5 | BY MR. TROCK: |
| 09:31:47 | 6 | Q. Was that the break that you just took with |
| 09:31:49 | 7 | Mr. Colt right now? |
| 09:31:50 | 8 | A. Yes, it was. |
| 09:31:54 | 9 | Q. Because it appears as if your testimony's now |
| 09:31:56 | 10 | different than it was just a moment ago; is that right? |
| 09:31:58 | 11 | A. It is not different. I just forgot to clarify |
| 09:32:01 | 12 | that which I'm here for, which is basically the |
| 32:05 | 13 | development of this specific campaign. |
| 09:32:06 | 14 | Q. So you're now testifying that you are not here |
| 09:32:10 | 15 | to testify on behalf of AKQA on the subject matter of the |
| 09:32:13 | 16 | requests that are in the subpoena before you? |
| 09:32:15 | 17 | A. I'm here to testify regarding the pieces of |
| 09:32:19 | 18 | information that are specific to the development and |
| 09:32:21 | 19 | implementation of our campaign. |
| 09:32:22 | 20 | Q. Well, let me ask you the question again: Are |
| 09:32:25 | 21 | you here on behalf of AKQA to testify about the subject |
| 09:32:28 | 22 | matter of the requests in that subpoena? |
| 09:32:31 | 23 | MR. COLT: Objection. It's vague and ambiguous |
| 09:32:32 | 24 | in that the subject matter of the subpoena also includes |
| 32:36 | 25 | the development and implementation of the campaign. |

14

JULIE PATTERSON - FEBRUARY 2, 2007

44:12 1   been terminated?

09:44:14 2       A.   Meaning that AKQA and Palm are no longer working

09:44:16 3   together.  Palm has since hired a new advertising agency.

09:44:22 4       Q.   When did that happen?

09:44:23 5       A.   The decision was made around early October.  But

09:44:32 6   the decision to put the business in review was made much

09:44:37 7   sooner than that.

09:44:48 8       Q.   Now going back to the selection and approval of

09:44:55 9   this theme line for this campaign, I believe you had

09:45:00 10  mentioned that AKQA had made several proposals to Palm, is

09:45:05 11  that correct, for a theme line?  Or did I misunderstand

09:45:10 12  you?

45:10 13       A.   I think you might have misunderstood.

09:45:12 14      Q.   Was there only one theme line that was ever

09:45:14 15  proposed to Palm for this campaign?

09:45:16 16      A.   Initially there was only one theme line.

09:45:18 17      Q.   All right.  What was that theme line?

09:45:20 18      A.   Not a Cell Phone at Treo.

09:45:28 19      Q.   When was that proposed to Palm?

09:45:30 20      A.   The first time it was proposed to Palm was

09:45:32 21  actually in January of 2005 for a previous campaign.

09:45:42 22      Q.   When were advertisements for this campaign first

09:45:45 23  published?

09:45:51 24      A.   In -- I believe the first time it was published

45:53 25   was in October.

23

| | | |
|---|---|---|
| 45:54 | 1 | Q.   October of when? |
| 09:45:55 | 2 | A.   I'm sorry.   October of 2006. |
| 09:46:02 | 3 | Q.   Was the theme line Not a Cell Phone at Treo ever |
| 09:46:06 | 4 | published? |
| 09:46:11 | 5 | A.   No, it was not. |
| 09:46:12 | 6 | Q.   What was the theme line that was published? |
| 09:46:13 | 7 | A.   Not Just a Cell Phone at Treo. |
| 09:46:22 | 8 | Q.   When was it changed? |
| 09:46:27 | 9 | A.   I'm sorry.   I don't understand the question. |
| 09:46:28 | 10 | Q.   Well, those two theme lines are different, |
| 09:46:29 | 11 | aren't they? |
| 09:46:31 | 12 | A.   Not Just a Cell Phone at Treo. |
| 46:32 | 13 | Q.   Yeah, isn't that different from Not a Cell Phone |
| 09:46:36 | 14 | at Treo? |
| 09:46:36 | 15 | A.   Well, Not a Cell Phone at Treo was never |
| 09:46:40 | 16 | published. |
| 09:46:40 | 17 | Q.   I understand that.   I'm asking when was it |
| 09:46:42 | 18 | changed? |
| 09:46:43 | 19 | A.   I'm sorry.   You're asking the development |
| 09:46:45 | 20 | process. |
| 09:46:46 | 21 | Q.   Yes. |
| 09:46:46 | 22 | A.   I'm sorry.   I misunderstood. |
| 09:46:48 | 23 | Q.   That's okay. |
| 09:46:49 | 24 | A.   I'm trying to remember the first time it was |
| 46:51 | 25 | suggested that we explore an alternative.   It was |

24

| | | |
|---|---|---|
| 46:54 | 1 | relatively early on in the campaign development.  I would |
| 09:46:57 | 2 | say maybe in May perhaps early June. |
| 09:47:06 | 3 | Q.   Of what year? |
| 09:47:12 | 4 | A.   Of '06. |
| 09:47:13 | 5 | Q.   Do you recall who suggested the change? |
| 09:47:21 | 6 | A.   Well, I believe that it was Page Murray who |
| 09:47:24 | 7 | first brought up the fact that -- you know, we had |
| 09:47:26 | 8 | basically presented this as a direction, and they weren't |
| 09:47:29 | 9 | really comfortable with the direction because they felt |
| 09:47:32 | 10 | that it may actually lead consumers to think that this |
| 09:47:35 | 11 | wasn't a cell phone at all.  And that was something that |
| 09:47:38 | 12 | was of great concern for Palm because this is the first |
| 47:41 | 13 | time they'd launched an antennaless device.  So there was |
| 09:47:46 | 14 | some concern about ensuring that people knew it was a cell |
| 09:47:50 | 15 | phone first. |
| 09:47:55 | 16 | Q.   Did you have discussions with Page Murray about |
| 09:47:57 | 17 | this concern? |
| 09:47:57 | 18 | A.   Yes.  It was brought up in a client review |
| 09:48:00 | 19 | initially and then communicated via e-mail that we should |
| 09:48:05 | 20 | explore some alternatives to the line. |
| 09:48:09 | 21 | Q.   Did you have e-mail communications with Page |
| 09:48:11 | 22 | Murray about this issue? |
| 09:48:16 | 23 | A.   I believe my e-mail communications with Page on |
| 09:48:17 | 24 | the topic were indirect.  Meaning, that they were e-mail |
| 48:21 | 25 | correspondence internally at Palm which were then |

25

JULIE PATTERSON - FEBRUARY 2, 2007

48:25      1    forwarded to me.

09:48:26   2         Q.   Who at Palm forwarded them to you?

09:48:28   3         A.   Scott Hancock.

09:48:44   4         Q.   Now, you -- I believe you mentioned that this

09:48:47   5    suggestion to change the theme line initially occurred

09:48:52   6    during a client review; is that right?

09:48:56   7         A.   The issue was raised during a client review as

09:48:58   8    to whether the line was misleading or not.

09:49:01   9         Q.   Can you explain to me what a client review is.

09:49:05   10        A.   A client review is when we as an agency present

09:49:09   11   creative ideas to the client and have some discussion

09:49:13   12   regarding specific direction and/or executions.

49:18      13        Q.   Do you recall when this client review occurred?

09:49:24   14        A.   Which client review?  Can you please clarify.

09:49:26   15        Q.   The one we're talking about, where there was a

09:49:29   16   concern that was expressed regarding the theme line and

09:49:34   17   the need to possibly change it.

