JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 53:17 | 1 | for people who want enhanced features from their cell |
| 13:53:20 | 2 | phone. |
| 13:53:29 | 3 | Q.    On page 40 there is the line here, "Realign the |
| 13:53:36 | 4 | brand."  And it says, below it, "Let's align ourselves |
| 13:53:40 | 5 | with the brands that people are passionate about."  Do you |
| 13:53:43 | 6 | see that? |
| 13:53:44 | 7 | A.    Yes. |
| 13:53:44 | 8 | Q.    What brands are those? |
| 13:53:46 | 9 | A.    In this case we were talking about brands such |
| 13:53:48 | 10 | as Yahoo, Google, eBay, Fandango, NetFlix.  At this time I |
| 13:54:02 | 11 | think we were still considering Orbitz. |
| 13:54:08 | 12 | Q.    How did you come to understand that these are |
| 54:10 | 13 | brands that people are passionate about? |
| 13:54:14 | 14 | A.    Some of it came from our personal experiences |
| 13:54:19 | 15 | with these brands.  Some of it came from the focus groups |
| 13:54:25 | 16 | when we put some of the adcepts in front of them that had, |
| 13:54:30 | 17 | say, a Google screen in it. |
| 13:54:36 | 18 | Q.    Any other sources of information that led you to |
| 13:54:42 | 19 | believe that the brands you mentioned were the ones that |
| 13:54:45 | 20 | people are passionate about? |
| 13:54:49 | 21 | A.    Just also talking to people internally at AKQA |
| 13:54:51 | 22 | about brands that they have relationships with. |
| 13:54:58 | 23 | Q.    On page 41, you have listed there the line Not a |
| 13:55:00 | 24 | Cell Phone at Treo.  Is it fair to say that this is the |
| 55:08 | 25 | line that you were considering for use with the Palm |

96

Dockets.Justia.com

55:18  1    campaign at that time?

13:55:19  2        A.    Yes.

13:55:31  3        Q.    And as you look at, say, page 43, 44, 45, are

13:55:39  4    these examples of some of the brands you believe people

13:55:43  5    are passionate about?  44 -- 43, for example, has FIFA on

13:55:50  6    it; 44 has Orbitz, 45 has Flickr.

13:55:54  7        A.    Yes.

13:56:04  8        Q.    So these are -- are these examples of what you

13:56:07  9    would refer to as an adcept or --

13:56:09  10        A.    No, no.

13:56:09  11        Q.    What would you refer to these as?

13:56:11  12        A.    This is an early comp.

56:13  13        Q.    An early comp.

13:56:17  14            I noticed then in these early comps 43 through

13:56:20  15    45 the line Not a Cell Phone at Treo is in the lower

13:56:24  16    right-hand corner.

13:56:25  17        A.    Correct.

13:56:26  18        Q.    Do you see that?

13:56:27  19        A.    Yes.

13:56:40  20        Q.    So if we could go to page 49.  Could you explain

13:56:57  21    to me what you were trying to convey on page 49.

13:57:01  22            MR. COLT:  Objection.  It's vague and ambiguous.

13:57:02  23    You may answer.

13:57:07  24            THE WITNESS:  We're trying to communicate the

57:08  25    idea of basically telling the story about what the product

97

JULIE PATTERSON - FEBRUARY 2, 2007

16:50        1        Q.    Under "Timing," it says, "Launch November 1 to
14:16:53     2   begin building awareness prior to holiday."
14:16:57     3              Why was November 1 chosen as the launch date?
14:17:03     4        A.    The primary reason was because we wanted to do
14:17:05     5   an out-of-home push to launch the campaign.  And you can
14:17:08     6   only buy out-of-home for month-long increments and it
14:17:14     7   begins at the 1st of the month.
14:17:16     8        Q.    Did that date slip for out-of-home?
14:17:19     9        A.    Yes, it did.
14:17:20    10        Q.    Do you know why it slipped?
14:17:21    11        A.    Because of the delay in the launch of the
14:17:23    12   product.
17:45       13        Q.    Do you have an understanding of what the delay
14:17:47    14   was in the launch of the product?
14:17:49    15              MR. COLT:  Objection.  This exceeds the scope of
14:17:51    16   this witness' designation.
14:17:53    17              You may answer if you have personal knowledge.
14:17:55    18              THE WITNESS:  I don't know the reason behind it.
14:17:57    19   BY MR. TROCK:
14:18:05    20        Q.    The -- under "Timing" there's an entry, "Afford
14:18:08    21   presence through February of '07."  Can you explain what
14:18:11    22   that means?
14:18:12    23        A.    Yes.  It means based on this pledge, that we
14:18:16    24   thought we could afford a sustained presence through
18:19       25   February.

                                                                    109

JULIE PATTERSON - FEBRUARY 2, 2007

18:23 1      Q.    And that would include all the media elements

14:18:25 2   that you were considering buying?

14:18:26 3      A.    Yes.    When we put this initial recommendation

14:18:29 4   together.

14:18:42 5      Q.    Page 130 talks about supporting a "minimum of

14:18:47 6   five partner and three Palm exclusive messages."  Do you

14:18:51 7   see that?

14:18:51 8      A.    Yes.

14:18:52 9      Q.    What is that referring to?

14:18:53 10     A.    Partner refers to support of one of the quote,

14:18:59 11  unquote passion brands that we had discussed.  And then

14:19:02 12  Palm exclusive messages refers to features that were more

19:07 13     Palm-specific.

14:19:08 14     Q.    Which features would those be?

14:19:11 15     A.    That would be chat or MP3 or phone.

14:19:22 16     Q.    On page 131 there appears to be a categorization

14:19:28 17  of the different partners that were being considered along

14:19:31 18  the bottom.  It has a row called "Sample Partners."  In

14:19:35 19  the first tier it has eBay, Google, CNN, NetFlix, and

14:19:40 20  MySpace.  Do you see that?

14:19:41 21     A.    Yes.

14:19:42 22     Q.    So these are examples, then, of some of the

14:19:44 23  partners you were recommending to Palm in July of 2006 for

14:19:48 24  the ad campaign; is that right?

19:51 25     A.    This wasn't recommended partners.  This was

110

JULIE PATTERSON - FEBRUARY 2, 2007

19:54  1  brands that would be considered as tier 1 versus 2 versus

14:19:58  2  3. But this wasn't a formal recommendation of partners

14:20:01  3  yet.

14:20:02  4      Q.   So these are just different brands that

14:20:08  5  you're -- that you want Palm to consider for purposes of

14:20:12  6  creating partnerships; is that right?

14:20:14  7          MR. COLT:  Objection.  Misstates testimony.

14:20:17  8          THE WITNESS:  These are the types of partners

14:20:20  9  that we would consider to be a tier 1 brand versus a tier

14:20:24  10  2 brand versus a tier 3 brand in the eyes of consumers.

14:20:29  11  BY MR. TROCK:

14:20:29  12      Q.   Out of the ones that are listed here, do you

20:31  13  have a recollection as to which partners Palm went with?

14:20:37  14      A.   We went with -- well, let me clarify.  Some of

14:20:42  15  them we actually had partnerships with; some we just used

14:20:45  16  in the campaign to showcase their brand.  But

14:20:48  17  all-inclusive, we used eBay, Google, CNN, Fandango, we ran

14:21:00  18  in Lucky magazine, Rolling Stone, and Real Simple.  We

14:21:06  19  also ran in Men's Health and we've run in Vanity Fair

14:21:14  20  previously but not with this campaign.

14:21:47  21      Q.   On page 139 it's referring to a "Market

14:21:54  22  Evaluation."  And then it's got first bullet points that

14:22:00  23  talks about the mobile market criteria.  So can you

14:22:04  24  explain to me what this mobile market criteria -- let's

22:08  25  talk about this -- let me rephrase the question.

                                                                    111

JULIE PATTERSON - FEBRUARY 2, 2007

22:11 1    I thought that this ad campaign was focused at

14:22:15 2 the smartphone market.  Is that what you testified to

14:22:20 3 earlier?

14:22:21 4    MR. COLT:  Objection.  Misstates testimony.

14:22:24 5    THE WITNESS:  The campaign was not targeted

14:22:25 6 towards the smartphone market.  The product falls into a

14:22:29 7 smartphone category.

14:22:30 8 BY MR. TROCK:

14:22:30 9   Q. Okay.  And which market was it focused on?

14:22:35 10   A. It was focused on a target, which was the mobile

14:22:38 11 accomplisher.

14:22:40 12   Q. So here we're referring to a market evaluation

22:45 13 and it's talking about mobile market criteria.  Is this

14:22:48 14 the same market, or is this something different?

14:22:52 15   A. This is a market evaluation used to try and help

14:22:57 16 us identify which markets we should have out-of-home

14:22:59 17 advertising in.

14:23:02 18   Q. Okay.  Are those different from the mobile

14:23:07 19 accomplisher market?

14:23:10 20   A. I think that you might be getting the two

14:23:12 21 confused.  The mobile accomplisher is the target we want

14:23:16 22 to reach with our advertising.  This mobile market

14:23:20 23 criteria is meant to try and help us identify which cities

14:23:22 24 we should have out-of-home advertising in.  And as a basic

23:26 25 criteria, we need to make sure that there's heavy cell

JAN BROWN & ASSOCIATES   (800)522-7096   (415)981-3498

JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 26:04 | 1 | Q.   Are there any others on this page that help |
| 15:26:07 | 2 | refresh your recollection? |
| 15:26:16 | 3 | A.   I believe -- there are eight titles and I |
| 15:26:23 | 4 | believe six of the eight are represented on this list. |
| 15:26:36 | 5 | Q.   Who had the final responsibility to approve |
| 15:26:42 | 6 | which print media were selected for the campaign? |
| 15:26:46 | 7 | MR. COLT:  Objection.  Exceeds the scope of this |
| 15:26:47 | 8 | witness' designation.  Lacks foundation.  And it calls for |
| 15:26:50 | 9 | speculation. |
| 15:26:53 | 10 | THE WITNESS:  I believe Scott Hancock provided |
| 15:26:56 | 11 | approval on the print list. |
| 15:26:58 | 12 | BY MR. TROCK: |
| 27:32 | 13 | Q.   On page 332 there is shown what's referred to as |
| 15:27:42 | 14 | a "Print Media Flowchart."  Do you see that? |
| 15:27:42 | 15 | A.   Yes. |
| 15:27:42 | 16 | Q.   Could you explain to me what this is. |
| 15:27:45 | 17 | A.   This is the list of recommended titles and the |
| 15:27:49 | 18 | issues or insertions that we recommend running in. |
| 15:28:02 | 19 | Q.   So it appears that as of the date of this |
| 15:28:05 | 20 | document you were recommending that at least two of the |
| 15:28:12 | 21 | titles run Palm advertising in May of 2007; is that right? |
| 15:28:21 | 22 | A.   Yes. |
| 15:28:21 | 23 | Q.   That would be Men's Health and Real Simple; is |
| 15:28:24 | 24 | that correct? |
| 28:24 | 25 | A.   Yes.  Men's Health and Real Simple, yes. |

135

| | | |
|---|---|---|
| 28:48 | 1 | Q.   Now on page 336, as part of the recommended |
| 15:28:53 | 2 | strategies, there's a bullet point which reads, "Make it |
| 15:29:00 | 3 | easy for the most interested prospects to find out more by |
| 15:29:05 | 4 | creating key word 'signposts' for campaign terms."  And |
| 15:29:12 | 5 | then it has listed "OnTreo," "Not a Cell Phone," and |
| 15:29:15 | 6 | "Flickr on Treo."  Do you see that? |
| 15:29:19 | 7 | A.   Yes. |
| 15:29:19 | 8 | Q.   This document is dated October 23, 2006.  But |
| 15:29:22 | 9 | it's making a reference to a line "Not a Cell Phone."  Do |
| 15:29:27 | 10 | you see that? |
| 15:29:28 | 11 | A.   Yes. |
| 15:29:28 | 12 | Q.   Can you explain to me why the line Not Just a |
| 29:32 | 13 | Cell Phone is not listed here? |
| 15:29:36 | 14 | A.   My assumption is that this deck was created |
| 15:29:40 | 15 | by -- |
| 15:29:40 | 16 | MR. COLT:  Hang on.  I don't want you to |
| 15:29:42 | 17 | speculate.  If you have an understanding, that's fine. |
| 15:29:43 | 18 | But if you're speculating, that's inappropriate for the |
| 15:29:47 | 19 | testimony. |
| 15:29:47 | 20 | THE WITNESS:  Okay.  Then since I did not author |
| 15:29:50 | 21 | this, I don't know. |
| 15:29:50 | 22 | BY MR. TROCK: |
| 15:29:50 | 23 | Q.   Well, what is your understanding? |
| 15:29:52 | 24 | A.   My understanding is that Courtney Kyle authored |
| 29:56 | 25 | the deck and she was not as involved in the discussions |

136

| | | |
|---|---|---|
| 29:59 | 1 | regarding the theme line.  And that some of the comp work |
| 15:30:04 | 2 | had Not a Cell Phone at Treo on it. |
| 15:30:09 | 3 | Q.   Was Exhibit 13 ever presented to Palm? |
| 15:30:15 | 4 | A.   Oh, yes. |
| 15:30:16 | 5 | Q.   Was it presented to Palm on or about the date |
| 15:30:18 | 6 | that it bears, October 23, 2006? |
| 15:30:21 | 7 | A.   Yes. |
| 15:30:27 | 8 | Q.   So are you testifying that page 17 of this |
| 15:30:30 | 9 | presentation was given to Palm with a theme line Not a |
| 15:30:34 | 10 | Cell Phone? |
| 15:30:37 | 11 | MR. COLT:  Objection.  It's argumentative.  It |
| 15:30:40 | 12 | misstates prior testimony. |
| 30:43 | 13 | THE WITNESS:  No. |
| 15:30:45 | 14 | BY MR. TROCK: |
| 15:30:45 | 15 | Q.   Okay.  Was some other version of Exhibit 13 |
| 15:30:49 | 16 | presented to Palm? |
| 15:30:51 | 17 | A.   This was the version that was presented to Palm. |
| 15:30:54 | 18 | Q.   All right.  So was this presented at a meeting? |
| 15:31:00 | 19 | A.   It was presented via conference call. |
| 15:31:02 | 20 | Q.   Via conference call.  So was Palm able to see |
| 15:31:06 | 21 | Exhibit 13 during this conference call? |
| 15:31:10 | 22 | MR. COLT:  Objection.  Lacks foundation.  And |
| 15:31:11 | 23 | calls for speculation. |
| 15:31:15 | 24 | THE WITNESS:  They were sent the document to |
| 31:16 | 25 | review over the phone. |

137

31:17      1    BY MR. TROCK:

15:31:18   2        Q.    Did you -- were you part of this presentation?

