QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
  Brian Cannon (Bar No. 193071)
  Doug Colt (Bar No. 210915)
  Andrea Pallios Roberts (Bar No. 228128)
    claudestern@quinnemanuel.com
    briancannon@quinnemanuel.com
    dougcolt@quinnemanuel.com
    andreaproberts@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-2139
Telephone:   (650) 801-5000
Facsimile:   (650) 801-5100

Attorneys for Defendant Palm, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

HELIO LLC

        Plaintiff,

  vs.

PALM, INC.

        Defendant.

CASE NO. C 06 7754 SBA

**DECLARATION OF HOWARD MARYLANDER (SECONDARY MEANING) IN SUPPORT OF PALM'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

-1-

Case No. C 06 7754 SBA
DECLARATION OF HOWARD MARYLANDER

Dockets.Justia.com

**DECLARATION OF HOWARD MARYLANDER**

In the Case Of

**HELIO LLC**

Plaintiff,

v.

**PALM, INC**

Defendant.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

March 19, 2007

-2-

## DECLARATION OF HOWARD MARYLANDER

I, Howard Marylander, declare that the statements in this declaration are based on my personal knowledge unless specifically noted. If I were called as a witness, I could and would competently testify thereto:

## QUALIFICATIONS

1. I am the President of Marylander Marketing Research, Inc., an opinion research firm. For over 31 years, MMR has provided opinion research services, consisting primarily of the design, execution, and analysis of survey research. Our clients during the past five years have included:

    AAA Texas, New Mexico, Hawaii

    Ameriquest Mortgage Co.

    Authentic Specialty Foods

    Automobile Club of Southern California

    Basic American Foods

    Blue Cross of California/Wellpoint

    CompUSA

    Denny's Restaurants

    El Pollo Loco

    First Federal Bank

    Hollywood Bowl

    Los Angeles Opera

    Nestlé USA, Inc.

    Nissan Motors

    PacifiCare Health Systems

    Pharmavite

    Public Storage

    Smart & Final

    Sparkletts Water

    University of California at Los Angeles

    Viking River Cruises

    Walt Disney World

    Zatarain's

2.     I received a Bachelor of Science in Accounting from the University of California at Berkeley and a Master of Business Administration in Marketing from the University of Southern California.

       Prior to forming my own company, I held executive positions in research capacities for four-and-a-half years at Carnation Company (now Nestlé USA, Inc.) and for two years at Mattel, Inc. I was employed at Haug Associates, Inc., a marketing research firm, for seven-and-a-half years. At the time I left to form my own company, Haug Associates was the largest marketing research consulting firm in Southern California and I was President. Marylander Marketing Research and I have designed and executed thousands of surveys to gauge public opinion, including consumer surveys for litigation.

       I have been a member of the American Marketing Association for over 40 years.

       I have lectured on both advanced and introductory marketing and opinion research for the American Management Association and American Marketing Association. I have guest lectured at UCLA, USC, and several other colleges and universities.

       My curriculum vitae are included in Exhibit A.

3.     A listing of the cases for which I have provided trial or deposition testimony as an expert in the past four years is included in Exhibit B.

## STUDY OBJECTIVES

4.     In this case, I designed and executed a study to determine whether each of two trademarks used by Helio in marketing and advertising its wireless communication products and network services have secondary meaning. Those marks are:

      - Don't Call It a Phone.

      - Don't Call Us a Phone Company.

5.     Marylander Marketing Research charges for this study are $37,800 plus incidental expenses. That figure covers all costs through this declaration. Charges for deposition, trial testimony, time related to preparation for those activities and travel will be billed at $450 per hour.