09:49:36   18        A.   Okay.  I don't remember the date.  I know that

09:49:38   19   it took place sometime in either late May or early June.

09:49:46   20        Q.   How -- can you describe for me how this client

09:49:51   21   review occurred physically?

09:49:55   22        A.   Yes.  This client review took place at Palm.

09:50:06   23   And that particular review was done via PowerPoint.

09:50:13   24        Q.   So it was done at a face-to-face meeting at

50:16      25   Palm?

                                                              26

55:42 1   to best communicate the idea visually that we want to get

09:55:45 2   across in the early stages of a campaign's development.  A

09:55:50 3   comp doesn't necessarily translate to what the end product

09:55:53 4   is going to look like.  It's just meant to help

09:55:56 5   communicate the emotions or messages that we want to get

09:56:00 6   across.

09:56:00 7        Q.   So you're talking about an advertisement?  Is

09:56:04 8   that what we're referring to here?

09:56:06 9        A.   For -- well, a comp is an early stage -- it can

09:56:08 10  be many things.  It can basically be the versioning of an

09:56:11 11  ad.  But in the early stages it's also the communication

09:56:14 12  of an idea in a tangible form.

56:17 13        Q.   I understand.  And what is Adam's

09:56:21 14  responsibilities for the campaign?

09:56:24 15       A.   Adam is the copywriting side of the creative

09:56:29 16  team and as well as the group creative director.  So he

09:56:35 17  also manages the development of creative executions that

09:56:38 18  other individual teams are responsible for.  But he comes

09:56:42 19  up with a lot of the lines themselves, copy lines.

09:56:47 20       Q.   So the words?

09:56:48 21       A.   Correct.

09:56:55 22       Q.   And how about Courtney Kile?  What were her

09:56:58 23  responsibilities for the campaign?

09:57:00 24       A.   Courtney is the -- or was the associate media

57:03 25  director.  She's no longer with AKQA.  She is -- her

30

57:06    1  primary responsibility is identifying media strategies and

09:57:10    2  making recommendations on how best to spend Palm's money

09:57:16    3  against identified targets.

09:57:20    4        Q.    How about Kate Harris?  What were her duties?

09:57:23    5        A.    Kate Harris is the director of account planning.

09:57:26    6  So her primary role is really understanding target

09:57:31    7  audiences and helping make recommendations on optimal

09:57:35    8  targets for Palm and development of the creative brief,

09:57:40    9  which is basically the strategy that the creative comes

09:57:44   10  out of.

09:58:07   11        Q.    I may have asked you this question before,

09:58:09   12  but -- so forgive me.  I'm just trying to clarify this.  I

58:13   13  believe it's your testimony that during this client review

09:58:16   14  which occurred in May or June of 2006, the issue was

09:58:20   15  raised that the current theme line Not a Cell Phone at

09:58:26   16  Treo might miscommunicate a concept and there was a

09:58:35   17  concern that it should be changed or altered in some

09:58:38   18  fashion.  Is that a fair statement?

09:58:39   19        A.    Let me clarify a little bit.  That meeting that

09:58:42   20  took place in late May or early April was the first time

09:58:47   21  that we had presented creative ideas that were based off

09:58:52   22  of the strategy Not a Cell Phone at Treo.  And so the

09:58:57   23  purpose of that initial meeting was to provide them with a

09:59:00   24  variety of creative directions, one of which had Not a

59:04   25  Cell Phone at Treo in it as the theme line.  And so during

31

59:09   1   that initial meeting, the clients felt that that was the

09:59:15  2   best creative direction to go in of the two or three that

09:59:18  3   we had presented to them.  And at that point said, you

09:59:24  4   know, we may want to think about this a little bit more.

09:59:26  5   But the primary purpose of that meeting was to pick a

09:59:29  6   direction.

09:59:31  7       Q.   So you mentioned there were two or three

09:59:34  8   creative ideas that were presented to Palm in May or June

09:59:38  9   of 2006; is that correct?

09:59:39  10      A.   Correct.

09:59:40  11      Q.   You also mentioned that this was the first time

09:59:42  12  that AKQA presented these creative ideas to Palm in this

59:45   13  campaign; is that right?

09:59:47  14          MR. COLT:  Misstates prior testimony.

09:59:51  15          THE WITNESS:  This was the first time that we

09:59:53  16  had presented this campaign direction to Palm.  But we had

10:00:00  17  presented the line Not a Cell Phone at Treo to them

10:00:05  18  previously.

10:00:06  19  BY MR. TROCK:

10:00:10  20      Q.   What were the other campaign directions aside

10:00:14  21  from the one we've been discussing that were presented to

10:00:17  22  Palm at that time during that client review?

10:00:25  23      A.   There was one campaign direction which I believe

10:00:26  24  the theme line was It Only Looks Serious.  And then there

00:35   25  were some promotional-type ideas.  One was called Flash

32

00:41   1   Mobs.

10:00:51   2      Q.   So these promotional ideas you're referring to,

10:00:54   3   would you characterize them as a campaign direction or no?

10:01:06   4      A.   The two primary campaign directions were It Only

10:01:09   5   Looks Serious and Not a Cell Phone at Treo.  And then we

10:01:14   6   had some ideas that we felt were really strong, isolated

10:01:21   7   program ideas that if Palm liked them we could kind of

10:01:30   8   work them into either direction.

10:01:31   9      Q.   When did Palm communicate to AKQA its decision

10:01:40  10   as to which of these two campaign directions it wanted to

10:01:44  11   pursue?

10:01:50  12      A.   During the course of the meeting they verbally

01:52  13   told us that they felt it was the right direction of the

10:01:55  14   two.

10:01:56  15      Q.   The direction Not a Cell Phone at Treo?

10:01:58  16      A.   That campaign direction Not a Cell Phone at

10:02:00  17   Treo, as far as the campaign strategy.  But we were way

10:02:05  18   too early on to be really making decisions about specific

10:02:08  19   creative elements.

10:02:10  20      Q.   So after that meeting in May or June of 2006, is

10:02:17  21   it fair to say that AKQA did not continue to pursue the

10:02:23  22   campaign direction It Only Looks Serious?

10:02:28  23      A.   Yes, that is safe to say.

10:02:31  24      Q.   And that was Palm's decision not to pursue that

02:34  25   campaign direction; is that right?

                                                                                 33

02:35    1    A.    That is correct.

10:02:41    2    Q.    Do you recall who at Palm communicated that

10:02:45    3    decision?

10:02:51    4    A.    I don't remember which individual we worked

10:02:54    5    with.  The three members of the marketing team, rather,

10:03:04    6    routinely did so.

10:03:12    7    Q.    You attended that meeting, right?

10:03:14    8    A.    Correct.

10:03:14    9    Q.    Was it your understanding at that meeting that

10:03:16    10    the three Palm representatives were all in consensus that

10:03:20    11    Palm wanted to pursue the campaign direction Not a Cell

10:03:27    12    Phone at Treo?

03:30    13    MR. COLT:  Objection.  Lacks foundation.  Calls

10:03:31    14    for speculation.

10:03:34    15    THE WITNESS:  At that time my understanding from

10:03:36    16    their feedback was that they felt that that campaign

10:03:40    17    direction and strategy of -- because basically the

10:03:44    18    campaign wasn't just about the line in the sense of how we

10:03:47    19    presented it to them; it was also about partnerships with

10:03:51    20    what we had considered to be passion brands.  So their

10:03:55    21    feedback was based on pursuing that as a strategy.

10:04:05    22    BY MR. TROCK:

10:04:05    23    Q.    What do you mean by "passion brands"?