15:31:20   3        A.    Yes, I was.

15:31:21   4        Q.    Did you discuss page 17 with them?

15:31:25   5        A.    I don't recall discussing it in any detail, but

15:31:28   6    we went through the deck.

15:31:30   7        Q.    Was it -- did it raise a concern to you that the

15:31:33   8    line Not a Cell Phone was being used instead of the line

15:31:38   9    Not Just a Cell Phone as late as October 23, 2006?

15:31:43   10        MR. COLT:    Objection.    Lacks foundation.    Calls

15:31:44   11   for speculation.

15:31:46   12        THE WITNESS:    No, it did not.

31:48      13   BY MR. TROCK:

15:31:49   14        Q.    Do you understand why it didn't raise a concern?

15:31:51   15        MR. COLT:    Same objections.

15:31:57   16        THE WITNESS:    I believe that she overlooked the

15:31:59   17   inclusion of the word.    And we actually also at one point

15:32:03   18   in time had discussed the Flickr on Treo or a partner on

15:32:08   19   Treo and yet that never came to be either.

15:32:12   20   BY MR. TROCK:

15:32:32   21        Q.    Did anyone during this presentation ever make

15:32:34   22   note of the fact that the line Not Just a Cell Phone did

15:32:38   23   not appear on page 17?

15:32:40   24        MR. COLT:    Objection.    Lacks foundation.    Again,

32:42      25   calls for speculation as to what Palm may have done.

138

JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 32:46 | 1 | THE WITNESS:  No, they did not. |
| 15:32:47 | 2 | (Plaintiff's Exhibit 14 marked |
| 15:32:47 | 3 | for identification.) |
| 15:35:00 | 4 | BY MR. TROCK: |
| 15:35:02 | 5 | Q.   The court reporter has handed you what's been |
| 15:35:05 | 6 | marked Exhibit 14, which is a document dated April 24, |
| 15:35:08 | 7 | 2006 which bears Bates numbers Palm 91 through Palm 92. |
| 15:35:16 | 8 | And in the upper right-hand corner it's got the |
| 15:35:18 | 9 | designation AKQA.  Do you recognize this as an AKQA |
| 15:35:24 | 10 | document? |
| 15:35:25 | 11 | A.   Yes, I do. |
| 15:35:26 | 12 | MR. COLT:  For the record I'll note this has |
| 35:28 | 13 | been marked "Attorneys' Eyes Only."  We'll designate the |
| 15:35:31 | 14 | testimony accordingly. |
| 15:35:33 | 15 | BY MR. TROCK: |
| 15:35:33 | 16 | Q.   Do you know who created this document? |
| 15:35:36 | 17 | A.   Kate Harris authored it. |
| 15:35:43 | 18 | Q.   What was the purpose of this document? |
| 15:35:44 | 19 | A.   The purpose of this document, this is the |
| 15:35:46 | 20 | creative brief, and this is the -- basically the outlining |
| 15:35:48 | 21 | of the assignment and the creative strategy which is then |
| 15:35:53 | 22 | presented to the creative team so that they could develop |
| 15:35:55 | 23 | concepts from it. |
| 15:36:07 | 24 | Q.   Was this document created before or after the |
| 36:09 | 25 | focus groups? |

139

JULIE PATTERSON - FEBRUARY 2, 2007

36:11    1        A.    After.

15:36:48   2        Q.    And at the top here it says, "What is the

15:36:50   3    assignment?"  And the assignment is described as "Develop

15:36:53   4    an advertising campaign featuring Camino to generate

15:36:58   5    preference for Treo."  Do you see that?

15:37:00   6        A.    Yes.

15:37:01   7        Q.    So as of April 24, 2006, is it fair to say that

15:37:05   8    AKQA had not yet developed an advertising campaign for

15:37:08   9    Palm which would feature Camino?

15:37:14  10        A.    It's safe to say we had not begun developing the

15:37:18  11    advertising campaign.  We had begun developing the

15:37:21  12    advertising strategy.

37:23   13        Q.    But the campaign itself had not been developed;

15:37:26  14    is that right?

15:37:26  15        A.    Creative executions hadn't been developed.

15:37:29  16                        (Plaintiff's Exhibit 15 marked

15:37:29  17                        for identification.)

15:38:07  18    BY MR. TROCK:

15:38:14  19        Q.    The court reporter has handed you a document

15:38:14  20    marked Exhibit 15 which is dated June 16, 2005 bearing

15:38:19  21    Bates numbers AKQA 3254 through 3256.  Do you recognize

15:38:25  22    this document?

15:38:28  23        A.    Yeah, I recognize this as a CNET e-mail

15:38:31  24    newsletter.

38:36   25        Q.    It says it's "From:  CNET On Call Dispatch," and

140

38:39    1    then it has your e-mail address at AKQA.  Do you see that?

15:38:44    2        A.    Yes, I do.

15:38:45    3        Q.    So did you receive this document on or about the

15:38:49    4    date that it bears?

15:38:52    5        A.    I believe I did.

15:38:53    6        Q.    Who did you receive it from?

15:38:55    7        A.    From CNET.

15:38:56    8        Q.    Is this because you're on some kind of an e-mail

15:38:59    9    list with CNET?

15:39:01    10        A.    Yes.

15:39:02    11        Q.    Which e-mail list are you on?

15:39:03    12        A.    I believe this one is hand-held alerts.  I'm not

39:13    13    entirely sure.

15:39:17    14        Q.    Are you on more than one e-mail list with CNET?

15:39:21    15        A.    I get probably three different ones from CNET:

15:39:25    16    A daily dispatch in the morning and in the afternoon, and

15:39:32    17    then a hand-held alerts.

15:39:38    18        Q.    If we look at the top, just below the caption

15:39:41    19    here, the title is "CNET On Call Dispatch.  The latest

15:39:44    20    cell phone reviews and buying advice."  Do you see that?

15:39:48    21        A.    Yes.

15:39:48    22        Q.    Is that your understanding of what CNET was

15:39:50    23    sending you?

15:39:53    24        A.    "Cell phone reviews and buying advice"?

39:56    25        Q.    Yes.

141

JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 39:57 | 1 | A.    Yes. |
| 15:39:57 | 2 | Q.    Now, this particular one refers to the latest |
| 15:40:02 | 3 | Samsung phones.  Do you see that? |
| 15:40:04 | 4 | A.    Yes. |
| 15:40:05 | 5 | Q.    And down towards the middle of the page it's got |
| 15:40:10 | 6 | "This week's five hottest products."  And you see that two |
| 15:40:13 | 7 | of them there are Palm devices.  Do you see that? |
| 15:40:16 | 8 | A.    Yes. |
| 15:40:16 | 9 | Q.    There's the Palm Treo 650 and then the Palm Treo |
| 15:40:21 | 10 | 700W.  Do you see that? |
| 15:40:23 | 11 | A.    Yup. |
| 15:40:31 | 12 | Q.    Then just below that it has the latest reviews |
| 40:33 | 13 | and features.  And it reviews some additional Samsung |
| 15:40:40 | 14 | devices.  Do you see that? |
| 15:40:42 | 15 | A.    Yes. |
| 15:40:43 | 16 | Q.    Flip over to page 3255. |
| 15:40:47 | 17 | A.    (Witness complies.) |
| 15:40:49 | 18 | Q.    And you'll see the third device down is the |
| 15:40:51 | 19 | Helio Hero.  Do you see that? |
| 15:40:54 | 20 | A.    Yes. |
| 15:40:56 | 21 | Q.    Did you read this e-mail when you got it? |
| 15:40:59 | 22 | A.    I don't believe so. |
| 15:41:00 | 23 | Q.    What makes you think that? |
| 15:41:03 | 24 | A.    Again, because I receive so many of these |
| 41:06 | 25 | newsletters on a daily basis and we were in the midst of |

142

JULIE PATTERSON - FEBRUARY 2, 2007

| | | |
|---|---|---|
| 41:11 | 1 | heavy campaign development and I was planning a wedding |
| 15:41:13 | 2 | that I didn't simply have time to read these types of |
| 15:41:16 | 3 | newsletters. |
| 15:41:17 | 4 | Q.    What did you do with it when you got it? |
| 15:41:19 | 5 | A.    I imagine that I put it in the industry news |
| 15:41:24 | 6 | folder. |
| 15:41:26 | 7 | (Plaintiff's Exhibit 16 marked |
| 15:41:26 | 8 | for identification.) |
| 15:41:41 | 9 | BY MR. TROCK: |
| 15:41:44 | 10 | Q.    The court reporter has handed you what's been |
| 15:41:46 | 11 | marked as Exhibit 16, which is a document dated July 26, |
| 15:41:51 | 12 | 2006 bearing the Bates number AKQA 3251.  Do you recognize |
| 41:56 | 13 | this document? |
| 15:42:00 | 14 | A.    Yes, I do. |
| 15:42:01 | 15 | Q.    This is sent from Kate Harris to the Palm team. |
| 15:42:05 | 16 | And apparently that is an e-mail group.  Is that a fair |
| 15:42:11 | 17 | statement? |
| 15:42:11 | 18 | MR. COLT:  Objection.  The document speaks for |
| 15:42:12 | 19 | itself.  Lacks foundation.  Calls for speculation. |
| 15:42:15 | 20 | THE WITNESS:  Yes, it is. |
| 15:42:18 | 21 | BY MR. TROCK: |
| 15:42:18 | 22 | Q.    Do you know who is on that e-mail group? |
| 15:42:20 | 23 | A.    I do not. |
| 15:42:21 | 24 | Q.    Are you on it? |
| 42:22 | 25 | A.    Yes, I am. |

143

| | | |
|---|---|---|
| 42:26 | 1 | Q.   So you received this document on or about the |
| 15:42:27 | 2 | date that it bears? |
| 15:42:30 | 3 | A.   Yes, I did. |
| 15:42:30 | 4 | Q.   The title is "Helio Effort Straddles Love/Hate |
| 15:42:35 | 5 | Line."  Do you see that? |
| 15:42:36 | 6 | A.   Yes, I do. |
| 15:42:37 | 7 | Q.   Do you have an understanding as to why |
| 15:42:39 | 8 | Ms. Harris sent this to you? |
| 15:42:41 | 9 | MR. COLT:  Objection.  Lacks foundation.  Calls |
| 15:42:42 | 10 | for speculation. |
| 15:42:45 | 11 | THE WITNESS:  I do not. |
| 15:42:46 | 12 | BY MR. TROCK: |
| 42:46 | 13 | Q.   Did you read it when you received it? |
| 15:42:48 | 14 | A.   I did not. |
| 15:42:49 | 15 | Q.   What did you do with it? |
| 15:42:50 | 16 | A.   I put it in the industry news folder. |
| 15:42:56 | 17 | Q.   Do you have a specific recollection of not even |
| 15:42:58 | 18 | reading this? |
| 15:42:59 | 19 | A.   I know that based on what time period this was, |
| 15:43:02 | 20 | I certainly didn't have time to read e-mail newsletters. |
| 15:43:10 | 21 | Q.   Well, is this a newsletter? |
| 15:43:11 | 22 | A.   I would categorize this as something that I |
| 15:43:14 | 23 | would file in industry news. |
| 15:43:15 | 24 | Q.   I understand that, but I think you just talked |
| 43:17 | 25 | about you didn't have time to read e-mail newsletters.  Is |

144

43:20  1  this an e-mail newsletter?

15:43:22  2      A.    This would be something I would classify as

15:43:23  3  industry news, something also that I was not making time

15:43:26  4  to read.

15:43:34  5      Q.    There's a note that's on there.  It says, "If

15:43:37  6  you haven't read it already, more on Helio."  Do you see

15:43:40  7  that?

15:43:41  8      A.    Yes, I do.

15:43:41  9      Q.    Well, was there earlier stuff on Helio?

15:43:47  10     A.    Not that I can recall.

15:43:55  11     Q.    Did you have any discussions with Ms. Harris

15:43:57  12  about this e-mail?

43:58  13     A.    No, I did not.

15:43:59  14     Q.    Did you have any discussions with anybody at

15:44:01  15  AKQA about this e-mail?

15:44:04  16     A.    No, I did not.

15:44:05  17     Q.    Did you have any discussions with anyone at Palm

15:44:07  18  about this e-mail?

15:44:08  19     A.    No, I did not.

15:44:12  20     Q.    Prior to July 26 of 2006, had you received any

15:44:16  21  other e-mails from anyone relating to Helio?

15:44:23  22     A.    Prior to July 2006.

15:44:27  23     Q.    July 26, to be specific.

15:44:31  24     A.    Again, not that I can recall offhand.

44:59  25     Q.    You mentioned you believe you had put this in

145

45:01 1   the industry folder.  I assume that's your Outlook?

15:45:05 2      A.   Yes.

15:45:06 3      Q.   Is that one of the folders that you searched for

15:45:08 4   purposes of this deposition?

15:45:09 5      A.   Yes, it is.

15:45:12 6      Q.   Did you search for the term "Helio"?

15:45:14 7      A.   Yes, I did.

15:45:36 8                 (Plaintiff's Exhibit 17 marked

15:45:36 9                 for identification.)

15:45:37 10  BY MR. TROCK:

15:45:41 11      Q.   The court reporter has handed you what's been

15:45:49 12   marked as Exhibit 17, which is a document dated July 31,

45:49 13   2006, bearing Bates number AKQA 3243.  Do you recognize

15:45:55 14   this document?

15:45:56 15      A.   Yes, I do.

15:45:56 16      Q.   Can you tell me what this is.

15:45:58 17      A.   This was a Meeting Maker that I had sent to some

15:46:02 18   members of the team in Outlook.

15:46:08 19      Q.   It says that the subject is to "Discuss POV on

15:46:12 20   Helio Campaign."  Do you see that?

15:46:13 21      A.   Yes, I do.

15:46:14 22      Q.   What does POV mean?

15:46:16 23      A.   Point of view.