6.   In preparation for this study, I reviewed the following materials:

- Plaintiff Helio LLC's Application for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue; Memorandum of Points and Authorities in Support

- Declaration of Jessica Weeks in Support of Plaintiff Helio LLC's Application for Temporary Restraining Oder and for Order to Show Cause Why a Preliminary Injunction Should Not Issue

- Opposition to Plaintiff's Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue

- Declaration of Doug Colt in Support of Palm's Opposition to Plaintiff's Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue

- Declaration of Scott Hancock in Support of Palm, Inc.'s Opposition to Plaintiff's Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue

- [Proposed] Order Denying Plaintiff Helio LLC's Application for Temporary Restraining Order

- The websites for Helio, Palm (Treo), and various mobile phone companies and service providers

- Information gathered on the internet by MMR staff employees regarding mobile phones companies and service providers including, but not limited to, national, international, and specialty carriers as well as mobile phone manufacturers

**SURVEY METHODOLOGY**

<u>**Overview of Study Design**</u>

7.   This study was designed to measure the secondary meaning of each of the two marks, "Don't Call It a Phone" and "Don't Call Us a Phone Company." Since secondary meaning is determined by association with a single source, even if that source is anonymous, there is substantial

"noise" in such measures. That is, almost any slogan will obtain some level of secondary meaning as a result of respondent guessing, misperception, and the assumption, by some respondents, that any theme, by the nature of product claims, is from a single source. (The terms, "slogan," "theme," "description," and "statement," are used interchangeably in this declaration.)

To adjust for the noise that exists in virtually all such studies, and to provide additional standards for judging the findings, control claims are used. In this case, four control claims were included:

- "Calling Tomorrow Today." and "Even More Mobile Than You Expected." These two fictitious claims were made up for this study and do not exist in the marketplace. The purpose of these fictitious statements is to set the noise level. True secondary meaning is calculated by taking the secondary meaning associated with the marks being evaluated (in this case, the two Helio slogans) *minus* the secondary meaning associated with the two fabricated claims.

- "Can You Hear Me Now?" This slogan for Verizon was used because it was felt that it had achieved secondary meaning since it has been heavily promoted over a long period of time. It is intended to show the secondary meaning achieved by a theme that I considered to be among the best known in the industry.

- "Where You At?" This theme, used by Boost Mobile, was selected to represent a brand of specialty carrier that had done some advertising, but probably not at the level for brands that have highly recognizable themes.

Two matched panels, or cells, of respondents were used on this study. One panel measured the secondary meaning of "Don't Call It a Phone" relative to the four controls, and the other measured the secondary meaning of "Don't Call Us a Phone Company" relative to the same four controls. Except for the different Helio slogans that were tested, the procedures used for the two cells were identical.

8. The study was conducted as follows:

- The research took place among males and females, 18 to 34 years of age.

  They were required to have a mobile phone or mobile communication device and to use that mobile phone or mobile communication device two or more times per day.

   In addition, they had to regularly use or think they will regularly use in the near future one or more of nine features of their mobile phone or mobile communication device beyond regular calling.

   - Respondents were randomly assigned to one of two cells referred to in this declaration as Cell I and as Cell II.

   Each cell was shown five different slogans. One of the statements was from Helio advertising; the other four were control statements. Respondents in Cell I saw the Helio slogan, "Don't Call It a Phone," along with the four control statements. Those in Cell II saw the Helio slogan, "Don't Call Us a Phone Company," along with the four control statements.

   - The five statements were exposed to respondents, one at a time and in random order.

   - After exposure to each statement, respondents were asked what company or companies or brand or brands, if any, use that description.

   - Those who volunteered a company or companies or brand or brands were then asked to explain fully why they felt that way.

   - Those who indicated that they didn't know or were not sure were asked whether they thought that the description was used by one company or brand, was used by more than one company or brand, was not used by any companies or brands, or whether they were not sure.

   After selecting one of those four possible answers, they were asked to explain fully why they felt that way.

9. The level of secondary meaning for the fictitious control statements indicates the base level of guessing or misperception of secondary meaning in the marketplace, sometimes referred to as "noise." The *difference* between the noise level from the made-up slogans and the secondary meaning achieved by the Helio statements provides a measure of actual secondary meaning.