10:04:09    24    A.    I guess the best way to define how we had sort

04:12    25    of defined passion brands were other consumer-friendly

34

04:18    1   brands that had a loyal following -- user-based sort of

10:04:25    2   following -- and that seemed to have a brand that was

10:04:28    3   favorable among consumers.

10:04:36    4        Q.    Did you discuss particular passion brands at

10:04:38    5   that time with Palm?

10:04:40    6        A.    We did in part because we had this -- we had

10:04:44    7   begun the discussion in the context of some focus group

10:04:47    8   research that we had done.  And prior to that at the

10:04:55    9   conclusion of 2005 we ran a campaign for Palm, which the

10:05:00   10   line in that campaign was It's Time for Treo.  And during

10:05:03   11   the course of that campaign, we had started to run on

10:05:07   12   certain web properties where we showcased their content on

05:10   13   the screen of the device.  And it seemed to be a favorable

10:05:15   14   strategy for us.

10:05:17   15        Q.    Which brands did you discuss during that client

10:05:21   16   review?

10:05:24   17        A.    During this first client review or the focus

10:05:27   18   group research?

10:05:27   19        Q.    The client review in May or June of 2006.

10:05:35   20        A.    I believe -- I'm trying to remember all the

10:05:37   21   comps that we had.  I believe we had included Orbitz,

10:05:41   22   eBay, Yahoo, Google, Fandango, maybe NetFlix.  I don't

10:05:55   23   think that's the exhaustive list, but it's pretty

10:05:59   24   representative.

06:44   25        Q.    Do you recall when Palm approved use of the

35

06:52    1    theme line Not Just a Cell Phone at Treo?

10:07:01    2         A.    I don't recall.  Because it was the topic of a

10:07:03    3    lot of discussion for many months.

10:07:31    4         Q.    Did you have discussions with people at Palm

10:07:33    5    about that change to the theme line?

10:07:38    6         A.    Yes.

10:07:39    7         Q.    Who at Palm did you have those discussions with?

10:07:42    8         A.    Again, Scott, Rose, and Page.

10:07:50    9         Q.    Did you have discussions with any of them about

10:07:54    10    changing that theme line by e-mail?

10:08:00    11         A.    Yes.

10:08:03    12         Q.    Did you have discussions with Scott about

08:05    13    changing the theme line by e-mail?

10:08:07    14         A.    Yes.

10:08:09    15         Q.    Did you have discussions with Rose about

10:08:13    16    changing that theme line by e-mail?

10:08:18    17         A.    Again, not directly, but indirectly through

10:08:21    18    e-mails forwarded to me by Scott.

10:08:24    19         Q.    Did you have discussions with Page about

10:08:28    20    changing that theme line by e-mail?

10:08:31    21         A.    Again, indirectly via e-mails that were

10:08:34    22    forwarded to me by Scott.

10:08:55    23         Q.    Did you ever have direct communications with

10:08:58    24    Rose by e-mail about the campaign?

09:05    25         A.    On occasion.

36

| | | |
|---|---|---|
| 11:25 | 1 | Q.   Did there come a time where specific ad |
| 10:11:28 | 2 | executions with this revised theme line were presented to |
| 10:11:39 | 3 | Palm for approval? |
| 10:11:40 | 4 | A.   With "just" in the line? |
| 10:11:43 | 5 | Q.   Yeah.  When I say "revised," I mean with the |
| 10:11:46 | 6 | addition of "just" in the theme line. |
| 10:11:49 | 7 | A.   So are you asking me did there come a time when |
| 10:11:52 | 8 | they had to approve those individual executions? |
| 10:11:54 | 9 | Q.   Yes. |
| 10:11:55 | 10 | A.   Yes. |
| 10:11:55 | 11 | Q.   Do you recall when that time period was? |
| 10:12:03 | 12 | A.   I believe individual execution approval began -- |
| 12:07 | 13 | and let me clarify.  When I say individual execution |
| 10:12:10 | 14 | approval, that's to the point where we have a media buy in |
| 10:12:15 | 15 | place where we're building to specific dimensions or |
| 10:12:18 | 16 | requirements.  And so we were at the point -- we were that |
| 10:12:22 | 17 | far down the path of approving individual executions, I |
| 10:12:27 | 18 | believe we started that in late August, perhaps. |
| 10:12:36 | 19 | Q.   Of '06? |
| 10:12:37 | 20 | A.   Yes. |
| 10:12:43 | 21 | Q.   Who at Palm would give approval for those |
| 10:12:45 | 22 | individual executions? |
| 10:12:47 | 23 | A.   Scott Hancock. |
| 10:13:12 | 24 | Q.   Did AKQA ever publish execution without the |
| 13:17 | 25 | approval of Palm? |

38

JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 13:23 | 1 | A. No. |
| 10:14:02 | 2 | Q. During your communications with Palm, did Helio |
| 10:14:22 | 3 | ever come up? |
| 10:14:25 | 4 | MR. COLT: Objection. It's vague as to time. |
| 10:14:27 | 5 | THE WITNESS: Yeah, can you please clarify. |
| 10:14:28 | 6 | BY MR. TROCK: |
| 10:14:29 | 7 | Q. At any time while you were at AKQA. |
| 10:14:32 | 8 | A. Did Helio come up? |
| 10:14:33 | 9 | Q. Yes. |
| 10:14:34 | 10 | A. Yes, Helio's advertising campaign came up. |
| 10:14:38 | 11 | Q. When did that happen? |
| 10:14:43 | 12 | A. At the end of July. July 31. |
| 14:50 | 13 | Q. What year was that? |
| 10:14:51 | 14 | A. 2006. |
| 10:14:51 | 15 | Q. Can you describe for me the context under which |
| 10:14:57 | 16 | it came up? |
| 10:14:58 | 17 | A. Yes. That was on a Monday. And one of the |
| 10:15:02 | 18 | members of our team came in and mentioned that he had seen |
| 10:15:06 | 19 | a TV spot for Helio that aired over the weekend and asked |
| 10:15:14 | 20 | if anyone else had seen it. |
| 10:15:20 | 21 | Q. Who was that person? |
| 10:15:20 | 22 | A. Brendon Robertson. |
| 10:15:23 | 23 | Q. What is Brendon's position at AKQA? |
| 10:15:26 | 24 | A. He's a senior account planner and he reports to |
| 15:29 | 25 | Kate Harris. |

39

15:41    1        Q.    Did he have this discussion with you or with

10:15:42    2    somebody else at Helio?  Sorry.  At AKQA.

10:15:49    3        A.    I don't know whether or not he mentioned it to

10:15:52    4    Kate before me, but then he came and mentioned it to me.

10:15:56    5        Q.    Did you know who Helio was when he mentioned the

10:15:59    6    name?

10:15:59    7        A.    I didn't know much about them, but I had heard

10:16:01    8    their name somewhat in passing in industry trades.

10:16:06    9        Q.    What -- at that time when Brendon had this

10:16:09    10    conversation with you, what was your understanding of who

10:16:12    11    Helio was?

10:16:13    12        A.    Honestly I didn't have a great understanding

16:15    13    other than to know that they were going to have -- be --

10:16:21    14    try to be sort of a combination of service provider and

10:16:23    15    manufacturer.

10:16:26    16        Q.    Service provider and manufacturer of what?

10:16:28    17        A.    Of a multimedia device.

10:16:46    18        Q.    The device -- the Palm device or devices that

10:16:49    19    are the focus of the ad campaign you're discussing, which

10:16:55    20    devices are those?

10:16:56    21        A.    The Treo?