15:46:17 24      Q.   You're sending this out to the team; is that

46:18 25   correct.

146

JULIE PATTERSON - FEBRUARY 2, 2007

46:18 1      A.   Yes.

15:46:19 2      Q.   Why did you send this out to them?

15:46:21 3      A.   I sent this after I had been informed by Brendon

15:46:26 4  about the TV spot that he saw airing.  And that also Bob

15:46:32 5  had mentioned the print ad.  And we had a meeting set up

15:46:37 6  with the clients two days later to do a creative review.

15:46:41 7      Q.   In your note it says, "Let's discuss the Helio

15:46:43 8  campaign and the tag line so we have a strong POV prior to

15:46:48 9  our Wednesday creative review."

15:46:50 10      Why did you want to have a strong POV prior to

15:46:53 11  that creative review?

15:46:57 12      A.   We wanted to have a strong POV.  Actually, we

47:01 13  didn't end up having a strong POV.  But we wanted to -- I

15:47:04 14  wanted to discuss it with the team because as I mentioned

15:47:07 15  earlier, we felt that there was a similarity between Don't

15:47:11 16  Call It a Phone and Not a Cell Phone at Treo.

15:47:15 17                          (Plaintiff's Exhibit 18 marked

15:47:15 18                          for identification.)

15:47:37 19  BY MR. TROCK:

15:47:45 20      Q.   This is a document marked Exhibit 18 that the

15:48:02 21  court reporter has handed you which is dated August 1,

15:48:06 22  2006 bearing Bates number AKQA 3242.  Do you recognize

15:48:11 23  this document?

15:48:12 24      A.   Yes, I do.

48:13 25      Q.   Can you tell me what this is.

147

48:16    1      A.    This was an e-mail that I sent to Bob and Adam

15:48:18   2   with some feedback that they needed to incorporate prior

15:48:21   3   to our creative review.

15:48:24   4      Q.    It starts out, "Hi there.  Scott provided some

15:48:28   5   additional feedback on the print out-of-home creative."

15:48:33   6   Do you see that?

15:48:34   7      A.    Yes.

15:48:34   8      Q.    Scott who?

15:48:36   9      A.    Scott Hancock.

15:48:39  10      Q.    How did you receive this additional feedback

15:48:41  11   from Mr. Hancock?

15:48:45  12      A.    If I recall it was over the phone.

49:01    13      Q.    And you have five bullet items here and you say,

15:49:05  14   "Here's what he had to say."  So are these five references

15:49:08  15   to your conversation with Mr. Hancock?

15:49:12  16      A.    Yes.

15:49:12  17      Q.    The second one says "Want to incorporate 'just'

15:49:18  18   back into the tag line."  Do you see that?

15:49:21  19      A.    Yes.

15:49:21  20      Q.    It says, "We talked about this one yesterday and

15:49:24  21   it may be a moot point given the Helio conversation, but

15:49:29  22   we should comp an actual outdoor board with this tag

15:49:33  23   line."  Do you see that?

15:49:34  24      A.    Yes, I do.

49:35    25      Q.    When you're referring to the "we talked about

148

49:38    1    this one yesterday," that would be the meeting that you

15:49:45    2    had at AKQA on July 31; is that right?

15:49:50    3        A.    Yes.

15:49:51    4        Q.    When did you have this telephone conversation

15:49:53    5    with Mr. Hancock?

15:49:57    6        A.    I don't recollect the exact date, but I imagine

15:50:06    7    it would have been within a couple of days of this e-mail.

15:50:09    8        Q.    Was it before the -- or after the internal

15:50:11    9    meeting you had with -- well, the team members to discuss

15:50:16    10    the Helio ad campaign and tag line?

15:50:18    11        A.    I don't recall.

15:50:30    12        Q.    It says here that "He wants to incorporate

50:32    13    'just'; back into the tag line."  Do you see that?

15:50:36    14        A.    Yes.

15:50:36    15        Q.    Was there a point in time when "just" was not in

15:50:39    16    the tag line?

15:50:40    17        A.    Yes.

15:50:41    18        Q.    When was that?

15:50:44    19        A.    Originally it was not in the tag line and then

15:50:51    20    there was some internal discussion at Palm regarding being

15:50:56    21    uncomfortable with what that line might lead consumers to

15:51:00    22    think.  And then there was a group of those people that

15:51:03    23    were trying to make a case for not using it in the US

15:51:06    24    marketing but perhaps in the European marketing.  And then

51:09    25    they came back to us saying no, we would like to use it

149

51:12    1  across the board because we are very uncomfortable that it

15:51:18    2  would indeed make the consumers think this it's not a

15:51:23    3  phone at all.

15:51:23    4       Q.   Okay.  Now, this is why I'm confused about the

15:51:26    5  at the statement on this document.

15:51:27    6       A.   Okay.

15:51:27    7       Q.   It says, "Want to incorporate 'just' back into

15:51:30    8  the tag line."  Now, when I read that, that indicates to

15:51:33    9  me that there was a point in time in which the word "just"

15:51:37   10  was part of the tag line but then it was taken out.

15:51:41   11            MR. COLT:  Hang on.  There's no question

15:51:43   12  pending.

51:43   13            THE WITNESS:  Okay.

15:51:44   14  BY MR. TROCK:

15:51:44   15       Q.   Now, am I misreading that?

15:51:47   16       A.   That there was a point in time at which "just"

15:51:49   17  was in -- that's correct.

15:51:51   18       Q.   The tag line.

15:51:52   19       A.   That's correct.

15:51:52   20       Q.   So there was?

15:51:53   21       A.   Yes.

15:51:54   22       Q.   Okay.  And then there was another point in time

15:51:56   23  after that in which the word "just" got taken out of the

15:51:59   24  tag line; is that right?

52:00   25       A.   Yes.

150

JULIE PATTERSON - FEBRUARY 2, 2007

52:00    1        Q.    And then you had this conversation with

15:52:03    2   Mr. Hancock sometime on or before August 1, 2006 and he

15:52:09    3   indicated that they wanted "just" to go back into the tag

15:52:12    4   line; is that right?

15:52:13    5        A.    Yes.

15:52:16    6        Q.    So it appears as if during the development of

15:52:20    7   this advertising campaign that Palm was going back and

15:52:24    8   forth in terms of making a decision as to whether or not

15:52:28    9   to use the word "just" in the tag line; is that right?

15:52:31   10        A.    Yes.

15:52:32   11        Q.    At least as late as August 1, 2006, right?

15:52:35   12        A.    Yes.

52:42   13        Q.    Now you go on and you say, "We talked about this

15:52:49   14   one yesterday and it may be a moot point given the Helio

15:52:49   15   conversation."  Why would it be a moot point given the

15:52:51   16   Helio conversation?

15:52:53   17        A.    Because at that point we knew again that there

15:52:55   18   was a lot of discussion around that line and a lot of

15:53:02   19   attention had been given to the meaning and if Not a Cell

15:53:04   20   Phone at Treo clearly communicated what we wanted to or if

15:53:08   21   it was going to confuse consumers.  And so we thought that

15:53:13   22   that might be the breaking point for Palm and even with

15:53:17   23   "just"; it could be including "just"; it could be looking

15:53:20   24   for an alternative that was even more overt.

53:27   25        Q.    Okay.  I understand that.  But I'm having a

                                                                        151

53:30    1  difficult time understanding why it would be a moot point.

15:53:34  2  What did you mean when you said "it may be a moot point"?

15:53:39  3       A.   I meant that it may be that we include just.

15:53:42  4  And they feel that with the fact that it's been under such

15:53:48  5  heavy scrutiny already and that there's another line being

15:53:52  6  used that says Don't Call It a Phone, that it may be

15:53:55  7  enough for them to want us to actually look at using just

15:53:59  8  or each a different alternative altogether.

15:54:03  9       Q.   Did there come a time after August 1, 2006 in

15:54:06 10  which Palm had you look at another alternative altogether?

15:54:10 11       A.   No.

15:54:17 12       Q.   Now, at the beginning of that sentence it says,

54:19   13  "We talked about this one yesterday."  So am I correct in

15:54:25 14  understanding that at a meeting on July 31, which is

15:54:31 15  referenced in Exhibit 17, that you discussed using the

15:54:35 16  word "just" in the Palm tag line?

15:54:40 17       A.   We had discussed the fact that the line had gone

15:54:44 18  back and forth from Not a Cell Phone at Treo and Not Just

15:54:48 19  a cell Phone at Treo.

15:54:57 20       Q.   Then you go on at the end of that sentence and

15:54:59 21  you say, "But we should comp an actual outdoor board with

15:55:03 22  this tag line."  Do you see that?

15:55:04 23       A.   Yes.

15:55:05 24       Q.   Prior to August 1, 2006, had you comp'd an

55:07   25  actual outdoor board with that tag line?

                                                                152

| | | |
|---|---|---|
| 55:09 | 1 | A.    Yes, I believe we had. |
| 15:55:12 | 2 | Q.    Then why would you want people to do it again? |
| 15:55:16 | 3 | A.    Because in the work that they had comp'd for the |
| 15:55:19 | 4 | meeting on the 1st it was not in there.  I'm sorry. |
| 15:55:24 | 5 | Comp'd for that meeting on the 2nd. |
| 15:55:28 | 6 | Q.    But you said that it had already been done. |
| 15:55:31 | 7 | A.    It had been done in a different presentation and |
| 15:55:33 | 8 | they had the deck pretty much completed already. |
| 15:55:36 | 9 | Q.    Okay.  The last item on the -- in your e-mail |
| 15:55:46 | 10 | here it says, "We want to make sure we boost the Treo |
| 15:55:48 | 11 | brand visually."  Why did you want to do that? |
| 15:55:53 | 12 | A.    Because Palm wanted to continue to reinforce the |
| 55:57 | 13 | association between Palm and Treo.  And, again, there was |
| 15:56:00 | 14 | some concern that because this device was their first |
| 15:56:04 | 15 | antennaless one, that people may not know that it's a cell |
| 15:56:07 | 16 | phone and a Treo. |
| 15:56:17 | 17 | Q.    Then you go on and say, "so we should include a |
| 15:56:20 | 18 | device shot in a comp where we've removed the Cingular |
| 15:56:25 | 19 | logo and replaced it with the Treo logo."  Why did you |
| 15:56:29 | 20 | want to do that? |
| 15:56:30 | 21 | A.    To help bridge the gap between the Palm and Treo |
| 15:56:33 | 22 | brands and logos. |
| 15:56:43 | 23 | Q.    You then go on and say, "In addition, we should |
| 15:56:45 | 24 | look at the sizing of the tag line."  Do you see that? |
| 56:48 | 25 | A.    Yes. |

153

58:39  1   bunch of conversations with Mr. Hancock, where Mr. Hancock

15:58:44  2   indicated that he wanted to incorporate the word "just"

15:58:47  3   back into the tag line.

15:58:49  4       A.   Mm-hmm.

15:58:49  5       Q.   And Adam says, "Figures.  Might be a moot point

15:58:53  6   anyway."  You see that?

15:58:54  7       A.   Yes.

15:58:55  8       Q.   What did you understand him to mean?

15:58:57  9       A.   I understood him to be frustrated by the fact

15:59:01  10  that there continued to be so much back and forth.  And

15:59:05  11  that, again, based on our previous conversation, they may

15:59:10  12  want to use "just"; they may want us to explore a

59:13  13  different line that's more explicit altogether.

15:59:24  14      Q.   Was there any expectation by you or other

15:59:29  15  members of the Palm core team that Palm might abandon the

15:59:37  16  use of this tag line because of Helio's ad campaign?

15:59:42  17      A.   There was --

15:59:45  18           MR. COLT:  Objection.  It's vague and ambiguous

15:59:50  19  as to "tag line."

15:59:50  20           THE WITNESS:  There was no expectation.

15:59:50  21  BY MR. TROCK:

15:59:56  22      Q.   Was there an expectation that Palm might ask you

15:59:58  23  to start considering a totally different tag line?

16:00:02  24           MR. COLT:  Same objection.

00:04  25           THE WITNESS:  Again, there was no expectation.

155

JULIE PATTERSON - FEBRUARY 2, 2007

00:08    1  BY MR. TROCK:

16:00:09    2      Q.    Well, I believe you testified that Palm may want

16:00:13    3  you to explore a different line; is that right?

16:00:20    4      A.    It was a possibility.

16:00:26    5      Q.    Why did you think it was a possibility?

16:00:28    6      A.    Because there had been so much discussion around

16:00:31    7  the importance of that line communicating that it was more

16:00:35    8  than a cell phone and being very clear to consumers.  And

16:00:39    9  so it was already the topic of discussion.  And there was

16:00:43   10  already a level of discomfort with Not a Cell Phone at

16:00:44   11  Treo that we felt that all of -- those factors as well as

16:00:50   12  the fact that there was now a line that said Don't Call It

00:52   13  a Phone, Don't Call Us a Phone Company may be reason

16:00:56   14  enough for them to want us to either include "just" or

16:01:02   15  explore alternatives.

16:01:28   16                      (Plaintiff's Exhibit 20 marked

16:01:28   17                           for identification.)

16:01:28   18  BY MR. TROCK:

16:01:30   19      Q.    The court reporter has handed you what's been

16:01:32   20  marked Exhibit 20, which is a document dated August 3,

16:01:36   21  2006 bearing Bates number AKQA 3253.  Do you recognize

16:01:41   22  this document?

16:01:43   23      A.    Yes, I do.

16:01:44   24      Q.    Tell me what this is.

01:47   25      A.    This is an e-mail that I sent to some members of

156

01:50    1    our team with a link to an article off of Gizmodo.

16:01:58    2         Q.   And the subject you have listed here is

16:01:59    3    "Interesting Helio campaign feedback."  Do you see that?

16:02:03    4         A.   Yes.

16:02:03    5         Q.   Why did you send this link to these people?

16:02:07    6         A.   This was -- I believe I mentioned this

16:02:09    7    previously, but I found it interesting that there was some

16:02:13    8    comment by consumers about the confusing nature of Helio's

16:02:19    9    lines and campaign.

16:02:21   10         Q.   How is it that this information came to your

16:02:26   11    attention?

16:02:28   12         A.   Because Gizmodo is one of the blogs related to

02:33   13    technology gadgets that I look at on occasion.

16:02:38   14         Q.   Why did you look at it on this occasion?