10. The study was conducted online.

-6-

**Detailed Discussion of the Study Design**

11. Interviewing took place from January 25, 2007, to February 2, 2007.

12. The study was conducted among males and females, 18 to 34 years of age.

13. Respondents were qualified on:

    - Having a mobile phone or mobile communication device.

    AND

    - Using their mobile phone or mobile communication device for any purpose two or more times per day. (The median number of uses per respondent was 8.1 times per day.)

    AND

    - Regularly using one or more of nine features on their mobile phone or mobile communication device. (Ninety-seven percent of the respondents used one or more of the features, and the average number used was 3.9.)

    OR

    - Thinking they will regularly use one or more of nine features on their mobile phone or mobile communication device in the near future. (One hundred percent of the respondents planned to do so, and the average number that will be used was 5.0.)

    The nine selected features are:

      - Text messaging
      - Sending or receiving e-mails
      - Taking pictures or videos
      - Using Bluetooth
      - Downloading and listening to music
      - Downloading and/or playing games
      - Downloading ring tones
      - Getting news, sports, or stock updates
      - Listening to radio or watching television

14. I determined from reading the pleadings (*See Section 6*) that the targets for Helio are males and females, 18 to 34 years. Age and gender quotas were set so that the sample reflected those demographics.

   A gender quota was established so that approximately 50% of the respondents were male and 50% were female.

   The following overall age quotas were set:

   | | |
   |---|---|
   | 18 to 20 years | 18% |
   | 21 to 25 years | 30% |
   | 26 to 30 years | 29% |
   | 31 to 34 years | 23% |

15. Respondents were further screened and not included in the study if they answered affirmatively to any of the following:

   - They or anyone in their household work in the advertising industry.

   - They or anyone in their household work for a marketing research company.

   - They or anyone in their household work for a company that makes, markets, distributes, or sells mobile phones or mobile communication devices or provides service for mobile phones or mobile communication devices.

16. Interviewing was conducted online through e-Rewards Market Research, one of the premier online panel companies. The company is highly regarded for the quality of its consumer panel. e-Rewards provided the sample as well as programmed the questionnaires and hosted the study. The e-Rewards panel contains over 1.7 million consumers in the U.S. and Canada (only the U.S. portion of the panel was used for this study).

17. As is the practice of online interviewing companies, e-Rewards provided compensation to survey participants using a rewards system that allows respondents to earn "rewards" or points redeemable at a large number of companies selling products and merchandise online.

18. A total of 649 interviews were completed. The distribution of completed interviews by gender and age are as follows:

-8-

|  | Completed Interviews | |
|---|---|---|
|  | % | # |
| **Gender** | | |
| Male | 50 | 326 |
| Female | 50 | 323 |
|  | 100 | 649 |
| **Age** | | |
| 18 to 20 years | 19 | 122 |
| 21 to 25 years | 30 | 196 |
| 26 to 30 years | 28 | 181 |
| 31 to 34 years | 23 | 150 |
|  | 100 | 649 |

19. When potential respondents were initially invited to the survey, they were told the following:

> *Thank you for accepting the invitation to participate in this survey. We encourage your honest responses. Your opinions will be combined with those provided by others in order to maintain your confidentiality.*
>
> *This survey is about mobile phones and related services.*
>
> *There are no right or wrong answers. If you don't know or are unsure of an answer to a question, then that is a perfectly acceptable response.*
>
> *Please take a moment to maximize this window on your computer and complete all of the questions appearing on each page. Always scroll down to make sure you have answered all of the questions.*
>
> *When you are ready to move on to they next page, click the ">>" button located at the bottom of the screen. DO NOT use your browser's "Forward" or "Back" button to go from one page to another.*

20. After determining that the respondent had a mobile phone or mobile communication device, the following definition was given to respondent in order to facilitate the flow of the interview:

> *For convenience in the questions that follow, the term <u>mobile phones</u> will be used to refer to mobile phones and mobile communication devices.*

21. After it was determined that a respondent met the qualifications for the study, he or she was randomly assigned to one of the two cells, or groups, referred to in this declaration as Cell I and as Cell II.