10:16:57    22        Q.    Yeah, are there particular Treos that were the

10:16:59    23    focus of that campaign or just Treos in general?

10:17:02    24        A.    We were launching the campaign in conjunction

17:06    25    with the launch of their latest product which was the Treo

40

17:09     1    680.  However, we didn't specifically call the model name

10:17:14  2    out in the advertising.

10:17:18  3         Q.    Is the Treo 680 a multimedia device?

10:17:22  4              MR. COLT:  Objection.  Lacks foundation.  Calls

10:17:23  5    for speculation.

10:17:27  6              THE WITNESS:  We would consider it to be a

10:17:29  7    smartphone.

10:17:30  8    BY MR. TROCK:

10:17:33  9         Q.    What's a smartphone?

10:17:34  10             MR. COLT:  Same objections.

10:17:35  11             THE WITNESS:  A smartphone is, I guess, best

10:17:38  12   described as having cell phone and e-mail capabilities

17:43     13   first and foremost.  And then oftentimes they're sprinkled

10:17:48  14   with other types of feature sets.  But when we talk about

10:17:53  15   smartphones, they often are clarified -- classified as

10:17:58  16   cell phone, e-mail, and oftentimes as QWERTY keyboard as

10:18:03  17   well.

10:18:09  18        Q.    Are you familiar with the Treo 680?

10:18:10  19        A.    Yes, I am.

10:18:11  20        Q.    What features does it have?

10:18:14  21        A.    It has phone; e-mail; QWERTY; e-mail, which is,

10:18:23  22   as I mentioned, why it's a smartphone; camera; video; MP3;

10:18:28  23   voice recorder; web; and then calendaring contacts,

10:18:45  24   address book-type features.

18:50     25        Q.    You used the terminology "multimedia device."

                                                                    41

18:54 1  What's a multimedia device?

10:18:56 2       A.    A multimedia device would, in my opinion, be

10:19:00 3  something where some of the multimedia features such as

10:19:04 4  camera and music and video are at the forefront of what

10:19:12 5  they describe their products to be.  So they're the

10:19:19 6  primary features of the device.  So, for example, like a

10:19:21 7  PS- -- port- -- a PSP would be something I would consider

10:19:25 8  to be a multimedia device.

10:19:33 9       Q.    What's a PSP?

10:19:34 10       A.    The Play Station Portable.

10:19:58 11       Q.    So after Mr. Robertson mentioned this television

10:20:03 12  spot of Helio's, what happened next?

20:07 13       A.    So after that I had actually asked -- I think I

10:20:13 14  asked Bob Pullum if he had seen it.  And he mentioned that

10:20:18 15  he had also seen a print ad which he -- I can't remember

10:20:24 16  if it was in Details or GQ, one of the two men's lifestyle

10:20:33 17  magazines.  And so not everyone on the team was aware of

10:20:38 18  the campaign of Helio and we had a client review scheduled

10:20:40 19  for two days later.  So I called an internal meeting to

10:20:45 20  make sure that everyone was aware of this campaign and

10:20:49 21  talk about preparation for our creative review.

10:21:02 22       Q.    Why did you do that?

10:21:03 23       A.    At that point in time we were still going back

10:21:05 24  and forth with Palm regarding various campaign elements,

21:11 25  one of which was the line Not a Cell Phone at Treo.  And

42

21:20    1    they had asked us on a couple of occasions to explore

10:21:24    2    alternatives, consider "just." And we had put it in,

10:21:28    3    taken it out, put it in, taken it out on a couple of

10:21:31    4    occasions on comp work. And there was still the lingering

10:21:34    5    concern that the line without the use of "just" might

10:21:40    6    imply that this was not a phone at all. And so in light

10:21:43    7    of the Helio campaign, I thought it was something that we

10:21:47    8    should discuss as a group.

10:21:54    9        Q.   Why did you care about the Helio campaign?

10:21:58    10       A.   Well, for one, I think we were trying to

10:22:00    11   understand what exactly they were offering. Because it

10:22:05    12   was -- their line was Don't Call Us a Phone Company, Don't

22:10    13   Call It a Phone. So we were discussing what exactly they

10:22:13    14   were. And had some discussion regarding whether there

10:22:21    15   were similarities to the line Not a Cell Phone at Treo and

10:22:29    16   Don't Call It a Phone.

10:22:39    17       Q.   What was the nature of those discussions about

10:22:41    18   similarities between the lines?

10:22:47    19       A.   I think that in general the feeling was that,

10:22:50    20   again, the line -- which we knew was a topic of discussion

10:22:55    21   with Palm, the line Not a Cell Phone at Treo might make

10:22:59    22   people in the marketplace think that it was indeed not a

10:23:02    23   cell phone, which was not what we were trying to

10:23:05    24   communicate. And so basically the discussion was around

23:10    25   the fact that there's a product in the marketplace that

43

23:15 1 has a line Not a Cell Phone -- I'm sorry -- Don't Call It

10:23:17 2 a Phone, Don't Call Us a Phone Company.  And then this

10:23:22 3 line of Not a Cell Phone at Treo and really wanting to

10:23:26 4 make sure that we distinguish the fact that Palm is a cell

10:23:31 5 phone first and more than that.

10:23:37 6         So we felt as -- basically we felt as a

10:23:41 7 responsible marketing partner, that we wanted to bring it

10:23:45 8 to Palm's attention that -- that there was a line that

10:23:51 9 said Don't Call It a Phone, Don't Call Us a Phone Company.

10:24:08 10        Q.   Do you recall about when this meeting took

10:24:10 11 place?

10:24:14 12        A.   The internal discussion or the meeting with

24:16 13 Palm?

10:24:16 14        Q.   The internal discussion.

10:24:17 15        A.   Yeah.  I believe it took place on July 31.

10:24:29 16        Q.   Who at AKQA attended the meeting?

10:24:37 17        A.   It was myself, Kate, Bob, and Adam, Stuart, and

10:24:45 18 Brendon.  And I don't recall if Courtney was in there, but

10:24:53 19 I -- actually, I don't think she was in there.

10:25:02 20        MR. COLT:  Kevin, we've been going a little over

10:25:04 21 an hour.  If we could take just a short break, I'd

10:25:07 22 appreciate that.

10:25:09 23        MR. TROCK:  Sure.  That would be fine.

10:25:11 24        MR. COLT:  Great.

25:11 25        THE VIDEOGRAPHER:  The time is 10:25 a.m.  And

44

25:14 1    we're going off the record.

10:25:23 2         (Recess taken from 10:25 a.m. to 10:48 a.m.)

10:47:52 3         THE VIDEOGRAPHER:  The time is 10:48 a.m.  And

10:47:56 4    we're going back on the record.

10:47:58 5    BY MR. TROCK:

10:48:49 6         Q.   Okay.  Just to clarify something.

10:48:53 7         A.   Okay.

10:48:53 8         Q.   As of the time of the meeting on July 31 that we

10:48:57 9    were talking about in which the Helio campaign was

10:49:01 10   discussed internally at AKQA, had Palm decided by that

10:49:11 11   point to go with the theme line Not Just a Cell Phone at

10:49:20 12   Treo?

49:21 13         MR. COLT:  Objection.  It lacks foundation.  And

10:49:24 14   calls for speculation.

10:49:25 15         You can answer if you know.

10:49:29 16         THE WITNESS:  By that time they had asked us to

10:49:32 17   explore alternatives and had suggested "just," but we had

10:49:36 18   not agreed upon the final line yet.

10:49:38 19   BY MR. TROCK:

10:49:43 20        Q.   With respect to this meeting on July 31, do you

10:49:47 21   recall seeing any written documentation about what was

10:49:50 22   discussed at that meeting?