16:02:41   15         A.   Because I was on the bus on my way to work and I

16:02:44   16    was trying to pass time.

16:02:50   17         Q.   Did you look at this blog with any specific

16:02:52   18    intention in mind?

16:02:54   19         A.   No.  More or less just to see what was going on

16:02:57   20    in the industry of news -- technology.  And it's a blog,

16:03:02   21    so it's not a -- it's not from a CNET or one of those

16:03:06   22    publications.

16:03:22   23         Q.   Had you already had the meeting with Palm that

16:03:24   24    was scheduled for around this time period?

03:28   25              MR. COLT:  Objection.  It's vague and ambiguous

                                                                    157

1 | STATE OF CALIFORNIA        )    ss.

2

3        I hereby certify that the deponent in the

4 | forgoing deposition was by me duly sworn to testify to

5 | tell the truth, the whole truth and nothing but the truth

6 | in the within-entitled cause; that said deposition was

7 | taken at the time and place therein stated; that the

8 | deposition is a true record of the deponent's testimony as

9 | reported to the best of my ability by me, a duly certified

10 | shorthand reporter and a disinterested person, and was

11 | thereafter transcribed under my direction into typewriting

12 | by computer.

13        I further certify that I am not interested in

14 | the outcome of the said action, nor connected with, nor

15 | related to any of the parties in said action, nor to their

16 | respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18 | this 11th day of February, 2007.

19

20

21 _____

22        HEIDI BELTON, CSR #12885, RPR

23

24

25

183

# EXHIBIT 4

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO A PENDING PROTECTIVE ORDER

# EXHIBIT 5

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO A PENDING PROTECTIVE ORDER

# EXHIBIT 6

# THIS EXHIBIT IS FILED UNDER SEAL PURSUANT TO A PENDING PROTECTIVE ORDER

# EXHIBIT 7

1   Deborah Bailey-Wells     (114630)
    Kevin C. Trock          (161787)
2   Harold H. Davis, Jr.    (235552)
3   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
    Four Embarcadero Center, 10th Floor
4   San Francisco, CA  94111
    Telephone   (415) 249-1000
5   Fax:        (415) 249-1001
    dbaileywells@klng.com
6   ktrock@klng.com
7   hdavis@klng.com

8   Attorneys for HELIO LLC

9              UNITED STATES DISTRICT COURT FOR THE

10      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

12  HELIO LLC,                            Case No. _____

13              Plaintiff,
                                          **PLAINTIFF HELIO LLC'S APPLICATION
14                                        FOR TEMPORARY RESTRAINING
                                          ORDER AND FOR ORDER TO SHOW
15      vs.                               CAUSE WHY A PRELIMINARY
                                          INJUNCTION SHOULD NOT ISSUE;
16  PALM INC.,                            MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT**
17
18              Defendant.                **Date Filed:  December 19, 2006**

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 3

I.     OVERVIEW ............................................................................................................ 3

II.    FACTUAL BACKGROUND ................................................................................... 4

    A.    Helio Has Exclusive Rights in its DON'T CALL IT A PHONE Marks ................... 4

    B.    Helio's DON'T CALL IT A PHONE Marks Are Distinctive And Have Obtained
          Consumer Recognition ............................................................................................... 7

    C.    PALM Recently Launched An Extensive, Infringing Advertising Campaign ......... 8

III.   THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER IN A
      TRADEMARK CASE WHERE LIKELIHOOD OF CONFUSION IS
      DEMONSTRATED ................................................................................................... 10

IV.    HELIO WILL LIKELY SUCCEED IN SHOWING A LIKELIHOOD
      OF CONFUSION ................................................................................................... 12

    1.    The marks are similar in sight, sound and meaning ............................................. 13

    2.    The goods and services offered by the parties are nearly identical .................... 16

    3.    The Parties Use Identical Marketing Channels ..................................................... 17

    4.    Helio's DON'T CALL IT A PHONE Marks Are Strong ..................................... 17

    5.    Palm intentionally copied Helio's DON'T CALL IT A PHONE advertising
         campaign and slogan ............................................................................................... 19

    6.    The "Likelihood of Expansion" factor is irrelevant where, as here, the parties
         already compete ...................................................................................................... 20

    7.    The degree of care factor weighs in Helio's favor ............................................... 21

    8.    Actual confusion factor should weigh in Helio's favor ....................................... 22

V.     CONCLUSION ....................................................................................................... 22

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
4
237 F.3d 198 (3d Cir. 2000) .................................................................................... 2

5
American Int'l Group, Inc. v. American Int'l Bank,
926 F.2d 829 (9th Cir. 1991) .................................................................................. 3
6

7
Anti-Monopoly, Inc. v. General Mills Fun Group,
611 F.2d 296 (9th Cir.1979) ................................................................................... 3

8
Apple Computer, Inc. v. Formula Intern, Inc.,
9
725 F.2d 521 (9th Cir. 1984) .................................................................................. 4

10
Big Country Foods, Investment v. Board of Education,
11
868 F.2d 1085 (9th Cir. 1989) ................................................................................ 2

12
Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,
174 F.3d 1036 (9th Cir. 1999) ............................................................................ 1, 7
13

14
Chance v. Pac-Telegraph Teletrac Inc.,
42 F.3d 1151 (9th Cir. 2001) .................................................................................. 2

15
Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,
16
269 F.3d 270 (3d Cir. 2001) ................................................................................... 2

17
Chemical Corp. of America v. Anheuser-Busch, Inc.,
18
306 F.2d 433 (5th Cir. 1962) .................................................................................. 1

19
Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,
109 F.3d 1394 (9th Cir.1997) ................................................................................. 1
20

21
Dreamwerks Prod. Group, Inc. v. SKG Studio,
142 F.3d 1127 ..................................................................................................... 1, 2
22

23
Duncan McIntosh Co., Inc. v. Newport Dunes Marina LLC,
324 F. Supp.2d 1078 (C.D. 2004)....................................................................... 1, 7

24
E. & J. Gallo Winery v. Gallo Cattle Co.,
25
967 F.2d 1280, 1290 (9th Cir. 1992) ................................................................ 12, 13

26
E. & J. Gallo Winery v. Consorzio del Gallo Nero,
27
782 F. Supp. 457 (N.D. Cal. 1991) ................................................................ passim

28
Earthquake Sound Corp. v. Bumper Indus.,

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

352 F.3d at 1210 (9th Cir. 2003)..................................................................................... 5

El Pollo Loco, Inc. v. Hashim,
316 F.3d 1032  (9th Cir. 2003)....................................................................................... 2

Entrepreneur Media, Inc. v. Smith,
279 F.3d 1135 (9th Cir. 2002) ...................................................................................... 3

Filipino Yellow Pages v. Asian Journal Pubs.,
198 F.3d 1143 (9th Cir. 1999) ...................................................................................... 5

GoTo.com, Inc. v. Walt Disney Co.,
202 F.3d 1199 (9th Cir. 2000) .............................................................................. passim

Hewlett-Packard Co. v. Packard Press, Inc.,
281 F.3d 1261 (Fed. Cir. 2002) .................................................................................... 2

Honor Plastic Indus., Co., Ltd. v. Lollicup USA, Inc.,
No. Civ-F-06-0707, 2006 WL 3199143 (E.D. Cal. Nov. 3, 2006).................................. 2

Interstellar Starship Services, Ltd. v. Epix, Inc.,
184 F.3d 1107 (9th Cir. 1999) ...................................................................................... 6

Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.,
963 F.2d 350 (Fed. Cir. 1992) ..................................................................................... 2

Lindy Pen Co. v. Bic Pen Corp.,
796 F.2d 254 (9th Cir. 1986)........................................................................................ 4

M2 Software, Inc. v. Madacy Entm't,
421 F.3d 1073 (9th Cir. 2005) .................................................................................. 1, 7

McGraw-Edison Co. v. Walt Disney Prod.,
787 F.2d 1163 (7th Cir. 1986) ..................................................................................... 9

Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,
856 F.2d 1445 (9th Cir. 1988) ............................................................................. 2, 5, 6

New West Corp. v. NYM Co. of Cal., Inc.,
595 F.2d 1194 (9th Cir. 1979) ..................................................................................... 3

Nissan Motor Co. v. Nissan Computer Corp.,
 378 F.3d 1002 (9th Cir. 2004) ..................................................................................... 1

Nutri/System, Inc. v. Con–Stan Indus., Inc.,
809 F.2d 601, 605 (9th Cir.1987).................................................................................. 4

iii

1

Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,
762 F.2d 1374 (9th Cir. 1985) ................................................................................ 2

Official Airline Guides, Inc. v. Goss,
6 F.3d 1385 (9th Cir. 1993) ................................................................................... 4

Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,
396 F.3d 1369 (Fed. Cir. 2005) .............................................................................. 1

Playboy Enters., Inc. v. Netscape Commc'ns Corp.,
354 F.3d 1020 (9th Cir. 2004) ............................................................................... 1

Prudhomme v. Procter & Gamble,
800 F. Supp. 390 (E.D. La. 1992)........................................................................... 3

Redmond Prods., Inc v. Amino Sabre, Inc.,
17 U.S.P.Q.2d 1386 (C.D. Cal. 1990)..................................................................... 1

Rodeo Collection, Ltd. v. West Seventh,
812 F.2d 1215 (9th Cir. 1987)................................................................................ 2

Sonista, Inc. v. Hsieh,
348 F. Supp.2d 1089 (N.D. Cal. 2004) ................................................................... 3

Southwest Voter Registration Ed. Project v. Shelley,
344 F.3d 914 (9th Cir. 2003) ................................................................................. 2

Sunenblick v. Harrell,
895 F. Supp. 616 (S.D.N.Y.1995)........................................................................ 2, 3

Surfvivor Media, Inc. v. Survivor Prods.,
406 F.3d 625 (9th Cir. 2005) ................................................................................. 1

Sutter Home Winery v. Madrona Vineyards, L.P.,
No. C 05-0587, 2005 WL 701599 (N.D. Cal. March 23, 2005) ............................ 18

Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd.,
 No. C 06-00527, 2006 WL 1214859 (N.D. Cal. May 6, 2006)  ....................... 14, 20

Vision Sports, Inc. v. Melville Corp.,
888 F.2d 609 (9th Cir. 1989) ................................................................................. 2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

## **FEDERAL STATUTES**

15 U.S.C. §1051 ................................................................................................................. 1

15 U.S.C. § 1125 ............................................................................................................... 1

Fed. R. Civ. P. 65 ....................................................................................................... 1, 11

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that on December 19, 2006 or as soon thereafter as counsel

3   may be heard, in the United States District Court for the Northern District of California, 450

4   Golden Gate Avenue, San Francisco, CA 94102, before a U.S. District Court judge to be

5   announced by the Court, Plaintiff Helio LLC ("Helio") will apply for a temporary restraining

6   order and order to show cause why a preliminary injunction should not issue pursuant to

7   Fed. R. Civ. P. 65 and Local Rule 65-1.  Notice of Helio's Application was delivered to Palm,

8   Inc. on December 19, 2006.

9       Specifically, Plaintiff Helio moves this Court for a temporary restraining order

10  immediately restraining Defendant Palm Inc. ("Palm") and its agents, servants, employees,

11  attorneys and all persons in active concern and participation with Defendant Palm, from

12  using Palm's "NOT JUST A CELL PHONE" advertising and any other advertising

13  confusingly similar to Helio's DON'T CALL IT A PHONE and DON'T CALL US A PHONE

14  COMPANY marks (1) in connection with Palm's sale of mobile media devices and service

15  including, without limitation, mobile telephones; and (2) in any print, billboard, television,

16  radio, broadcast, direct marketing, internet advertising or other advertising or marketing

17  media related to Palm's "NOT JUST A CELL PHONE" campaign.

18      Helio moves that this restraining order stay in effect pending a hearing and

19  determination of Helio's motion for a preliminary injunction, on the grounds that immediate

20  and irreparable injury, loss and damage will result to Helio before notice can be given and

21  Defendant Palm and its attorneys can be heard in opposition, as is more fully argued below,

22  and the Declarations of Jessica Weeks and Kathryn Wheble submitted herewith.  Palm

23  intends to use and is using the "NOT JUST A CELL PHONE" slogan as a prominent tagline

24  in the centerpiece of its recently launched $25 million advertising campaign which is

25  confusingly similar to Helio's DON'T CALL IT A PHONE and DON'T CALL US A PHONE

26  COMPANY marks.

27

28

                                    1

1    Helio further moves for leave to take expedited discovery after entry of the

2    Temporary Restraining Order including a) taking the deposition of Palm, Inc. and up to two

3    employees thereof, as to its intent in using marks confusingly similar to Helio's DON'T CALL

4    IT A PHONE mark, the goodwill in Palm's marks, and any evidence of actual, likely or

5    possible confusion that has arisen therefrom, or any anticipation of such confusion; b)

6    requesting the production of documents from Palm relating to its intent in using marks

7    confusingly similar to Helio's DON'T CALL IT A PHONE mark, the goodwill in Palm's marks,

8    and any evidence of actual, likely or possible confusion that has arisen therefrom, or any

9    anticipation of such confusion and c) subpoenaing the deposition and documents from

10    Palm's advertising agencies or companies relating to its knowledge of Helio's DON'T CALL

11    IT A PHONE marks and any intent to infringe these marks by creating a likelihood of

12    confusion in creating Palm's infringing, holiday advertising campaign.

13    Helio further moves the court for an expedited time period for this discovery so that

14    thirty-six (36) hours notice shall be deemed sufficient for any deposition provided by the

15    order and forty-eight (48) hours notice shall be deemed sufficient for the production of any

16    such documents.

17    This Application is based on this Application, the attached Memorandum of Points

18    and Authorities, the attached Declarations of Jessica Weeks and Kathryn Wheble filed

19    separately, the Proposed Temporary Restraining Order, all pleadings, records and files in

20    this action, and upon all other matters that may be presented at the hearing on this

21    Application.

22

23

24

25

26

27

28

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Overview

Palm's just launched holiday advertising campaign promoting its Treo mobile media devices as "NOT JUST A CELL PHONE" is an unmistakable example of infringement of Helio's intellectual property including its DON'T CALL IT A PHONE trademarks.  Not only has Palm publicly recognized the substantial similarity between its new campaign and Helio's prior used DON'T CALL IT A PHONE marks, Palm has put up nearly $25 million dollars in its most "significant marketing efforts" to date to place advertisements in the very same magazines and advertising channels that Helio's DON'T CALL IT A PHONE advertising appears.  Palm's advertising campaign seeks to take advantage of the goodwill that Helio established through great expenditure and effort.  Thus, Palm's actions will likely cause confusion, mistake or deceive consumers into believe that there is some affiliation, connection, association, origin, sponsorship or approval with respect to Palm's and Helio's products and services.