22. Respondents were informed of the following:

    > *You will see some statements that might be used by some companies and brands that put out mobile phones or mobile services or provide network service for mobile phones. Each statement will be shown for 30 seconds. You may view each statement as long as you want up to 30 seconds.*

    > *You will be asked a few questions about each statement. If you don't know or are unsure of the answer, that is a perfectly fine response.*

23. Each cell was exposed to five different statements. One of the slogans was from Helio advertising; the other four were control statements.

24. The five statements were exposed, one at a time and in random order. Each theme was shown for a maximum of 30 seconds. Based on previous experience, it is very unlikely that a respondent would spend as long as 30 seconds reviewing a statement. The 30-second limit was imposed to eliminate the remote possibility that a respondent might look for the slogan on the Internet or some other outside source.

    The font size of the statements was 24 pt. Arial, in bold. The statements were shown in all uppercase letters.

25. Each statement was on a single page (*See Exhibit D*):

    *Here is the (first/next) statement:*

    # **INSERT STATEMENT**

    *When you have finished looking at this statement, click the ">>" button to continue.*

    The online survey was designed so that respondents could not return to the page showing the statement once they continued to the next page.

26. Respondents in Cell I were shown this statement from the Helio advertising:

   Don't Call It a Phone.

27. Respondents in Cell II were shown this statement from the Helio advertising:

   Don't Call Us a Phone Company.

28. The four control statements shown to both Cell I and Cell II were the same:

   <u>Fictitious Statements - Cell I and Cell II</u>

   Calling Tomorrow Today.

   Even More Mobile Than You Expected.

   <u>Verizon Wireless Statement - Cell I and Cell II</u>

   Can You Hear Me Now?

   <u>Boost Mobile Statement - Cell I and Cell II</u>

   Where You At?

29. After exposure to each statement, respondents were asked:

   *What company or companies or brand or brands, if any, use that description? If you don't know or are unsure, please select the box to the right.*

   The online survey was designed so that respondents could not return to the page asking the question about what company or companies or brand or brands, if any, use the description once they continued to the next page.

30. Respondents who volunteered a company or companies or brand or brands were then asked:

   *Please explain fully why you feel that way.*

   After answering this question, these respondents were asked about the next statement, or if it was the last statement, they were thanked and the survey concluded.

-11-

31. Respondents who selected the box "I don't know/I'm not sure." were asked a question to address the issue of an anonymous single source. Two versions of the question were used, with approximately half of the respondents being asked each version.

    The two versions were the same, except the order of the answer options (other than "are you not sure") were reversed:

    Version A

    *Do you think that this description is used by only one company or brand, by more than one company or brand, or not by any companies or brands, or are you not sure?*

    Version B

    *Do you think that this description is not used by any companies or brands, by more than one company or brand, or by only one company or brand, or are you not sure?*

    The online survey was designed so that respondents could not return to the page showing the question about the statement once they continued to the next page.

32. After selecting one of the four possible answers to the preceding questions, they were then asked:

    *Please explain fully why you feel that way.*

    After answering this question, these respondents were asked about the next statement, or if it was the last statement, they were thanked and the survey concluded.

33. Based on my previous experience with online surveys and extensive discussions with e-Rewards online panel executives, it was felt that a minimum of 90 seconds would be required to complete the survey. The few respondents who completed the survey in less time were not included in the findings.

34. In addition to the duration of the entire survey, the lengths of time the respondents spent on the following three pages, with information or questions about each statement, were examined:

    - The page showing the statement.

    - The page asking, "What company or companies or brand or brands, if any, use this description?"

- The page asking one of two versions of a question about the statement. Either, "Do you think that this description is used by only one company or brand, by more than one company or brand, or not by any companies or brands, or are you not sure?" or "Do you think that this description is not used by any companies or brands, by more than one company or brand, or by only one company or brand, or are you not sure?"