10:49:56 23        A.   Is there -- sorry.  Can you repeat your

10:49:57 24   question.

49:58 25         Q.   Do you recall seeing any written documentation

45

JULIE PATTERSON - FEBRUARY 2, 2007

49:59    1    about what was discussed at that meeting, whether it be in

10:50:02    2    e-mail form, notes, or anything of that nature?

10:50:07    3    MR. COLT:  Objection.  It's vague as to time.

10:50:10    4    THE WITNESS:  Our internal?

10:50:10    5    BY MR. TROCK:

10:50:10    6    Q.    Yes.

10:50:11    7    A.    There was no documentation.  It was just

10:50:13    8    conversation.

10:50:13    9    Q.    Do you recall anybody taking any notes at the

10:50:15    10    meeting?

10:50:16    11    A.    No.

10:50:16    12    Q.    So you don't recall seeing any e-mails about the

50:19    13    discussions of that meeting; is that correct?

10:50:21    14    A.    During the 7/31 meeting, no.

10:50:25    15    Q.    Not during the meeting itself.

10:50:26    16    A.    Oh.

10:50:26    17    Q.    At any time do you recall seeing any written

10:50:29    18    communications regarding the discussions that occurred

10:50:32    19    during the meeting?

10:50:33    20    A.    I'm sorry.  I misunderstood your question.

10:50:35    21    Q.    Okay.

10:50:38    22    A.    Following that discussion and before we

10:50:40    23    presented to the client, I sent an e-mail to Bob and Adam.

10:50:45    24    Q.    Do you recall the content of that e-mail?

50:48    25    A.    It was -- the topic was essentially some

46

JULIE PATTERSON - FEBRUARY 2, 2007

50:51  1   creative revisions that we needed to make in preparation

10:50:57  2   of our creative review with the clients the following day.

10:51:11  3       Q.   Now, I believe you testified that there were

10:51:13  4   some discussions in that meeting as to whether the Helio

10:51:19  5   tag line -- do you think -- I just want to clarify this

10:51:22  6   because we're using two terms of art here.  We're using

10:51:28  7   the term "tag line" and we're using the term "theme line."

10:51:29  8   And I take it by the time of this July 31 meeting you had

10:51:33  9   seen the Helio television advertisement; is that correct?

10:51:37  10      A.   I had not seen that TV advertisement.  I

10:51:39  11  personally had seen the print advertisement.

10:51:42  12      Q.   You had seen the print advertisement.  So by the

51:45  13  time you attended the meeting, you were familiar with the

10:51:48  14  slogan that was being used in the advertising, though, is

10:51:51  15  that correct?

10:51:53  16          MR. COLT:  Objection.  It's vague as to

10:51:54  17  "slogan."

10:51:56  18          THE WITNESS:  I was familiar with the fact that

10:51:57  19  they were using the line Don't Call Us a Phone Company,

10:51:58  20  Don't Call It a Phone.

10:52:02  21  BY MR. TROCK:

10:52:02  22      Q.   Are you comfortable if I use the word "line" as

10:52:04  23  opposed to "slogan" or "tag line" or "theme line"?

10:52:07  24      A.   That's fine.

52:08  25      Q.   Because I just want to clarify the terms of art

47

52:11 1  we're using here.

10:52:12 2      A.    Well, and I can't speak to what Helio considered

10:52:14 3  using that line in part because in that advertisement

10:52:17 4  specifically they had called out Don't Call Us a Phone

10:52:18 5  Company in the legal.  And so I don't know if that meant

10:52:24 6  to them that this was their tag line.

10:52:27 7      Q.    So we can use the word line and we'll both know

10:52:30 8  what we're discussing here?  Is that fair enough?

10:52:32 9      A.    Yes.

10:52:34 10     Q.    Now, I believe you had mentioned that there was

10:52:38 11 some discussion at that July 31 meeting about whether or

10:52:41 12 not there were similarities between the line in the Helio

52:45 13 advertisements and the line being proposed for the Palm

10:52:50 14 campaign; is that correct?

10:52:52 15         MR. COLT:  Objection.  Misstates prior

10:52:53 16 testimony.

10:52:55 17         THE WITNESS:  The similarity that we saw was

10:52:57 18 with the line Not a Cell Phone at Treo and Don't Call It a

10:53:03 19 Phone -- Don't Call Us a Phone Company, Don't Call It a

10:53:11 20 Phone.

10:53:13 21 BY MR. TROCK:

10:53:14 22     Q.    And what were the similarities that were being

10:53:15 23 discussed?

10:53:18 24     A.    Essentially the fact that Don't Call It a Phone

53:22 25 implies that it's not a phone at all.  And Palm's issues

48

53:28    1   that they had raised with Not Just -- Not a Cell Phone at

10:53:31    2   Treo was that they felt it might mislead consumers to

10:53:35    3   thank it wasn't a cell phone.

10:53:42    4        Q.   So is it fair to say that to your mind these two

10:53:46    5   lines were similar to each other?

10:53:48    6             MR. COLT:  Objection.  Misstates prior

10:53:49    7   testimony.

10:53:51    8             THE WITNESS:  I think that there were

10:53:52    9   similarities between Not a Cell Phone at Treo and Don't

10:53:57   10   Call It a Phone.

10:54:21   11   BY MR. TROCK:

10:54:33   12        Q.   At AKQA was there any concern that you became

54:40   13   aware of about Palm using the line Not a Cell Phone at

10:54:49   14   Treo?

10:54:53   15        A.   I'm sorry.  Can you restate your question.

10:54:56   16        Q.   Well, is it fair to say that there was

10:55:05   17   sufficient -- you had sufficient concern about Helio's

10:55:12   18   advertisements and the line it was using to call this

10:55:16   19   meeting internally at AKQA to discuss it?  Is that a fair

10:55:21   20   statement?

10:55:22   21        A.   No.

10:55:22   22             MR. COLT:  Objection.  Misstates prior

10:55:23   23   testimony.

10:55:24   24             THE WITNESS:  I wouldn't use the word "concern,"

55:26   25   no.

49

| | | |
|---|---|---|
| 55:26 | 1 | BY MR. TROCK: |
| 10:55:27 | 2 | Q. What word would you use? |
| 10:55:29 | 3 | A. The first purpose was really to make everyone |
| 10:55:32 | 4 | aware of it because there was a lack of awareness about |
| 10:55:35 | 5 | it. And then secondly, to discuss if we felt that there |
| 10:55:39 | 6 | were any similarities. And, again, knowing that this |
| 10:55:44 | 7 | line -- our theme line was under so much debate prior to |
| 10:55:49 | 8 | us having any knowledge and Palm having asked us to |
| 10:55:55 | 9 | explore other alternatives, we thought that it was |
| 10:55:58 | 10 | something that we should discuss. |
| 10:55:59 | 11 | Q. Was there any concern amongst the team members |
| 10:56:03 | 12 | at AKQA about Palm going forward with using this line? |
| 56:10 | 13 | MR. COLT: Objection. It's vague as to "line." |
| 10:56:14 | 14 | BY MR. TROCK: |
| 10:56:14 | 15 | Q. You understand what I mean by the word "line"? |
| 10:56:16 | 16 | A. Can you clarify which line you're referring to, |
| 10:56:18 | 17 | though. |
| 10:56:19 | 18 | Q. Well, Palm's line, the one that you were |
| 10:56:20 | 19 | proposing at the time, Not a Cell Phone at Treo, in light |
| 10:56:24 | 20 | of Helio's advertisements and the use of its line, was |
| 10:56:29 | 21 | there any concern at AKQA about Palm going forward with |
| 10:56:32 | 22 | the use of the line Not a Cell Phone at Treo? |
| 10:56:37 | 23 | A. We had already established by that point that |
| 10:56:40 | 24 | Palm was uncomfortable with the line Not a Cell Phone at |
| 56:41 | 25 | Treo and had been exploring alternatives previously. |

50

JULIE PATTERSON - FEBRUARY 2, 2007

56:51    1        Q.    Okay.  But did the knowledge of Helio's campaign

10:56:58   2    and Helio's slogan cause anyone at AKQA any concern about

10:57:06   3    Palm going forward and using this line?