Moreover, Palm has intentionally timed its scheme to trade on Helio's established goodwill during the "peak" holiday shopping season.  The fact that Helio sold Palm's Treo phones, and that it provides services to Treo users, further compounds the likelihood that the relevant public will be confused by Palm's advertising campaign because the messages of the parties' slogans are identical and the wording and consumer impression are confusingly similar.

The timing, size, and design of Palm's advertising campaign to piggy-back on Helio's trademarks and goodwill associated therein make time of the essence and render this case ripe for a temporary restraining order to preserve the status quo between the parties.  Thus, the Court should enter a temporary restraining order and an order to show cause why a preliminary injunction should not issue which prohibits Palm from using the "NOT JUST A CELL PHONE" advertising and other confusingly similar infringements of Helio's DON'T CALL IT A PHONE marks.

## II.    FACTUAL BACKGROUND

### A.    Helio Has Exclusive Rights in its DON'T CALL IT A PHONE Marks

Helio is a Mobile Virtual Network Operator ("MVNO") that provides wireless communication products and network services to consumers. Declaration of Jessica Weeks in Support of Application for a Temporary Restraining Order ("Weeks Decl.") ¶ 2. In part, Helio combines wireless telephone, audio, video, data, GPS and Internet innovation with noteworthy service and support designed to deliver a breakthrough mobile experience for consumers. Id. As an MVNO, Helio offers its wireless services under its own brand name but procures these wireless network services from large network providers such as Sprint Nextel Corporation and Verizon Wireless. Id. Helio currently offers for sale three different mobile media devices that utilize its wireless services for sale to consumers which are known as the KICKFLIP[tm], the HERO[tm], and the DRIFT[tm]. Id. at ¶ 3.[1] Helio also offered for sale Treo smartphones until August 2006. Id. at ¶ 35. As of November 30, 2006, Palm Treo devices represented approximately 10% of Helio's paid subscriber base. Id.

Helio was started in January 2005 as a joint venture between Earthlink, Inc., a US internet service provider, and SK Telecom Co., Ltd., a Korean telecommunications and mobile phone operator. Weeks Decl. ¶ 3. From its inception, Helio developed a new marketing strategy to directly target technology-savvy consumers who were interested in more than standard wireless telephone service. Id. ¶¶ 4-9. The main goal of Helio's new marketing and branding strategy was to differentiate and distinguish Helio from other major US wireless carriers in that it offered the latest in cutting-edge handset technology and services. Id.

Based on this marketing strategy, Helio engaged IPG/Deutsch LA, a well respected Los Angeles-based advertising agency to manage the company's debut to the mobile telecommunications marketplace. Weeks Decl. ¶¶ 5-6. Helio ultimately developed a branding strategy that would inform consumers about the highly demanded, multiple non-

---

[1] More information and display of Helio's brand can be found at www.helio.com.

4

1 | cellular phone functions that Helio branded devices offered, including GPS capabilities, full-
2 | motion video streaming, portable music functions (similar to devices such as Apple's iPod),
3 | direct access to MySpace (the largest internet social networking site), peer-to-peer location
4 | services using advanced satellite technology, and a camera/video camera. Id.
5 | Helio officially launched its branding campaign in May 2006 when Helio used the
6 | slogans "DON'T CALL IT A PHONE" and "DON'T CALL US A PHONE COMPANY" in
7 | commerce on such internet sites as MySpace.com and Yahoo.com. Weeks Decl. ¶ 9;
8 | Declaration of Kathryn Wheble ("Wheble Decl.") ¶¶ 4-13 (Exhibits A-B). This branding
9 | initiative expanded to more traditional media such as magazines, newspapers, radio and
10 | television advertising in the weeks that followed. Weeks Decl. ¶¶ 9-13. Print
11 | advertisements have been featured in many of the most widely distributed US magazines
12 | including Rolling Stone, GQ, Wired, Details, Spin and Lucky among many others. Id. Major
13 | broadcast and cable television stations have run three different television advertisements
14 | which all prominently use Helio's marks DON'T CALL IT A PHONE and DON'T CALL US A
15 | PHONE COMPANY. Id. These television commercials have appeared hundreds of times
16 | on ESPN, MTV, VH-1, Comedy Central, BET, E! Entertainment Television, Cartoon
17 | Network, and Spike TV.[2] Id.
18 | Helio has also featured its DON'T CALL IT A PHONE marks in online campaigns on
19 | such websites as AOL, YAHOO!, GOOGLE, MYSPACE, CNET, IDG ENTERTAINMENT,
20 | MSN.COM, MTV.COM, and PLANETOUT, among others. Weeks Decl.¶ 10.
21 | Further, local media outlets such as San Francisco's "Live 105" radio station (KITS
22 | 105.3 MHz) have broadcast Helio advertisements using Helio's marks DON'T CALL IT A
23 | PHONE and DON'T CALL US A PHONE COMPANY. Weeks Decl. ¶ 12.
24 |
25 |
26 | [2] These commercials include (1) "Meet The Parents" (viewable at
http://www.youtube.com/watch?v=dwQkU7jLXRY); (2) "Frenchie" (viewable at
27 | http://www.youtube.com/watch?v=o5ed2F4bFsw&mode=related&search=); and (3) "Scuba" (viewable at
http://www.youtube.com/watch?v=YZES-rix6yM&mode=related&search=), which are all available to be seen
28 | over the Internet on various sites including www.youtube.com.

5

1    Helio has also sponsored special events that incorporate the DON'T CALL IT A

2 PHONE marks. Weeks Decl. ¶¶ 15-18. These include many widely attended parties at

3 fashionable nightlife establishments in Los Angeles, San Francisco, Dallas, Chicago,

4 Boston, Philadelphia, Washington DC, New York, Miami and Atlanta. Id. Thousands of

5 influential trendsetters (including celebrities such as Justin Timberlake and Cameron Diaz)

6 attended these parties where Helio distributed branded material that included the "DON'T

7 CALL IT A PHONE" marks. Id.

8    Helio branded devices and service are offered for sale at thousands of retail

9 establishments throughout the country. Weeks Decl. ¶ 12. Helio has also opened its own

10 branded retail stores to distribute Helio products and services in Santa Monica, San Diego

11 and Palo Alto, California. Id. at ¶ 12. Helio will be opening new stores in Denver and New

12 York, and has plans to open stores in Miami, Chicago, Boston, Dallas, Seattle, and Atlanta.

13 Id. Helio's "DON'T CALL IT A PHONE" marks appear on screen savers on in-store

14 computers, on signage in the store, and on the uniforms worn by store employees. Id.

15    Helio has spent over $30 million to establish the HELIO brand, with the prominent

16 use of the "DON'T CALL IT A PHONE" and "DON'T CALL US A PHONE COMPANY" marks

17 representing over 85% of such spending. Weeks Decl. ¶ 14. Most, if not all, Helio branded

18 consumer media advertising features Helio's "DON'T CALL IT A PHONE" marks. Id.

19    Helio's broad-based use and promotion of its slogans "DON'T CALL IT A PHONE"

20 and "DON'T CALL US A PHONE COMPANY" are the subject of Helio-owned federal

21 trademark applications U.S. Ser. Nos. 78735805, 78735810 and 78735812 (for the slogan

22 DON'T CALL IT A PHONE) and U.S. Ser. Nos. 78735814, 78735817 and 78735819 (for the

23 slogan DON'T CALL US A PHONE COMPANY) for use with computer software programs,

24 communication services, and audio-video broadcasting via wireless communication

25 networks, among other things (collectively the "DON'T CALL IT A PHONE" marks). The

26 applications were filed on October 18, 2005 under 15 U.S.C. §1051(b) with a first use date

27 on May 2, 2006. Wheble Decl. ¶¶ 11-13. Notices of Allowance have been issued for

28

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

1 | Application Ser. Nos. 78735805 and 78735812 and statements of use are being filed this
2 | week. Id. at ¶ 6

3 |     "To establish ownership of a mark, the prior user must establish not only that at
4 | some date in the past it used the mark, but that such use has continued to the present."
5 | Thomas McCarthy, McCarthy on Trademarks § 16:9 (2005); Chance v. Pac-Tel Teletrac Inc.
6 | 242 F.3d 1151, 1158 (9th Cir. 2001) ("evidence showing, first, adoption, and second, use in
7 | a way sufficiently public to identify or distinguish the marked goods in an appropriate
8 | segment of the public mind as those of the adopter of the mark is competent to establish
9 | ownership, even without evidence of actual sales."); Honor Plastic Indus., Co., Ltd. v.
10 | Lollicup USA, Inc., No. Civ-F-06-0707, 2006 WL 3199143, *5 (E.D. Cal. Nov. 3, 2006) citing
11 | Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219.  ("[O]nce an application for trademark is
12 | granted that party is presumed to have established ownership of the mark as of the filing
13 | date of the application.").  Consequently, Helio now has exclusive rights to the DON'T CALL
14 | IT A PHONE marks.

15 | **B.**     **Helio's DON'T CALL IT A PHONE Marks Are Distinctive And Have Obtained**
16 |       **Consumer Recognition**

17 |     Since the development of its DON'T CALL IT A PHONE branding campaign
18 | beginning in 2005 and first use in May 2006, Helio has consistently used the DON'T CALL
19 | IT A PHONE marks in the marketing, advertising, sale, and distribution of their mobile media
20 | devices throughout the United States with respect to its Helio brand.  Weeks Decl. ¶ 21.

21 |     As a result of Helio's extensive use of its DON'T CALL IT A PHONE marks in its
22 | national media campaign, Helio has built up valuable recognition among consumers that
23 | associate the DON'T CALL IT A PHONE marks with Helio, and Helio owns the valuable
24 | consumer goodwill that is associated with the DON'T CALL IT A PHONE marks.  See
25 | Weeks Decl. ¶ 21.  The internet's largest social networking site, MySpace, lists Helio as
26 | having over 180,000 linked "friends," many of which have posted comments recognizing
27 | and approving of Helio's DON'T CALL IT A PHONE marks.  Weeks Decl. ¶ 20, Ex. G
28 | (MySpace page showing over 180,000 "friends").  In fact, the largest free internet

1  encyclopedia, Wikipedia, recognizes Helio's DON'T CALL IT A PHONE marks as a key

2  identifier for Helio. See http://en.wikipedia.org/wiki/helio.

3       To confirm the effectiveness of its DON'T CALL IT A PHONE marks, Helio

4  commissioned a brand equity study of over 1,900 individuals. Weeks Decl. ¶ 19. Of those

5  surveyed, approximately sixty-one (61%) correctly attributed the DON'T CALL IT A PHONE

6  to Helio. Id. When asked to state in their own words what the key message is for Helio

7  devices, a substantial percentage of individuals responded "it's not just a phone." Id.

8       Further, the PTO has not determined that any of Helio's DON'T CALL IT A PHONE

9  marks are not distinctive and no examiner has required any limitation or required a showing

10  of consumer recognition of the marks during prosecution of Helio's trademark applications.

11  Wheble Decl. ¶¶ 5-10.

12       Consequently, the DON'T CALL IT A PHONE marks are distinctive and have

13  developed substantial consumer recognition among members of the public.

14  **C.     PALM Recently Launched An Extensive, Infringing Advertising Campaign**

15       Palm Inc. is a publicly traded personal digital assistant manufacturer based in

16  Sunnyvale, California. Wheble Decl. Exhibit D (March 27, 2006 Press Release). Founded

17  in 1992, Palm Inc. has developed into one of the leading manufacturers personal digital

18  devices. Id. and http://en.wikipedia.org/wiki/Palm%2C_Inc. Palm, Inc. is now a subsidiary

19  of 3Com, a publicly traded computer networks company. Id. On November 24, 2003, Palm

20  launched its Treo 600 series of smartphones. See Exhibit E to Wheble Decl. Palm touted

21  these devices as a "full-featured mobile phone and Palm OS organizer with wireless

22  communication applications, such as email, messaging and web browsing, and even a

23  digital camera." Id.

24       Three years after its initial launch of this cell phone line, and months after Helio's

25  well-recognized and well-received DON'T CALL IT A PHONE branding initiative, Palm

26  embarked on an entirely new advertising campaign. On December 11, 2006, Palm

27  announced that it was launching a $25 million campaign to promote its newest phone in the

28  Treo 680 line, the Treo 680,  using the "the **category-defining** tagline '**Not just a cell**

8

**phone. A Treo.'"**  See Wheble Decl., Exhibit F (Press Release) (emphasis added).

According to Scott Hancock, Palm's director of marketing communications, the Treo 680 Campaign "is the **most significant [marketing] effort** behind Treo to date." Weeks Decl. ¶ 22, Exhibit H.  Mr. Hancock also admitted that Palm's campaign was strategically designed to take place during the critical holiday season.  Mr. Hancock stated that "And the holiday is the peak season. It has reached the price point for purchase as a gift." Id.  Mr. Hancock further has admitted that this campaign and the use of the "It's Not a Just a Cell Phone" slogan is similarly positioned to Plaintiff's DON'T CALL IT A PHONE marks.  Id.

Palm's new holiday advertising blitz has just begun and appears in not only the same marketing channels as Helio's DON'T CALL IT A PHONE advertising, but in some cases, the very same magazine edition or on billboards mere blocks apart. Weeks Decl. ¶ 23. For example, Palm has taken out advertising in the January 2007 issues of GQ and Lucky magazines featuring its "Not Just a Cell Phone" advertisements where Helio has placed its DON'T CALL IT A PHONE advertising.  Weeks Decl. ¶ 23.  Palm also placed advertising in the December 15, 2006 edition of Entertainment weekly, just one week after Helio's DON'T CALL IT A PHONE advertising appeared in the December 8, 2006 edition of the same magazine.  Id.[3]

Palm's new "NOT JUST A CELL PHONE" campaign also touts its strategic partnerships with the very same companies (Google, Yahoo!, Orbitz, The Onion, Fandango, MySpace) that already have such relationships with Helio.  Weeks Decl. ¶¶ 36-38.  Palm has therefore consciously chosen to copy key strategic partners in its "NOT JUST A CELL PHONE" advertising as Helio in its DON'T CALL IT A PHONE branding campaign.  Helio relies on these strategic partners as a key differentiator in its products and services, and utilizes its DON'T CALL IT A PHONE marks to emphasize and reinforce that differentiation. Id.