The lengths of time respondents took for each of these pages was measured in seconds as a precaution against the unlikely possibility that they might try to obtain additional information on the internet or from another source while they were completing the survey. After reviewing that information, I determined that there was no pattern about which to be concerned.

35. A total of 649 interviews were completed -- 331 among respondents in Cell I and 318 among those in Cell II.

36. The 649 respondents who participated in the study constitute 36% of the total number of people who attempted to take the survey. The remaining 64% of respondents was not included for the reasons shown in the following table:

|  | People Who Attempted To Complete the Survey | |
|---|---|---|
|  | % | # |
| **Completed** | **36** | **649** |
| **Incomplete** | | |
| Did not qualify during screening | 14 | 256 |
| Quotas full | 38 | 684 |
| Incomplete/abandoned | 8 | 150 |
| Rejected as invalid | 3 | 60 |
| **Grand Total** | **100** | **1,799** |

Note: Due to rounding, figures may not add exactly to 100%.

37. The procedures employed in sample planning, questionnaire design, data processing, and quality control are consistent with or exceeded generally accepted standards for developing objective data:

-13-

    a. Respondents were allowed to examine the statements for as long as they wanted up to a maximum of 30 seconds.

    b. The closed-end questions contained all the options that a respondent might consider.

    They were told that a "don't know/not sure" response was acceptable.

    They were provided with the opportunity to fully explain their responses in a follow-up open-end question.

    c. The study design, questionnaire, and data tabulation were carried out under my direction.

    d. Marylander Marketing Research gave explicit instructions to e-Rewards about the sampling plan and project responsibilities and questionnaire design/programming (*See Questionnaire in Exhibit C*).

    e. After programming of the online questionnaires had been completed, I tested the questionnaire to ensure that the specified wording, format, design, and skip patterns were correctly executed (*See Screenshots in Exhibit D*).

    f. One hundred percent of the keypunching was verified to ensure accuracy of data processing. In addition, a "data cleaning" program was employed.

38. All statistical tests were at the 95% confidence level.

39. Attached as Exhibits C through E are copies of the materials used for the study:

- Exhibit C contains the questionnaire.

- Exhibit D is a set of the screenshots of the questionnaire as it was programmed and appeared to respondents online.

- Exhibit E is the computer tabulations of actual responses from the questionnaires.

I have personally reviewed the tabulations, and Exhibit E accurately reflects the questions asked and the responses obtained.

## SURVEY FINDINGS

### Overview

40. In my professional opinion, neither of the Helio statements has secondary meaning:

    - After adjusting for "noise," "Don't Call It a Phone" has a secondary meaning level of just 13%.

    - After adjusting for "noise," "Don't Call Us a Phone Company" has a secondary meaning level of only 17%.

    These levels are very low based on my experience with commercial surveys evaluating slogans, with guidelines that I have been given by attorneys, and with the "standard" of 50% that I have read in McCarthy on Trademarks.

41. In striking contrast, the Verizon theme, "Can You Hear Me Now?" has substantial secondary meaning, 65% (average of the findings for the two respondent cells) after adjusting for "noise."

42. Boost Mobile's slogan, "Where You At?" has no secondary meaning, at 17% (average of the two cells), and adjusting for "noise."

### Detailed Discussion of Findings -- Measures of Secondary Meaning

43. Respondents were asked two questions, previously discussed, to measure the secondary meaning of each of the five statements to which they were exposed. (See Questions 13 and Questions 15a/15b in Exhibit C)

44. As expected, the made-up statements did achieve some claimed single-source association. Averaging the two fictitious slogans and the two cells, those statements achieved secondary meaning among more than one-in-seven respondents. This establishes the "noise" level. Secondary meaning for the slogans being used by Helio, Verizon, and Boost Mobile is determined by subtracting the "noise" from the apparent secondary meaning for those statements.

45. Secondary meaning for both of the Helio statements was low. "Don't Call It a Phone," at 13% (after adjusting for "noise"), and "Don't Call Us a Phone Company," at 17% (after adjusting for "noise"), hardly met any criterion for having strong equity based both on my commercial and forensic research experience.