10:57:11   4        A.    No.

10:57:21   5        Q.    Do you recall anyone at Palm expressing a

10:57:22   6    concern about using this line Not a Cell Phone at Treo in

10:57:26   7    light of Helio's use of its line Don't Call It a Phone?

10:57:31   8        A.    I'm sorry.  I think the -- the last question

10:57:34   9    that you asked me, my response was to the line -- was

10:57:37  10    there any concern with moving forward Not Just a Cell

10:57:40  11    Phone at Treo.  And my response was no.  So I think maybe

10:57:43  12    we need to clarify when you say line for Palm if you're

57:46     13    considering the inclusion of "just" or not.

10:57:51  14        Q.    Well, let's start with the line Not a Cell Phone

10:57:52  15    at Treo.

10:57:54  16        A.    Okay.

10:57:57  17        Q.    Was there any concern at AKQA about Palm using

10:58:03  18    that line in light of Helio's use of its line Don't Call

10:58:06  19    It a Phone?

10:58:08  20        A.    So by that time we knew that we would not be

10:58:11  21    proceeding with Not a Cell Phone at Treo.  Because we

10:58:18  22    needed to come up with something that more clearly

10:58:18  23    articulated that this was a cell phone first; a next

10:58:24  24    generation cell phone, if you will.

58:33     25        Q.    I believe you testified that a couple days later

51

| | | |
|---|---|---|
| 58:36 | 1 | you had a meeting with Palm; is that correct? |
| 10:58:37 | 2 | A.    Correct. |
| 10:58:37 | 3 | Q.    Was that a face-to-face meeting? |
| 10:58:40 | 4 | A.    Yes. |
| 10:58:40 | 5 | Q.    And Palm had asked you at that point to explore |
| 10:58:43 | 6 | alternatives to the line Not a Cell Phone at Treo; is that |
| 10:58:47 | 7 | right? |
| 10:58:51 | 8 | A.    They had asked us to do that previously, and we |
| 10:58:52 | 9 | had discussions regarding incorporating "just."  And we |
| 10:58:57 | 10 | also had a couple of other treatments. |
| 10:58:59 | 11 | Q.    What were the other treatments? |
| 10:59:03 | 12 | A.    We had a treatment that was -- just said Treo by |
| 59:09 | 13 | Palm. |
| 10:59:11 | 14 | Q.    Any others? |
| 10:59:12 | 15 | A.    No. |
| 10:59:13 | 16 | Q.    So you were proposing two different treatments |
| 10:59:16 | 17 | to Palm at that time, Not Just a Cell Phone at Treo and |
| 10:59:20 | 18 | Treo by Palm; is that right? |
| 10:59:21 | 19 | A.    Yes.  And also movement of the Palm logo. |
| 10:59:38 | 20 | Q.    What was Palm's response to the proposal Treo by |
| 10:59:41 | 21 | Palm? |
| 10:59:42 | 22 | MR. COLT:  Objection.  Vague as to time. |
| 10:59:48 | 23 | THE WITNESS:  They didn't want to move forward |
| 10:59:49 | 24 | with it because they felt that it didn't help communicate |
| 59:52 | 25 | to consumers that the Treo was a cell phone first. |

52

59:56    1    BY MR. TROCK:

11:00:02    2    Q.    When did they express that to you?

11:00:08    3    A.    I don't remember when that meeting was, but I

11:00:10    4    want to say it was in mid- to late June.

11:00:13    5    Q.    Well, the internal meeting you had you believe

11:00:17    6    was July 31.

11:00:19    7    A.    Well, we had presented -- as I mentioned, we --

11:00:21    8    the issue had been raised about exploring alternative

11:00:25    9    lines for Not a Cell Phone at Treo in early June.  So

11:00:31    10    then -- and in subsequent creative review we came back

11:00:36    11    with various treatments of Not a Cell Phone at Treo -- Not

11:00:40    12    Just a Cell Phone at Treo and Treo by Palm, all of which

00:44    13    occurred well before the 7/31 meeting.

11:00:46    14    Q.    So sometime -- had you proposed those different

11:00:48    15    line treatments sometime in June; is that right?

11:00:51    16    A.    Yeah.  I don't remember exactly when.  I'm

11:00:53    17    sorry.

11:01:10    18    Q.    This meeting that you had with Palm, that was a

11:01:11    19    face-to-face meeting?

11:01:13    20    A.    Yes.

11:01:13    21    Q.    Where did that occur?

11:01:14    22    A.    At Palm.

11:01:17    23    Q.    That was sometime in August; is that right?

11:01:19    24    A.    August 2, I believe.

01:31    25    Q.    Did you discuss with Palm at that meeting the

53

01:35    1  Helio campaign?

11:01:38  2       A.    Yes, we did.

11:01:40  3       Q.    Who attended the meeting for Palm?

11:01:44  4       A.    It was Page Murray, Rose Rodd, and Scott

11:01:48  5  Hancock.

11:02:16  6       Q.    Did any of those three say anything to -- say

11:02:21  7  anything during the meeting about the Helio campaign?

11:02:28  8       A.    Yes.

11:02:28  9       Q.    What did they say?

11:02:29 10       A.    In response to us showing them a print ad.

11:02:33 11       Q.    What did they say?

11:02:39 12       A.    I don't remember if Rose said anything.  But we

02:43    13  shared the print ad with them.  I believe Scott mentioned

11:02:47 14  he had seen a TV spot.  And then Page Murray said, "Thank

11:02:58 15  you for bringing this to our attention, but we feel that

11:03:03 16  Not Just a Cell Phone at Treo means something different."

11:03:19 17       Q.    Do you recall any other discussions by the

11:03:20 18  people at Palm about the Helio campaign or line?

11:03:27 19       A.    No.  Honestly it was a less-than-five-minute

11:03:32 20  conversation out of our roughly 90-minute creative review.

11:03:37 21       Q.    Did you leave a copy of the print ad with them?

11:03:39 22       A.    I think we brought it back with us.  I don't

11:03:42 23  recall.

11:03:50 24       Q.    Do you recall whether or not Rose said anything

03:53    25  about the Helio campaign or line during the meeting?

54

03:57  1          MR. COLT:  Objection.  Asked and answered.

11:04:00  2          THE WITNESS:  I don't believe she did.  But I --

11:04:02  3   again, I can't remember.

11:04:03  4   BY MR. TROCK:

11:04:05  5      Q.   Who attended the meeting from AKQA?

11:04:10  6      A.   It was myself, Stuart, Bob, Adam, and a woman

11:04:22  7   named Krista Knable, K-N-A-B-L-E, who reports to me.

11:04:33  8      Q.   What is her position?

11:04:34  9      A.   She's account supervisor.

11:04:44  10     Q.   Did you make a PowerPoint presentation to Palm

11:04:47  11  during this meeting?

11:04:48  12     A.   Yes, we did.  It may have been a PDF, but

04:56  13  basically a video presentation.