Consequently, Palm's actions have been taken to intentionally undermine Helio's

---

[3] Palm has even set up an interactive website at www.ontreo.com which prominently displays the "Not Just a Cell Phone" tagline.

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

1  brand equity, cause confusion and loss of brand awareness, and irreparably harm Helio.

2  Weeks Decl. ¶¶ 39-40.

3  **III.    The Court Should Grant A Temporary Restraining Order in a Trademark Case**
4  **Where Likelihood of Confusion is Demonstrated**

5          The Lanham Act precludes conduct which is likely to cause confusion, or to cause

6  mistake, or to deceive as to the affiliation, connection, or association of one company with

7  another company, or as to the origin, sponsorship, or approval of its goods, services, or

8  commercial activities with another company.  15 U.S.C. § 1125.

9          This case deals with consumer confusion.  There are several types of consumer

10  confusion that can occur.  Forward confusion occurs when consumers mistakenly associate

11  a junior user's mark with that of a "well-known senior mark." Dreamwerks Prod. Group, Inc.

12  v. SKG Studio, 142 F.3d 1127, 1130 n. 5 (9th Cir. 1998).  Reverse confusion occurs where

13  consumers dealing with a senior trademark-holder (Helio) mistakenly believe that they are

14  doing business with a junior user (Palm).  Id.  Surfvivor Media, Inc. v. Survivor Productions,

15  406 F.3d 625, 630 (9th Cir. 2005).  Both reverse and forward confusion cases require a

16  showing of likelihood of confusion among consumers. M2 Software, Inc. v. Madacy Entm't,

17  421 F.3d 1073, *1079 (9th Cir. 2005).

18          Another kind of confusion, "initial interest confusion" describes a situation in which,

19  although the consumer may not ultimately experience confusion as to the source of goods

20  or services, the defendant, by diverting or capturing the consumer's initial attention,

21  improperly benefits from the goodwill that the plaintiff developed in its mark.  Brookfield

22  Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1047, 1062-63 (9th Cir. 1999);

23  see also Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1025 (9th Cir.

24  2004); Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018-19 (9th Cir. 2004)

25  (Initial interest confusion results where a "defendant uses [a] plaintiff's trademark in a

26  manner calculated to capture initial consumer attention".).  The existence of initial interest

27  confusion does not depend on whether a sale is completed as a result of the confusion.  Id.;

28  Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir.1997).  In

1   this case all three types of confusion are likely to exist.

2      A temporary restraining order may be granted if (1) it clearly appears from the

3   specific facts shown by affidavit or by the verified complaint that immediate and irreparable

4   injury, loss, or damage will result to the applicant before the adverse party or that party's

5   attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in

6   writing the efforts, if any, which have been made to give the notice and the reasons

7   supporting the claim that notice should not be required.  Fed. R. Civ. P. 65(b).

8      A party seeking injunctive relief must show either (1) a combination of probable

9   success on the merits and the possibility of irreparable harm, or (2) that serious questions

10  are raised and the balance of hardships tips sharply in the moving party's favor. See Miss

11  World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1448 (9th Cir. 1988); Rodeo

12  Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987). "These are not two

13  distinct tests, but rather the opposite ends of a single 'continuum in which the required

14  showing of harm varies inversely with the required showing of [sic] meritoriousness.'" Miss

15  World, 856 F.2d at 1448 (quoting Rodeo Collection, 812 F.2d at 1217). So long as the Court

16  finds that there is some threat of an immediate irreparable injury, even if that injury is not of

17  great magnitude, a temporary restraining order may issue. See Big Country Foods, Inv. v.

18  Board of Educ., 868 F.2d 1085, 1088 (9th Cir. 1989) (citing cases); Oakland Tribune, Inc. v.

19  Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985) (citing cases).  The

20  components of these two tests, together with the added consideration of the public interest,

21  operate on a sliding scale or "continuum." Southwest Voter Registration Educ. Project v.

22  Shelley, 344 F.3d 914, 918 (9th Cir. 2003). Consequently, "the less certain the district court

23  is of the likelihood of success on the merits, the more plaintiffs must convince the district

24  court that the public interest and balance of hardships tip in their favor." Id. (citation omitted).

25      In a trademark infringement claim, however, "'irreparable injury may be presumed

26  from a showing of likelihood of success on the merits.'" El Pollo Loco, Inc. v. Hashim, 316

27  F.3d 1032, 1038 (9th Cir. 2003) (citation omitted); see also Vision Sports, Inc. v. Melville

28  Corp., 888 F.2d 609, 612 n. 3 (9th Cir. 1989) ("In trademark infringement or unfair

11

competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."). "[A] plaintiff is therefore entitled to a preliminary injunction in a trademark case simply when it shows a likelihood of confusion." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 n. 5 (9th Cir. 2000).

Further, public policy favors granting an injunction when an infringing product is likely to cause consumer confusion. See Anti-Monopoly, Inc. v. General Mills Fun Group, 611 F.2d 296, 300-02 (9th Cir.1979). "Such an injunction may issue even if the plaintiff's mark has not been registered with the PTO." See Nova Wines, Inc. v. Adler Fels Winery LLC, No. C. 06-06149, 2006 WL 3498574, * 4 (N.D. Cal. Dec. 4, 2006) (granting TRO and preliminary injunction based on non-registered trade dress comprised of photographs of Marilyn Monroe); New West Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1198 (9th Cir. 1979) ("It is not necessary that a trademark be registered in order for it to qualify for protection under the Lanham Act"); Prudhomme v. Procter & Gamble, 800 F. Supp. 390, 395 (E.D. La. 1992) (holding that registration is not a prerequisite to protection under § 32(1) of the Lanham Act). Consequently, the Court should grant Helio's request for a temporary restraining order so long as it demonstrates that its likelihood of confusion claims are meritorious.

**IV.    HELIO WILL LIKELY SUCCEED IN SHOWING A LIKELIHOOD OF CONFUSION**

Regardless which type of confusion occurs, Helio must establish that Palm's use of its slogan gives rise to a likelihood of confusion in the consuming public. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1290 (9th Cir. 1992). Thus, the critical factor in this case is whether or not there is a likelihood of confusion between Helio's DON'T CALL IT A PHONE marks and Palm's recently adopted "NOT JUST A CELL PHONE" advertising campaign.

In determining whether there is a likelihood of confusion, the court considers eight factors: (1) the similarity of the marks; (2) the relatedness of the two companies services; (3) the marketing channel used; (4) the strength of the mark; (5) Palm's intent in selecting its

1  mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets;

2  and (8) the degree of care likely to be exercised by purchasers. GoTo.com, Inc. v. Walt

3  Disney Co., 202 F.3d 1199 at 1205 (citing AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348

4  (9th Cir. 1979) (hereinafter "Sleekcraft")).  The Court is not required to consider, and plaintiff

5  is not required to prove, all of the Sleekcraft factors at the TRO / preliminary injunction stage

6  of the litigation. See Apple Computer, Inc. v. Formula Intern, Inc., 725 F.2d 521, 526 (9th

7  Cir. 1984).

8          As an initial matter, this case is relatively straightforward on the likelihood of

9  confusion issue because Palm has publicly acknowledged that its new advertising campaign

10  is similarly positioned to Helio's and various media have reported on this confusing

11  similarity. See Weeks Decl. ¶¶ 22, 26, Exhibit H (BrandWeek Article) and Exhibit K

12  (MediaPost Article).  According to one industry magazine, "**interestingly, the tagline -- Not**

13  **just a cell phone. A Treo -- is a little too much like Helio's "Don't call us a phone**

14  **company. Don't call it a phone"**.  Michael Kwan, Palm Goes viral, markets the new Treo

15  680 smartphone, Mobile Magazine, December 11, 2006

16  (www.mobilemag.com/content/100/333/C10874) (attached as Exhibit H to Wheble

17  Declaration).  An analysis of the Sleekcraft factors supports Palm's public statements of

18  confusing similarity between the slogans.

19          1.      The marks are similar in sight, sound and meaning

20          Palm's admission of similarity is not surprising given the resemblance of the parties'

21  marks.  Both Helio's DON'T CALL IT A PHONE mark and Palm's "NOT JUST A CELL

22  PHONE" sound the same, but more importantly, they convey the identical, critical  message

23  to the target consumers, namely that the mobile media devices and service sold by each

24  company are not simply a telephone or wireless service.  The implication is that there are

25  value-added and unique aspects of each parties' goods and services that transcend

26  standard cellular phone devices and wireless telephony service.

27          The similarity of the parties' marks "has always been considered a critical question in

28  the likelihood-of-confusion analysis." GoTo.com, 202 F.3d at 1205.  In comparing the

13

1 parties' marks, the Court must focus on how each of the marks is perceived by the ordinary

2 consumer in the marketplace. See Brookfield Commc'ns, 174 F.3d 1036, 1054;

3 Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1131. The "greater the

4 similarity between the two marks at issue, the greater the likelihood of confusion."

5 GoTo.com, 202 F.3d at 1206.

6     In this comparison, "similarities [are] weighted more heavily than differences."

7 Brookfield Commc'ns, 174 F.3d at 1054. "The proper test for likelihood of confusion is not

8 whether consumers would be confused in a side-by-side comparison of the products, but

9 whether confusion is likely when a consumer, familiar with the one party's mark, is

10 presented with the other party's goods alone." E. & J. Gallo Winery v. Consorzio del Gallo

11 Nero, 782 F. Supp. 457, 466 (N.D. Cal. 1991).

12     Because the parties' two slogans are similar, the Courts may issue a temporary

13 restraining order and preliminary injunction even though marks at issue are not identical.

14 See e.g. Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd., No. C 06-00527, 2006 WL

15 1214859, *3-4 (N.D. Cal. May 6, 2006) (granting preliminary injunction because defendant's

16 use of "The Black Chook" was similar in meaning and sound to "Black Chicken"); Nova

17 Wines, Inc. v. Adler Fels Winery LLC, 2006 WL 3498574, *11 (granting preliminary

18 injunction for use of similar photographs of Marilyn Monroe on wine bottles); Redmond

19 Prods., Inc v. Amino Sabre, Inc., 17 U.S.P.Q. 2d 1386 (C.D. Cal. 1990) (granting TRO and

20 preliminary injunction against defendant for using AUSSIE PRO in violation of plaintiff

21 AUSSIE marks); Duncan McIntosh Co., Inc. v. Newport Dunes Marina LLC, 324 F. Supp. 2d

22 1078, 1085 (C.D. 2004) (issuing injunction because of confusing similarity in sight sound

23 and meaning between "Newport Boat Show" and "Newport Beach Boat Show at the

24 Dunes"); Chemical Corp. of America v. Anheuser-Busch, Inc., 306 F.2d 433 (5th Cir. 1962)

25 (finding a likelihood of confusion caused by the use of the slogan "where there's life . . .

26 there's bugs" for a floor wax insecticide product where Anheuser Busch had for many years

27 employed a the slogan "where there's life . . . there's Bud" to great effect); Palm Bay

28 Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 1376

(Fed. Cir. 2005) (determining that Veuve Clicquot and VEUVE ROYALE were sufficiently similar in sight sound and meaning); Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 1266-67 (Fed. Cir. 2002) (holding that PACKARD TECHNOLOGIES and HEWLETT PACKARD differ in appearance and sound, but the marks convey a similar commercial impression because consumers would be aware of Hewlett-Packard's heavy involvement in technology-based goods, and therefore the marks are similar in their entireties); Kenner Parker Toys, Inc. v. Rose Art Indus., Inc., 963 F.2d 350, 355 (Fed. Cir. 1992) (holding that in light of the appearance, sound and meaning of the marks PLAY-DOH and FUNDOUGH, consumers may receive the "same commercial impression" from the marks).

Further, in the context of reverse confusion the Court must also evaluate the strength of Palm's mark so as to gauge its ability to overpower Helio's mark. Dreamwerks, 142 F.3d at 1130, n. 5); see also Checkpoint Systems, Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 303 (3d Cir. 2001) (holding that in a reverse confusion case, "[w]hile analysis of the strength of the senior user's mark is relevant, the more important inquiry focuses on the junior user's mark. [T]he lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion ···" (internal quotation marks and citations omitted)); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 231 (3d Cir. 2000) ("in a reverse confusion claim, a court should analyze the … factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark").

"It is the essence of reverse confusion that the senior user's mark will be comparatively weaker-and quite probably much weaker indeed-than that of the powerful junior user. It is in such cases, where the visibility and strength of the junior user's mark have occupied the field, that the consumer is likely to consider the senior user's product as either emanating from the junior user or infringing upon the junior user's trademark rights." Sunenblick v. Harrell, 895 F. Supp. 616, 627 (S.D.N.Y.1995).  The court must therefore

15

1   consider the commercial strength of Palm's mark in determining likelihood of confusion.

2   The stronger Palm's mark, the more likely that there is reverse confusion.  Id.

3        Here, Palm is a well recognized and popular personal digital assistant manufacturer

4   that is now investing $25 million into its "Not Just A Phone" holiday, advertising blitz.  By its

5   own estimation, Palm has "shipped more than 34 million mobile-computing products" to

6   consumers.  Exhibit D to Wheble Decl. (3/27/06 Press Release).  Helio, by virtue of being in

7   existence for less than two years, and its public launch of the DON'T CALL IT A PHONE

8   branding campaign in May, is in serious danger that it will be overwhelmed by Palm's

9   confusingly similar and overpowering advertising.  Thus, this factor strongly weighs in favor

10  of Helio from a reverse confusion standpoint.

11       2.    The goods and services offered by the parties are nearly identical

12       The second Sleekcraft factor to be considered is the relatedness or proximity of the

13  parties' goods. This factor reflects the common-sense intuition that the danger of consumer

14  confusion is heightened where goods are related or complimentary.  See E. & J. Gallo, 967

15  F.2d at 1291 (citing Sleecraft, 599 F.2d at 350).  In other words, if products or services are

16  "sufficiently 'complementary' or 'related,'" then "the public is likely to be confused as to the

17  source of the services."  American Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 832

18  (9th Cir. 1991).  Using a similar mark on related goods, is the "[m]ost important for purposes

19  of the likelihood of confusion analysis…".  E. & J. Gallo Winery, 782 F. Supp. at 459-60.