46. That companies can establish strong secondary meaning for their themes is clearly evidenced by the 65% (after adjusting for "noise") obtained by Verizon's "Can You Hear Me Now?"

47. Boost Mobile, with 15%, also failed to achieve secondary meaning with its claim, "Where You At?"

48. The following table summarizes the findings on secondary meaning:

## SUMMARY OF SECONDARY MEANING MEASURES[1 & 2]

| | CELL I STATEMENTS N=331 | | | | | CELL II STATEMENTS N=318 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | FICTITIOUS | | | | | FICTITIOUS | |
| | VERIZON Can You Hear Me Now? | BOOST MOBILE Where You At? | HELIO Don't Call It a Phone. | Calling Tomorrow Today. | Even More Mobile Than You Expected. | VERIZON Can You Hear Me Now? | BOOST MOBILE Where You At? | HELIO Don't Call Us a Phone Company. | Calling Tomorrow Today. | Even More Mobile Than You Expected. |
| | % | % | % | % | % | % | % | % | % | % |
| Exclusive correct mentions[3] | 77 | 16 | 12 | NA | NA | 76 | 14 | 18 | NA | NA |
| Anonymous single source[4] | 4 | 14 | 17 | 19 | 14 | 7 | 20 | 17 | 15 | 17 |
| Total | 81 | 30 | 29 | 19 | 14 | 83 | 33 | 35 | 15 | 17 |
| "Noise"[5] | -16 | -16 | -16 | | | -16 | -16 | -16 | | |
| **Actual secondary meaning** | 65 | 14 | 13 | | | 67 | 17 | 19 | | |

1 See Q.13 and Q.15a/Q.15b in Exhibit C.
2 See computer tables 9-1, 11-1, and 13-1 in Exhibit E.
3 Exclusive correct mentions in Q.13:
    Verizon for "Can You Hear Me Now?"
    Boost Mobile for "Where You At?"
    Helio for "Don't Call It a Phone."/"Don't Call Us a Phone Company."
4 Anonymous single source: Selected "The description is used by only one company or brand" in Q.15a/Q.15b.
5 Average secondary meaning for the two fictitious statements, "Calling Tomorrow Today" and "Even More Mobile Than You Expected."
NA Brands not available for fictitious statements.
Note: Due to rounding, figures may not add exactly to total.

-16-

**_Detailed Discussion of Findings -- Reasons for Opinions_**

49. Regardless of how respondents answered the questions on secondary meaning, they were asked to fully explain their opinion. The purpose of these questions is to determine whether respondent opinions are based on some extraneous factors, unrelated to the slogans themselves. (An example would be, "I looked at a magazine to try to find the ad for the company.") The question is not intended to make respondents justify their response. An open-end question of this type is not a meaningful way to explain the existence or lack of existence of secondary meaning for these reasons:

    - The control groups used in this study serve as the best way to control for random reasons or "noise."

    - Advertising and marketing efforts are designed to communicate a message about the product, not the medium. It is of minor consequence that the respondent knows where or why they became familiar with a slogan; the key issue is whether they are familiar with it and its source.

50. Given these caveats, there is nothing in the volunteered responses to suggest that respondents were basing their answers on anything more than their viewing of the statements on this survey and whatever past experiences they have had.

51. The comments indicate that respondents were, for the most part, relying on their recall of advertising and experience with the various mobile phone brands and providers.

52. The following table summarizes the responses from questions 14 and 16 in which respondents were asked to explain their opinions about the source of the statements. (See Questionnaire in Exhibit C)