11:05:27  14     Q.   So just to clarify, then, after this August 2

11:05:30  15  meeting with Palm, was it your understanding that Palm

11:05:39  16  wanted you to pursue use of the line Not Just a Cell Phone

11:05:42  17  at Treo?

11:05:46  18     A.   It was our understanding, actually, a little

11:05:49  19  before that that they wanted us to use "just" in the line.

11:05:57  20     Q.   But during that meeting did you discuss the

11:06:00  21  other alternatives?

11:06:01  22     A.   No.

11:06:02  23     Q.   So you just discussed Not Just a Cell Phone at

11:06:04  24  Treo.  That was the only line you discussed during that

06:08  25  meeting; is that right?

                                                              55

JULIE PATTERSON - FEBRUARY 2, 2007

20:20    1  it's only through -- I don't know if it has its own e-mail

11:20:24  2  client or it's through accessing Yahoo and Google via the

11:20:28  3  Web -- accessing the e-mail account via the Web.

11:20:35  4  BY MR. TROCK:

11:20:35  5      Q.   Do you know whether or not the Helio devices

11:20:37  6  have a camera?

11:20:38  7          MR. COLT:  Same objections.

11:20:43  8          THE WITNESS:  I don't, actually.

11:20:43  9  BY MR. TROCK:

11:20:44  10     Q.   Do you know whether or not the Helio devices

11:20:46  11 have video capability?

11:20:47  12         MR. COLT:  Same objections.

20:48     13         THE WITNESS:  I don't.

11:20:49  14 BY MR. TROCK:

11:20:50  15     Q.   Do you know whether or not the Helio devices

11:20:51  16 have MP3 or music capability?

11:20:56  17         MR. COLT:  Same objections.

11:20:57  18         THE WITNESS:  I believe yes.  Yes, I believe so.

11:21:01  19 BY MR. TROCK:

11:21:02  20     Q.   Do you know whether or not the Helio devices

11:21:03  21 have Web access capability?

11:21:05  22         MR. COLT:  Same objections.

11:21:06  23         THE WITNESS:  Yes.

11:21:06  24 BY MR. TROCK:

21:09     25     Q.   By yes you mean it's your understanding that

61

21:11 1   they do have that capability; is that correct?

11:21:14 2       A.   It's my understanding that they have Web

11:21:16 3   capability.

11:21:26 4       Q.   Did you have a belief as to whether or not Helio

11:21:29 5   was a competitor of Palm?

11:21:31 6         MR. COLT:   Same objections.

11:21:33 7         THE WITNESS:   We do not consider Helio to be a

11:21:35 8   competitor.

11:21:36 9   BY MR. TROCK:

11:21:37 10       Q.   If you don't consider Helio to be a competitor,

11:21:39 11   then why would you bring its advertising campaign to

11:21:49 12   Palm's attention?

21:49 13       A.   We brought it to their attention because there

11:21:49 14   was a product in the marketplace that seemed to be taking

11:21:52 15   an approach to say that it was not a phone.  And we knew

11:21:59 16   that that was of great consideration to Palm, to really

11:22:02 17   distinguish themselves in the marketplace.  And so we felt

11:22:05 18   that it was appropriate to bring it to their attention.

11:22:13 19       Q.   Did you have a belief as to whether or not Palm

11:22:15 20   needed to distinguish itself from Helio in the

11:22:16 21   marketplace?

11:22:19 22       A.   No, I did not think that they needed to

11:22:22 23   distinguish themselves from Helio.

11:22:23 24       Q.   Did you have a belief as to whether or not Palm

22:27 25   needed to distinguish itself from Helio's advertising line

62

22:36  1    in the marketplace?

11:22:38  2        A.    No, I did not.

11:22:55  3        Q.    During your work on the Palm advertising

11:22:57  4    campaign, did you ever bring any competitor's advertising

11:23:05  5    line to their attention?

11:23:08  6        A.    During this specific campaign?

11:23:10  7        Q.    Yes.

11:23:10  8        A.    We brought the Motorola Q launch campaign to

11:23:17  9    their attention.

11:23:23  10        Q.    Why did you do that?

11:23:24  11        A.    In the case of the Motorola Q campaign, we

11:23:28  12    actually did consider the Q to be a competitor and were

23:31  13    interested in seeing and sharing how they were positioning

11:23:36  14    their products.

11:23:40  15        Q.    When did you bring that Motorola Q campaign to

11:23:42  16    Palm's attention?

11:23:48  17        A.    I believe that campaign broke sometime in April.

11:23:51  18    I don't recall exactly, but I would guess sometime around

11:23:57  19    April.

11:23:57  20        Q.    Of '06?

11:23:59  21        A.    Yes.

11:24:03  22        Q.    What kind of a product is -- was the focus of

11:24:07  23    Motorola's Q campaign?

11:24:09  24        A.    A smartphone.

24:21  25        Q.    Other than the Motorola Q campaign, did you ever

63

24:26    1  bring any other competitor's advertising campaigns to

11:24:31   2  Palm's attention?

11:24:32   3      A.   We did discuss a Microsoft campaign, but

11:24:38   4  actually I believe that campaign was promoting a Treo

11:24:43   5  product.  But AKQA was not responsible for that

11:24:45   6  advertising campaign.

11:24:52   7      Q.   All right.  Now I want to expand those questions

11:24:54   8  because I used the word "competitor."

11:24:56   9          During the time period that you worked on Palm's

11:24:59  10  advertising campaign that we've been discussing here, have

11:25:01  11  you ever brought anyone else's advertising campaign to

11:25:05  12  their attention?  Other than the two we've already

25:07  13  discussed:  Helio and Motorola.

11:25:11  14      A.   Have we brought any other ad campaign?

11:25:13  15      Q.   Yes.

11:25:13  16      A.   No.

11:25:15  17      Q.   So just to make sure the record is clear, during

11:25:21  18  the entire time period that you worked on Palm's

11:25:25  19  advertising campaign, you have only brought two ad

11:25:28  20  campaigns to their attention, one for the Motorola Q

11:25:32  21  campaign and one for the Helio campaign; is that right?

11:25:34  22      A.   Yes.

11:26:09  23      Q.   Now, I may have asked you this question and I

11:26:11  24  just want to make sure I cover it.  So I'm not trying to

26:14  25  ask it a second time.

64

26:17   1             After the August 2 meeting that you had with

11:26:20   2   Palm in which you discussed the Helio campaign, were you

11:26:25   3   aware of any other discussions at AKQA about Helio other

11:26:31   4   than these news articles that may have been shared?

11:26:38   5         A.     No.   I believe after we had that meeting with

11:26:41   6   Palm the only discussion -- or, actually, I don't even

11:26:44   7   believe that there was necessarily a verbal discussion,

11:26:47   8   only communication was through sharing of industry

11:26:51   9   articles or mentions.

11:26:56   10         Q.     So after August 2, nobody at AKQA ever brought

11:27:00   11   to your attention any other Helio advertisements; is that

11:27:05   12   right?

27:08   13         A.     Not that I can recall.

11:27:12   14         Q.     And you don't recall any other discussions with

11:27:14   15   anyone at AKQA about any Helio advertisements after

11:27:18   16   August 2; is that right?

11:27:20   17         A.     Not that I can recall.

11:27:54   18         Q.     Now, I believe you mentioned earlier that you

11:27:56   19   had gone through some of your materials to see whether you

11:28:00   20   had documents that were relevant to this deposition; is

11:28:06   21   that correct?

11:28:07   22         A.     Yes.