20       "Related goods are those products which would be reasonably thought by the buying

21  public to come from the same source if sold under the same mark."  Entrepreneur Media,

22  Inc. v. Smith, 279 F.3d 1135, 1147 (9th Cir. 2002).

23       Here, there can be no doubt that Palm's Treo smartphone and Helio's devices are

24  related goods.  First, In addition to providing mobile telephone service, both devices provide

25  an array of functionality that goes far beyond wireless voice communication – functionality

26  that both Helio's and Palm's advertising campaigns are specifically designed to promote.

27  See Sonista, Inc. v. Hsieh, 348 F. Supp. 2d 1089, 1095 (N.D. Cal. 2004) (J. Whyte)

28  (determining that consumer electronics offered by parties, specifically speaker systems,

16

were related goods because of similar features); <u>E. & J. Gallo Winery</u>, 782 F. Supp. at 459-60, 463 (finding that different wines were "substantially similar" for purposes of establishing a likelihood of confusion).

Second, Helio sold Treo devices and approximately 10% of Helio's paid subscriber base are Treo users. <u>See</u> <u>supra</u> Section II.A. Thus, the products are identical and in the same market. It is clear error for a court to find no likelihood of confusion when two products with similar marks are in the same market. <u>Lindy Pen Co. v. Bic Pen Corp.</u>, 796 F.2d 254, 257 (9th Cir. 1986).

Finally, the fact that Palm has now engaged Helio's strategic partners to promote Palm's "Not Just a Cell Phone" advertising, it is clear that Palm is targeting the very same market as Helio has focused on since its inception with its DON'T CALL IT A PHONE branding initiative.

3.    The Parties Use Identical Marketing Channels

The third <u>Sleekcraft</u> factor requires the court to examine the marketing channels that each of the parties uses to sell and advertise its goods or services. "Convergent marketing channels increase the likelihood of confusion." <u>Official Airline Guides, Inc. v. Goss, 6 F.3d 1385 (9th Cir. 1993)</u> (quoting <u>Nutri/System</u>, 809 F.2d at 606). Similarity of the parties' advertising methods is also considered as part of this inquiry. <u>Nutri/System, Inc. v. Con–Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir.1987)</u> (citing <u>Pizzeria Uno Corp. v. Temple</u>, 747 F.2d 1522, 1535 (4th Cir. 1984)).

Here, the marketing channels are identical. Helio and Palm both run print advertisements in the same magazines, such as GQ, Entertainment Weekly, Rolling Stone, and Lucky. Certain of these advertisements have appeared in the very same magazine edition. <u>See</u> <u>supra</u> Section II.C. The advertisements in these magazines are very similar in appearance. <u>Id.</u> Moreover, both Helio and Palm sell their product through similar retail establishments, including, but not limited to, Fry's Electronics, Best Buy and various other retailers. Consequently, this factor weighs heavily in favor of Helio.

4.    Helio's DON'T CALL IT A PHONE Marks Are Strong

17

1    A mark is considered to be stronger, and therefore accorded greater protection, when

2  it is more likely that the mark will "be remembered and associated in the public mind with the

3  mark's owner." Go To.com, Inc., 202 F.3d at 1207. "This 'strength' of the trademark is

4  evaluated in terms of its conceptual strength and commercial strength." Id. The conceptual

5  strength – distinctiveness – of a mark is determined by the "imagination test" and the "need

6  test." Earthquake Sound Corp. v. Bumper Indus., 352 F.3d at 1210, 1221 n. 4 (9th Cir.

7  2003). With the "imagination test," the Court " 'asks how much imagination a consumer

8  must use to associate a given mark with the goods or services it identifies . . . [t]he more

9  imagination required, the stronger the mark is.' " Id. (quoting Miss World (UK) Ltd., 856 F.2d

10  at 1449. With the "need test," the Court " 'asks to what extent a mark is actually needed by

11  competitors to identify their goods or services.' " Id. The commercial strength of a mark may

12  be "acquire[d] . . . through use in commerce." Sutter Home Winery v. Madrona Vineyards,

13  L.P., No. C 05-0587, 2005 WL 701599, * 9 (N.D. Cal. March 23, 2005).

14    Here, Helio's DON'T CALL IT A PHONE marks are distinctive because there are

15  arbitrary. The USPTO has not once suggested that Helio's marks are not distinctive and

16  have not required Helio to disclaim or alter portions of its DON'T CALL IT A PHONE marks.

17  Wheble Decl. ¶ 5.

18    If Helio's DON'T CALL IT A PHONE marks are not arbitrary, then they are at least

19  suggestive, but still distinctive and protectable,  because "imagination" or a "mental leap" is

20  required in order to reach a conclusion about the nature of the product being offered. See

21  Filipino Yellow Pages v. Asian Journal Pubs., 198 F.3d 1143, 1147 n.3 (9th Cir. 1999).

22  Specifically, the person experiencing the DON'T CALL IT A PHONE mark only knows that

23  the product is not to be called a phone. They know nothing else about the product.

24  Therefore, consumers must make a mental leap to understand that, not only is the Helio

25  device a phone, but it is much more than that because it offers many services not

26  traditionally offered with telephone services. See e.g. Conversive, Inc. v. Conversagent,

27  Inc., 433 F. Supp. D 1079, 1091 (C.D. Cal. 2006) (finding suggestive term "CONVERSIVE"

28  to be inherently distinctive).

1    At the same time, Palm does not "need" its confusingly similar slogan to advertise its

2    Treo devices.  Indeed, Palm has offered variations of its Treo 600 devices since 2003 (and

3    older versions for years before then) without the need to advertise its product with the

4    confusingly similar slogan at issues in this case.  See Exhibit E to Wheble Decl. (11/23/03

5    Press Release).  Only after Helio began its successful promotion of its devices did Palm

6    decide to copy Helio's advertising campaign, slogan, and marketing strategy.  Compare

7    Miss World (UK) Ltd., 856 F.2d at 1450 (finding need of competitor beauty pageant  to use

8    mark "high" where use of marital prefix and geographic designation was at issue, and these

9    concepts are often used to describe beauty pageants)

10    Helio has spent tens of millions of dollars successfully promoting its "DON'T CALL IT

11    A PHONE" marks.  See supra Section II.  Helio's market research shows that its advertising

12    campaign is successful, garnering significant brand awareness among its targeted

13    demographic.  In fact, over 61% of those surveyed recognized Helio's brand.  Id.; see also

14    Exhibit C to Wheble Decl. (blog entry recognizing strength of Helio's DON'T CALL IT A

15    PHONE mark).  This, no doubt, is why Palm has intentionally designed an advertising

16    campaign containing marks confusingly similar to Helio's and promoted its advertising

17    campaign using the same strategic partners as Helio.

18        5.    Palm intentionally copied Helio's DON'T CALL IT A PHONE advertising
           campaign and slogan
19

20    Palm has all but admitted that it intentionally chose a slogan that is confusingly

21    similar to Helio's when Palm acknowledged it was aware of Helio's advertising campaign.

22    See supra Section II.C.  Under these circumstances, intent to confuse may be presumed.

23    Interstellar Starship Servs., Ltd. v. Epix, Inc., 184 F.3d 1107, 1111 (9th Cir. 1999) (intent to

24    confuse presumed where defendant became aware of EPIX trademark when the defendant

25    applied for its own registration of EPIX).

26    In addition to admitting the similarity of the positioning of the campaigns, Palm has

27    run its confusingly similar advertising in the same magazines and same media channels,

28    partnered with Helio's largest and most influential strategic partners (e.g. Google) to show

19

1   the functionality and non-traditional features of their mobile media devices as Helio has

2   done for months, and chose the hectic holiday season to embark on this infringing

3   advertising campaign even though Palm had sold the Treo over the previous three years.

4   See supra Section II.C.

5       Moreover, where there is evidence that a defendant intended to create confusion,

6   there is a presumption that actual confusion has occurred. M2 Software, Inc. v. Madacy

7   Entm't., 421 F.3d 1073, 1085; Duncan McIntosh Co., Inc. v. Newport Dunes Marina LLC,

8   324 F. Supp. 2d at 1085. ("When an alleged infringer adopts a mark similar to another's,

9   there is a **presumption** that the defendant can achieve his purpose of deceiving the

10  public.") (emphasis added).

11      6.   The "Likelihood of Expansion" factor is irrelevant where, as here, the parties
             already compete

12

13      The "likelihood of expansion" factor is a non-issue.  This factor is relatively

14  unimportant where the parties compete to a significant extent.  See Brookfield Comm'cns,

15  174 F.3d at 1058; see also Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd., 2006 WL

16  1214859, *10 (when parties "'already sell directly competing products,' this factor does not

17  weigh in either party's favor").

18      Here, Palm and Treo are competitors.  The parties' sale of similar devices and

19  services, Palm's advertising in the same magazines, use of the same media channels,

20  partnership with Helio's largest and most influential strategic partners all show that Palm is

21  focused in the same market and is a direct competitor with Helio.

22      7.   The degree of care factor weighs in Helio's favor

23      It is more likely that consumers will be confused by two marks where the goods at

24  issue involve relatively inexpensive products to which the average consumer does not

25  devote a great deal of care and consideration in purchasing.  E. & J. Gallo, 782 F. Supp. at

26  465.  Here, because of the rapidly decreasing costs of mobile media devices, and the

27  frequency consumers switch to different devices, consumers do not exercise a significant

28  amount of care in choosing such devices due to the perceived fungiblity in functionality.

20

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

Even Palm has admitted that the price of the devices has fallen to the "gift" price point. Ex. H to Weeks Decl. Moreover, because Helio offered for sale and continues to support Treo devices, the degree of care factor solidly weighs in Helio's favor. Consumers who have purchased Treo devices from Helio would necessarily have to be sophisticated enough to distinguish between a reseller and the original manufacturer of the mobile media devices, and then further be able to discern that the two are separate corporate entities. Even under the best case scenario, this level of sophistication is unlikely.

In addition, the level of consumer sophistication is necessarily reduced during the hectic holiday shopping season. Consumers are bombarded by media advertisements, have reduced amount of time to make purchasing decisions due to the holidays and make more impulse decisions in their rush to satisfy their gift giving needs. Thus, Palm's decision to embark on its infringing advertising campaign during the holiday season is intentionally designed to take advantage of these factors and exploit consumer's distraction and reduced attention.

Further, even if consumers of the mobile media devices in this case are paying closer attention, Palm's actions cause initial interest confusion weighing this factor in Helio's favor. In Starbucks Corp. v. Lundberg, No. Civ. 02-948, 2005 WL 3183858, *6, *10 (D. Or. Nov. 29, 2005), the Court enjoined defendant's use of the term "Sambuck's" because it created initial interest confusion with Starbucks' marks. Even though the Court realized that a consumer might distinguish the two producers as to source of origin at the time of purchase, the use of the "Sambuck's" name attracted customers to defendant's products by using Starbuck's prior established goodwill. Here, even if consumers may ultimately distinguish between the parties' different products, confusion has still occurred. Palm's misappropriation of the sight, sound and meaning of Helio's DON'T CALL IT A PHONE marks creates initial interest confusion and diverts consumers to Palm's Treo line of devices.

Evidence of actual confusion also exists. At least one internet commentator has already written about his confusion between the marks: "Palm has launched its Treo

21

smartphone campaign under the tagline "Not just a cell phone. A Treo." **I've noted that**

**Helio is running a similar campaign** under the mantra "Don't call us a phone company.""

William Lozito, Palm Treo and Helio Follow Same Road,

http://www.namedevelopment.com/blog/, December 12, 2006 (emphasis added) (attached

as Exhibit G to Wheble Decl.).  Here, the consumer/journalist mistakenly notes that Helio is

running a campaign similar to Palm, when in reality it is Palm who has just started running a

campaign similar to Helio's previously established branding initiative.  Thus, the consuming

public is initially led away from Helio's devices because of Palm's exploitation of the goodwill

generated by Helio's DON'T CALL IT A PHONE marks.

       8.    Actual confusion factor should weigh in Helio's favor

     This factor should weigh in Helio's favor because of the evidence that at least one

consumer-commentator believes that Helio is copying Palm's advertising.  See supra

Section IV.7.  Very little proof of actual confusion is necessary to prove likelihood of

confusion as such evidence is accorded "substantial weight."  McGraw-Edison CO. v. Walt

Disney Prod., 787 F.2d 1163, 1172-73 (7th Cir. 1986).  The longer that Palm is allowed to

continue with its "Not Just a Cell Phone" campaign, the greater risk that there will be

widespread actual confusion among members of the consuming public.

## V.    CONCLUSION

     For the forgoing reasons, Helio respectfully requests this Court to issue a temporary

restraining order in a form similar to the proposed order filed with this memorandum and

issue an order showing cause why a preliminary junction should not issue.

1

Dated:  December 18, 2006

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

By: _____
Deborah Bailey-Wells
Kevin C. Trock
Harold H. Davis, Jr.

ATTORNEYS FOR PLAINTIFF
HELIO LLC

HELIO'S APPLICATION FOR A TRO AND ORDER TO SHOW CAUSE

# EXHIBIT 8

1  **Deborah Bailey-Wells     (114630)**
   **Kevin C. Trock          (161787)**
2  **Harold H. Davis, Jr.     (235552)**
3  **KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP**
   Four Embarcadero Center, 10th Floor
4  San Francisco, CA  94111
   Telephone    (415) 249-1000
5  Fax:         (415) 249-1001
   dbaileywells@klng.com
6  ktrock@klng.com
7  hdavis@klng.com

8  Attorneys for HELIO LLC

9              UNITED STATES DISTRICT COURT FOR THE

10      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

11

12  HELIO LLC,                          Case No. _____

13            Plaintiff,
                                         **DECLARATION OF JESSICA WEEKS IN**
14                                       **SUPPORT OF PLAINTIFF HELIO LLC'S**
                                         **APPLICATION FOR TEMPORARY**
15      vs.                              **RESTRAINING ORDER AND FOR**
                                         **ORDER TO SHOW CAUSE WHY A**
16                                       **PRELIMINARY INJUNCTION SHOULD**
    PALM INC.                            **NOT ISSUE**
17
18            Defendant.                 **Date Filed:  December 19, 2006**
19
20
21
22
23
24
25
26
27
28

_____
                DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

I, Jessica Weeks, declare as follows:

1. I am the Senior Manager of Marketing/Advertising for Plaintiff Helio LLC (hereafter "Helio"), a limited liability company. My business address is Helio House, 10960 Wilshire Boulevard, Suite 700, Los Angeles, California 90024. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify competently to them.