SUMMARY OF RESPONSES[1 & 2 & 3] CONCERNING REASONS FOR OPINIONS ABOUT SOURCE

|  | CELL I STATEMENTS N=331 | | | | | CELL II STATEMENTS N=318 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | | | | FICTITIOUS | | | | | FICTITIOUS | |
|  | VERIZON Can You Hear Me Now? | BOOST MOBILE Where You At? | HELIO Don't Call It a Phone. | Calling Tomorrow Today. | Even More Mobile Than You Expected. | VERIZON Can You Hear Me Now? | BOOST MOBILE Where You At? | HELIO Don't Call Us a Phone Company. | Calling Tomorrow Today. | Even More Mobile Than You Expected. |
|  | % | % | % | % | % | % | % | % | % | % |
| **Mentioned one or more reasons** | **91** | **76** | **79** | **74** | **75** | **93** | **85** | **80** | **75** | **77** |
| Seen/heard/know slogan/ad/commercial - Net | 70 | 26 | 18 | 5 | 7 | 73 | 29 | 21 | 6 | 8 |
| Seen/heard commercial | 23 | 6 | 4 | * | 1 | 21 | 8 | 5 | * | 1 |
| Know/recognize/remember commercial | 15 | 5 | 2 | * | * | 17 | 6 | 3 | 1 | 0 |
| Ads/commercials (unspecified) | 10 | 4 | 3 | * | 1 | 8 | 3 | 3 | * | 1 |
| Seen/heard slogan | 9 | 2 | 2 | 0 | 1 | 7 | 4 | 1 | 1 | * |
| Popular slogan/ad/commercial | 7 | 1 | 0 | 0 | 0 | 9 | 1 | 0 | 0 | * |
| Know/recognize/remember slogan | 7 | 2 | 2 | * | 0 | 7 | 2 | 2 | 1 | 0 |
| Seen/heard ad/advertising | 7 | 1 | 2 | * | 1 | 5 | 3 | 1 | * | 1 |
| Seen/heard slogan/ad/commercial, but not sure of company/brand | 2 | 6 | 4 | 2 | 3 | 5 | 5 | 6 | 2 | 2 |
| All other seen/heard/know slogan/ad/commercial comments | 6 | 2 | 2 | 1 | 1 | 4 | 2 | 2 | 1 | 2 |
| Negatives about slogan/ad/commercial (stupid, silly, not catchy, etc.) | 3 | 6 | 3 | 5 | 2 | 3 | 7 | 2 | 3 | 2 |
| Comments on meaning/strategy of slogan/company | 2 | 3 | 8 | 2 | 2 | 3 | 7 | 6 | 4 | 3 |
| Logically only one company would use slogan/ad/commercial | 2 | 4 | 5 | 9 | 6 | 1 | 3 | 5 | 4 | 6 |
| Don't know/recognize/remember slogan/ad/commercial | 1 | 3 | 4 | 5 | 6 | 1 | 5 | 5 | 8 | 6 |
| Have not/never seen/heard slogan/ad/commercial | 1 | 21 | 26 | 31 | 29 | 1 | 17 | 25 | 31 | 29 |
| Comments on grammar or lifestyle connotations | 0 | 4 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 |
| All other comments | 22 | 21 | 24 | 24 | 27 | 23 | 27 | 21 | 22 | 28 |
| **Did not mention a reason** | **9** | **24** | **21** | **26** | **25** | **7** | **15** | **20** | **25** | **23** |
| No answer/non sequitur | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 2 | 1 |
| Nothing/none | 0 | 0 | 0 | 0 | * | * | * | 2 | 0 | 0 |
| Don't know/not sure | 7 | 22 | 19 | 24 | 23 | 5 | 13 | 16 | 22 | 22 |
| **Mean number of reasons mentioned** | **1.2** | **0.9** | **0.9** | **0.8** | **0.8** | **1.2** | **1.1** | **0.9** | **0.8** | **0.8** |

1 See Q.14 and Q.16 in Exhibit C.
2 See computer tables 10-1, 12-1, and 14-1 in Exhibit E.
3 Comments volunteered by 6% or more about a statement in Cell I or Cell II.
* Less than 0.5%

## CONCLUSIONS

53. The study findings very clearly indicate that the Helio slogans, "Don't Call It a Phone" and "Don't Call Us a Phone Company," lack secondary meaning.

-18-

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Encino, California, on March 19, 2007.

*[signature]*

Howard Marylander