11:28:10   23         Q.     Could you please tell me where you looked for

11:28:15   24   these materials.

28:16   25             MR. COLT:   Objection to the extent this calls

65

20:47    1    Q.   Did you use any advertising copy with any of

13:20:59   2    these focus groups?

13:21:01   3    A.   No.   We used what are called adcepts.

13:21:07   4    Q.   Explain what those are.

13:21:11   5    A.   Adcepts are essentially meant to be

13:21:16   6    communications of an idea basically through picture and/or

13:21:20   7    copy to try and get across a specific positioning

13:21:24   8    statement without the consumer -- or the focus group

13:21:30   9    really understanding the underlying theme of those

13:21:33   10    messages.   So you wouldn't necessarily use that as a

13:21:36   11    headline in an ad.

13:22:55   12       MR. TROCK:   Let's go off the record for just a

22:57    13    second.   I'll be right back.

13:23:00   14       THE VIDEOGRAPHER:   The time is 1:23 p.m.   We're

13:23:02   15    going off the record.

13:27:32   16      (Recess taken from 1:23 p.m. to 1:28 p.m.)

13:27:58   17             (Plaintiff's Exhibit 2 marked

13:27:58   18             for identification.)

13:28:05   19       THE VIDEOGRAPHER:   The time is 1:28 p.m.   And

13:28:09   20    we're going back on the record.

13:28:10   21    BY MR. TROCK:

13:28:10   22    Q.   The court reporter has marked and handed to you

13:28:14   23    Exhibit 2, which are a series of documents bearing Bates

13:28:19   24    numbers AKQA2661 to 2674.   Could you take a look at that

28:29    25    and tell me whether or not you recognize it.

79

28:33 1    A.    This page is unrecognizable.  I don't know what

13:28:35 2  that is.

13:28:56 3         Yes, I recognize this document.

13:28:58 4    Q.    Can you explain to me what this is we're looking

13:29:01 5  at?

13:29:01 6    A.    Yes.  This is essentially one of the creative

13:29:09 7  campaign directions that we had presented to Palm in

13:29:13 8  January of 2005.

13:29:48 9    Q.    Were there other campaign directions presented

13:29:50 10  to Palm at this time?

13:29:51 11    A.    Yes, there were.

13:29:52 12    Q.    What were those?

29:56 13    A.    The only one I remember offhand is the one we

13:29:58 14  ended up producing, which was a campaign with the line

13:30:02 15  It's Time for Treo.

13:30:14 16    Q.    So what do you mean that "we ended up

13:30:16 17  producing"?  What does that mean?

13:30:18 18    A.    It means that we -- that the client selected

13:30:20 19  that campaign direction, we produced it, and then ran the

13:30:24 20  campaign to the public.

13:30:26 21    Q.    When was that run?

13:30:32 22    A.    That ran in the fall of 2005.  And, actually,

13:30:37 23  some into early 2006.

13:30:45 24    Q.    So this campaign direction uses the line Not a

30:51 25  Cell Phone at Treo.  Do you see that?

80

30:54    1         A.    Yes.

13:30:54    2         Q.    So in January of 2005, this was not selected by

13:30:59    3    Palm to be used; is that correct?

13:31:01    4              MR. COLT:   Objection.   Misstates prior

13:31:02    5    testimony.

13:31:05    6              THE WITNESS:   That's correct.

13:31:05    7    BY MR. TROCK:

13:31:16    8         Q.    So what did you do -- what did AKQA do with this

13:31:20    9    campaign direction after Palm decided not to use it in

13:31:25    10   January 2005?

13:31:30    11             MR. COLT:   Objection.   It's vague and ambiguous.

13:31:30    12             You may answer.

31:30    13               THE WITNESS:   I don't know what you mean what

13:31:30    14   did we do with it?

13:31:33    15   BY MR. TROCK:

13:31:34    16        Q.    Did you do anything with it?

13:31:36    17             MR. COLT:   Same objection.

13:31:37    18             THE WITNESS:   We kept the files and moved on to

13:31:40    19   the next campaign.

13:31:44    20   BY MR. TROCK:

13:31:44    21        Q.    So the files just sat there, correct?

13:31:47    22        A.    Correct.

13:31:47    23        Q.    Was this campaign ever reactivated by Palm?

13:31:52    24        A.    You mean for the campaign in 2005?

31:55    25        Q.    At any time.

81

| | | |
|---|---|---|
| 50:52 | 1 | that list, BlackBerry RIM. |
| 13:50:54 | 2 |      Q.   I'm sorry.  What was the -- Blackjack?  RIM.  I |
| 13:50:57 | 3 | see. |
| 13:50:58 | 4 |      So does Rim provide smartphones? |
| 13:51:01 | 5 |      MR. COLT:  Same objections. |
| 13:51:02 | 6 |      THE WITNESS:  Yes. |
| 13:51:02 | 7 | BY MR. TROCK: |
| 13:51:03 | 8 |      Q.   Do you know which smartphones RIM provides? |
| 13:51:06 | 9 |      A.   BlackBerry. |
| 13:51:20 | 10 |      Q.   Does a smartphone have to be a QWERTY keyboard |
| 13:51:25 | 11 | to be considered a smartphone? |
| 13:51:27 | 12 |      MR. COLT:  Same objections. |
| 51:28 | 13 |      THE WITNESS:  There's not a real clear |
| 13:51:30 | 14 | definition.  We typically look at models that do.  But |
| 13:51:33 | 15 | there are some manufacturers who are now creating products |
| 13:51:36 | 16 | that don't have QWERTY keyboard. |
| 13:51:38 | 17 | BY MR. TROCK: |
| 13:51:38 | 18 |      Q.   But would still be considered a smartphone; is |
| 13:51:42 | 19 | that right? |
| 13:51:42 | 20 |      A.   Yes. |
| 13:51:42 | 21 |      MR. COLT:  Same objections. |
| 13:51:43 | 22 | BY MR. TROCK: |
| 13:51:43 | 23 |      Q.   Do you know which manufacturers those are? |
| 13:51:45 | 24 |      MR. COLT:  Same objections. |
| 51:48 | 25 |      THE WITNESS:  BlackBerry is a good example where |

94

51:49    1    the earlier devices have QWERTY keyboards.  And then they

13:51:53    2    went to the "SureType" or whatever it's called.

13:51:56    3    BY MR. TROCK:

13:51:59    4        Q.    What does that mean, SureType?

13:52:01    5        A.    I don't know because I'm not a BlackBerry user.

13:52:03    6    But I think it's that they have -- they have fewer keys

13:52:08    7    where the letters read -- I think there's two letters per

13:52:12    8    key or something along those lines.

13:52:22    9        Q.    Any other manufacturers of smartphones without

13:52:24    10    QWERTY keyboards that you can think of?

13:52:27    11            MR. COLT:  Same objections.

13:52:31    12            THE WITNESS:  The Nokia Communicator has an

52:34    13    open-up keyboard.

13:52:36    14    BY MR. TROCK:

13:52:42    15        Q.    Any others?

13:52:43    16            MR. COLT:  Same objections.

13:52:44    17            THE WITNESS:  No.

13:52:45    18    BY MR. TROCK:

13:52:50    19        Q.    The next page, 38, there's a statement,

13:52:56    20    "Redefine the category."  And underneath it says,

13:52:58    21    "Smartphones are not just for career-obsessed workaholics

13:53:01    22    anymore."  If smartphones are not just for career-obsessed

13:53:06    23    workaholics, who are they for now?

13:53:10    24        A.    Smartphones are for people who want to have a

53:14    25    better balance in their work and personal life and also

95