2. Helio is a Mobile Virtual Network Operator ("MVNO") that provides wireless communication products and network services to consumers. In part, Helio combines wireless telephone, audio, video, data and Internet innovation with noteworthy service and support designed to deliver a breakthrough mobile experience for consumers. As an MVNO, Helio offers its wireless services under its own brand name but procures these wireless services from large network providers such as Sprint Nextel and Verizon Wireless.

3. Helio was created in January 2005 as a joint venture between EarthLink, Inc., one of the largest US internet service providers, and SK Telecom Co., Ltd., one of the largest Korean telecommunications and mobile phone operators. Helio launched its business to consumers on or about May 2, 2006 with two mobile handset models, the HERO™ and the KICKFLIP™ , and services that included multimedia and Internet services, including, but not limited to, the ability to access most features of the social networking service MySpace® from a mobile device.

4. Prior to my employment with Helio, I was employed by IPG/Deutsch LA, a Los Angeles-based advertising agency, as an account supervisor for marketing of certain consumer brands.

5. In the late summer of 2005, Helio decided to engage an advertising agency to help plan and direct its debut into the telecommunications market place. Helio's management gave a presentation to a number of advertising agencies, explaining Helio's vision, focus, target market, demographics and mission. The August 2005, presentation entitled "SK-Earthlink-Introduction," is attached hereto as Exhibit A.

6. By the beginning of October 2005, Helio had decided to engage the

1

advertising firm of IPG/Deutsch LA to design and develop a branding strategy for Helio that would alert Helio's consumers to the multiple non-cellular phone functions that the Helio devices offer.  These non-cellular phone functions would include:

- GPS capabilities
- Video capabilities
- MySpace access
- Camera
- Peer to peer locator through satellite technology
- Music capabilities

7.    At first, Helio had thought that the new branding campaign would focus primarily on the HELIO brand.  However IPG/Deutsch LA had an innovative campaign pitch which focused not only on the HELIO brand but also on the concept that the Helio device was much more than a phone; it was a multimedia device.

8.    The IPG/Deutsch campaign was also clever in that it tapped directly into Helio's core target market 18-32 year olds with $40k+ household income. Helio has divided this target market into three priority segments: 1. "FEED ME"- affluent, young adult lead users in technology and cell phones; 2. "SPOIL ME" students with heavy entertainment and communication needs, seeking "cool" image and features; and 3. "SEE ME"-trendsetting, multi-ethnic urban dwellers willing to spend on technology.

9.    On or about May 2006, Helio debuted the IPG/Deutsch-created branding campaign: "DON'T CALL IT A PHONE" and "DON'T CALL US A PHONE COMPANY."  The message embodied in this initial advertising push was featured on the internet sites MySpace.com and Yahoo.com.  Later the campaign was broadened to include more traditional media such as magazines, newspapers, radio and television.  For example, ads featuring the "DON'T CALL IT A PHONE" branding have appeared in:

- LUCKY magazine

2

1    • ROLLING STONE magazine

2    • SPIN magazine

3    • DETAILS magazine

4    • ENTERTAINMENT WEEKLY magazine

5    • GQ magazine

6    • BLENDER magazine

7    • BLACKBOOK magazine

8    • FILTER magazine

9    • SOMA magazine

10    • FLAUNT magazine

11    • MEAN magazine

12    • GIANT magazine

13    • THE FADER magazine

14    • OUT magazine

15    • SWINDLE magazine

16    • WIRED magazine

17    In every one of these magazines, the HELIO ad appears on page 1 through 4 or the back

18    cover. The "DON'T CALL IT A PHONE" brand is always used in each ad. Representative

19    examples of these ads are attached hereto as Exhibit B.

20        10.    Additionally, the "DON'T CALL IT A PHONE" branding has been featured

21    online in campaigns on AOL, CNET, Google, IDG Entertainment, MSN.COM,

22    MTV.COM, MySpace, PLANETOUT and Yahoo!, among others.

23        11.    National television has not been left out. Ads featuring the "DON'T CALL IT

24    A PHONE" branding have appeared on MTV, ADULT SWIM (Cartoon Network), Spike

25    TV, VH-1, Comedy Central, BET, E! and ESPN. The three national television ads for the

26    HELIO device all feature the "DON'T CALL IT A PHONE" brand and are reproduced on a

27    DVD which is included as Exhibit C.

28        12.    Likewise local media outlets such as Live 105 Radio have been used to

3

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

1  spread the "DON'T CALL IT A PHONE" brand message, particularly in markets where

2  HELIO brand stores have opened.  Such a store opened the week of December 11,

3  2006 in Palo Alto, California on University Avenue. Photos of the store are attached

4  hereto as Exhibit D. As can been seen, "DON'T CALL IT A PHONE" appears

5  throughout the store.  Furthermore all store employees wear shirts with "DON'T CALL IT

6  A PHONE" emblazoned in bold type on the back of the shirt.  Other stores are presently

7  open in Los Angeles and San Diego, with future openings planned for in Denver, New

8  York, Miami, Chicago, Boston, Dallas, Seattle and Atlanta.  Helio branded devices and

9  service are also offered for sale at thousands of retail establishments throughout the

10  country.

11       13.    Outdoor billboards and wild posting signage also deliver the "DON'T CALL

12  IT A PHONE" message. The outdoor advertising is featured in Los Angeles, New York

13  and San Francisco. Attached hereto as Exhibit E are examples of such signage.

14       14.    All together, over 85% of Helio's HELIO brand advertising budget is

15  directly spent on the "DON'T CALL IT A PHONE" campaign.  In 2006, Helio has spent

16  over $30M in advertising dollars with respect to the HELIO brand to date.  Most, if not

17  all, of Helio's HELIO brand consumer media advertising features the "DON'T CALL IT A

18  PHONE" brand positioning.

19       15.    The "DON'T CALL IT A PHONE" branding campaign has also been

20  featured at HELIO sponsored parties and events.

21       16.    From May to November 2006, twenty (20) cocktail parties were held at trendy

22  bars and clubs in Los Angeles, San Francisco, Dallas, Chicago, Boston, Philadelphia,

23  Washington DC, New York, Atlanta and Miami.

24       17.    Over 9,000 trendsetters attended these parties.  HELIO brand devices were

25  demonstrated and cards were distributed that featured the BLUE HELIO cocktail recipe on

26  one side and on the other side, the "DON'T CALL IT A PHONE" brand positioning.

27  Attached hereto as Exhibit F, is one of the cards.

28       18.    One of the Helio events that was reported in the popular media, such as

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

1  E!ONLINE, was the NYLON/MySpace Music Issue Launch event. Held at the celebrity bar

2  Element in Los Angeles, 400 attendees, such as Justin Timberlake and Cameron Diaz

3  received the BLUE HELIO cocktail recipe on the "DON'T CALL IT A PHONE" branded card.

4        19.    Approximately five months into the brand campaign, Helio commissioned a

5  brand equity study of 1,900 individuals.  These individuals were either sampled using an

6  internet survey (nationally) or interviewed in the Chicago, New York, Los Angeles or San

7  Francisco markets.  Of those individuals surveyed, Sixty-One percent (61 %) correctly

8  attributed the "DON'T CALL IT A PHONE" branding to the HELIO brand.  When asked to

9  state in their own words what the key message is for HELIO devices, the Helio target

10  market said "it's not just a phone." Forty-Four percent (44%) of the Helio target market

11  responded thus and Thirty-Seven percent (37%) of the 18-34 year old market also

12  responded in the same way.

13        20.    There is also a page that Helio has created on the MySpace.com website. It

14  can be found at www.myspace.comlhelio.  There are over One Hundred Eighty Thousand

15  friends that can be found on the Helio web page.  A number of HELIO friends have posted

16  comments on the page, which are easily retrieved. Here are some representative

17  comments from these friends:

18        •      "What's up helio people. Helio the best. Dcn't (sic) call us a phone company,

19               don't call us a phone."

20        •      "Don't call it a phone. Don't call us a phone company."

21        •      "Wat up Helio.Love the commercials you guys have out, exspecially (sic)the

22               one with the Chinese man in. "It's not a phone." Don't call us a phone

23               company. Don't call us a phone. Lol

24  A representative sample of these MySpace posts are attached hereto as Exhibit G.

25        21.    Since the development of its DON'T CALL IT A PHONE branding campaign

26  beginning in 2005 and first use in May 2006, Helio has consistently used the DON'T CALL

27  IT A PHONE marks in the marketing, advertising, sale and distribution of their mobile media

28  devices throughout the United States with respect to its Helio brand.  As a result of Helio's

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

1  extensive use of its DON'T CALL IT A PHONE marks in its national media campaign, Helio

2  has built up valuable recognition among consumers that associate the DON'T CALL IT A

3  PHONE marks with Helio, and Helio owns the valuable consumer goodwill that is associated

4  with the DON'T CALL IT A PHONE marks.

5        22.    I first became aware of Palm, Inc.'s ("Palm") use of the tagline NOT JUST A

6  CELL PHONE on or about December 12, 2006 when I read an article from that day's edition

7  of Brandweek.com entitled "Fresh Push Begins for Palm's Treo 680." The article states that

8  "[Palm's director of marketing communications Scott] Hancock acknowledged the similarity

9  to the positioning of rival Helio." A copy of that article is attached as Exhibit H.

10        23.    I subsequently became aware of Palm's new holiday advertising blitz that has

11  begun to appear in the same marketing channels as Helio's DON'T CALL IT A PHONE

12  advertising, as well as the very same magazine edition or on billboards mere blocks apart.

13  For example, Palm has reportedly taken out advertising in the February 2007 issues of GQ

14  and Lucky magazines featuring its "Not Just a Cell Phone" advertisements where Helio has

15  placed its DON'T CALL IT A PHONE advertising.[1] Palm also placed advertising in the

16  December 15, 2006 edition of Entertainment weekly, just one week after Helio's DON'T

17  CALL IT A PHONE advertising appeared in the December 8, 2006 edition of the same

18  magazine.

19        24.    Attached as Exhibit I is a copy of an advertisement for Palm's Treo device

20  from the December 14, 2006 issue of Rolling Stone.

21        25.    Attached as Exhibit J is a copy of an advertisement for Palm's Treo device

22  from the December 15, 2006 issue of Entertainment Weekly.

23        26.    Attached as Exhibit K is a copy of an article from the December 14, 2006 issue

24  of  Media Post entitled "Palm Launches $25 Million campaign for Treo."

25

26

27

28  [1] The February 2007 issues of GQ and Lucky will be released in January of 2007.

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

27.    I am informed and believe that the photograph of an advertisement for Palm's Treo device attached as Exhibit L was taken on December 14, 2006 in New York, New York.

28.    I am informed and believe that the photograph of an advertisement for Palm's Treo device attached as Exhibit M was taken on December 14, 2006 in New York, New York.

29.    I am informed and believe that the photograph attached as Exhibit N of an advertisement for Palm's Treo device was taken on December 14, 2006 in New York, New York.

30.    I am informed and believe that the photograph attached as Exhibit O an advertisement for Palm's Treo device was taken on December 14, 2006 in New York, New York.

31.    Attached as Exhibit P is a screen print of a website advertising Palm's Treo device at www.ontreo.com.

32.    Palm is a much larger company than Helio with far greater financial resources. According to Palm, its fiscal 2006 revenues were $1.6 billion dollars, with profits of $336 million. Attached as Exhibit Q is a press release from Palm's website that sets forth its fiscal year 2006 revenue and profits.

33.    In contrast, Helio has not yet made a profit. For the nine months ending September 30, 2006, Helio incurred a net loss of $117,652,000 on revenues of $23,987,000.

34.    The $25 million that Palm plans to spend on this single six-month campaign is represents an enormous portion of Helio's entire 2006 marketing budget for the Helio brand.

35.    Up until August 2006, Helio sold Palm's Treo device. Helio still provides customer support for those Treo device consumers. As of November 30, 2006, Palm Treo devices represented approximately 10% of Helio's paid subscriber base.

7

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

36.    Helio's main strategic partners include MySpace, Google and Yahoo!. Helio provides access to content on Fandango, The Onion, FUELTV, IGN, Jimmy Kimmel, POPSUGAR, SLATE, SURFLINE, among others.

37.    Palm's "NOT JUST A CELL PHONE" campaign features Helio's partners such as Google, The Onion, Fandango and Yahoo! They are running online ads on the Onion, Fandango and Yahoo! Additionally, Palm's outdoor billboard ads feature some of these same partners. Please see examples of Palm's outdoor billboard ads attached hereto as Exhibit R.

38.    Helio had an exclusive relationship with MySpace that recently expired. Exhibit S is a Palm TREO advertisement that shows the "NOT JUST A CELL PHONE" campaign. This ad is co-branded with Cingular Wireless, a large wireless network provider. Attached as Exhibit T is a news release carried by CNN.com dated today which announces that Cingular has made a deal with MySpace. The release also notes that MySpace already has a deal with Helio.

39.    I believe Palm intentionally adopted its tagline to confuse consumers into believing that there is some relationship between the two companies. This is due to the similarity between Helio's and Palm's taglines and Palm's emulation of our marketing and partnership strategy.

40.    Palm's use of the slogan NOT JUST A CELL PHONE will seriously undermine Helio's brand equity in its marks. Given how important these marks are to Helio's brand message, such a loss would likely be disastrous. Helio is a very young company competing in a crowded, aggressive market. Consumer confusion and loss of brand awareness at this stage of the company's life will be a serious setback in terms of wasted marketing resources and lost sales.

41.    The timing of Palm's campaign is especially devastating because the holiday season is the most important revenue-generating period in the year for consumer products companies, specifically in the wireless industry.

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO

1      I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3      Executed this 15th day of December, 2006, in Los Angeles, California.

4

5

6

7                                              _Jessica Weeks_

8                                         JESSICA WEEKS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JESSICA WEEKS ISO APPL. FOR A TRO